Mildred K. O'Linn (State Bar No. 159055)
*missy.olinn@manningkass.com*
Maya Sorensen (State Bar No. 250722)
*Maya.Sorensen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

v.

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,

Plaintiffs,

v.

CITY OF FRESNO and DOES 1-5,

Defendants.

Case No. 1:23-cv-01575-JLT-SAB

District Judge: Jennifer L. Thurston
Magistrate Judge: Stanley A. Boone

**DEFENDANTS' NOTICE OF MOTION AND OMNIBUS MOTION FOR SUMMARY JUDGMENT AS TO ALL PLAINTIFFS AND ALL CAUSES OF ACTION; MEMORANDUM OF POINTS AND AUTHORITIES**

*Filed concurrently with:*
Defendants' Separate Statement of Undisputed Material Facts
Joint Statement of Facts
Declaration of Maya Sorenson
Declaration of Custodian of Records
Notice of Lodgment
[Proposed] Order

Judge: Hon. Jennifer L. Thurston
Date: November 20, 2026
Time: 9:00 a.m.
Crtrm.: 4

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 20, 2026, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Jennifer L. Thurston, located in Courtroom 4 of the Robert E. Coyle United States Courthouse, 2500 Tulare Street, Fresno, CA 93721, DEFENDANTS CITY OF FRESNO, FORMER POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR (collectively, "Defendants") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 56 for an order entering judgment in their favor as to all causes of action set forth in the Olivares Plaintiffs' Fourth Amended Complaint and the Sosa Plaintiffs' Second Amended Complaint.

This Motion is made upon the following grounds:

1. Pursuant to California Code of Civil Procedure § 377.20, only Plaintiff Martha Olivares has standing to pursue survival claims on decedent's behalf.

2. Alternatively, if representation of the estate transfers to Plaintiffs Maria Sosa, L.S. and M.S., Martha does not have standing to pursue the decedent's claims.

3. Neither Martha Olivares nor Maximiliano Sosa, Sr. have standing to bring wrongful death claims, because they were not financially depended on the decedent.

4. No plaintiff has standing in his or her individual capacity to bring claims for violation of the Fourth Amendment, municipal liability (*Monell*), violation of the Americans with Disabilities Act, negligence, assault, battery, or California's Bane Act, and no plaintiff can recover wrongful death damages on any survival claim brought under 42 U.S.C. § 1983, California's Bane Act.

5. The cause of action under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment fails as a matter of law because on the undisputed record and in the totality of the circumstances, the Defendant Officers' use of force was reasonable. Alternatively, the Officers are entitled to qualified immunity.

6. The cause of action under 42 U.S.C. § 1983 for interference with familial relationships in violation of the Fourteenth Amendment fails as a matter of law because on the undisputed record the Defendant Officers' conduct did not shock the conscience. Alternatively, the

MK MANNING | KASS

Officers are entitled to qualified immunity.

7. The cause of action under 42 U.S.C. § 1983 for municipal liability for unconstitutional custom and practice fails as a matter of law because there is no predicate constitutional violation on which to base liability, and because Plaintiffs have not adduced evidence of a widespread, pervasive practice that is so closely related to the alleged constitutional injury so as to be considered its cause.

8. The cause of action under 42 U.S.C. § 1983 for municipal liability for constitutionally deficient training fails as a matter of law because there is no predicate constitutional violation on which to base liability, and because Plaintiffs have adduced no evidence of a pattern of similar violations by untrained officers sufficient to put the municipal defendants on notice of the need for better, different or additional training.

9. The cause of action under 42 U.S.C. § 1983 for municipal liability based on ratification by a policymaker fails as a matter of law because there is no predicate constitutional violation on which to base liability, and because Plaintiffs have not adduced evidence of any ratification beyond a failure to discipline the Defendant Officers which is insufficient under controlling law.

10. The common law cause of action for (assault and) battery fails as a matter of law because on the undisputed record and in the totality of the circumstances, the Defendant Officers' use of force was reasonable.

11. The common law cause of action for negligence fails as a matter of law because on the undisputed record and in the totality of the circumstances, the Defendant Officers' use of force and their pre-force tactical decisions were reasonable and there is no evidence that the Defendant Officers provoked decedent into attacking them.

12. The common law cause of action for negligence fails as a matter of law because Plaintiffs cannot prove that any of the Defendant Officers' conduct leading up to the use of deadly force caused decedent's injury.

13. The cause of action for violation of the Bane Act fails as a matter of law because there is no evidence that the Defendant Officers had the specific intent to violate decedent's rights.

14. The causes of action for violation of the Americans with Disabilities Act, the Rehabilitation Act, and the Unruh Act fail because: (a) there is no evidence that decedent had a disability; (b) even if decedent had a disability, he was not entitled to accommodations because he was a danger to public safety; (c) even if decedent had a disability, Plaintiffs have not adduced evidence that any accommodations were feasible and would have actually helped decedent; and (d) even if decedent was disabled, there is no evidence that any responding officer intentionally discriminated against him.

15. Plaintiffs' request for punitive damages should be stricken because on the undisputed record there is no evidence that any Defendant Officer acted maliciously, despicably, or with evil intent.

16. If any claims survive the motion, Defendants request the Court decide which Plaintiff(s) have standing to bring which claim(s), and dismiss or strike Plaintiffs' request for punitive damages, and any other damages that the law does not allow them to recover.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, and the concurrently-filed Declarations of Maya Sorensen and Lt. Zeb Price, Separate Statement of Undisputed Facts, Joint Statement of Undisputed Facts, Notice of Lodgment, and Exhibits, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

DATED: October 16, 2026

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Maya Sorensen
Maya Sorensen
Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

MK MANNING | KASS

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. Summary of Facts ........ 2

B. Procedural History ........ 6

III. LEGAL STANDARD ........ 7

IV. PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS, OR ARE OTHERWISE BARRED FROM ASSERTING THEM ........ 7

A. Survival Claims ........ 7

1. Only Martha Can Pursue Max's Claims. ........ 7

2. If Representation of the Estate Transfers to the Sosa Plaintiffs, Martha Lacks Standing to Bring Any Survival Claim. ........ 10

3. Sosa Plaintiffs' Individual-Capacity Claims Must Be Dismissed. ........ 10

B. Martha and Max Sr. Do Not Have Standing to Pursue Wrongful Death Damages ........ 10

V. PLAINTIFFS' § 1983 CLAIMS FAIL ........ 12

A. The Estate's Cause of Action for Excessive Force Fails ........ 12

1. The Officers' Use of Deadly Force Was Reasonable Under the Circumstances ........ 12

B. The Officers Are Entitled to Qualified Immunity on Max's Excessive Force Claim ........ 14

C. Plaintiffs' Cause of Action for Interference with Family Relationship Fails ........ 17

1. The Officers' Conduct Did Not Shock the Conscience ........ 17

2. The Officers Are Entitled to Qualified Immunity from Plaintiffs' Fourteenth Amendment Claims ........ 18

D. Plaintiffs' *Monell* Claims Fail ........ 18

1. Unconstitutional Custom or Practice (SAC 3rd; 4AC 4th) ........ 19

2. Failure to Train (SAC 4th; 4AC 3rd) ........ 22

3. Ratification (SAC 5th) ........ 23

VI. PLAINTIFFS' TORT CAUSES OF ACTION FAIL ........ 24

A. Plaintiffs' Claims for (Assault and) Battery Fail With Their Excessive Force Claims (Olivares 10th; Sosa 7th) ........ 24

1. The Officers' Use of Force Was Reasonable ........ 24

B. There Is No Triable Issue of Fact as to Plaintiffs' Claims for Negligence (Olivares 6th and 7th; Sosa 7th) ........ 25

1. The Officers' Use of Force Was Reasonable ........ 25

2. Plaintiffs Cannot Prove That Any of the Officers' Pre-Force Tactical Decisions Caused Max's Injury ........ 26

3. The Officers Are Immune from Liability ........ 28

C. Wrongful Death Claims Based on the Officers' Alleged Battery or Negligence ........ 28

D. Plaintiffs' Bane Act Claims Fail (Olivares 8th; Sosa 10th) ........ 29

VII. PLAINTIFFS' DISABILITY CAUSES OF ACTION FAIL ........ 29

VIII. EVEN IF SOME CAUSES OF ACTION SURVIVE, PLAINTIFFS' DAMAGES MUST BE LIMITED ........ 32

A. Wrongful Death Damages Are Not Available for the § 1983, Bane Act or ADA Claims . 32

B. Plaintiffs Are Not Entitled to Punitive Damages ........ 33

IX. CONCLUSION ........ 34

CERTIFICATE OF COMPLIANCE – MEET AND CONFER ........ A

MANNING | KASS

TABLE OF AUTHORITIES

## Cases

*A.B. v. City of Santa Ana*,
2019 WL 1578380 (C.D. Cal. Feb. 11, 2019) ........ 9

*Alves v. Cnty. of Riverside*,
135 F.4th 1161 (9th Cir. 2025) ........ 24, 25

*Arvizu v. Hammon*,
2024 WL 3758368 (E.D. Cal. Aug. 12, 2024) ........ 14

*Barnes v. Felix*,
605 U.S. 73 (2025) ........ 24

*Barrera v. City of Woodland*,
2023 WL 3977397 (E.D. Cal. June 13, 2023) ........ 18

*Bay Area Rapid Transit Dist. v. Superior Ct.*,
38 Cal. App. 4th 141 (1995) ........ 9

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,
520 U.S. 397 (1997) ........ 22

*Bresaz v. Cnty. of Santa Clara*,
136 F. Supp. 3d 1125 (N.D. Cal. 2015) ........ 9

*Briones v. City of Ontario*,
2018 WL 6017037 (C.D. Cal. May 21, 2018) ........ 24

*Brown v. Ransweiler*
(2009) 171 Cal.App.4th 516 ........ 24, 26

*Cheairs v. City of Seattle*,
145 F.4th 1233 (9th Cir. 2025) ........ 7, 18, 19

*City & Cnty. of San Francisco, Calif. v. Sheehan ("Sheehan II")*
575 U.S. 600 (2015) ........ 15, 16

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989) ........ 22

*City of Springfield, Mass. v. Kibbe*,
480 U.S. 257 (1987) ........ 20, 22

*Connick v. Thompson*,
563 U.S. 51 (2011) ........ 19, 22

*Cornell v. City & County of San Francisco*,
17 Cal.App.5th 766 (2017) ........ 29

