# EXHIBIT 23

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- o0o --

CERTIFIED COPY

MARTHA ZEPEDA OLIVARES,
individually and on behalf
of the ESTATE OF MAXIMILIANO
SOSA, JR.; MAXIMILIANO
SOSA, SR.,

Plaintiffs,

vs. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, UNKNOWN LAW
ENFORCEMENT OFFICERS, POLICE
CHIEF PACO BALDERRAMA and
DOES 1-30,

Defendants.

(CONTINUED ON PAGE 2)

______________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
MARIA DEL CARMEN SOSA

Fresno, California
Monday, July 28, 2025
10:10 a.m. to 4:17 p.m.

By: Gracie E. Becerra, CA CSR No. 13136
Our File No.: 8403

FRESNO DEPOSITION REPORTERS
516 WEST SHAW AVE., STE. 111, FRESNO, CALIFORNIA
P.O. BOX 755, WOODLAKE, CALIFORNIA 93286

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- o0o --

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually, and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO and DOES 1-5,

Defendants.

______________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF MARIA DEL CARMEN SOSA

Fresno, California
Monday, July 28, 2025
10:10 a.m. to 4:17 p.m.

By: Gracie E. Becerra, CA CSR No. 13136
Our File No.: 8403

-- o0o --

The deposition of Maria Del Carmen Sosa was taken in the above-entitled matter pursuant to stipulation via videoconference by all counsel, Maria Del Carmen Sosa, and the court reporter.

The witness' physical location for the taking of the deposition was: Fresno, California.

The reporter's physical location for the taking of the deposition was: Tulare County, California.

-- o0o --

A P P E A R A N C E S

For the Plaintiffs, MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually, and as successors-in-interest to Maximiliano Sosa:

LAW OFFICES OF DALE K. GALIPO
By: Cooper Alison-Mayne, Esq.
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(818) 347-3333

STEVEN A. LERMAN & ASSOCIATES, INC.
By: Nicholas Lerman, Esq.
nmlerman@yahoo.com
6033 West Century Boulevard, Suite 740
Los Angeles, California 90045
(310) 659-8166

For the Plaintiffs, MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.:

LAW OFFICE OF KEVIN G. LITTLE
By: Kevin G. Little, Esq.
kevin@kevinglittle.com
- and -
Michelle Tostenrude, Esq.
michelle@kevinglittle.com
Post Office Box 8656
Fresno, California 93747
(559) 342-5800

APPEARANCES CONTINUED

For the Defendants, CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, and POLICE CHIEF PACO BALDERRAMA:

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
By: Lynn L. Carpenter, Esq.
Lynn.Carpenter@manningkass.com
801 S. Figueroa Street, 15th Floor
Los Angeles, California 90017
(213) 624-6900

Also appearing via videoconference:

Maximiliano Sosa, Sr., Plaintiff
Martha Zepeda Olivares, Plaintiff
Heather Gillespie, videographer

-- o0o --

I N D E X

| MARIA DEL CARMEN SOSA | Page |
|---|---|
| Examination by Ms. Carpenter | 8 |
| Examination resumed by Ms. Carpenter | 80 |
| Examination by Mr. Little | 136 |
| Further examination by Ms. Carpenter | 145 |

-- o0o --

INFORMATION TO BE SUPPLIED:

(None.)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

(None.)

E X H I B I T S

| Defendants' Exhibit No. | Description | Page |
|---|---|---|
| EXHIBIT 1 | 9-1-1 recording of 11/4/2023 | 48 |
| EXHIBIT 2 | Transcript of 9-1-1 recording of 11/4/2023 | 63 |
| EXHIBIT 3 | Second 9-1-1 recording of 11/4/2023 | 67 |
| EXHIBIT 4 | Transcript of 9-1-1 recording of 11/4/2023 | 68 |
| EXHIBIT 5 | Photographs of screenshots from the phone of Maria Sosa | 72 |
| EXHIBIT 6 | Audio recording of police interview of Maria Sosa | 82 |
| EXHIBIT 7 | Transcript of police interview of Maria Sosa | 83 |
| EXHIBIT 8 | Funeral invoices | 117 |
| EXHIBIT 9 | Tax form 540; W-2s of Maximiliano Sosa, Jr., for the years 2020, 2021 and 2022 | 122 |
| EXHIBIT 10 | 2023 1099-MISC of Maximiliano Sosa, Jr. | 124 |
| EXHIBIT 11 | Photograph Bates stamped: PLT000023 | 125 |
| EXHIBIT 12 | Amended Notice of Deposition of Maria Sosa | 126 |

~ FRESNO, CALIFORNIA; MONDAY, JULY 28, 2025; 10:10 A.M. ~

-- o0o --

THE VIDEOGRAPHER: Good morning. This is the video-recorded deposition of Maria Sosa taken on behalf of the defendant in the matter of Martha Zepeda Olivares, et al. versus City of Fresno, et al. and related cross-action. This case is venued in the United States District Court, Eastern District of California. The case number is 1:23-cv-01575-JLT-SAB. This deposition is being held via videoconference on July 28, 2025. The video operator is Heather Gillespie of PES Video Service. Our main office is located in Fresno, California. The court reporter is Gracie Becerra of Fresno Deposition Reporters located in Fresno, California. We are going on the record at approximately 10:10 a.m.

Will counsel please state their appearances for the record.

MS. CARPENTER: Good morning. My name is Lynn Carpenter. I represent Defendant City of Fresno and Officers Ayers, Crockett, Aguilar, and Abraham.

MR. MAYNE: Good morning. This is Cooper Mayne. I represent Plaintiff Maria Sosa and her two kids. And Nick Lerman is also here -- oh, there you are, Nick. I'll let you introduce yourself.

MR. LERMAN: Good morning. Nick Lerman on behalf of Plaintiff Maria Sosa. Thank you.

MS. TOSTENRUDE: Michelle Tostenrude from the Law Office of Kevin Little. Mr. Little is also present, Martha -- on behalf of Martha Zepeda Olivares, individually, and on behalf of the Estate of Maximiliano Sosa, Jr., and Maximiliano Sosa, Sr.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

MARIA DEL CARMEN SOSA,
called as a witness herein, being
by me first duly sworn, was examined
and testified as is hereinafter set forth.

