# EXHIBIT 25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- oOo --

CERTIFIED COPY

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

vs.

Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

[CONTINUED ON PAGE 2]

VIDEOCONFERENCE VIDEORECORDED DEPOSITION OF MAXIMILIANO SOSA, SR.

Yreka, California
Tuesday, August 5, 2025
10:09 a.m. to 12:21 p.m.

By: Taylor Ann Waltrip, CA CSR 14090
Our File: 8650

FRESNO DEPOSITION REPORTERS, INC.
516 W. SHAW AVENUE, SUITE 111, FRESNO, CALIFORNIA
PO BOX 755 WOODLAKE, CALIFORNIA 93286

A. In Fresno.
Q. And how long have you lived in Fresno?
A. Since '86.
Q. And who lives with you now?
A. My mother and my youngest brother.
Q. And how long have you lived with your mom and your youngest brother?
A. About 15 years.
Q. And have you ever been married, sir?
A. Yes.
Q. And how many times have you been married?
A. Two. Twice.
Q. And who was the first person you married?
A. Martha Zepeda.
Q. Martha Zepeda?
A. Yes.
Q. Is Martha Zepeda the mother of your son, Max -- Maximiliano Sosa, Jr.?
A. Yes.
Q. Okay. And she's also a plaintiff in this case?
A. Yes.
Q. And who was the -- what year did you marry her?
A. In about 9 -- the year '94.
Q. And what -- what year did you split up?
A. In '97.

and I think it's spelled very much the same as Eunice.

THE WITNESS: And then last one is Denice.

BY MS. SORENSEN:

Q. And are any of these children with -- did you have any of these children with Martha Zepeda?

A. Yes. Selise Sosa.

Q. And anybody else? Any of the other children?

A. No.

Q. So Martha is only the mother of Selise Sosa?

A. And Maximiliano Sosa, Jr., as well.

Q. Okay. And then who was the mother of Lucerio Sosa?

A. She's in Mexico.

Q. Okay. And what about Brenda Sosa?

A. Her name is Custodia Mendez.

THE INTERPRETER: The interpreter spells that C-U-S-T-I-O-D-I-A. I'm sorry. Correction. The interpreter spells that C-U-S-T-O-D-I-A Mendez, as common spelling.

BY MS. SORENSEN:

Q. And were you ever married to Brenda's mother?

A. No.

Q. Okay. And then how about the mother of Eunice Sosa?

A. Rut Lopez is the mother of Eunice and Denice.

communicate with with "encounters."

MS. SORENSEN: I think that sounds right. Yeah. And what he described is in general what I was wondering about.

BY MS. SORENSEN:

Q. And when you -- when they would come when the alarm was triggered at your work, what were those -- what were those interactions like with the officers?

A. They would just come to check to see if everything was okay and then they would leave.

Q. Are you currently employed?

A. Yes.

Q. And where do you work?

A. I work for myself.

Q. And what is your business?

A. Diesel mechanic.

Q. And how long have you had that business?

A. Since 2006.

Q. And do you have a business partner?

A. No.

Q. Okay. At some point, did you give that business to Mr. Sosa, Jr.?

A. Yes.

Q. Okay. Now, other than the current lawsuit, have you ever been a party to a civil lawsuit?

MS. SORENSEN: Yes.
THE WITNESS: Yes.
BY MS. SORENSEN:
Q. Now, just to clarify, on the date of the incident, you did not personally observe any of the interaction between Mr. Sosa, Jr., and the Fresno police officers, correct?
A. No.
Q. And so you would not know one way or the other whether Mr. Sosa, Jr., ever complied with any of the commands that any officers were giving him, correct?
A. No. I was not present.
Q. How did you learn about Mr. Sosa, Jr.'s passing?
A. My daughter called me telling me she had been called.
Q. If you know, who informed her?
A. No.
Q. You -- you don't know who told her?
A. No.
Q. And when did she tell you about his passing?
A. She did not tell me that he had passed away; she called me.
Q. And she called you and told you that something had happened to Mr. Sosa, Jr.?
A. She told me that we -- we should go look for him.

A. Yes.
Q. And what were their names?
A. I don't remember, but I do have their business cards saved.
Q. Okay. Did you -- did you receive information from any other -- any other people related to the incident other than your attorney?
A. No.
Q. What happened after the detectives told you that your son had passed away?
A. Nothing.
Q. Did you go anywhere after they told you about Mr. Sosa, Jr., passing away?
A. No.
Q. How long did you stay at the apartments after you were informed of Mr. Sosa's passing?
A. Until he was picked up. 3:00 p.m., 3:30, almost 4:00.
Q. Okay. And you stayed at the apartments for that whole time?
A. Yes.
Q. Did you talk to anyone else on the scene besides the detectives?
A. No.
Q. Now, you were talking about your diesel business

earlier, and you said that you had given the business to Mr. Sosa, Jr., correct?

A. When I recovered the business after it was stolen from me, I -- I put it on his name.

Q. And what year was that?

A. Mid 2014, around there.

Q. Okay. And was your name still on the business?

A. When it was stolen from me, it was under his name.

Q. And only his name?

A. Yes. Yes.

Q. And why -- why did you give the business to Max in 2014?

A. I had given him the business because I was going to go to Mexico.

Q. Were you intending to move back to Mexico?

A. Yes.

Q. And did you move back to Mexico for a period of time?

A. No.

Q. Okay. One second, Counsel.

Sorry about that.

So you said that you did not move to Mexico, correct?