*Dang v. Cross*,
422 F.3d 800 (9th Cir. 2005) ........ 33

*Deen v. City of Redding*,
2014 WL 1513353 (E.D. Cal. Apr. 11, 2014) ........ 8

*Dist. of Columbia v. Wesby*,

583 U.S. 48 (2012) .......... 15
*Douris v. City of Henderson*, 2023 WL 4421409 (D. Nev. July 10, 2023) .......... 32
*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) .......... 32
*E.V. v. City of Covina*, 2026 WL 2334322 (9th Cir. Aug. 12, 2026) .......... 17
*Elmansoury v. City of Garden Grove*, 2018 WL 3155138 (C.D. Cal. May 9, 2018) .......... 20, 22
*Est. of Hernandez by and through Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) .......... 13
*Est. of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154 (N.D. Cal. 2016) .......... 7
*Est. of Nunis by & through Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867 (S.D. Cal. 2023) .......... 25
*Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614 (9th Cir. 2023) .......... 12, 14
*Eyre v. City of Fairbanks*, 2023 WL 2188457 (D. Alaska Feb. 23, 2023) .......... 31
*Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976 (C.D. Cal. 2022) .......... 29
*Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811 (N.D. Cal. 2015) .......... 10, 11
*Gasho v. United States*, 39 F.3d 1420 (9th Cir. 1994) .......... 15
*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) .......... 14
*Goodwin v. California Dep't of Corr. & Rehab.*, 2010 WL 11484527 (N.D. Cal. Nov. 12, 2010) .......... 11
*Gordon v. Cnty. of Orange*, 6 F.4th 961 (9th Cir. 2021) .......... 21
*Graham v. Connor*, 490 U.S. 386 (1989) .......... 12, 14
*Handy v. Jones*, -- F.4th -- , 2026 WL 2716416 (9th Cir. Sept. 15, 2026) .......... 12, 14, 15, 17
*Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013) .......... 18
*Hayes v. County of San Diego*, 57 Cal.4th 622 (2013) .......... 25, 26, 27

*Henderson v. City and Cnty. of San Francisco*,
2006 WL 3507944 (N.D. Cal. Dec. 1, 2006) ........ 20, 22, 23

*Hernandez v. City of Pomona*,
46 Cal.4th 501 (2009) ........ 14

*Hofer v. Emley*,
2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) ........ 25, 26

*Holland v. Silverscreen Healthcare, Inc.*,
18 Cal. 5th 364 (2025) ........ 29

*Hopson v. Alexander*,
71 F.4th 692 (9th Cir. 2023) ........ 15

*Hui Jie Jin v. Alameda Cnty.*,
2019 WL 7831143 (N.D. Cal. Feb. 4, 2019) ........ 31, 32

*Hyde v. City of Wilcox*,
23 F.4th 863 (9th Cir. 2022) ........ 22, 23

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ........ 7

*Inzunza v. Naranjo*,
94 Cal. App. 5th 736 (2023) ........ 11

*Kisela v. Hughes*,
584 U.S. 100 (2018) ........ 15, 16, 17

*Koussaya v. City of Stockton*,
54 Cal. App. 5th 909 (2020) ........ 25

*Lal v. California*,
746 F.3d 1112 (9th Cir. 2014) ........ 15, 16

*Lemire v. Cal. Dep't of Corr. & Rehab.*,
726 F.3d 1062 (9th Cir. 2013) ........ 17

*Lockett v. Cnty. of Los Angeles*,
977 F.3d 737 (9th Cir. 2020) ........ 18, 22

*Los Angeles Police Prot. League v. Gates*,
907 F.2d 879 (9th Cir. 1990) ........ 21

*Lowry v. City of San Diego*,
858 F.3d 1248 (9th Cir. 2017) ........ 12

*Marsh v. Cnty. of San Diego*,
680 F.3d 1148 (9th Cir. 2012) ........ 22, 23

*Mattos v. Agarano*,
661 F.3d 433 (9th Cir. 2011) ........ 12

*McCarty v. State of Cal. Dep't of Transp.*,
164 Cal. App. 4th 955 (2008) ........ 28

*Monell v. Dept. of Soc. Servs.*,
436 U.S. 658 (1978) ........ 19



MANNING | KASS

MANNING | KASS

*Moore v. City of Berkeley*,
2018 WL 1456628 (N.D. Cal. Mar. 23, 2018) .... 31

*Mullenix v. Luna*,
577 U.S. 7 (2015) .... 15

*Mulligan v. Nichols*, 835 F.3d 983 (9th Cir. 2016) .... 27

*Norgart v. Upjohn Co*.,
21 Cal. 4th 383 (1999) .... 29

*Pacific Gas & Elec. Co. v. Super. Ct*.,
24 Cal.App.5th 1150 (2018) .... 33, 34

*Peck v. Cnty. of Orange*,
528 F. Supp. 3d 1100 (C.D. Cal. 2021) .... 24

*Perez v. City of Fresno ("Perez II")*,
98 F.4th 919 (9th Cir. 2024) .... 22

*Perez v. City of Fresno*,
591 F. Supp. 3d 725 (E.D. Cal. 2022) .... 17

*Perry v. Medina*,
192 Cal. App. 3d 603 (Ct. App. 1987) .... 10, 11

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
422 F.3d 949 (9th Cir. 2005) .... 33

*Porter v. Osborn*,
546 F.3d 1131 (9th Cir. 2008) .... 17

*Reese v. County of Sacramento*,
888 F.3d 1030 (9th Cir. 2018) .... 29

*Richards v. Remington*,
2025 WL 3713778 (D. Ariz. Dec. 23, 2025) .... 32

*S.R. Nehad v. Browder*,
929 F.3d 1125 (9th Cir. 2019) .... 17

*Scalia v. Cnty. of Kern*,
308 F. Supp. 3d 1064 (E.D. Cal. 2018) .... 9

*Scott v. Harris,*
550 U.S. 372 (2007) .... 7

*Shafer v. Cnty. of Santa Barbara*,
868 F.3d 1110 (9th Cir. 2017) .... 15

*Sheehan v. City & Cnty. of S.F. ("Sheehan I")*,
743 F.3d 1211 (9th Cir. 2014) .... 23, 30, 31

*Smith v. City of Fontana*,
818 F.2d 1411 (9th Cir. 1987) .... 8

*Stephenson v. California*,
2026 WL 1708903 (C.D. Cal., Mar. 6, 2026) .... 8

*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992) ........ 21

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ........ 17

*Szarowicz v. Birenbaum* (2020) 58 Cal.App.5th 146 ........ 33

*Tabares v. City of Huntington Beach*, 988 F.3d 1119 (9th Cir. 2021) ........ 26

*Tan Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020) ........ 17

*Tennessee v. Garner*, 471 U.S. 1 (1985) ........ 13

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996) ........ 19

*U.S. v. Smith*, 389 F.3d 944 (9th Cir. 2004) ........ 8

*United States v. Somnia, Inc.*, 339 F.Supp.3d 947 (E.D. Cal. 2018) ........ 8

*Ventura v. Rutledge*, 978 F.3d 1088 (9th Cir. 2020) ........ 16

*Villalobos v. City of Santa Maria*, 85 Cal. App. 5th 383 (2022) ........ 26, 28

*Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) ........ 30

*Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) ........ 16

*Waid v. Cnty. of Lyon*, 87 F.4th 383 (9th Cir. 2023) ........ 16, 18

*Wiggins v. Cnty. of Riverside*, 2025 WL 2005481 (C.D. Cal. June 9, 2025) ........ 30

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) ........ 7, 17

*Wolcott v. Cnty. of Orange*, 2023 WL 3984215 (C.D. Cal. June 7, 2023) ........ 8


## Statutes


28 C.F.R. § 35.130(b)(7) ........ 30

28 C.F.R. § 35.139(a) ........ 31

42 U.S.C. § 12102(1)(A) ........ 31




MANNING | KASS

42 U.S.C. § 12132 .......... 30
Cal. Civ. Proc. Code § 3294 .......... 33
Cal. Civ. Proc. Code § 377.20 .......... 7, 8
Cal. Civ. Proc. Code § 377.60 .......... 10, 28
Cal. Civil Code § 52.1 .......... 29
Cal. Gov. Code § 815.2 .......... 28
Cal. Gov. Code § 820.2 .......... 28
Cal. Penal Code § 835a .......... 24, 25

## Other Authorities

CACI No. 440 .......... 25
California Judicial Council Jury Instructions No. 3060 .......... 30
Ninth Cir. Model Civil Jury Instruction 5.1 .......... 11
Ninth Circuit Model Civil Jury Instruction 9.5 .......... 19, 20
Ninth Circuit Model Civil Jury Instruction 9.8 .......... 23
Ninth Circuit Model Civil Jury Instruction No. 5.5 .......... 33

## Rules

Fed. R. Civ. P. 56 .......... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

On November 4, 2023, after finding out his wife was in a sexual relationship with another man, Maximiliano Sosa, Jr. decided to end his life. His chosen method: suicide by cop. Responding Officers John Ayers, Jonathan Abraham, Brandon Crockett and Anthony Aguilar tried unsuccessfully to end their encounter with Max peacefully: they spoke to him calmly, maintained their distance from him, repeatedly offered him help, and, failing that, tried to subdue him with a Taser. Sadly, Max didn't want their help, telling the Officers, "There is no helping me," "I am not one you can save," and "Tonight I die." In the final seconds of his life, Max – gripping kitchen shears and noncompliant with the Officers' commands to stand down – charged at them, coming within a foot of Crockett before the Officers each opened fire. Max died from his injuries at the scene.

Max's death is tragic, but it was not the result of excessive, negligent or malicious acts by any Officer. To the contrary, the undisputed evidence shows Max was an immediate threat to the Officers such that their last-resort use of deadly force was reasonable under the circumstances. Because no rational juror could find otherwise, and without a predicate violation of Max's rights on which to find the City or Former Chief Balderrama liable, the Court should enter judgment in favor of all Defendants on Plaintiffs' causes of action. If any claims survive this motion, Defendants request the Court adjudicate which Plaintiff(s) have standing to bring which claims, and dismiss or strike Plaintiffs' request for punitive damages, and for wrongful death damages to the extent dependent on a § 1983 or Bane Act violation.[1]

[1] For ease of reading, and without any intended disrespect, Plaintiffs' decedent is referred to as "Max." Max's father is referred to as "Max Sr." and his mother and wife are referred to as "Martha" and "Maria," respectively. Max. Sr. and Martha are the "Olivares Plaintiffs." Maria and her minor children, M.S. and L.S., are the "Sosa Plaintiffs." Defendant-officers and other law enforcement on scene are identified by their last names, or as "the Officers" when two or more are referenced. The defendant officers, City of Fresno and Former Chief Balderrama are the "Defendants."



MANNING | KASS

MANNING | KASS

## II.

## BACKGROUND

### A. Summary of Facts

On November 3, 2023, Maria went out to socialize with her friends after work. Defendants' Separate Statement of Undisputed Facts ("SUF") 1. As the evening drew to a close, Max offered to give her a ride home, and she accepted. SUF 2. She and Max were separated at the time, and Max knew Maria had an affair with a coworker before they separated, but the two continued to coparent their two young children. SUF 156, 157. They joked with each other over text while Max waited outside the bar; Max also seemed "normal" earlier in the week, according to his father. Max and Maria left the bar together in his Tesla and proceeded to her apartment. SUF 3, 4. At around 3:00 a.m., Max woke her, calling her a "whore" and a "liar." SUF 6, 7. Maria could tell Max had been drinking (his blood alcohol level was later determined to be 0.09). SUF 8, 151. He had gone through Maria's phone and found text exchanges between Maria and her affair partner, showing they were still in an intimate relationship. SUF 9. Max was "highly emotional" and texted friends that he found out Maria was "still f*cking" her affair partner. SUF 10, 15. He also texted Maria's affair partner, from Maria's phone, to "come over now please, I want you to f*ck me" and telling him, "the door is unlocked." SUF 11.