EXAMINATION

BY MS. CARPENTER:

Q. Good morning, Ms. Sosa. As you heard, my name is Lynn Carpenter and I represent the defendants in this case. So are you present in your home in Fresno at this time?

A. Good morning. Yes, I am.

Q. Okay. And is anyone located in the room with you?

A. No. It's just myself at home.

Q. All right. Ms. Sosa, have you ever had your deposition taken before today?

that?

A. No.

Q. What was the date of your marriage to Max Sosa?

A. July 11th, 2014.

Q. Okay. How did you two meet?

A. We met at an outing with my friends. I don't remember exactly, but it was a summer that I was back from school, from Cal State. It was the summer of 2011.

Q. And how long did you date?

A. We dated for three years until we were married.

Q. Okay. And from the time that you were in a relationship and dating, was that in Fresno?

A. Yes. Well, while I finished my education in LA, we dated long distance until I moved back in December of 2012.

Q. Okay. And did you live with Max after your marriage in Fresno the entire time?

A. Yes. We moved -- we lived in Sanger briefly, in Fresno, and then with my parents in Del Rey briefly before then moving to the address on Oak.

Q. And what is that address, so it's clear?

A. I don't remember the number, honestly, but it's Oak Avenue in Fresno, 93722.

Q. And do you remember when you first moved to the Oak -- the Oak address?

Q. Okay. So do you recall the date that you decided to separate from Max?
A. I don't remember the exact date. I don't remember the exact date, but we talked about it and we both agreed.
Q. Okay. So it was a mutual decision?
A. It was.
Q. And do you believe it was in February of 2023?
A. I -- I want to say yes.
Q. Okay. So did you ever consult with a fam -- family law attorney around the time of your separation?
A. No. It was never a discussion.
Q. Okay. And then you at some point moved out of the home on Oak, correct?
A. Yes. Yes.
Q. And how long after you decided to separate did you do that?
A. I want to say a couple weeks after.
Q. And why -- or how was the decision arrived at that you would move out of the home rather than Max?
A. Because that home that we were living at was his best friend's. We were renting from his best friend, so it was natural for me to be the one to move out since it was his friend's home.
Q. Okay. And when you moved out, that was into the 5555 Dante Avenue or -- was that the right --

Q. Okay?
A. Uh-huh.
Q. Were you in another -- in a relationship with someone else, meaning another man, before your separation?
A. At -- at the beginning of our separation.
Q. Okay. And was that an individual named Matt Lea?
A. Yes.
Q. And how did you meet Mr. Lea?
A. We were co-workers.
Q. And where did you work at that time?
A. Madera Unified.
Q. Is that still where you are employed?
A. No.
Q. Okay. How long did you work at Madera Unified?
A. Two years.
Q. And in what capacity did you work there?
A. I was a school counselor. My title was intervention specialist.
Q. Okay. And how did you meet Matt Lea at your job? Like, what caused you to cross -- cross paths?
A. Well, I was a counselor and he was a teacher, so we often interacted with the students that I had on my caseload.
Q. Okay. And when did you first become romantically involved with him?

A. It was very brief. I don't remember the exact date. But what was a co-worker relationship had turned into a -- a friendship, and then one day it just was more than that. And it was the one time. But it was -- it was not something that was long-term or that I would define as an affair.

Q. Okay. But when you say it was more than a friendship, are you meaning that you were physically intimate with him?

A. Yes.

Q. Okay. And that was before you separated from Max, correct?

A. It was literally the night before we agreed to separate.

Q. Okay. Did Max find out about it?

A. He found out after we were already separated.

Q. I see. And did you continue to have a relationship or -- or some level of involvement with Mr. Lea after your separation?

A. We were still co-workers.

Q. Did you continue to be physically intimate with him?

A. At some point, yes.

Q. And then how often or frequently did that occur after the date of your separation from Max?

A. It was not frequent at all. Yeah.
Q. Okay. Prior to November 4th, 2023, when was the very last time that you had been intimate with Mr. Lea?
A. I can't recall, honestly.
Q. Okay. All right. So you and Max Sosa had two children?
A. Yes.
Q. Maximiliano, III?
A. Yes.
Q. And then Lucas?
A. Yes.
Q. And they both currently reside with you?
A. They do.
Q. And then are you -- are you currently employed still in education?
A. I am still in education.
Q. Okay. And where are you employed now?
A. I'm not employed. It's summer right now. Yeah.
Q. Oh, okay. Where do you -- do you have a job whenever the summer is over?
A. Not yet.
Q. Okay. When did you stop working at Madera Unified?
A. July -- or I'm sorry. June 2024. Yeah. It was last June.

knew him?
A. Yeah, socially, which was not often. You know, couple beers at, like, a family gathering.
Q. How often would you say -- or how many drinks per week would you say that he had?
A. I would say even maybe per month, maybe, like, two. Because it wasn't -- we usually stayed at home with the kids. So if we went out to, like, a family gathering, he'd have a couple beers.
Q. During the time that you knew Max, did he ever exhibit signs or symptoms of having a mental illness?
A. Can you repeat that? I'm sorry.
Q. During the time that you knew Max, did he ever exhibit signs or symptoms of having a mental illness?
MR. MAYNE: Objection. Calls for speculation, calls for expert opinion.
You can answer if you -- if you can.
BY MS. CARPENTER:
Q. You can answer.
A. He's shared that he struggled with sadness growing up.
Q. Did he ever -- so was he ever formally diagnosed or treated for depression that you are aware of?
A. No, not that I'm aware of.
Q. Okay. Was there ever a time where you noticed a

THE WITNESS: Do I answer?
BY MS. CARPENTER:
Q. You can answer. Yes.
A. Could you repeat that question again? I'm sorry.
Q. What did Max say to you about being sad or depressed about your separation?
A. Oh. I mean, he definitely wanted to preserve our marriage just as I did.
Q. Okay. And I understand that. But what did he say specifically about being sad or depressed?
A. Just that he was sad that we weren't together, like living together, because at that time I was living in that apartment.
Q. Okay. And even though you were separated, you continued to see Max very regularly due to the fact that you had a custody arrangement, right?
A. Uh-huh. Informal, but yes.
Q. And what was your informal custody arrangement as far as the care of your children were concerned?
A. We had agreed to do weekly Wednesday to Wednesday and we would alternate.
Q. And when you say "Wednesday to Wednesday," you mean one of you would take them from Wednesday to the following Wednesday and they would stay in the home with you, right?