A. Yes. I did not move. I did not leave.

A. Yes.
Q. And do you know how long he worked there?
A. Under a year.
Q. Now, Mr. Sosa, Jr., and the other plaintiff, Maria Sosa, they were separated at the time of the incident, correct?
A. Yes.
Q. To your knowledge, did Mr. Sosa, Jr., and Maria Sosa ever have any child custody disputes?
A. I did not know that. At the time, I didn't know about it.
Q. At the time, you did not know if there was any child custody disputes between them?
A. He had them for a week, and then she had them for a week.
Q. Okay. So from your personal knowledge, Mr. Sosa, Jr., and Maria Sosa shared the children in an amicable way?
A. Yes.
Q. What was your understanding as to why Maria Sosa and your son, Mr. Sosa, Jr., were separated?
A. After she cheated on him.
Q. And do you have any knowledge as to when she cheated on him?
A. January or February of that same year.

Q. And how did you find out that she had cheated on him?
A. He told me.
Q. And did you ever talk to Ms. Sosa -- Maria Sosa about that -- about her cheating on him?
A. No.
Q. To your knowledge, did Mr. Sosa, Jr., own a home?
A. You mean a home or a house?
Q. Did he own -- did he own property?
A. No.
Q. To your knowledge, did he have any assets like a savings account or a retirement account?
A. No.
Q. Did Mr. Sosa, Jr., ever provide you with financial support?
A. No.
Q. In the year leading up to his death, approximately how many times per month would you see Mr. Sosa, Jr., in person?
A. Two, three, or four times a week.
Q. And did he live near by where you live?
A. I live and work in between where he -- where he lived.
Q. And what would you do when you would see each other?

A. He would go help me with jobs. Or -- or we would go out to eat after work.
Q. And where did you go out to eat?
A. Different restaurants that he liked to go to.
Q. I'm talking about on that Thursday before Mr. Sosa, Jr., passed away. Do you recall which restaurant you went to with him?
A. That Thursday, we were just there at the -- at the shop. He picked up something to eat.
Q. Okay. So that particular Thursday, you just spent time together at the shop?
A. Yes.
Q. And approximately how many hours did you spend with him that day?
A. From about 4:00 until about 8:00 p.m.
Q. And you stated earlier that he had helped you with some jobs that you had?
A. Yes.
Q. And you also had a meal together?
A. Yeah. In the evening, for dinner.
Q. And what were your observations of him?
A. Everything norm.
Q. Did he exhibit any signs of mental distress?
A. No.
Q. Did he exhibit any signs of sadness?

A. No.
Q. So everything was just normal with him that day?
A. Yes.
Q. It sounds like your relationship with Max was pretty strong before he died. How would you describe your relationship with him?
A. Unique, I would say. I never had problems with him, between us. Not when he -- not even when he was a child, as an adult, married. No problems with him.
Q. Did you spend -- did you two spend a lot of time together?
A. Yes.
Q. Did you spend a lot of time engaging in particular activities together?
A. On the weekends, we would go camping to the Sierra or to -- to the mountains or to -- or to the ocean.
Q. And how frequently would you go on those camping trips with him?
A. Two or three times a year.
Q. Did Mr. Sosa, Jr., ever bring his boys on those camping trips?
A. Yes. Whenever we would go to the river. Whenever we would go out to eat, he always had them with him.
Q. Did anyone else go on those camping trips with

A. No. I knew it through other sources, other people.

Q. And were those other people other family members?

A. No. Friends of hers that knew her.

Q. And they told you that Maria Sosa did not want your son to spend time with you and -- and his family?

A. Yes. She never liked that.

Q. Did you -- did you ever get along with Maria Sosa at any point that you knew her?

A. No. Because she did not like spending time with the family.

Q. And how did you know that she didn't like to spend time with the family?

A. When he would come with -- by himself with the kids and she wouldn't come.

MS. SORENSEN: Okay. I don't have anything else at this time.

MR. LERMAN: No questions on my end. Thank you.

MR. LITTLE: I just have a few things that I wanted to clarify.

EXAMINATION

BY MR. LITTLE:

Q. Mr. Sosa, you answered earlier that your son wasn't supporting you financially at the time he died, but

he was helping you in business that you use to support yourself; is that correct?

A. Yes.

Q. And who were you planning on having take over your business when you got too old to work?

A. He was my beneficiary.

Q. And were you relying on your business to help you support yourself after you retired?

A. Yes.

MR. LITTLE: That's all I have. Thank you, sir.

MS. SORENSEN: I don't have any follow up to that.

THE VIDEO OPERATOR: All right. This the videographer here. Does anybody want the recordings or copies of the recordings Besides Lynn?

Can you guys hear me?

MR. LITTLE: Oh, I'm sorry.

Yeah, I don't need the video. My only request would be that the review copy that Mr. Sosa will review be e-mailed to my office.

THE VIDEO OPERATOR: Okay. All right. And I will have -- I will make a note of that. And you are Nick Lerman.

MR. LITTLE: No, I am not. I'd be a lot younger if I were. I am Kevin Little.

THE VIDEO OPERATOR: Sorry. I'll make a note of

I, Taylor Ann Waltrip, CSR 14090, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a rtue record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein names and thereafter reduced to text under my direction.

__X__ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

_____ No changes have been provided by the witness during the period allowed.

_____ The changes made by the witness are appended to the transcript.

_____ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 9th day of August, 2025.

Taylor Ann Waltrip

__________________________________________
Taylor Ann Waltrip, CSR 14090