Max and Maria argued. SUF. 13. Max was "out of control" and acting in a way she had never seen before. SUF 14. Maria tried to calm him down, but Max said he was going to find the affair partner and kill him and himself, and left the apartment. SUF 15, 16. At 3:08 a.m. Maria called 9-1-1. Joint Statement of Undisputed Facts ("JtSF") 1. She told the dispatcher that Max had taken a bottle of tequila and had gone to confront her affair partner. SUF 17. Maria also said she was scared Max was going to kill himself and the other man, and provided a description of Max and the Tesla he was driving. SUF 16, 18, 19. At 3:10 a.m. the Fresno Police Department created a zero-priority (i.e., highest priority) call for a suicidal male. SUF 20. The call was deemed "Emergency, Presumed Life Threatening." JtSF 2.

At 3:21 a.m. Ayers arrived at the apartment and spoke to Maria, accompanied by Abraham and Equihua. JtSF 4. Maria told the Officers that Max left and said he was going to kill her affair

partner and himself. SUF 22. Maria gave the Officers Max's address and the name of the complex where her affair partner lived, and they told her they would search the area for him and let her know if they found him. SUF 23.

At 3:30 a.m. Max returned to Maria's apartment complex. SUF 24. Max attempted to strike Equihua with his vehicle before driving away again. SUF 25. Before driving away, Max shouted, "You wanna play games?" SUF 26. Equihua and Abraham shouted to Max to "Stop!" but he sped away and out of the complex. SUF 27, 28. At 3:32 a.m. Equihua broadcast that Max "tried to run me over." SUF 30. One minute later, dispatch broadcast "Confirmed 245 [i.e., assault with a deadly weapon] on an officer." SUF 31. Officers pursued Max in their vehicles. SUF 32.

Between 3:33 a.m. and 3:58 a.m., Max led FPD officers on several high-speed chases, during which he drove recklessly: speeding, disregarding traffic signs, driving opposite traffic, and performing evasive maneuvers. SUF 32. Officers lost sight of Max's Tesla several times. SUF 34. While the vehicle pursuit was in progress, Max and Maria spoke on the phone. SUF 35. Max told Maria he was going to commit suicide by cop, and that he would "take a cop" or "take a pig" with him. SUF 37.

At 3:42 a.m. Ayers broadcast that he was going back to Maria's apartment in case Max returned there. SUF 38. At 3:44 a.m. Maria called dispatch again to report that Max made comments about wanting to die; she was worried he would make it look like he was armed so the police would shoot him. SUF 39, 40. Max had evaded police and she did not know where he was. SUF 41. At 3:46 a.m., dispatch broadcast Max's intention to commit suicide by cop. SUF 42.

At 3:55 a.m. Ayers returned to Maria's apartment. SUF 43. Maria and Max were on the phone, and Maria handed the phone to Ayers. SUF 44, 45. Max cursed at Ayers and hung up. SUF 45.

At 3:57 a.m. Maria called Max. Ayers tried to talk to Max again, but Max hung up. SUF 46, 47. Ayers told Maria that her calling Max was not helping but instead was making Max angry, and told her not to call him again. SUF 48.

After FPD lost track of Max for a third time and Sergeant Oliver directed units to cease pursuit. SUF 49.





MK MANNING | KASS

MANNING | KASS

Officer Ayers continued to speak with Maria at the apartment. SUF 51. She told him Max had never done anything like this before and denied that he had ever been arrested or placed on a psychiatric hold. SUF 51. While Ayers was gathering information from Maria, Maria also called Max's friend Damian to tell him what was happening. SUF 50.

At 4:03 a.m., Ayers called Max. SUF 52. Ayers assured Max that he wanted to help him and wanted to bring the incident to a "peaceful resolution." SUF 53. Max would have none of it: he threatened, "Tonight I die or he [the affair partner] dies or one of your cops dies" and that "there is no other way out of this." SUF 55, 58. Max resisted Ayers' offers of help, telling Ayers "There is no helping me" and "I'm not one of those you can save." SUF 56, 60. Max hung up at 4:10 a.m., having reiterated his determination that "one person is gonna die tonight," and saying "I tried to run over one of your cops. I don't give a f*ck. I want blood tonight." SUF 57, 59, 61-63. Ayers continued speaking with Maria. SUF 64. She told him that Max had never threatened suicide before, and that he had no diagnoses of any mental health disorder. SUF 64.

At 4:12 a.m., Abraham arrived at Maria's apartment. SUF 65. He and Ayers conferred for a few minutes on the sidewalk outside. SUF 66. When they re-entered the apartment, Maria was on the phone with Max again. SUF 67. Ayers took the phone from her and repeated to Max that he wanted to help. SUF 68, 69. Max again rebuffed him, stating, "There's nothing you can do here. When a man reaches rock bottom, that's it." SUF 70, 71. Max also stated, "Listen, if my wife didn't give a f*ck about me, you think I'm gonna f*cking believe that you give a f*ck about me? No." SUF 73. He repeated his intention that he, Maria's affair partner, or an officer would die, and explicitly threatened Ayers: "I'm gonna take down not just myself, but you with me. I'm gonna come after you, motherf*cker." SUF 72, 74, 75. Ayers hung up at 4:18 a.m. SUF 76.

Ayers and Abraham remained in the apartment with Maria. SUF 77. At 4:24 a.m., while Abraham was holding Maria's phone, he saw a text from Damian stating that Max was at a charging station. SUF 77. Ayers broadcast this information. SUF 78. A few moments later, Ayers and Abraham exited the apartment to canvas the area but did not see Max or his Tesla. SUF 79, 80. They went back inside, where Maria was once again on the phone with Max. SUF 81. Maria said to Max, "Please just tell me where you are." SUF 81. Max did not answer but said to her: "Tonight I die.

MK MANNING | KASS

You ruined me. Congratulations, you won." SUF 82-84. Ayers took the phone from Maria and hung up, telling her not to answer it again. SUF 85.

Five minutes later, at 4:35 a.m., Abraham said, "I think a car door just ---." SUF 86. He opened the door to investigate and saw Max coming up the walkway. SUF 87. Max, who was clutching a pair of kitchen shears in his right hand, said "Are you ready for this?" as he rapidly approached the door. SUF 88. Abraham said twice, "Don't do it, bro," but Max continued to advance toward Abraham and entered the apartment. SUF 90. Given the speed at which Max was walking, there was no time for Abraham to safely close the door. SUF 91.

Over the next three minutes, Max yelled, paced, and pointed the shears at the Officers. SUF 95, 96. The Officers raised their guns and pointed them at Max, each of them stepping further back to create distance. SUF 93. Ayers and Abraham entreated Max to step back, to calm down, and to let them help him, but to no avail: Max continued to rage, spouting invectives and shouting at Maria, "This is what you f*cking wanted!" and lamenting that no one understood the sacrifices that he had made for her. SUF 97, 100-104. Maria pleaded with Max to stop and to "think of" his children, but he kept going. 98. He taunted the Officers, saying, "Pop it, dude. Are you ready for this?" and "Have you shot anybody before? Today's gonna be the day." SUF 107, 108. Ayers and Abraham told Max repeatedly "Get back" and to "Stop," but he did not comply. SUF 100, 104.

At 4:37:06 a.m. Crockett arrived at the apartment, just in time to hear Max declare that his fate was sealed. SUF 108, 109. Crockett said to Max, "Let's chill out, man," to which Max responded "No! F*ck no!" SUF 111. At 4:37:29 a.m., Crockett broadcast, "One at gunpoint, scissors in right hand." SUF 112. Seconds later, at 4:37:35 a.m., Aguilar arrived at Maria's apartment. SUF 113. Crockett described the scene inside. SUF 114.

At 4:38:01 a.m. – approximately three minutes after he arrived at Maria's apartment and thirty seconds after Aguilar arrived on the scene – Max said again, "Sorry you guys have to do this, but it's gonna happen either way." SUF 116. Abraham asked Max if he would talk to "one of my partners," but Max again declined, saying, "No, I don't want to talk to any of them f*cking guys. My fate is sealed, my guy." SUF 118. Undeterred, Aguilar asked Max, "hey, can we talk?" to which Max responded "F*ck no!" SUF 119, 120.

As the tense scene continued, Aguilar readied his Taser. SUF 122. At 4:38:50 a.m., Abraham gestured to Ayers and Maria to exit the apartment. SUF 123. Ayers walked toward the door and out, but Maria remained seated on the couch. SUF 124, 125. Max told Abraham he could also leave by the front door, but Abraham told him Maria "has to come with me." JtSF 5. Max said he was not going to hurt Maria. JtSF 6. Crockett, standing at the doorway, called Maria's name and motioned for her to come outside. SUF 128. Abraham said twice, "Maria, get out." SUF 129. Maria stood and started walking toward the door. SUF 130.

At 4:39:22 a.m., as Maria stepped forward toward the door, Max turned and faced Crockett, Aguilar, and Ayers, who were all outside in the breezeway. SUF 131. Max advanced toward the door and the Officers stepped back. SUF 131. The Officers shouted: "Wait!" "Stop!" "Get back, bro!" and "Chill out!" as Max continued to advance toward them. SUF 133.

At 4:39:25 a.m., four and a half minutes after he arrived at the apartment, Max stepped across the threshold and into the breezeway. SUF 134. One second later, at 4:39:26 a.m., Aguilar deployed his Taser, striking Max. SUF 135. The Taser did not immobilize Max, who stumbled briefly and swatted the air in front of him. SUF 136. At 4:39:27 a.m., Max yelled, gritted his teeth, and charged toward Crockett, Aguilar and Ayers, scissors in hand and pointed upwards. SUF 138, 139. All four Officers opened fire at 4:39:28 a.m. SUF 140. Max was approximately a foot away from Crockett when the Officers discharged their weapons. SUF 144.

Max fell to the ground, still holding the scissors. SUF 141. Aguilar called in "shots fired." SUF 143. Crockett retrieved a medical kit from his vehicle, and, after Aguilar took the scissors out of Max's hand and tossed them away, the Officers began administering emergency medical aid. SUF 146-148. Max was pronounced dead at 4:58 a.m. JtSF 7. The cause of his death was a gunshot wound to the chest. SUF 149.

**B. <u>Procedural History</u>**

The Olivares Plaintiffs filed suit in this District on November 7, 2023. The Sosa Plaintiffs separately filed suit in this District on August 30, 2024. On January 13, 2025, on the parties' stipulation, the Court consolidated the two actions. Dkt. No. 46. The Sosa Plaintiffs filed their operative Second Amended Complaint ("SAC") on June 30, 2025 and defendants answered on

August 5, 2025. Dkt. Nos. 63, 74. The Olivares Plaintiffs filed their operative Fourth Amended Complaint ("4AC") on July 12, 2026 and defendants answered on July 17, 2026. Dkt. Nos. 85, 86.

## III.

## LEGAL STANDARD

The Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).[2] "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* Although disputed facts must be viewed in the light most favorable the nonmoving party, the Court must consider the facts in light of what the officers "could have known at the time of the incident." *Cheairs v. City of Seattle*, 145 F.4th 1233, 1239 (9th Cir. 2025). Where the facts of a police interaction are captured on video, they may be deemed undisputed for purposes of summary judgment. *See Williams v. City of Sparks*, 112 F.4th 635, 642 (9th Cir. 2024). If the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) (citing *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

## IV.

## PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS, OR ARE OTHERWISE BARRED FROM ASSERTING THEM

### A. Survival Claims

#### 1. Only Martha Can Pursue Max's Claims.

California law allows a decedent's estate to "recover damages for injuries on behalf of the decedent for injuries that the decedent has sustained." *Est. of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154, 1166 (N.D. Cal. 2016); *see also* Cal. Civ. Proc. Code § 377.20. By statute, the authority to

[2] All citations are "modified" as defined in Bluebook Rule B5.3 (22d ed.). Parallel reporters, subsequent history and citations are omitted, and emphasis is added, unless otherwise noted.