encounters or run-ins with members of police --
A. No.
Q. -- from any department?
A. No.
Q. Okay. So you understand the incident at issue in your lawsuit involves an incident involving members of the Fresno Police Department that occurred at 555 North Dante Road, Apartment 124, your former residence, on November 4th, 2023, right?
A. Yes.
Q. And the officer-involved shooting incident actually happened at some point after 4:30 a.m. or thereabouts, right?
A. Yes.
Q. Okay. And you were actually physically inside the apartment when the shooting occurred, correct?
A. Yes.
Q. Before the shooting occurred, you had made a few calls to 9-1-1, right?
A. Yes.
Q. You made some calls to 9-1-1 requesting a police response, true?
A. Yes.
Q. All right. So at this time I think we'll listen to the first 9-1-1 call.

A. Do I have to listen to it?

Q. I -- I apologize, ma'am, but there are certain questions that I have and out of fairness to you, I think you need to listen to it before I ask you questions about it so it's fresh in your mind. We can take a break after I play it, but I feel like -- I feel like that is the best way.

(Exhibit 1 was marked and attached.)

BY MS. CARPENTER:

Q. Can you hear that when I'm playing it? Could you hear what I was playing?

A. No.

Q. Okay. I'll have to try it again.

(Audio played.)

BY MS. CARPENTER:

Q. Ms. Sosa --

A. Yes.

Q. -- did you recognize your voice in that recording?

A. I did, yes.

Q. Okay. And when you were speaking to the 9-1-1 operator on November 4th, 2023, as heard in that recording, were you reporting to her things that were actually happening that you had observed?

A. Yes.

Q. Okay. And were all the things that you reported

to her truthful and accurate?

A. Yes.

MS. CARPENTER: Okay. Now I think it's time to take our first break. So if it's all right with you, we'll take a break for about 10 minutes.

THE WITNESS: Yes, please. Thank you.

THE VIDEOGRAPHER: We have reached the end of our first media. We are off the record at 11:17 a.m.

(Recess taken.)

THE VIDEOGRAPHER: This begins media number two in the continuing deposition of Maria Sosa. Today's date is July 28th, 2025. We are back on the record at 11:30 a.m.

BY MS. CARPENTER:

Q. So in the recording that you just listened to, which was the first 9-1-1 call for a police response on November 4th that I believe that you made, and that will be Exhibit 1 --

A. Yes.

Q. -- what was happening between you and Max before that call that caused you to request police assistance?

A. I was asleep and I was woken up by him. He was highly emotional. I saw that he had looked through my phone because it was open. He told me that I was still seeing Matt and he said that he wanted to hurt himself. He said he wanted to go look for him, for Matt, and his words were to

kill him and himself. I was really scared and worried for Max's well-being because I had never seen this side of him. I knew that he was experiencing a mental health crisis.

After, I tried to -- tried to, like, deescalate the situation, I tried to calm him down, but I realized that it was just making him more upset. I had initially tried to go out and stop him myself, but I couldn't. And then at one point he brought me back into the apartment and I fell back. At the time, because he had never acted this way, I wasn't sure if he had pushed me or if I fell because the apartment door has, like, that little, like, lip to prevent, like, air, I guess, to come in. So he brought me back into the apartment and he shut the door, and that's when I got really scared for him. And that's when I realized the severity of the situation, and that's when I called 9-1-1.

Q. Well, in that call you indicated that he was drunk and that you had been drinking.

A. Yes.

Q. Earlier in the evening you had been drinking at a place outside of your apartment, true?

A. Yes. Yes.

Q. You had gone out with some girlfriends --

A. Yes.

Q. -- and that's where you had consumed alcohol; is that right?

down. It was new to me, so I don't know the -- I don't remember the name.

Q. Do you remember what type of food they served?

A. It was small bites.

Q. Okay. And then when you went to Bobby's, do you remember about what time that was?

A. I don't. No.

Q. How many alcohol -- or, first of all, what type of alcohol did you consume?

A. What are they -- cocktails.

Q. Okay. And do you remember what type of cocktail?

A. I don't, honestly. I don't.

Q. Then do you remember how many drinks that you had?

A. I had -- I had one at the first place and then I had a couple more at Bobby's. I continued drinking because Max had offered to pick me up and I wasn't driving.

Q. When did you speak with Max where you arranged to have him pick you up that night?

A. He texted me. He knew that I was gonna be out with my friends. He texted me sometime after midnight asking if he could pick me up, that he was somewhere near Tower if I remember correctly. And because he didn't have the boys, I said yes. Yeah.

Q. Had he ever picked you up when you had gone out with your friends before?

A. He has. It was very rare that I'd go out without him. But when we were separated, I went out with my friends, which he had met previously, and he was at a -- at a football game for his nephew that night.
Q. Okay. During the time of your separation, was there ever an occasion where he had picked you up after you had gone out drinking with your friends --
A. No.
Q. -- similar to the night of this incident?
A. No.
Q. Okay. So when he picked you up, do you remember what time that was?
A. It was -- it was close to the closing time, like last call for alcohol, because I remember that he wasn't able to get in. They had already stopped letting people in. So when he came, I told my friends that he was here. And since he couldn't come in, we left with him.
Q. And when Max arrived to pick you up, was he sober?
A. To me he looked sober. He's -- I've never seen him that intoxicated like that night when we were home.
Q. Okay. So did he drink any alcohol, like, on the way to your apartment?
A. With me, no.
Q. Did he drink alcohol after he got to your apartment?

A. I'm assuming, yes, because I noticed that when I woke up, he was intoxicated. And I did have a bottle of tequila that I had on my counter.