MK MANNING | KASS

pursue the estate's claims is conferred to *either* the estate's representative *or* the decedent's successors in interest – ***but not both***. *Id.* (decedent's cause of action "may be commenced by the decedent's personal representative, ***or***, ***if none***, by the decedent's successor in interest"); *Deen v. City of Redding*, 2014 WL 1513353, at *5 (E.D. Cal. Apr. 11, 2014) (dismissing successor-in-interest because "[p]laintiffs have not cited any case law authorizing ***both*** the personal representative and the successor in interest to be joint plaintiffs in a survival action").

Defendants litigated the issue of standing to pursue Max's claims in their motion to dismiss the Olivares Plaintiffs' Third Amended Complaint. Dkt. Nos. 75, 77. The Court ruled that Martha is the Estate's legal representative, Dkt. No. 84 at 5, and that ruling is now the law of the case. *United States v. Somnia, Inc.*, 339 F.Supp.3d 947, 952 (E.D. Cal. 2018) ("Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court … in the same case."); *U.S. v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) ("issues that a district court determines during pretrial motions become law of the case"). And that means Martha, ***and only Martha***, can pursue any survival claims on Max's behalf. Cal. Civ. Proc. Code § 377.20.

As applied to the claims before the Court, Martha is the only plaintiff who can bring the following claims:

- **Any claim for excessive force, including for the City's and Balderrama's liability under *Monell* (4AC 1st, 4th, and 5th; SAC 1st, 4th, 5th, and 6th).**

Fourth Amendment rights cannot be asserted vicariously and there is no allegation or evidence that any of the Plaintiffs were personally subjected to any use of force at all (the only plaintiff at the scene was Maria). *E.g.*, *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir. 1987) *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (finding decedent's children could not assert a claim for relief under the Fourth Amendment because they "were not directly subjected to the excessive use of force"); *Stephenson v. California*, 2026 WL 1708903, at *7 (C.D. Cal. Mar. 6, 2026) ("plaintiffs bringing survivor actions who were not directly subjected to the excessive use of state force ... cannot maintain personal causes of action under section 1983"). A § 1983 violation also cannot be the basis of any wrongful death claim or damages. *E.g.*, *Wolcott v. Cnty. of Orange*, 2023 WL 3984215, at *7 (C.D. Cal. June 7, 2023) ("a state law



MANNING | KASS

claim for wrongful death may not be asserted under § 1983"); *A.B. v. City of Santa Ana,* 2019 WL 1578380, at *6 (C.D. Cal. Feb. 11, 2019) ("Plaintiffs cannot seek wrongful death damages under 42 U.S.C. § 1983 and the Fourth Amendment"). Put simply, the excessive force claims are survival claims only; Martha alone can bring them, and (if the case proceeds to trial and Plaintiffs prevail) the only recoverable damages are for *Max*'s injuries.

- **Negligence, Assault, and Battery (4AC 6th and 10th; SAC 7th and 8th).**

Likewise, no other plaintiff was assaulted or battered, so no other plaintiff can assert those claims in their individual capacities. The Olivares Plaintiffs bring the negligence cause of action on behalf of the Estate *only*; the Sosa Plaintiffs' complaint is ambiguous (*see below*) but there is no argument or evidence that the Officers owed or breached a duty of care to Maria, M.S. or L.S. Negligence and assault-and-battery are survival claims, and only Martha as the legal representative of the Estate can bring them.

- **Bane Act (4AC 8th; SAC 10th).**

Plaintiffs also lack standing in their individual capacities to bring any claim under the Bane Act, which does not create "derivative liability for persons not present and not witnessing the actionable conduct." *Bay Area Rapid Transit Dist. v. Superior Ct.*, 38 Cal. App. 4th 141, 144-45 (1995). The statute instead "provides for a *personal* cause of action for the victim of a hate crime," and "is limited to plaintiffs who themselves have been the subject of violence or threats." *Id.* (emphasis in original). The alleged Bane Act violations also cannot be the basis of any cause of action for wrongful death. *See id.* And even if Plaintiffs' Fourteenth-Amendment cause of action was supported by the evidence, it also does not support a Bane Act claim. *Bresaz v. Cnty. of Santa Clara*, 136 F. Supp. 3d 1125, 1138 (N.D. Cal. 2015) (finding that *BART* precludes Bane Act liability based on deprivation of family relationship). Plaintiffs' Bane Act claim is a survival claim only, and only Martha can pursue it on Max's behalf. *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("Bane Act claims are not cognizable as wrongful-death actions and may only be brought as survival claims").



MK MANNING | KASS

2. If Representation of the Estate Transfers to the Sosa Plaintiffs, Martha Lacks Standing to Bring Any Survival Claim.

If the Sosa Plaintiffs are the designated representatives to bring the survival claims (by stipulation or court order), the above analysis operates in reverse.[3] That is, because the survival statute confers standing on the representative ***or*** the successors but ***not both***, if Martha has relinquished her status as Max's representative, then only the Sosa Plaintiffs can pursue the survival claims identified above, and any claims Martha brings on Max's behalf must be dismissed.

3. Sosa Plaintiffs' Individual-Capacity Claims Must Be Dismissed.

The Sosa Plaintiffs' causes of action are brought generically by "Plaintiffs." *See generally* SAC. For the reasons explained, none of them are entitled to bring Fourth Amendment, *Monell*, ADA or Bane Act claims in their individual capacities nor do any of these causes of action entitle them to wrongful death damages. The Sosa Plaintiffs' claims for negligence and battery that are brought by "plaintiffs" must also be dismissed to the extent they are brought in Maria's or the children's individual capacities. *See* SAC 7th, 8th. If these claims survive, it is only as a basis for wrongful death damages.

**B. Martha and Max Sr. Do Not Have Standing to Pursue Wrongful Death Damages**

Where a surviving spouse or children can claim wrongful death damages, the parents cannot also do so unless they were "dependent on the decedent." Cal. Civ. Proc. Code § 377.60(a) and (b)(1). "Dependence" in this context means financial dependence. *Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811, 843 (N.D. Cal. 2015). Financial dependence, in turn, refers to reliance on the decedent to "obtain[] shelter, clothing, food and medical treatment." *Perry v. Medina*, 192 Cal. App. 3d 603, 610 (Ct. App. 1987), *abrogated on other grounds by Saldana v. Globe-Weis Sys. Co.*, 233 Cal. App. 3d 1505 (Ct. App. 1991).

[3] During the parties' meet and confer, counsel for the Sosa Plaintiffs and the Olivares Plaintiffs represented that they had agreed that Maria Sosa would bring Max's survival claims. Defendants are also aware that there is a pending petition "to substitute administrator of estate" by Maria, M.S. and L.S., set for hearing in Fresno County Superior Court on November 2026. As of the date of this filing, no stipulation or court order has been entered that affects Martha's status as the estate's legal representative.



MK MANNING | KASS

Martha and Max Sr. cannot show dependence on Max. Martha testified that Max did not provide her with financial support during his lifetime. *Goodwin v. California Dep't of Corr. & Rehab.*, 2010 WL 11484527, at *7 (N.D. Cal. Nov. 12, 2010) (granting summary judgment and noting plaintiff's testimony that she did not receive financial support from her son); SUF 166. Martha's assertion that Max "was always talking about" taking care of her when she got older (SUF 167) is not evidence that at the time of his death she was "actually dependent" on him for the "necessaries of life." *Frary*, 81 F. Supp. 3d at 843; *see also Inzunza v. Naranjo*, 94 Cal. App. 5th 736, 747 (2023) ("dependence refers to financial support at the time of decedent's death"). It is also far too speculative. *See* Ninth Cir. Model Civil Jury Instruction 5.1 (damages cannot be based on "speculation, guesswork or conjecture").

Max Sr.'s evidence also falls short of the mark. He testified he depended on Max to help run his business and that he planned to have Max take over his business when he retired. SUF 164-165. . Like Martha, though, Max Sr. acknowledged he did not receive financial support from Max during his lifetime. SUF 163. There is no authority for Plaintiffs' position that being saddled with a parent's debt or having one's wages garnished for their benefit, or helping to make a business more successful, is the type of financial dependence contemplated by the statute. *See Perry*, 192 Cal. App. 3d at 610 ("a parent cannot claim they are dependent within the meaning of [§ 377.60] if they receive financial support from their children which merely makes available to them some of the niceties of life they might not otherwise be able to afford"). Nor is there any evidence that Max Sr.'s business has failed or that he is unable to afford food, clothing, shelter, medicine, or other basic necessities due to the loss of any customers. *See id.*

Neither Martha nor Max Sr. was dependent upon Max within the meaning of § 377.60(b)(1), so neither one has standing to claim wrongful death damages.

MANNING | KASS

## V.

## PLAINTIFFS' § 1983 CLAIMS FAIL[4]

### A. The Estate's Cause of Action for Excessive Force Fails

#### 1. The Officers' Use of Deadly Force Was Reasonable Under the Circumstances

Force is excessive when it is greater than is reasonable under the circumstances as viewed from the perspective of a reasonable officer on the scene. *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness "inquiry requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 619 (9th Cir. 2023). The Court must weigh "the severity of the intrusion on the individual's Fourth Amendment rights" against "the government's interest in the use of force," to determine whether, on balance, the force used was excessive. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017). In considering the government's interest in the use of force, the "most important factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Est. of Strickland*, 69 F.4th at 619. Thus, at summary judgment, "the test is … whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted." *Handy v. Jones*, -- F.4th -- , 2026 WL 2716416, at *5 (9th Cir. Sept. 15, 2026). "A determination of reasonableness does not mean that the officer could not have taken some other action." *Id.*

Based on the objective facts known to them at the time, it was reasonable for the Officers to believe the use of deadly force was necessary under the circumstances. Those facts were that Max:

- was armed with kitchen shears, which he pointed at the Officers several times while in Maria's apartment;

---

[4] Given the acknowledged overlap between the two complaints and the fact that standing is an unresolved question, the claims will be addressed in the aggregate for the remainder of this brief unless specified otherwise.

- was charging toward Crockett, Aguilar and Ayers;
- was a foot away from Crockett, at which distance he could have stricken Crockett with the scissors or taken the Officers' weapons;

  was rapidly closing the distance between himself and the Officers;
- was not immobilized by Aguilar's less-lethal Taser probe deployed just one second earlier;
- refused the Officers' commands to "Wait!" and "Stop!";
- did not comply with the Officers' other commands while in Maria's apartment;
- rejected numerous attempts by Ayers, Abraham, and Aguilar to talk, engage and build rapport;
- was belligerent and repeatedly cursed at the Officers, yelling "F*ck you!" and "F*ck off!";
- led Crockett and other law enforcement officers on several high-speed vehicle chases, during which he exhibited no regard for his own or others' safety;
- made explicit threats against Ayers;
- made explicit threats that he would take an officer's life;
- made explicit threats against Maria's affair partner; and
- assaulted Equihua with his vehicle.