Q. And then what about his behavior or his speech made you believe that he was intoxicated at that point?

A. It's just the way -- the way that he was behaving, he was very emotional. I don't know. I guess I could just tell when he would drink, so I know what it was like when he was tipsy, I guess, where, like, he's -- you know, when you feel the drinks. So I knew that he was beyond that just because of how he -- emotional he was and how he was behaving.

Q. Did he appear to you to be out of control emotionally?

A. Emotionally, yes.

Q. And then when you were speaking to the 9-1-1 operator, you indicated that he discovered some communications on your phone and you said that you had been talking to this guy or he knew that you had been talking to this guy. Did you ever convey what specifically Max located on your phone?

A. I don't remember.

Q. And did Max ever talk to you about or express any emotion toward you about the specific nature of the messages he found on your phone?

A. Not, like, specifics, but he -- he saw something and he -- he -- he had the phone. And the way that he was talking to me, I knew that he had found those messages. My phone was open to -- to that -- the message thread with Matt.

Q. Okay. And do you recall when you received the message from Matt that Max found on your phone?

A. I didn't receive any messages from him. I believe that he went into my phone to try --

Q. Right.

A. -- to find something.

Q. And do you believe that Max found some messages that you had sent to Max and received -- or excuse me -- sent to Matt and received from Matt on your phone?

A. Yes.

Q. Okay. Do you remember when you received the messages from Matt that Max found on your phone?

A. No. They must have been from earlier that week or -- I don't know.

Q. Okay. But you knew that Max was upset because of the specific nature of what he found on your phone, right?

A. Yeah.

Q. Okay. And that's what set him off?

A. Yes.

Q. Correct?

A. Yes.
Q. All right. So I'm going to pull up -- there's a transcript that corresponds with that 9-1-1 call. Hopefully I pull up the right one.
A. Okay.
Q. I think this is it. So the transcript corresponds to the 9-1-1 call we just listened. And on the first page, some of the first words out of your mouth after it says, "State your emergency," you indicated that you were at 555 North Dante Avenue, 124, and you said, "My ex is -- he's -- he's -- he's trying to kill himself."
Why did you make that specific statement to the 9-1-1 caller right off the bat in your call?
A. What specifically? The "my ex, he's trying to kill himself"?
Q. Yes.
A. Because he stated that he wanted to kill himself.
Q. Okay. And did he tell you more than once that he tried to kill -- or he wanted to kill himself?
A. I don't recall.
Q. Okay. And his behavior was out of control emotionally enough for you to take him seriously, right?
A. Yes. Yes.
Q. Okay. On page 3, again, the caller at the bottom of page 2 said, "Any idea where he's going?" And then you

answer, "He says he wants to go see where this guy is at. 'Cause he says he wants to kill him and himself."

Did Max say that to you, that he wanted to kill Matt and then himself?

A. Yes. That's what I remember.

Q. Okay. And where was Matt staying at or living at relative to you at that time?

A. He lived not far from the area that we lived in.

Q. So he lived in -- in Villa Lu -- Lucia --

A. Yes.

Q. -- right?

A. Yes.

Q. And that's only about a mile or less away from you, correct?

A. Something like that, yes.

Q. Takes about four or five minutes to get there, right?

A. Uh-huh. I would say.

Q. Okay. So if Max, your ex, wanted to go find Matt at the place where he lived, it was only a few minutes away, true?

A. Yes.

Q. It wouldn't have taken him very long to get over there and find him, provided he knew where to look for him, right? Okay.

THE REPORTER: Sorry, Counsel, I need a verbal -- I need a verbal response to that last question.

THE WITNESS: Oh. I said, "Right."

THE REPORTER: Thank you.

THE WITNESS: He didn't know exactly where he lived. He just knew -- I don't think he even knew the name of the apartment. He just had an idea.

BY MS. CARPENTER:

Q. Okay.

A. And I wasn't so much concerned about him really doing anything to Matt --

Q. Okay.

A. -- because...

Q. Well, you said, "He wants to kill him and himself."

A. Yeah. Because --

Q. So --

A. -- that is what he said. I'm sorry.

Q. Okay. So according to Max at least, in that moment he wanted to kill Matt, right?

A. That is what he said.

Q. And then himself, right?

A. Yes.

Q. Had he ever at any point in your marriage ever told you that he wanted to kill himself before that date?

A. Yes. He had shared with me that when he was young, when he was little, he tried to hang himself or something like that.

Q. Did he say how old he was when he tried to hang himself?

A. He was really young. It was around the time that his parents separated.

Q. Okay. When he was still a child?

A. He was.

Q. Was he ever in the foster system or child protective services?

A. From what he told me, there was a point where he was removed from his mother's care and he was what he described to be kind of like a group home because he wasn't able to be placed at a -- at a foster home --

Q. Okay.

A. -- if I remember correctly, yes --

Q. So --

A. -- while they did an investigation.

Q. So he told you that at least on one other occasion he had tried -- he tried to kill himself when he was a kid?

A. That he had told me, yes.

Q. Did he ever say to you, like, during a fight or at any other time while you were married that he wanted to kill himself, like, then in that moment?

A. No.
Q. Okay. So this was the first time he had made that type of threat to you?
A. The explicit, yes, verbal threat, yes.
Q. Okay. So then on, this is on page 5, at the bottom you said, "Something from" -- "I don't know if he maybe grabbed something from the kitchen when he grabbed the bottle. I don't want to walk outside. I don't want to see if he did."
So when you said "he maybe grabbed something from the kitchen," what led you to believe that he might have done that?
A. Because of his emotional state and how he had explicitly said he wanted to kill himself, I did see that he had a bottle and that's the only thing I saw. But because of his emotional state, I was worried that maybe he got a knife or something to hurt himself. And I was afraid that if I was to walk outside, I may see him hurt.
Q. Okay. Then on page 7, at the very bottom it says, "He's speeding." I think you were trying to describe what Max was doing when he backed up to leave or as he was leaving your apartment complex. But you said here at the bottom, "He's speeding. He drove off really fast. He's probably going towards Villa Lucia Apartments. He doesn't know where the other -- where the guy lives. Like he just