Lethal force is justified if an officer has "probable cause to believe that a suspect poses a significant threat of death or serious physical injury to the officer or others." *Est. of Hernandez by and through Hernandez v. City of Los Angeles*, 139 F.4th 790, 799 (9th Cir. 2025) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). And here, the threat to the Officers cannot be overstated: Max's behavior was volatile, violent, and unpredictable from his very first interaction with them, when he (as he himself admitted) tried to hit Equihua with his car. Max was at all times threatening to harm himself, the people around him, and the Officers.

The undisputed evidence, as demonstrated by the bodycamera footage, conveys the urgency of the situation: Max was in Maria's apartment for roughly four minutes, during which he cursed and yelled at Maria and the Officers and never let up his grip on the shears. The Officers reasonably

believed that Max posed a threat of serious injury or death to themselves, Maria, and each other. And in the approximately four ***seconds*** that elapsed from the time Max exited the apartment to when the Officers opened fire, there is no dispute they were in danger: Max put his head down and the scissors up as he yelled and charged at Crockett. The Officers were not required "delay their fire" until Max "turn[ed] his weapon on them" and made good on his promise to take Ayers or anyone else "down with him." *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023); *accord Hernandez v. City of Pomona*, 46 Cal.4th 501, 521 (2009) (officers have "no obligation" to retreat). In the "tense, uncertain, and rapidly evolving" circumstances, *Graham*, 490 U.S. at 397, the Officers were entitled to make the split-second decision to use deadly force in the reasonable belief that Max posed a threat to their own and others' lives. *See Arvizu v. Hammon*, 2024 WL 3758368, at *10 (E.D. Cal. Aug. 12, 2024) (where it was "undisputed that [decedent] charged at the officers with a knife and closed in on them in a matter of seconds," a "reasonable officer in that situation would objectively perceive [decedent's] conduct as an immediate threat"); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (the use of deadly force is reasonable where suspect "poses a significant threat of death or serious physical injury to the officer or others," the use of deadly force is reasonable").

Until the moment the Officers opened fire, Max "remained armed, agitated and capable of immediately [striking] at" the Officers. *Handy*, 2026 WL 2716416, at *6. The Officers' use of deadly force against a belligerent and armed individual rapidly advancing in their direction was objectively reasonable and justified as a matter of law. *Id.* at *8; *see also Est. of Strickland*, 69 F.4th at 619. Viewing the situation from the Officers' perspective and in the context of the totality of the circumstances, no rational juror would conclude otherwise.

**B. <u>The Officers Are Entitled to Qualified Immunity on Max's Excessive Force Claim</u>**

For the reasons discussed above, none of the Officers violated Max's right to be free from the use of excessive force in these circumstances. But even if the facts supported a finding of unreasonableness, the Officers are entitled to qualified immunity.

Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have



MK MANNING | KASS

known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "Officers are entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right; and (2) the unlawfulness of their conduct was clearly established at the time." *Handy*, 2026 WL 2716416, at *5 (citing *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2012)). "The doctrine of qualified immunity assumes that police officers do not knowingly violate the law," and the Court must start by "presum[ing]" the officers' immunity. *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). In excessive force cases, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

The Officers tried unceasingly to calm Max down and to resolve the situation without violence: they spoke to him directly and calmly, tried to establish a rapport, increased the distance between themselves and Max, and, when Max continued his assault, tried to subdue him with a Taser. None of these efforts were successful. Max "kept coming at the [O]fficers" and was approximately a foot away from Crockett, angrily brandishing his scissors, when the Officers opened fire. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 612-13 (2015) ("*Sheehan II*") (reversing denial of qualified immunity in analogous circumstances). Plaintiffs cannot meet their burden to show that clearly established law prohibited the Officers' use of deadly force in the face of Max's lethal assault. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (once qualified immunity is raised, plaintiff bears the burden of demonstrating that right was clearly established).

Although it is not Defendants' burden to identify law "clearly establishing the lawfulness of [their] actions," *see Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023), analogous precedent confirms the Officers' entitlement to qualified immunity. In *Lal v. California*, for example, the Ninth Circuit addressed the use of deadly force against an individual who was "intent on suicide by cop." 746 F.3d 1112, 1117 (9th Cir. 2014). The facts are strikingly similar: Lal, the decedent, engaged the officers in a vehicle chase and told them over the phone that he wanted to kill himself or have the police shoot him. *Id.* at 1114. The confrontation came to a head when Lal lost control of his vehicle. *Id.* Emerging from the wreckage, he began to throw rocks at the responding officers before hitting himself in the head several times and saying, "just shoot me." *Id.* The officers retreated and tried to

get Lal to surrender, but he kept throwing rocks. *Id.* Finally, Lal picked up a football-sized rock and advanced towards the officers, ignoring their commands to drop it. *Id.* When Lal was just a few feet away from the officers, they discharged their weapons. *Id.* at 1115. Just four minutes had elapsed from the time Lal crashed his vehicle and when he was shot. *Id.*

The Ninth Circuit affirmed summary judgment for the officers. *Id.* at 1022. The court found that, in the context of Lal's actions throughout the night – including a "high speed chase, hitting himself with a stone, throwing rocks at the officers" – the officers reasonably believed Lal would continue his assault by "heav[ing] the rock at them." *Id.* at 1117. Lal posed an immediate threat to the officers; but even if he did not, the court found, it was reasonable for the officers to believe he did. *Id.* The court also found unpersuasive the plaintiff's arguments that the officers should have done more to defuse the situation before it got to the point where deadly force was necessary, noting that "Lal forced the issue by advancing on the officers." *Id.* The officers "were patient" and "tried to talk [Lal] into surrendering," but Lal "forced the confrontation." *Id.* at 1118. In the totality of the circumstances, the officers' use of force was reasonable: "The fact that Lal was intent on suicide by cop," the court found, "***did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct***." *Id.*

*Lal* supports the Officers' reasonable belief that the use of deadly force was required and permissible in the circumstances they confronted. Other examples abound.[5] And as confirmed recently in *Handy*, the law in this Circuit is that peace officers act reasonably when they respond with deadly force to a belligerent and armed individual advancing in their direction. *Handy*, 2026

[5] *See*, *e.g.*, *Kisela*, 584 U.S. at 105 (officer entitled to qualified immunity where suspect armed with a knife was standing close to her roommate and ignored commands to drop the knife); *Sheehan II*, 575 U.S. at 612-13 (finding "the use of potentially deadly force was justified" where suspect was wielding knife and pepper spray had not immobilized her); *Waid v. Cnty. of Lyon*, 87 F.4th 383 (9th Cir. 2023) (officers entitled to qualified immunity where suspect "used aggressive language," "ignored" their orders, and "rushed towards them in a small and confined space"); *Ventura v. Rutledge*, 978 F.3d 1088, 1092 (9th Cir. 2020) (officer entitled to qualified immunity for use of deadly force against armed suspect who was "within striking range" and did not comply with her orders to stop); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018) (officers who opened fire on suspect who "acted aggressively" and brandished a pair of scissors at close range entitled to qualified immunity).

WL 2716416, at * 8. The Officers' use of deadly force was reasonable. But even if it wasn't, they are entitled to qualified immunity on Plaintiffs' Fourth Amendment claim, because Max's right to be free from the use of deadly force in the specific circumstances the Officers encountered was not clearly established such that "any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 584 U.S. at 105.

## C. Plaintiffs' Cause of Action for Interference with Family Relationship Fails

### 1. The Officers' Conduct Did Not Shock the Conscience

Family members may assert a claim under the Fourteenth Amendment "if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab*., 726 F.3d 1062, 1075 (9th Cir. 2013). Because such a claim states a substantive due process violation, "is cognizable only if the alleged abuse of power shocks the conscience and violates the decencies of civilized conduct." *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009). This standard is "quite demanding." *Id.* Where, as here, the law enforcement officer "makes a snap judgment because of an escalating situation, his conduct may ***only*** be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "Legitimate purpose[s]" include "arrest, self-defense, [and] the protection of the public." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1003-04 (9th Cir. 2020). "The purpose to harm standard is a subjective standard of culpability." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019).

The Officers' use of force does not shock the conscience. They were "forced to act quickly because of an escalating situation" and did not have time to deliberate. *Perez v. City of Fresno*, 591 F. Supp. 3d 725, 763 (E.D. Cal. 2022), *aff'd*, 98 F.4th 919 (9th Cir. 2024); *see also Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (holding purpose-to-harm standard applies to "quickly evolving and escalating" situations that require "repeated split-second decisions"). Each Officer believed that Max posed a threat of immediate and deadly harm, based on objective and observed facts. SUF 172-175. Nor is this a case where the use of force was "so grossly and unreasonably excessive" that subjective purpose to harm can be inferred from the use of force alone. *E.V. v. City of Covina*, 2026 WL 2334322, at *2 (9th Cir. Aug. 12, 2026).



MK MANNING | KASS

On the undisputed record, no rational juror could find that the Officers discharged their weapons for any other purpose than the "legitimate law-enforcement objective of defending themselves." *See Waid*, 87 F.4th at 393 (affirming summary judgment). The undisputed record would not lead a rational juror to find that the Officers violated Plaintiffs' substantive due process rights.

**2. The Officers Are Entitled to Qualified Immunity from Plaintiffs' Fourteenth Amendment Claims**

The Officers' use of deadly force was not even unreasonable, let alone conscience shocking. *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) (finding officer did not violate Fourteenth Amendment where deadly force used for self-defense). Regardless, Plaintiffs cannot identify any controlling precedent that would have put the Officers on notice that the use of deadly force against Max to defend themselves and their fellow officers would violate his wife's, children's, or parents' constitutional right to his companionship. *Barrera v. City of Woodland*, 2023 WL 3977397, at *4 (E.D. Cal. June 13, 2023) (finding officer entitled to qualified immunity in the absence of controlling authority that would have placed him on notice that his conduct violated the Fourteenth Amendment specifically).

Thus, the Officers are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment cause of action.

**D. <u>Plaintiffs' *Monell* Claims Fail</u>** [6]

Municipal liability claims "require [Plaintiffs] to show an underlying constitutional violation," which they have not done for the reasons explained above. *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). "[W]ithout a constitutional claim that can survive summary judgment," Plaintiffs "cannot establish *Monell* liability." *Cheairs*, 145 F.4th at 1239. If the Officers' use of force was reasonable – and it was – then Plaintiffs' *Monell* claims fail as a matter

[6] The Sosa Plaintiffs' *Monell* claims, which arise under § 1983 and are survival claims as pled, are stated against the City only. If Martha is determined not to have standing to bring claims on Max's behalf, the *Monell* claims against Chief Balderrama must be dismissed because no other Plaintiff has pled them.

of law. *Id*.

But even assuming there is sufficient evidence of a constitutional violation, the City and Chief Balderrama are only liable if they "subject[ed]" or "cause[d] [Plaintiffs] to be subjected" to such violations. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978)). The undisputed evidence does not establish a triable issue of fact that the City (or Balderrama) fostered an unconstitutional custom or practice, failed to train its officers, or ratified the Officers' use of force against Max.

**1. Unconstitutional Custom or Practice (SAC 3rd; 4AC 4th)**

Plaintiffs assert *Monell* liability on the basis of custom and practice, which requires them to prove the existence a "persistent and widespread" custom that "constitutes a "permanent and well settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also* Ninth Circuit Model Civil Jury Instruction 9.5 (requiring § 1983 plaintiff to prove that defendant "acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the defendant".