Q. And was Damian, to your knowledge, able to get in touch with Max?
A. I believe so.
Q. Okay. And then had you called 9-1-1 before you spoke to Damian or was it after?
A. I honestly can't remember. I don't know if I called him before or after, during. I -- I don't know.
Q. Okay. Did you ever call any of Max's family members that night?
A. No.
Q. Okay. All right. So at some point you -- you made a second 9-1-1 call, correct?
A. I made a few. I don't remember how many, but yes.
Q. I think at one point you tried to call the police department on the nonemergency line, and then you called -- it's like a second 9-1-1 emergency call. Does that sound familiar?
A. I think so, yes.
Q. And do you remember what was happening to cause you to call 9-1-1 again?
A. I was just really worried for Max. I was really worried about his safety.
Q. And the police had responded, though, to your apartment based on that first 9-1-1 call, correct?
A. I don't remember, but, yes, they showed up

eventually.
Q. And did you -- did you speak with them and tell them what was happening with you and Max?
A. I did, yes. Yes.
Q. Did you tell the police that Max had made statements to you that he wanted to kill himself?
A. I believe I told him what he had said, yes.
Q. Did you tell the police that he had made statements that he wanted to kill Matt, the other gentleman you were having a -- a relationship with?
A. Like I said, I don't remember exactly explicitly the conversation, but if I would have to guess, I guess, I would -- I -- I told them -- I was honest to -- to who I spoke to about everything that was happening that night.
Q. And did you ever show the police that responded based on that initial 9-1-1 call the messages on your phone that Max had found?
A. I don't remember.
Q. Okay. Did you plan for Max to spend the night at your apartment that night?
A. It wasn't planned, but, I mean, he had spent the night before. So when he picked me up, I guess I just assumed that he would.
Q. Okay.
A. It wasn't like it was just drop me off and leave.

I had no problem with him staying.

Q. Okay. And were you and Max physically intimate that night before he woke you up and -- and asked you about your phone?

A. No.

Q. Okay. So I need to share my screen with you again and play that second 9-1-1 call. It's not very long, so...

(Audio played.)

BY MS. CARPENTER:

Q. Okay. Ms. Sosa, did you recognize your voice in that -- that 9-1-1 call I just played?

A. Yes.

MS. CARPENTER: Okay. And that will be Exhibit 3.

(Exhibit 3 was marked and attached.)

BY MS. CARPENTER:

Q. When you spoke to the 9-1-1 operator in that call, were you being truthful and honest about the information that you were reporting?

A. Yes.

Q. And were you reporting that information based on conversations and observations that you had had with Max?

A. Yes.

Q. Okay. So this is the transcript from that 9-1-1 call we just heard, and this will be Exhibit 4. It's only three pages, but...

(Exhibit 4 was marked and attached.)

BY MS. CARPENTER:

Q. In this particular transcript, there on line 22 you're explaining to the 9-1-1 caller and you said, "And I've been trying to get a hold of someone because he -- my ex, he called me and I just wanna say what's going on because he's talking crazy, and I know -- I'm just really worried about him. I know he doesn't have any kind of weapon on him, but I'm just really worried that he's gonna make it look like he does so that he can get, like, shot by the police or something."

So that statement, do you recall making that to the 9-1-1 operator in that recording you just heard?

A. I mean, that's my voice.

Q. Okay.

A. But I don't remember exactly what I said.

Q. Did Max tell you he wanted to incite the police to shoot him?

A. Uh-huh. I don't remember the exact words, but that's what I got from the conversation.

Q. So he did say that?

A. Yes.

Q. All right. And when you told the 9-1-1 operator, "I know he doesn't have any kind of weapon on him," I mean, what were you referring to?

out. I don't remember exactly what was said. I just remember him walking in with the scissors.

Q. Okay. So I will not play any video footage. I'll honor my word --

A. Thank you.

Q. -- of the actual shooting incident, but I am going to play a portion a little bit later today of what happened inside the apartment. Okay?

A. Okay.

Q. Let's see here. This will be Exhibit 5.

(Exhibit 5 was marked and attached.)

BY MS. CARPENTER:

Q. This is a copy of some -- they're just photographs of a screen.

A. Uh-huh.

Q. And I believe it's your cell phone.

A. Yes.

Q. That were taken -- I believe it was from the night of the incident --

A. Yes.

Q. -- when you were interviewed. So the first page is -- let me see if I can make this a little bit smaller. Okay. The first page is -- I believe this appears to be some messages from Max to you around the time he was picking you up; is that right?

A. Yes. Yes.

Q. So starting at the beginning, at the top, "Who you with? Laugh out loud. Do I pretend or just run in to you?" And then you say, "You may" -- I don't know what the F U stands for.

A. I was just trying to say you may have to pay. But because we were in a dark space, I couldn't really --

Q. Okay.

A. It was hard for me to text. Yeah. But I was trying to tell him that he may have to pay to come in.

Q. Okay. And then he said, "They won't let me in. LOL. They said my dick too big. LOL." And then you went, "LOL." And then, "I'm at the entrance. LOL. Hurry, girls trying to talk to me. LOL." And then "We. We." And then "LOL. Save me. LOL. Okay. They are fine. Sorry. Take your time."

And then at the bottom it has Matt Lea and it looks like his contact information. Did you send that to Max?

A. No. I don't remember sending that to Max. No.

Q. Okay.

A. That -- when I was woken up by Max, that was already on my phone.

Q. So do you believe he sent that to himself?

A. Yes.

Q. I see. So when he got into your phone, he sent himself the contact information for Matt Lea?
A. Yes.
Q. Okay. And then I think this is just another -- on page 2 another screenshot or a picture of that screen.
A. Yes.
Q. Looks like the very same thing. And you would agree this is from your phone, right?
A. Yes.
Q. Okay. And these are true and accurate pictures of screenshots from your phone, right?
A. Yes.
Q. Okay. And then there -- it looks like there's a -- this looks like it might be from a different day because it's clearly daylight.
A. Yes.
Q. It says to Damian. Is this a screenshot of you speaking with Damian or texting Damian during the incident?
A. Yes. Yes.
Q. And are those your hands holding the phone?
A. Those are, yes.
Q. Okay. And so at the top it says, "I want to see if he knows his plates. I called Eli to tell him to call Max. Or can see something at the house with his plates."
What did you mean by that? Who are you talking

apartment?
A. Yeah. I believe that would have been very important for them to know.
Q. And then this is page 4. It's some messages between you and Matt. So I'm not going to read this one, but I'd like for you to read it. I think it's very explicit. But can you read it and please confirm that this is an actual message between you and Matt Lea?
A. Yes.
Q. The whole thing?
A. Do you want me to read it out loud?
Q. No.
A. Oh, no --
Q. I want you to read it to yourself.
A. No. I -- I see it and, yes, that's -- that's a conversation between us.
Q. Okay. And do you recall at what point in time you and Matt had had this conversation with each other that, and this is the conversation -- well, let me ask you this. So strike that prior question.
This is the conversation that Max found on your phone before he got so upset, correct?
A. Yes. The --
Q. Okay.
A. Yes.