Plaintiffs' complaints each set forth a vague theory that the City "tolerates" excessive force, as evidenced both by the incident in question and a string cite of other lawsuits involving excessive force. During meet and confer, Plaintiffs confirmed that the basis of their custom-and-practice theory is that by deeming a series of use-of-force incidents identified in their pleadings as "within policy," the City and Balderrama have fostered a culture that accepts and condones excessive force. Between their two complaints, Plaintiffs have identified eight lawsuits against the City which they assert are evidence of this force-condoning culture.[7]

Plaintiffs' theory is not supported by these lawsuits. Beyond the high-level gloss of "excessive force," the lawsuits are too factually dissimilar and temporally remote to establish a custom and practice that is "***so closely related***" to the alleged violation of Max's Fourth Amendment

[7] These are: *Hernandez* (no case number or docket found); *Murietta-Golding* (a/k/a *Lopez*), Case No. 18-cv-314; *Estate of Casillas*, Case No. 16-cv-1042; *Wallace*, Case No. 19-cv-1199; *Estate of Noble*, Case No. 16-cv-1690; *Estate of Willis*, Case No. 09-cv-1766; *Reyes ex rel. Reyes*, Case No. 13-cv-418; and *Enriquez*, Case No. 10-cv-581.

rights as to be considered the "moving force" behind it. Ninth Circuit Model Civil Jury Instruction 9.5; *see also City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267 (1987) (noting the Supreme Court "repeatedly has stressed the need to find a ***direct causal connection*** between municipal conduct and the constitutional deprivation") (in dissent). Yet here, differences abound: three cases (*Willis*, *Reyes*, and *Enriquez*) involve events that occurred ten or more years before the incident giving rise to this lawsuit. 4AC ¶ 69f; SAC ¶¶ 64b, 64d, 64e. One (*Wallace*) does not involve the use of deadly force. 4AC ¶ 69d. Two involve fleeing suspects (*Murietta-Golding* and *Casillas*), four involve unarmed suspects (*Noble*, *Murietta-Golding*, *Reyes*, and *Enriquez*) and another (*Casillas*), by Plaintiffs' own summary, involved a suspect who was "not an immediate threat to anyone" (although he was armed with an axe). 4AC at ¶¶ 69a, 69b, 69c, 69e; SAC at ¶¶ 64a, 64c, 64e. One (*Reyes*) concerned the use of deadly force against an incapacitated individual. SAC, ¶ 64d. Only two (*Casillas* and *Willis*) reached a jury verdict. And none of them appear to have involved an armed, belligerent suspect who was advancing rapidly towards the officers with a sharp implement at the ready.

Nor have Plaintiffs developed any evidence that would "enable a factfinder to put [them] in context." *Henderson v. City and Cnty. of San Francisco*, 2006 WL 3507944, at *11 (N.D. Cal. Dec. 1, 2006) (finding plaintiffs' reliance on other incidents of excessive force insufficient to raise a dispute of material fact). At bottom, Plaintiffs ask the Court to infer the existence of an improper custom and practice from "[eight] incidents spanning [ten] years in a police department that serves a community of well over [half a million] residents." *Elmansoury v. City of Garden Grove*, 2018 WL 3155138, at *7 (C.D. Cal. May 9, 2018). That's not enough. *See id.* (dismissing *Monell* claims).

Setting aside Plaintiffs' anecdotal hodgepodge of remote, dissimilar and untested cases, Defendants produced a Rule 30(b)(6) witness who reviewed six deadly-force incidents occurring in the five years prior to November 4, 2023, in which the suspect was: (1) in crisis and (2) armed with an edged weapon. The witness confirmed that in each case, the use of force was determined to be within policy and justified; and importantly, that neither the District Attorney nor the Department of Justice made ***any*** findings of criminality or pursued charges arising out of any of those six cases (or in Max's, either). In other words, the circumstances leading to the use of deadly force in those



MK MANNING | KASS

six cases (and most analogous to the circumstances the Officers were in) were ***independently*** reviewed and confirmed to be legal. Only one of the six resulted in a settlement and none were tried to verdict, so any allegation that the use of force in any of those cases was constitutionally excessive remains unproven.

Nor is the purported improper "practice and custom" "demonstrated," "evidenced," or "exemplified" by the Officers' use of deadly force on November 4, 2023. *See* SAC, ¶¶ 62f-k, 64. The Ninth Circuit expressly prohibits Plaintiffs from bootstrapping the existence of an unconstitutional custom from the incident that is the subject of their lawsuit. "Consistent with the commonly understood meaning of custom," singular events, even if they can show a constitutional violation, do not suffice to establish a "permanent and well-settled practice." *Los Angeles Police Prot. League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) ("liability for improper custom may not be predicated on isolated or sporadic incidents").

To briefly address other allegations purporting to show custom and practice: That the ACLU expressed "concerns" about the use of force in incidents predating Max's death by up to ***22 years*** falls well short of meeting Plaintiffs' evidentiary burden to show a causal link between the two for the same reasons discussed above. SAC, ¶ 64. In any event, "[f]or a constitutional violation, the text of the Constitution determines the appropriate standard of conduct" – not the ACLU. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 n.20 (9th Cir. 1992). And to the extent the improper custom or practice is untethered to the facts of this case – for example, a purported practice of using force against individuals "who do not pose an imminent threat of serious injury or harm or that are solely in need of mental health services" – that too is insufficient to establish any causal link to Max's death. *See* 4AC, ¶ 67f and SAC, ¶62g; *see also*, *e.g.*, 4AC, ¶¶ 67a (referring to use of force as a "first resort"); 67b (referring to officers with a history of using unreasonable force); SAC, ¶¶ 62a (referring to use of force "where there is no imminent threat to officers"); 62c (referring to officers with "dangerous propensities"); 62f (referring to "conflicting orders"). *See Elmansoury*, 2018 WL 3155138, at *8 (noting cited incidents did not "bear any substantial similarity to the incident described in the complaint").



MK MANNING | KASS

Courts must employ "rigorous standards of culpability and causation" when assessing municipal-liability claims. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). Plaintiffs' reliance on stale, disconnected cases and bootstrapping their custom-and-policy allegations to the use of force against Max does not meet this high standard. *Kibbe*, 480 U.S. 267-68 (noting that a "remote connection" between the alleged wrongdoing and the municipal custom or policy will not suffice to establish that the latter caused the former). For municipal liability to attach, plaintiff must adduce evidence of pervasive conduct. *Lockett*, 977 F.3d at 741. Instead, Plaintiffs have proffered only (at best) a "catalog of disquieting events" that does not "coalesce into a discernible policy." *Elmansoury*, 2018 WL 3155138, at *7 n.4. Their evidence fails to establish the necessary "direct causal link" between an established practice and the alleged violation of Max's Fourth Amendment rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

**2. Failure to Train (SAC 4th; 4AC 3rd)**

Plaintiffs' *Monell* claim based on a "failure to train" theory fails for the same reasons. Like custom-and-practice, "an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Wilcox*, 23 F.4th 863, 875 (9th Cir. 2022). As courts have recognized, "even adequately trained officers occasionally make mistakes." *Perez v. City of Fresno*, 98 F.4th 919, 932 (9th Cir. 2024) ("*Perez II*"). So "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

Plaintiffs' evidence is not enough to meet the "high standard" of proof for failure-to-train claims that the Supreme Court has "adopted … to avoid having federal courts endlessly second-guess the wisdom of municipal training programs." *Henderson*, 2006 WL 3507944, at *10 (citing *City of Canton*, 489 U.S. at 392). The eight cases referred to in their complaints are remote in time and factually dissimilar. *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012). And there is no evidence that any use of deadly force in these cases (even if excessive) was the result of officers who were improperly trained in crisis management or dealing with suicidal subjects, as Plaintiffs allege. As with their custom-and-practice claim, Plaintiffs also cannot rely on the singular



MANNING | KASS

MANNING | KASS

incident of Max's death to establish a failure to train: "a showing that a single employee was inadequately trained [is not] sufficient; there must be a widespread practice." *Id.* at 1159. "Otherwise, a plaintiff could effectively shoehorn ***any single incident*** with no other facts into a failure-to-train claim against the … municipality." *Hyde*, 23 F.4th at 932. Defendants' Rule 30(b)(6) witness confirmed that in the five years preceding Max's death, there had been no finding that a fatal use of force was the result of the officer failing to deescalate a situation. SUF 177-181. That witness and the Officers also described the extensive training that all officers receive regarding deescalation, crisis management and dealing with individuals in mental distress. SUF 168. *See Henderson*, 2006 WL 3507944, at *11 (contrasting cases where training programs were "far below national standards" or "nonexistent").

In short, even if Plaintiffs could prove excessive force, they cannot establish the requisite causal connection between Max's constitutional injury and the City's training program: there is no evidence of ***any*** training deficiency, let alone a "pattern of similar constitutional violations by untrained officers." *Perez II*, 98 F.4th at 931; *see also* Ninth Circuit Model Civil Jury Instruction 9.8 (defect in training must "actually cause" or "play[] a substantial part in bringing about" the harm). Plaintiffs' failure-to-train claim fails on the undisputed record.

**3. Ratification (SAC 5th)**

The Sosa Plaintiffs also state a cause of action for municipal liability based on ratification.[8] SAC ¶¶ 82-90. This cause of action fails for the same reasons above: although Plaintiffs allege that the Officers violated policy by shooting a suspect who "did not pose an immediate threat of death or serious bodily injury to the involved Officers or anyone else," the undisputed evidence negates that assertion. SAC, ¶87. Without evidence that the Officers did anything unconstitutional, there is no basis to find that the City should have disciplined the Officers. In any event, the Ninth Circuit decreed long ago that the "mere failure" to discipline an officer "does not amount to ratification." *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on other grounds

[8] The Olivares Plaintiffs do not bring a ratification claim, which is a survival claim only. If Maria or the children are determined not to have standing to bring claims on Max's behalf, this cause of action fails because no other Plaintiff has pled this claim.

by *Sheehan II* ("*Sheehan I*"). "[F]ailure to discipline is insufficient in itself to create a dispute of material fact on a ratification theory," *Briones v. City of Ontario*, 2018 WL 6017037, at *10 (C.D. Cal. May 21, 2018), so Plaintiffs' *Monell* claim based on ratification fails as a matter of law.

## VI.

## PLAINTIFFS' TORT CAUSES OF ACTION FAIL

Summary judgment in the Officers' favor is also merited on Plaintiffs' tort causes of action arising under state common law.

### A. Plaintiffs' Claims for (Assault and) Battery Fail with Their Excessive Force Claims (Olivares 10th; Sosa 7th)

#### 1. The Officers' Use of Force Was Reasonable

Plaintiffs acknowledge their "battery and negligence claims turn on a very similar reasonableness inquiry as the Fourth Amendment claim." Dkt. No. 91 at 4. For battery, it is more than "very similar" – it's identical. *Peck v. Cnty. of Orange*, 528 F. Supp. 3d 1100, 1107 (C.D. Cal. 2021) (noting that battery is the "state law counterpart of a federal excessive force claim and implicates the same reasonableness considerations as a Fourth Amendment excessive force analysis"); *see also Alves v. Cnty. of Riverside*, 135 F.4th 1161, 1166 n.3 (9th Cir. 2025) ("California battery claims are coextensive with claims for excessive force under the Fourth Amendment"). As with the claims for constitutionally excessive force, "[t]he question is whether the force deployed was justified from the perspective of a reasonable officer on the scene, taking due account of both the individual interests and the governmental interests at stake." *Barnes v. Felix*, 605 U.S. 73, 79 (2025). California law expressly authorizes peace officers to use deadly force where "necessary … to defendant against an imminent threat of death or serious bodily injury to the officer or another person." Cal. Penal Code § 835a(c)(1)(A).