AFTERNOON SESSION

THE VIDEOGRAPHER: We are back on the record at 12:57 p.m.

EXAMINATION RESUMED

BY MS. CARPENTER:

Q. So, Ms. Sosa --

A. Yes.

Q. -- you gave an interview to police detectives on the night of this incident; is that true?

A. Yes.

Q. And that was shortly after the shooting incident with Max Sosa occurred, correct?

A. Yes.

Q. Have you ever had the opportunity to listen to that police interview?

A. No.

Q. Okay. So I have to apologize because it's quite long, but I think you need to listen to it before I ask you questions about it on the record. Okay?

A. Okay.

Q. So I'm going to go ahead and share my screen and we'll get through as much of it as we can before we take our next break. All right?

A. Okay.

(Recess taken.)

THE VIDEOGRAPHER: This begins media number three in the continuing deposition of Maria Sosa. Today's date is July 28th, 2025. We are back on the record at 1:46 p.m.

(Audio played.)

BY MS. CARPENTER:

Q. Okay. Ms. Sosa?

A. Yes.

Q. Did you recognize your voice in that -- that very lengthy portion of the recorded interview we just listened to?

A. Yes.

Q. And I stopped it around the 1 hour 28 minute mark because I think beyond that they only really discuss the incident outside and then you're informed of his passing. Okay?

A. Yes.

MS. CARPENTER: That will be Exhibit 6.

(Exhibit 6 was marked and attached.)

BY MS. CARPENTER:

Q. And then I have some questions just in follow-up to what you heard. But I do need to ask you: Were the statements that you described and that you provided to the interviewers, those investigators who spoke to you, were they truthful and accurate as far as the information you

provided?

A. Yes.

Q. And were they based upon your personal observations and the things that you saw and that you did leading up to this incident?

A. Yes.

Q. All right. Just give me one second. This next exhibit will be Exhibit 7. And this is just a transcribed -- it's a transcript of the interview we just listened to together. And I'll show you exactly what I'm referring to as I ask these questions. Okay?

A. Okay.

(Exhibit 7 was marked and attached.)

BY MS. CARPENTER:

Q. So here at page 9 on line 339 --

A. Yes.

Q. -- it states, "He struggled a lot. He struggled a lot throughout our relationship. He slowly started talking about some of the trauma he had when he was younger." And, "Um, his parents were divorced. He told me one day that he was raped when he was little when he was living with his mom in a trailer park in Fowler." And then you go on to describe it.

Is that description about the trauma he experienced as a child, is that what you were referring to

Q. So at this point was he drinking more frequently?

A. I -- I wasn't aware of -- to what extent, like, that he was drinking, but he did mention -- excuse me. Sometime after that, maybe a couple months, he did mention that he was starting to drink more and he didn't like that. He felt like it was becoming a problem, so he -- he had stopped or wanted to stop drinking altogether.

Q. Okay. And then on the night of the incident you indicated that he looked like he was intoxicated, but you're not sure when he ingested or drank the alcohol, right?

A. Yes.

Q. All right.

A. That's correct.

Q. And is it correct that he did not ingest or drink the alcohol when he was in your presence?

A. I did not see him drink.

Q. Okay. Okay. So then on page 18, at the top it states:

"He went to his own therapist
through I don't know who, but I
went with my therapist at Family
Therapy.

"Q: So he barely gave it a chance?

"A: Yes. He barely -- yeah. But
he did tell me that his therapist

were together, we weren't, because that was the truth. And, yeah, I just didn't want to talk about it because I know that it had upset him.

Q. Okay. But you were continuing to at least spend time with Matt at some level and engage in physical relations with him, correct?

A. Yeah. I mean, it was more --

Q. Okay.

A. -- just physical for sure.

Q. Okay. But you did -- but Max did not know about that aspect of it or at least that it was continuing to happen --

A. Yeah.

Q. -- until November 4th, right?

A. Right. He did not know.

Q. Okay. And the way he learned of it was through your text messages on your phone, right?

A. Right. Yes.

Q. Okay. Okay. I'm just making sure it's all clear.

Now, here on page 27 at line 1114, you said, "He was threatening to tell the school that basically we were having an affair." So is that an accurate statement?

A. Yes.

Q. Did Max threaten you that he was going to tell the school about the relationship that you had with Matt?

everything visually from that night.
Q. Okay. Do you believe you were intoxicated?
A. At some point in the night, yes.
Q. Okay. And, I mean, just knowing yourself and how you tolerate alcohol, you can say that you felt intoxicated at some point in the night, right?
A. Yes.
Q. Okay. Did you feel intoxicated when he woke you up when -- when you were in bed?
A. No. I just felt dazed, I guess, from just being woken up, not understanding what was happening.
Q. Okay. And then from your phone he texted Matt saying, "I want you to come fuck me. The door is unlocked," correct?
A. Yes. I don't remember. Like I said, yes, the -- everything that you're reading I -- I said. I recognize my voice and everything that I've said. But I was in so much shock that I don't remember specifics and I still don't remember specifics. But what I do remember from that specifically is that I -- I said that he texted Matt because I don't remember texting Matt that.
Q. Okay.
A. So I assumed that it was him that was --
Q. And did --
A. I'm sorry. The timestamp for that was before I

was woken up.
Q. I see. So from that you gathered that at some point before he woke you up that he had done that?
A. Right. Yes.
Q. Okay. And then did you ever have any voice or text communications yourself with Matt that night?
A. No.
Q. Did you ever speak to Matt after this incident?
A. He called me the next day because he had received calls from me at such an early hour in the morning and of a random phone number.
Q. Okay.
A. Yeah.
Q. Did you and Matt continue to have a relationship after this?
A. No.
Q. When was the last time that you spent any -- any time with Matt, just you two?
A. Gosh, I don't know.
Q. Was it before or after the incident date?
A. After. Because we still continued to work.
Q. Okay. But did you spend any time with Matt outside of work --
A. No.
Q. -- after the incident date? Okay.