On the undisputed record and for the same reasons discussed above, the Officers' use of deadly force was "objectively reasonable based on the facts and circumstances confronting" them. *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009). As described above, those circumstances included that Max was armed with sharp scissors, and was charging at and within striking distance of Crockett; did not stop his attack despite Aguilar striking him with a Taser; was noncompliant

with the Officers' commands; made explicit threats against Ayers and others during the incident and rejected the Officers' efforts to reach a peaceful resolution of the encounter; and displayed a lack of regard for his own and others' safety through his conduct.

The Officers' use of deadly force was reasonable and justified and privileged under California law. Cal. Penal Code § 835a(c)(1)(A). Their privileged use of force precludes "any tort liability arising out of such use of force." *Hofer v. Emley*, 2019 WL 4575389, at *17 (N.D. Cal. Sept. 20, 2019). And since the Officers are not liable for battery, the City and Chief Balderrama aren't, either. *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 944 (2020) ("If the agent or employee is exonerated, the principal or employer cannot be held vicariously liable.").

**B. <u>There Is No Triable Issue of Fact as to Plaintiffs' Claims for Negligence (Olivares 6th and 7th; Sosa 7th)</u>**

**1. The Officers' Use of Force Was Reasonable**

The claim that the officers were negligent in their use of force also fails. "[O]fficers have a duty to act reasonably when using force," and, as with battery and Fourth Amendment claims, "the reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Est. of Nunis by & through Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 887 (S.D. Cal. 2023). The "totality of circumstances" include the officer's and subject's conduct leading up to the use of force. *See* CACI No. 440; *Alves*, 135 F.4th at 1172.

Consideration of the Officers' pre-force conduct is ***not*** independently actionable, though. *Hayes v. County of San Diego*, 57 Cal.4th 622, 639 (2013). In fact, *Hayes* unequivocally rejects that notion:

> The reasonableness of the deputies' preshooting conduct should not be considered in isolation, however; rather, it should be considered as *part of the totality of circumstances* surrounding the fatal shooting of [decedent]. We perceive no sound reason to divide plaintiff's cause of action artificially into a series of decisional moments…and then to permit plaintiff to litigate each decision in isolation, when ***each is part of a continuum of circumstances surrounding a single use of deadly force by the deputies***. Any other approach would be both inefficient and confusing, and would conflict with our past decisions on negligence.

*Id.* at 630.

Under *Hayes*, then, there is no actionable standalone injury from the Officers' tactical





MANNING | KASS

decisions leading up to the shooting. Instead, there is a ***single indivisible*** cause of action which seeks recovery for a ***single wrong***: *the shooting itself*. *Id.* at 630. The Officers' pre-shooting conduct is relevant here to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent – but not more. *Id.* at 631; *see also Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) (officers are liable only "if the tactical conduct *and decisions leading up to the use of deadly force* show, as part of the totality of circumstances, that the use of deadly force was unreasonable"). Neither *Hayes* nor *Tabares* create distinct and separate causes of action for each and every discretionary decision made by law enforcement but instead contrast reasonability under negligence as encompassing a wider range of pre-force conduct so as to render the force reasonable or not.

Here, even viewed in Hayes' "broader" context of negligence, the Officers' conduct was reasonable for the reasons already discussed in this motion. "Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation." *Villalobos v. City of Santa Maria*, 85 Cal. App. 5th 383, 391 (2022). "As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Id.* at 390-91. Plaintiffs cannot show that the Officers' actions leading up to the use of force – including their many attempts at deescalation, SUF169 – were not within the range of reasonableness. *Id.*; *see also Brown*, 171 Cal.App.4th at 537 ("The law has never been applied to suggest that there is only one reasonable action that an officer may take under a given set of circumstances."). That their use of force (including the tactical decisions leading to it) was reasonable also precludes liability for negligence. *Hofer*, 2019 WL 4575389, at *17.

**2. Plaintiffs Cannot Prove That Any of the Officers' Pre-Force Tactical Decisions Caused Max's Injury**

*Hayes*' totality-of-the-circumstances test dooms Plaintiffs' negligence cause of action for another reason: they cannot prove causation. Plaintiffs have made much of the fact that the Officers did not request a crisis negotiator at the scene, and have criticized the Officers' other tactical choices.



MK MANNING | KASS

Not only are these criticisms  at odds with the evidence and testimony, but Plaintiffs cannot prove that any of the Officers' supposed negligent failures leading up to the use of deadly force unreasonably provoked the confrontation that led to Max's death.

As discussed above, under *Hayes*, if the use of force/seizure itself is ***otherwise reasonable***, officers' tactical decisions are actionable in negligence only if: (1) from the perspective of a reasonable officer, the pre-force conduct is objectively unreasonable under the totality of the circumstances known to the defendant officer at the time; ***and*** (2) the pre-force conduct unreasonably provokes the suspect to take the very action that the officer, in turn, relies upon to justify his subsequent use of force. *See Hayes*, 57 Cal.4th at 638-640.

There is no evidence here that any of the Officers' tactical choices were either objectively unreasonable or that they provoked Max to charge at the Officers wielding a pair of kitchen shears. *See Mulligan v. Nichols*, 835 F.3d 983, 986-987 (9th Cir. 2016) (finding no issue for trial where officers left a 5150 suspect in a hotel instead of taking him into custody, and he later left the hotel and died in a confrontation with officers, because the officers' pre-force conduct did not provoke the suspect's to act in a way that necessitated the use of force).

For example, Plaintiffs criticize the Officers for not calling a specially-trained crisis negotiator to the scene. That is contradicted by the evidence that Ayers did, in fact, try to contact his sergeant to discuss the availability of other resources, including a crisis negotiator, had the sergeant deemed one necessary. SUF 170. Nevertheless, all of the Officers at the scene were trained in crisis intervention techniques. And all four of them repeatedly tried to help Max, invited him to talk to them or any other officer, and encouraged him to end the night without violence. But Max never relented from his suicide-by-cop plan, telling them:

"There is no helping me."

"You have to know that you can't save them all."

"You got no f*cking chance."

"My fate is sealed."

"It's how it has to be man."

"You ain't changing sh*t."

"This is done."

"Listen, if my wife didn't give a f*ck about me, you think that I'm gonna believe that you give a f*ck about me?"

Max was also impervious to Maria's pleas to "stop" and "think of" his two young sons, and when his best friend told him to "stop what [he] was doing" and "talk to the police," Max told him, "Thank you for everything. I love you." SUF 182, 183.

The Officers employed other deescalation techniques: they increased their distance from Max, trained their weapons on him, called for additional officers to respond to the scene, and attempted to use less-lethal force. SUF 169. None of these were successful and the Officers were required to use deadly force to defend themselves and each other from Max's assault. But none of their pre-force tactical choices goaded him into that assault.

Plaintiffs say the Officers should have handled the incident differently, but it is speculative at best to say that the presence of yet another person at the scene, or different tactical decisions, would have changed the outcome. Plaintiffs' argument to the contrary is hindsight-driven and conjectural, and not supported by the undisputed record of the Officers' continuous efforts to bring the incident to a non-violent resolution. No rational juror could conclude that anything the Officers did or did not do before they discharged their weapons had provoked the use of deadly force and caused Max's death as a result.

**3. The Officers Are Immune from Liability**

The Officers are statutorily immune from liability pursuant to Government Code § 820.2, which shields them from liability for their discretionary decision-making at the scene. Cal. Gov. Code § 820.2; *see also Villalobos*, 85 Cal. App. 5th at 391. And since the City's and Chief Balderrama's alleged liability for negligence is vicarious only, *see McCarty v. State of Cal. Dep't of Transp.*, 164 Cal. App. 4th 955, 977 (2008), they are immune from liability to the same extent as the Officers. Cal. Gov't Code § 815.2.

**C. Wrongful Death Claims Based on the Officers' Alleged Battery or Negligence**

Section 377.60 of the California Code of Civil Procedure authorizes a wrongful death claim for a death caused "by the wrongful act or neglect" of the defendant. *Holland v. Silverscreen*



MK MANNING | KASS

*Healthcare*, *Inc*., 18 Cal. 5th 364 (2025). Plaintiffs must prove: "(1) a wrongful act or neglect on the part of one or more persons that (2) causes (3) the death of another person." *Norgart v. Upjohn Co*., 21 Cal. 4th 383, 390 (1999). As noted above, no Plaintiff can pursue a claim for battery or negligence in their individual capacities. And no Plaintiff is entitled to wrongful death damages for the Officers' alleged battery or negligence fails because for the reasons explained, the undisputed evidence shows the Officers' conduct was reasonable under the circumstances. Any wrongful death claim therefore fails as a matter of law.

**D. Plaintiffs' Bane Act Claims Fail (Olivares 8th; Sosa 10th)**

The Bane Act makes it unlawful for any person to interfere, or attempt to interfere, with another's constitutional or legal rights by means of threat, intimidation, or coercion. Cal. Civ. Code § 52.1. In excessive force cases, the crucial inquiry is whether the "circumstances indicate the arresting officer had the *specific intent* to violate the arrestee's right to be free from unreasonable seizure." *Cornell v. City & County of San Francisco*, 17 Cal.App.5th 766, 801 (2017); *Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976, 993 (C.D. Cal. 2022) ("the Bane Act requires an additional element of specific intent"). It is not enough that the defendant intended to use force that was later determined to be unreasonable: the evidence must demonstrate the defendant "intended not only the force, *but its unreasonableness and its character as more than necessary under the circumstances*." *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018).

There is no such evidence here: the Officers' intent was not to violate Max's constitutional rights (or anyone else's) but to defend themselves from his ongoing assault. Because general intent is insufficient to establish a Bane Act claim, *id.*, even if Plaintiffs' evidence is sufficient to state a prima facie claim for excessive force, the Court should enter judgment in Defendants' favor on their Bane Act cause of action.

**VII.**

**PLAINTIFFS' DISABILITY CAUSES OF ACTION FAIL**

Plaintiffs assert causes of action under the Americans with Disabilities Act, the Rehabilitation Act, and the Unruh Civil Rights Act against the City of Fresno (Olivares 5th and 9th; Sosa 6th). Broadly, Plaintiffs allege that Max was suffering from a mental health disability at the



MK MANNING | KASS

time of the incident and that the City failed to accommodate this disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. 28 C.F.R. § 35.130(b)(7). To prevail, Plaintiffs must show: (1) Max was a qualified individual with a disability; (2) he was either excluded from participation in, denied the benefits of, or otherwise discriminated against by a public entity; and (3) such exclusion, denial, or discrimination occurred "by reason of" his disability. *Id.* To recover monetary damages, Plaintiff must show intentional discrimination, meaning that the defendant acted with deliberate indifference. *Wiggins v. Cnty. of Riverside*, 2025 WL 2005481, at *9 (C.D. Cal. June 9, 2025). In the Ninth Circuit, Title II applies to arrests. *Sheehan I,* 743 F.3d at 1232.