And then when -- when did -- so when did the situation at work occur that they found out about your out-of-work relationship with Matt?

A. They told me about that sometime in January or February of last year.

Q. Okay. And did you have to go through some sort of an administrative process?

A. Yes.

Q. Okay. Was there like a -- a hearing or something?

A. No.

Q. Okay. Did they allow you to voluntarily leave or did they just fire you?

A. They asked -- I believe, if I remember correctly, they had asked, so they -- but they also let me just finish the year and not rehire me.

Q. Okay. So I'm going to fast-forward to page 65. So down at line 2697, you said, "Um, and that I was just scared and worried because he had made the statement that he wanted to go kill Matt and himself. And when I told Max on the phone that I had called the police, he, uh, made a comment, something like, 'I'm gonna take a cop with me' or 'take a pig with me.'"

Now, when you spoke to Max on the phone, was he driving his Tesla around?

A. Honestly, I -- I don't remember. Like I said,

these are my statements, but I don't remember in details specifically, so I -- I can't answer that question if he was driving or not.

Q. Were you aware on the night of the incident that Max was involved in a pursuit with the police?

A. I want to say at one point -- I don't know if somebody told me or I heard it between the officers, but I -- I do recall something about that.

Q. And do you -- okay. And do you recall the specific statement from Max that you said here in your interview, "I'm gonna take a cop with me" or "take a pig with me," because that's in quotes?

A. Right. Yeah. I -- today I -- I don't remember anything.

Q. But when you told the investigators, were you telling them the truth?

A. Yes. I -- I -- I was in shock. But when the officers came in, I was having so much anxiety and it's like adrenaline took over and I just -- I answered everything as it -- as I remembered from that night. So, yes, everything that I said was from what I remembered that night.

Q. Okay. And then from the way you're describing it, it sounds like the incident was fresher in your mind back then than it is now.

A. Yeah.

Q. Is that accurate?
A. Yes.
Q. Okay. And then on page 66, you also state down here at 2748, you're asked, "I mean, it sounds -- he's -- he's wanting to, you know, suicide by cop, is that what he's describing to you, right" -- or "is what he's describing to you, right?" Answer: "Yeah."
So when you're asked specifically by the investigator whether Max was indicating to you by his statements and his behavior he wanted to commit suicide by cop, there was no question in your mind, right?
A. That's what I felt from his actions, the way that he was just highly emotional.
Q. Okay. You also indicated in your interview that -- when you were asked about what the officers did in response to Max when he came in with the scissors, you said that they were, you know, saying we don't have to do this, you know, it doesn't need to -- you know, this doesn't need to happen or words to this effect. Did you believe that their response to him was appropriate given his -- the level of his -- you know, the level of his emotional -- just where he was at emotionally at that time?
A. No. I mean, they did say that, but I was -- I just kept waiting for the crisis response team to arrive. Having worked in mental health, I -- I -- I know that that's

what they do and so I was waiting for that. So when the officer said that, I -- I remember just keep -- kept waiting to see if a clinician or somebody would show up. That's what I got from -- from him saying that. I just remembered waiting for that to happen.

Q. I see. Is it your -- so are you saying that based on your education that you believe that is what should have happened here?

A. Yes. Well, having worked in mental health, whenever we had a patient in crisis, we would contact law enforcement. And from my understanding, is they have a program in Fresno County that works with law enforcement where they send a clinician to do a crisis evaluation. And I assumed that that's what would be happening.

Q. But you would also agree that your efforts to de-escalate Max were unsuccessful, true?

A. Yes.

Q. And you would agree that the officers -- so there were at least three officers talking and one primary officer talking to Max, trying to de-escalate. That was also not having an effect on his emotions, correct?

A. Right. No, because they kept -- he was just becoming more upset, specifically I remember when one of the officers asked about the girls or something. And I remember speaking to the officer and I told him that we had boys.

And that visibly upset Max even more.

Q. Yeah. And also on -- you also indicated, "They were trying to calm him down. They -- I remember hearing, 'We don't have to do this,' and Max saying something like, 'Yes, we do,' something like that. And then just asking if he was the one that he was talking to."

You also mention that he was, let's see here, you knew what he wanted to do and you said suicide by cop. And then on the following page you said he was just angry. The way he was talking to them was very angry. And then finally you said, when they asked you what he looked like -- so I'm going to read the whole page to you just so that we're on the same page. This is page 79.

A. Okay.

Q. "Was it both officers that were
talking to him and trying to...
"Yeah.
"...reason with him?
"A: Both of them. I know Max
was very upset. He kept saying,
like, 'Are you the motherfucker?'
Or something like that. Like,
the way he was talking to them
was very angry.
"Q: Were the officers talking to

him in an angry way? Sorry?
"A: No.
"Okay. And you're -- you're describing that they were saying, you know, 'We don't have to do this.' He's sayin', 'Yes, we do.' Like, what else do you recall the officers saying?
"A: I don't remember.
"Q: Okay.
"A: I just -- just remember just looking at him and he looked so angry.
"Q: Max?
"A: Like, yeah, he looked determined...
"What do you mean...
"...to do...
"Q: ...by that?
"I don't know. Just -- just, like, he had no fear. Because of the way he was talking to the police officers, like, his body language."
So were those your truthful observations that you

were describing to the officers -- or to the investigators in that statement?

A. Yes.

Q. Okay. And you realize that if someone is armed with a sharp-edged weapon, that that can kill somebody, right?

A. Well, they were just kitchen scissors. I -- like I said --

Q. You realize that kitchen scissors are sharp and that if you use them as a weapon, they can kill someone, right?

A. I honestly don't see how the scissors would have --

MR. LITTLE: I don't think the witness finished her answer. She was interrupted.

MS. CARPENTER: Mr. Little, I don't think that's your client, but thank you.

BY MS. CARPENTER:

Q. Can I have -- I'll ask the question again.

You realize that a pair of scissors is sharp because you use it to cut things, and that if used as a weapon it can kill someone?

A. I don't know if it could, honestly.

Q. Okay. Have you ever cut yourself with scissors?

A. I'm sure, like, a paper -- like a little slice

from scissors cutting paper.
Q. And I will submit to you that there's no clinician that would approach someone -- or law enforcement would not allow a clinician to approach someone who is currently dangerous. That's just not gonna happen. So are you saying that you expected that in the midst of this situation?
A. No. Because I wasn't aware that he had scissors or at one point I assumed that before it escalated to that point they would have --
Q. Okay.
A. -- contacted for a crisis evaluation.
MS. CARPENTER: Okay. I think we'll take another break. Is five minutes or do you need 10 minutes?
THE WITNESS: Five minutes is fine.
MS. CARPENTER: Okay. Thank you so much.
THE VIDEOGRAPHER: We have reached the end of our third media. We are off the record at 3:07 p.m.
(Recess taken.)
THE VIDEOGRAPHER: This begins media number four in the continuing deposition of Maria Sosa. Today's date is July 28, 2025. We are back on the record at 3:14 p.m.
BY MS. CARPENTER:
Q. So, Ms. Sosa, once Max left the apartment and then the officers followed him, you did not see any further action of his toward the officers, correct?

A. Right. I did not.
Q. And then once he left the apartment, you did not see any of the officers' actions towards Max, right?
A. Yes, I did not.
Q. And then based on your interview statement, it sounds like you stayed in the apartment and even in your room while he was receiving medical care afterward; is that true?
A. Yes.
Q. When was the next time that you saw Max after the shooting?
A. I didn't.
Q. Okay. At some point you -- did you -- were you asked to go and identify his remains, like at the coroner's office?
A. No.
Q. Okay. I listened to another interview that was conducted by inter -- or investigators of you after the incident, like a couple of days later, and in that interview you described that members of Max's family basically asked you or said they wanted to have a second autopsy conducted; is that true?
A. Yes.
Q. And did you give them permission for a second autopsy to be conducted?

A. No. What was given to me was the only thing that I knew that was on Max's person that night.
Q. Okay. Prior to the incident date, did you ever have any prior contacts with any of the officers that were involved in the incident, including Officer Ayers, Officer Crockett, Officer Abraham or Officer Aguilar?
A. I had no other contact with any other officers aside from the officer that transported me to the -- to downtown.
Q. Okay. In the time that you knew him, did Max Sosa have any bias or, like, animosity toward law enforcement?
A. No.
Q. Okay. Did he ever make any statements to you that indicated he did not like the police?
A. No.
Q. Okay. Did anyone ever --
A. Everything -- sorry.
Q. Oh, go ahead. I'm sorry.
A. I'm so sorry. I was just going to say that everything from that night was very out of character of him because of his emotional state.
Q. During the time that you knew Max, did he ever engage in any physical fights with a co-worker?
A. No.
Q. Did he ever threaten a co-worker?

A. No.
Q. Was he ever involved in any other lawsuits?
A. No. I mean, I don't know if anything related to the -- his father's business, if there was anything that he was directly involved with legally. I don't know. Like I said, I stopped asking questions about that.
Q. You mentioned in that interview, the really long one we listened to today, that a member of his family had basically signed over rights to a business to avoid any consequence in a divorce. Is that a good summary?
A. That's what Max told me, yes.
Q. Okay. What was the name of that business?
A. I don't remember.
Q. Okay. And did he still have -- was he still the -- the owner of that business, at least on paper, at the time of his death?
A. No. I believe that that business was dissolved and a new business was...
Q. Okay. And he had -- he had incurred or assumed -- in the process of assuming that business, he had also assumed debt associated with the business; is that true?
A. A lot of debt, yes.
Q. And at some -- at one point I think you indicated it was approximately $50,000?
A. I believe it was more than that.

Q. Okay.
A. I will say that although, yes, his name was on it, his dad would make efforts to pay him back. It would just take a long time, which was what was causing a lot of the financial --
Q. Okay.
A. -- stressors.
Q. And which relative was it that had him assume, at least on paper, ownership of the business?
A. His father.
Q. Okay. And so the business ownership, all of the debt associated with the business and any of the legal complications that arose from it, that was as a result of helping his father Maximiliano Sosa, Sr.?
A. Yes.
Q. Okay. But as far as you knew, at the time of his death was that all resolved, at least as far as your husband Max Sosa's, I don't know, liability for it?
A. No. My understanding was that he was still having to deal with that. I -- I believe that they were doing amended returns, which was taking them the longest.
Q. Okay. And at one point his wages were being garnished --
A. Yes.
Q. -- at least according to your statement?

EXAMINATION

BY MR. LITTLE:

Q. Good afternoon, ma'am.

A. Good afternoon.

Q. Based on your familiarity with Max Sosa, Jr., do you believe that he would have insisted in a monogamous committed relationship?

MR. MAYNE: Objection. Calls for speculation.

BY MR. LITTLE:

Q. You can answer still.

A. I'm not really clear on what you're asking.

Q. Based on all of the conversations you had and knowing Max Sosa, Jr. for as many years as you did and from being married to him for as long as you were, do you believe that he would have insisted on a committed monogamous relationship?

A. When we were together, yes, we had a monogamous relationship until the end.

Q. Okay. The separation in February of 2023, that coincided with your beginning to have a relationship with Matt Lea, true?

A. It wasn't the beginning of a relationship. It was more so an intimate relationship. There was never an intention of starting a romantic, like, boyfriend-girlfriend relationship.

I, Gracie E. Becerra, CSR 13136, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn via video conference pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand via video conference and thereafter reduced to text under my direction.

X That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

No changes have been provided by the witness during the period allowed.

The changes made by the witness are appended to the transcript.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 12th day of August, 2025.

Gracie E. Becerra, CSR 13136