"[T]here is no significant difference in the analysis of rights and obligations created by" the ADA and the Rehabilitation Act, and the two claims may be analyzed together. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002). The Unruh Act also requires a showing that the Officers denied Max full and equal access to services and that their "perception" of Max's disability was "a substantial motivating reason for" their failure to accommodate him. California Judicial Council Jury Instructions No. 3060 – Unruh Civil Rights Act – Essential Factual Elements.[9]

Plaintiffs' disability causes of action fail on the merits. *First*, the undisputed evidence does not establish that Max had a disability nor that the Officers should have been aware of it. Plaintiffs allege that Max suffered from "a chronic depressive disorder that had persisted throughout his entire adult life, that substantially limited his ability to care for himself and control his mental health condition." Sosa, ¶ 92. Yet they have produced no evidence to substantiate this claim. Maria told the Officers that Max did not have any diagnosed mental health conditions; she also described his behavior that night as unusual and out of character. Martha and Max Sr. each denied at deposition

[9] The Unruh Act cause of action is brought solely by Martha on behalf of the Estate; to the extent she is no longer the Estate's legal representative, this cause of action fails because she has no standing to assert it and no other Plaintiff has pled this claim.

MANNING | KASS

that Max had a mental health condition. And despite Plaintiffs' self-interested testimony that Max was "sad" about his and Maria's separation, the objective evidence is that he voluntarily discontinued therapy and was able to work, socialize with family and friends, and care for himself and his children until the night he died. Defendants do not dispute that Max was "highly emotional" and threatened to kill himself and others on November 4, 2023. But "one occasion of suicidality" does not establish "disability" within the meaning of the ADA. *Eyre v. City of Fairbanks*, 2023 WL 2188457, at *20 (D. Alaska Feb. 23, 2023), rev'd in part on other grounds, appeal dismissed in part, 2024 WL 3688540 (9th Cir. Aug. 7, 2024) (granting summary judgment); 42 U.S.C. § 12102(1)(A).

*Second*, even if Max had a disability, the City was not required to accommodate it if he "pose[d] a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). The assessment of whether Max was a direct threat is based on the Officers' "reasonable judgment." *See id.*, subsection (b). "[W]hen it comes to officers' use of force during an arrest," the Fourth Amendment's reasonableness analysis and the analysis of whether a defendant provided a reasonable accommodation "are one and the same." *Moore v. City of Berkeley*, 2018 WL 1456628, at *14 (N.D. Cal. Mar. 23, 2018), *aff'd*, 801 F. App'x 480 (9th Cir. 2020); *see also Sheehan I*, 743 F.3d at 1232 ("exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment"). In other words, if the Officers' use of force was reasonable – and it was, for the reasons explained – any failure to accommodate Max's disability was also reasonable. *See Moore*, 2018 WL 1456628, at *15 (equating the reasonability of the use of force with the reasonability of the failure to accommodate).

*Third*, Plaintiffs cannot establish that any proposed accommodation was "feasible on its face," "would actually have helped [Max]," and "that the benefits of providing the accommodation outweighed the burdens of doing so." *Hui Jie Jin v. Alameda Cnty.*, 2019 WL 7831143, at *8 (N.D. Cal. Feb. 4, 2019). During meet and confer, Plaintiffs' counsel identified the accommodations that should have been provided as: less-lethal uses of force; additional backup at the scene; and the presence of a crisis negotiator at the scene. Plaintiffs' argument is essentially that the Officers should have used different tactics, transparently (and improperly) applying a hindsight-driven analysis of the use of force in hindsight by calling it a failure to accommodate. And Plaintiffs' theory is not

supported by the undisputed record: the Officers employed a variety of deescalation techniques with Max: they tried to establish rapport (to which he responded "F*ck you!" and "No we can't f*cking talk!"); offered to have him talk to someone else (which he likewise declined); increased their physical distance from him (he rapidly closed it); engaged in show-of-force and directed their weapons at him (that did not deter him); requested that additional officers respond to the scene (and they did); and deployed a Taser on him (it had no effect). Given these outcomes, even if the "accommodations" Plaintiffs have identified were feasible in the six minutes that Max and the Officers were face-to-face, it is pure speculation to assert they would have "actually helped" and were worth any increased risk to the Officers or others that may have resulted from their use. *Hui Jie Jin*, 2019 WL 7831143, at *8.

*Finally*, even if Plaintiffs could prove Max was suffering from a disability, and that there was a reasonable accommodation for that disability to which Max was entitled and that the City failed to provide, "no reasonable jury could find – based on the evidence presented – that [the Officers'] actions were based on [Max's] disability." *Douris v. City of Henderson*, 2023 WL 4421409, at *8 (D. Nev. July 10, 2023) (granting summary judgment). "The ADA … require[s] a causal nexus between the denial of an accommodation and the resulting injury, ***not merely harm occurring during a police encounter***." *Richards v. Remington*, 2025 WL 3713778, at *19 (D. Ariz. Dec. 23, 2025), *appeal filed* Dec. 30, 2025 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001)). Plaintiffs have "presented no evidence that [the Officers'] conduct was motivated by discriminatory animus" and so have not shown any such causal connection. *Id.* Their disability claims fail as a matter of law.

## VIII.

## EVEN IF SOME CAUSES OF ACTION SURVIVE, PLAINTIFFS' DAMAGES MUST BE LIMITED

### A. Wrongful Death Damages Are Not Available for the § 1983, Bane Act or ADA Claims

Even if any cause of action survives this motion, Plaintiffs' damages must be limited. First, and for the reasons explained, Plaintiffs are not entitled to wrongful death damages for any § 1983 cause of action or for their Bane Act claims. Even if those claims survive this motion, then, no



MANNING | KASS

plaintiff is entitled to recover wrongful death damages for them.

**B. <u>Plaintiffs Are Not Entitled to Punitive Damages</u>**

Plaintiffs are also not entitled to punitive damages, which are only warranted for malicious conduct. *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 953 (9th Cir. 2005).[10] For § 1983 claims, Plaintiffs must prove defendants were "motivated by evil motive or intent," or were "reckless[ly] or callous[ly] indifferen[t]" to a their or Max's constitutional rights. *See Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005). "Malicious" conduct is done for spite or to harm another. Model Instruction 5.5. Callous indifference occurs when a defendant acts with "complete indifference" or "in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." *Dang*, 422 F.3d at 806. For state law tort claims, Plaintiffs must show by clear and convincing evidence either an "intent to injure" or "despicable conduct." *See Pacific Gas & Elec. Co. v. Super. Ct.*, 24 Cal.App.5th 1150, 1161 (2018) (further noting that "despicable … refers to circumstances that are base, vile or contemptible") (citing Cal. Civ. Proc. Code § 3294). Although a plaintiff is not required to "prove" their case for punitive damages to "defeat summary adjudication," the court must nevertheless "view the evidence presented through the prism of the substantive clear and convincing evidentiary burden." *Szarowicz v. Birenbaum*, 58 Cal.App.5th 146, 171 (2020) (collecting cases).

The undisputed evidence in the record does not support a finding of malice or intent to harm. The Officers reasonably perceived that Max posed a threat to their lives and safety as he charged forward toward them, scissors in hand, after they unsuccessfully tried to take him down with a Taser. Faced with the split-second choice to defend themselves and their fellow officers or to allow Max to continue his deadly attack, each of them responded with deadly force, and each of them testified to their subjective belief that such force was permissible in the totality of the circumstances. Even assuming the use of deadly force was unreasonable, no rational juror could find it was reckless, spiteful, or despicable. Plaintiffs' requests for punitive damages should be summarily denied. *See*

[10] During the parties' meet and confer, Plaintiffs' counsel agreed that punitive damages are not available for the ADA claim.



MK MANNING | KASS

*Pacific Gas & Elec. Co*, 24 Cal.App.5th at 1176 (where evidence does not show despicable conduct, the court "need not, and indeed should not, submit the issue of punitive damages to the jury.").

## IX.

## CONCLUSION

For the reasons stated above, judgment in Defendants' favor is warranted on all causes of action. If Martha is no longer the Estate's legal representative, she has no standing to bring the Estate's claims and neither she nor Max Sr. have established the financial dependency that would entitle them to wrongful death damages. Conversely, if Martha is the Estate's legal representative, none of the Sosa Plaintiffs have standing for any of their claims, including wrongful death. Even if the parties proceed to a jury, Plaintiffs' respective standing (for which each of them bears the burden of proof) is a purely legal question that should be resolved before trial.

On the merits, the undisputed evidence does not suffice to establish a material fact for trial as to any cause of action. The Officers' use of deadly force was reasonable under the totality of the specific circumstances they faced, and did not wrongfully deprive Plaintiffs of their family relationship with Max. Even if the Court finds otherwise, the Officers are entitled to qualified immunity from Plaintiffs' federal constitutional claims. Plaintiffs' *Monell* claims against the City and Chief Balderrama are also unsupported because the evidence does not establish an underlying constitutional violation; nor a widespread practice, a failure of training, or a policymaker's ratification of unconstitutional conduct, as is necessary to impose liability. Finally, even if any cause of action survives this motion, Plaintiffs are not entitled to wrongful death damages for any § 1983 or Bane Act violation proven at trial, and are not entitled to any punitive damages whatsoever.

Defendants respectfully request the Court grant this motion and enter judgment in their favor on all of Plaintiffs' causes of action. If any claims survive this motion, Defendants request the Court issue an order (1) dismissing or striking Plaintiffs' requests for punitive damages and wrongful death damages to the extent dependent on a § 1983 or Bane Act violation; and (2) adjudicating which Plaintiff(s) have standing to proceed on which claims.

DATED: October 16, 2026

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Maya Sorensen
Maya Sorensen
Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

MANNING | KASS

**CERTIFICATE OF COMPLIANCE – MEET AND CONFER**

The undersigned counsel certifies that, in compliance with the Court's May 15, 2025, Scheduling Order [Dkt. No. 56], counsel for the parties met and conferred October 5, 2026, by Zoom for approximately 45 minutes. Cooper Alison-Mayne participated for the Sosa Plaintiffs. Kevin Little participated for the Olivares Plaintiffs. Maya Sorensen and Susannah R. Conn participated for Defendants. The parties discussed Defendants' anticipated arguments in support of summary judgment, whether the parties could stipulate to any facts, and the Court's requirement for a Joint Statement of Facts. The parties reached some agreements as described in this motion, but were unable to avoid motion practice.

Also in compliance with the Scheduling Order, on October 9, 2026, our office sent Messrs. Alison-Mayne and Little a list of 152 proposed undisputed facts and invited their comment or, if necessary, a further meet and confer. On October 15, 2026, both counsel responded. The Sosa Plaintiffs agreed that 15 of Defendants' proposed facts were undisputed (with one minor correction to L.S.'s initials). The Olivares Plaintiffs agreed that 15 of Defendants' proposed facts were undisputed, but not the same 15 facts as the Sosa Plaintiffs agreed to. The concurrently-filed Joint Statement of Undisputed Facts states the facts that Defendants, the Sosa Plaintiffs, and the Olivares Plaintiffs **all** agree are undisputed. All other facts, including those for which complete agreement was not reached, are set forth in Defendants' Separate Statement of Undisputed Material Facts.

DATED: October 16, 2026

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Maya Sorensen
Maya Sorensen
Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR