# EXHIBIT 26

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.

________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JOHN AYERS

WEDNESDAY, APRIL 22, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24521

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Said Hofiani, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: JOHN AYERS

EXAMINATION BY PAGE

MR. MAYNE............................6, 81

MR. LITTLE.............................59

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 1 - Statement...............................89

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 22nd day of April, 2026, commencing at the hour of 10:02 a.m., thereof, JOHN AYERS, appeared remotely in Fresno, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good morning. We're on record at 10:02 a.m. Today's date is April 22nd, 2026. This is the recorded remote video deposition of John Ayers, in the matter of Sosa versus City of Fresno, et al. Case number 1:23-cv-01575-DLT-SAB.

This deposition is being held via web conference. My name is Said Hofiani. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will state her CSR license number and swear in the witness.

MR. MAYNE: Good morning. I'm Cooper Mayne,

BY MR. MAYNE:
Q. And what was your job after you left your position at Fresno?
A. I worked for the Amazon delivery service partner in Texas.
Q. Any other jobs between when you left your work with Fresno and now, other than the position with Amazon?
A. When I moved back, I got hired with Amazon. And right now, I currently work for the Sanger Police Department.
Q. Can you spell that?
A. Yeah. It is S-A-N- as in "north," G-E-R.
Q. Sanger.
How long have you been working for the Sanger Police Department?
A. Since December of 2025.
Q. Starting from the beginning of your training to be a police officer, did you receive any specific training about suicide by cop?
A. All of my training in the basic academy and the FTO and in-service training, and training during briefings, have been related to that kind of situation and incident in the past.
Q. So there was training on it in the academy?

A. Yes.
Q. And then there was also training on it once you were out of the academy, working for Fresno PD?
A. Yes.
Q. Did you receive any Crisis Intervention Team certification?
A. No certification.
Q. Did you receive any specific training about crisis intervention?
A. When I was in the basic academy, which is six months, field training, in-service, and also during briefings, we discussed crisis negotiation, when it comes to that kind of training.
Q. Do you know if your department had Crisis Intervention Team -- a Crisis Intervention Team available that officers could call, if necessary?
MS. O'LINN: Objection.
Counsel, do you mean the particular night of the incident or in general?
Scope.
MR. MAYNE: We can start with in general.
BY MR. MAYNE:
Q. Taking your mind back to the time of the incident, was that a service that was available? Could you guys call -- call in a team that specialized in

crisis intervention?
A. I'm sorry. I'm still a little confused as to the question. Do you mean in general?
Q. Yeah. So at the time of the incident, did the Fresno Police Department have a Crisis Intervention Team?
A. Yes.
Q. And on the specific date of this incident -- date and time of this incident, was that Crisis Intervention Team ever called?
A. I believe they were asked for on the radio.
Q. Did they ever respond to the scene?
A. Not to my knowledge.
Q. Do you know if they responded to the request for their services in any way?
A. Not to my knowledge.
Q. Do you know who called for the Crisis Intervention Team?
A. I do not recall.
Q. Have -- in your experience at the FPD, before the date of this incident, had you been part of any call that involved the Crisis Intervention Team?
A. Yes.
Q. About how many?
A. Approximately, two to three.

Q. Could you describe the nature of those calls?
A. Normally, the nature of the calls would be somebody barricaded, not mobile.
Q. Did any of the calls involve a suicide-by-cop situation?
MS. O'LINN: Objection. Calls for speculation. To the extent you know.
THE WITNESS: To the extent that I know, none of them ended that way.
BY MR. MAYNE:
Q. Did any of them involve a suicidal individual?
MS. O'LINN: If you know. Don't guess.
THE WITNESS: Not -- not that I recall.
BY MR. MAYNE:
Q. Were you trained that deadly force is the highest level of force an officer can use?
A. Yes.
Q. Would you -- were you trained that deadly force should only be used when there reasonably appears to be an immediate or imminent threat of death or serious bodily injury?
A. Yes.
Q. Were you trained that if that threshold is not met, you should not use deadly force?
A. Yes.

subjects and how we would handle them in, like, tactical ways.

Q. Could you describe some of the -- the key parts of your training about suicide-by-cop situations?

MS. O'LINN: Objection. Vague. Overbroad.

BY MR. MAYNE:

Q. When you were trained about suicide-by-cop situations, what were you trained is the goal of resolving a situation like that?

A. To try and deescalate, using a calm tone, reassuring them, offering assistance.

Q. Is the goal to resolve the situation without anybody being hurt?

A. Yes.

Q. Did your training cover the concept of "officer-created jeopardy"?

A. Yes.

Q. Could you give an example of that, just so -- to give it some clarity? What would be an example of that?

A. Where an officer puts himself in the position that forces him to use some kind of force that may not be justifiable.

Q. And were you trained to try to avoid doing that?

A. Sounds correct.
Q. Did you eventually get to speak with the reporting party, Maria Sosa?
A. When I first arrived on scene, I spoke with her.
Q. And did that help you conclude that this was not a domestic violence call?
A. At the time, yes.
Q. Did you see any injuries on Maria Sosa's body?
A. No.
Q. At what point did you first learn that Mr. Sosa may have been armed with scissors?
A. When he showed up at the door.
Q. Prior to the date of this incident, did you have any personal experience with scissors being used as a weapon?
A. Not that I recall.
Q. Have you ever seen somebody be physically injured by scissors?
MS. O'LINN: Objection, Counsel. Vague and ambiguous.
In person? I'm sorry.
BY MR. MAYNE:
Q. Have you ever personally observed somebody hurt by scissors, by being attacked by scissors?

BY MR. MAYNE:

Q. When did you first learn that Mr. Sosa was -- had arrived at the apartment?

A. We heard a car door, and we went to check.

Q. So when you heard the car door, and you realized Mr. Sosa was at the apartment; is that correct?

MS. O'LINN: Objection. Argumentative. Misstates the testimony of the witness.

You can explain.

THE WITNESS: So when we heard the car door, we didn't know for a fact if it was him or not, so we went to check.

BY MR. MAYNE:

Q. Did you think there was a probability that it was him?

MS. O'LINN: Objection. Calls for speculation. Argumentative.

You can explain.

THE WITNESS: A possibility.

BY MR. MAYNE:

Q. How likely did you think that it was Mr. Sosa?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: A decent probability, I would say.

BY MR. MAYNE:

Q. When -- who opened the door after you decided to go check who was outside?

A. Officer Abraham.

Q. And when the door was open and you saw Mr. Sosa, were you surprised that it was him?

A. Yes.

Q. In the time that you were in the apartment with Mr. Sosa -- well, first of all, about how much time do you think that was?

MS. O'LINN: Objection. Vague.

Do you understand the question?

THE WITNESS: Yes.

MS. O'LINN: Go ahead.

THE WITNESS: Approximately, five to six minutes.

BY MR. MAYNE:

Q. And so let's start -- to help keep this organized, let's start from the beginning.

When Officer Abraham opened the door, what happened next?

A. When Officer Abraham opened door, we saw the subject, Max, with scissors in his right hand, and he said, "Are you ready for this?", and was still walking towards us.

Q. And where did you go, after that?
A. I backed into the living room.
Q. And where did Officer Abraham go?
A. He backed into the hallway.
Q. And then, where did Mr. Sosa go?
A. He walked in the front door and was and pacing in front of the kitchen, back and forth.
Q. And did you maintain those relative positions for some time?
A. Yes.
Q. About how far from Officer Abraham was Mr. Sosa?
MS. O'LINN: Objection. Vague as to time.
It also wasn't a static event, so please be specific.
BY MR. MAYNE:
Q. I understand from what you were saying that Mr. Sosa was moving back and forth, to some extent. At his closest, how close do you think he got to Officer Abraham?
MS. O'LINN: At any point in time, up to the shooting, Counsel?
BY MR. MAYNE:
Q. I'm talking about while you were in the room with Mr. Sosa. How close do you think Mr. Sosa got to

Officer Abraham, at his closest?

MS. O'LINN: At any point, inside the apartment.

THE WITNESS: Okay. Speaking -- well, from my perspective, I would probably say about a foot to foot and a half was the closest that he got to Officer Abraham in the apartment.

Q. And at that time, did he have scissors in his hands?

A. Yes.

Q. But you did not believe he posed an imminent threat of severe bodily injury or death at that time; is that correct?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: Maximilian had already been driving under the influence. He tried to strike an officer with his patrol vehicle. He led officers on multiple high-speed pursuits that put the public in danger, as well. So I would say during this whole incident, I would have considered him to be a high threat of great serious bodily injury or death.

BY MR. MAYNE:

Q. So my question was a little different from that. That moment -- there was a time you described

when he was one to one and a half feet away from Officer Abraham. And I was just asking at that moment, did he pose an immediate threat of death or severe bodily injury to Officer Abraham, in your view?

A. Yes.

Q. In your statement, you said that Mr. Sosa took one or two steps towards you and the other officer, but that it never raised to the level of justifying deadly force. Is that right?

A. Yeah, I believe so.

Q. So I guess using that phrasing that you used in your statement, would it be accurate to say when he was one to one and a half feet away from Officer Abraham, the situation wasn't such that it would justify the use of lethal force?

MS. O'LINN: Objection. Asked and answered.

You can answer.

THE WITNESS: I would say that it probably would have still been justified. We were -- we just -- we didn't want -- we didn't wanted to, you know. We didn't want to have to.

(Reporter clarification.)

MS. O'LINN: Counsel, when you're ready, we'll take our first break.

MR. MAYNE: Okay. Great. Let me just ask one

A. Well, I'm not -- I'm not a certified crisis negotiator.
Q. And why did you believe this situation, in particular, required that sort of training?
MS. O'LINN: Objection. Argumentative as phrased as to "required."
You can respond.
THE WITNESS: Crisis negotiators typically have more tools, more in depth, advanced training, to be able to speak to individuals going through crisis.
BY MR. MAYNE:
Q. What kind of tools or training?
A. I'm not a certified crisis negotiator.
Q. Did you try to call Sergeant Oliver on the date of the incident, before the shooting occurred?
A. I did.
Q. How many times?
A. I called him once after I spoke to Maria, and then, I believe, twice during the incident.
Q. Did you also try to contact him over the radio?
A. I did.
Q. Before the shooting, were you able to reach Sergeant Oliver?
A. I was not.
Q. Why were you calling Sergeant Oliver?

A. Sergeants are typically the ones that we go through to get different resources.

Q. Were you calling him so that he could send a crisis negotiator?

A. If he believed that was going to be necessary.

Q. In your statement, you said you were "trying to reach Sergeant Oliver so he could possibly send a crisis negotiator or something to try to talk to this guy."

Is that still accurate, to your understanding, now?

A. Yes.

Q. Taking you back to where you and Officer Abraham, in the minutes before Mr. Sosa arrived at the apartment, was one of you the senior officer at the scene or had some kind more authority; or were you both equals?

A. We had different badge numbers. I guess that's what seniority would be, but equal patrol officers.

Q. Was one of you the primary on this call?

A. Yes.

Q. Who was the primary?

A. I was.

Q. As the primary, do you have any different responsibilities from another officer at the scene, or is it -- or do you have similar responsibilities?

A. No.
Q. Did you ever consider keeping the door closed?
A. No.
Q. Would Mr. Silva have been able to pose an immediate threat of death or severe bodily injury if the door had remained closed?
MS. O'LINN: Objection. Argumentative as phrased, assumes facts not in evidence, and incomplete hypothetical.
You can respond.
THE WITNESS: Mr. Sosa would, I would say, be a threat, not only to the officers that are there, but the other officers that would be responding to the apartment complex, and also any other civilians that might have been leaving their apartment, due to the previous threats that he had already made; his reckless driving, which showed no care for the public and other people on the road; and him trying to run over one of our police officers.
BY MR. MAYNE:
Q. With the door closed, do you think he could have posed an immediate threat of death or severe bodily injury to you, Officer Abraham, or Ms. Sosa?
A. With the door closed, no.
Q. Did you consider verifying the identity of the

Q. After Mr. Sosa came out of the apartment, but before he was Tased, could you describe your memory of what he did?
A. Yeah. He was following us out of the apartment.
Q. Was he walking?
A. Yes.
Q. Before he was Tased, did he charge at anybody?
A. Prior to him being Tased, if we're looking at the totality of the circumstances, earlier in the night, he had already been driving under the influence. He tried to run over a police officer. He went on several high-speed pursuits.
He threatened me on the phone, threatened other officers, and showed up at the apartment with scissors in his hand, which show a -- a timeline of aggressive and assaultive behavior.
Q. When Mr. Sosa left the apartment, but before he was Tased, in your view, was he an immediate threat of death or severe bodily injury to officers or anybody else?
A. Yes.
Q. So as he was leaving the apartment, but before he was Tased, you believe lethal force was justified?
A. I'm sorry. Can you rephrase that?

Q. So I'm talking about the limited time from when Mr. Sosa leaves the apartment and you described him as walking out of the apartment; but that time up until when he's Tased, did he pose an immediate threat of death or severe bodily injury to anybody?
A. Yes. He was still armed with the scissors.
Q. So was lethal force justified during that time?
A. "Justified"? As long as you can articulate it, I --
MS. O'LINN: You can explain.
THE WITNESS: So based on the history and everything, and then him following us out and already showing aggressive and assaultive behavior, I would say, my opinion, it would have been justified.
BY MR. MAYNE:
Q. Why did you choose not to shoot during that period of time?
A. We had already tried multiple different de-escalation techniques. And then using a moderate-force option instead of deadly force was something that we wanted to be able to do to get the situation under control and to safely apprehend Maximiliano, instead of having to use that force. So any chance to possibly avoid it is what we did.
Q. So I'm just trying to understand. You thought

he posed an immediate threat of death or severe bodily injury to one of your officers, one of whom was a good friend of yours, but you chose not to shoot. I'm trying to understand why.

MS. O'LINN: Objection as to the lead-in, as to facts, foundational facts not stated in evidence.

But you can answer.

THE WITNESS: We did not shoot him because we were trying to use de-escalation tactics, such as talking to him, speaking to him, and we did not want to have to use deadly force.

BY MR. MAYNE:

Q. So in the situation where he's outside the apartment and he's walking towards the officers, you're saying lethal force would have been justified. How is that different from earlier when he's inside the apartment and he's taking steps towards Officers -- Officer Abraham; but in that case, lethal force, you said, was -- would not have been justified. What's the difference?

MS. O'LINN: Objection. Misstates the testimony of the witness.

I believe he said "they chose not to." Well, the record speaks for itself.

Go ahead.

THE WITNESS: I don't understand the question. I'm sorry.

MS. O'LINN: That's okay.

BY MR. LITTLE:

Q. But you would agree, clear communication is important in a crisis situation?

MS. O'LINN: Objection. Asked and answered.

You can answer, again.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. All right. And at the time of this incident, I'm assuming you were aware that the law had changed, where you were supposed to use the least intrusive level of force that was reasonable under the circumstances?

MS. O'LINN: Objection. Argumentative. Misstates the law. Calls for a legal conclusion as to "least intrusive." Misstates the law, frankly.

You can answer, if you know.

THE WITNESS: I -- I don't know.

BY MR. LITTLE:

Q. Was it your goal to use the least damaging level of force in this situation that was reasonable?

A. My goal was to try to de-escalate the situation without anybody being injured.

Q. Okay. So would you also agree that the force

that -- the reasonableness of force is based on what's going on in the moment; right? Not what someone may have done five minutes go, ten minutes ago; true?

MS. O'LINN: Objection. Incomplete hypothetical. Argumentative as phrased.

You can answer.

THE WITNESS: I would say the totality of the circumstances definitely plays a part into the use of force. Going back to him driving under the influence, trying to run over a police officer already, getting into multiple pursuits, causing a danger to the public.

(Reporter clarification.)

THE WITNESS: He was trying to run over a police officer. He had threatened me, individually, and other officers, when I was on the phone with him, saying specifically it was going to be either his life, the guy that Maria was seeing's life, or one our lives.

Based on -- and then he showed up at the apartment with scissors in his hand. So far, based on the assaultive and hostile behavior, that can all play a part into use of force, as well.

BY MR. LITTLE:

Q. Okay. Are you trained that force has to be reasonable based on the circumstances confronting you at the very moment you use force?

MS. O'LINN: Objection. Misstates the law. I am positive you are aware of Barnes. So calls for a legal conclusion on the part of this witness.

You can answer.

THE WITNESS: I would say that what is going on at the exact moment definitely plays a big part in it; but still, you have to look at the totality of the circumstances, such as him driving under the influence, trying to run over a police officer --

(Reporter clarification.)

THE WITNESS: -- leading officers on multiple pursuits that endanger the public, threatening me, individually, threatening other officers while speaking to them on the phone, and then showing up to the apartment armed with scissors, after expressing those direct threats, still all play a very big role in the incident.

BY MR. LITTLE:

Q. Okay. But you're trained that the use of force -- and I don't want to get into an argument with you. You're trained that it has to be justified at the moment you use it?

MS. O'LINN: Objection, Counsel. Misstates the law. Asked and answered.

You can answer, again.

Q. Okay. Well, in the two or three minutes before the shooting incident, Mr. Sosa was in the vicinity of the kitchen counter and sink area; right?
A. Yes.
Q. And the counter in the apartment was such that Mr. Sosa would have had to walk all the way around it to get back to the exit of the apartment; true?
MS. O'LINN: Objection. Argumentative as phrased as to "all the way around it."
You can answer.
THE WITNESS: Yes.
BY MR. LITTLE:
Q. So there was an opportunity when Mr. Sosa was on the other side of the apartment, on the other side of the kitchen counter, where Ms. Sosa could have been asked to leave?
MS. O'LINN: Objection. Argumentative as to "opportunity."
You can answer.
THE WITNESS: At that time when she went into the kitchen -- or when he went to the kitchen, she was asked to leave by Officer Abraham. That is also when he gestured for us to go.
BY MR. LITTLE:
Q. You're talking about the same occasion where

Q. And you have not only your academy training, but your continuing training after you become an officer that reinforced that; true?

A. Yes.

Q. And you were also taught, as part of your training, that there were -- and again, I'm asking about your training. I know you are not a lawyer; but you were trained that there were cases that said that you couldn't shoot someone just because he has knife or a gun in his possession?

A. Yes.

Q. So if I'm understanding your responses to Mr. Mayne's questions, when Mr. Sosa got outside of the apartment and started walking with the scissors, you believe that deadly force was appropriate at that point?

MS. O'LINN: Objection. Misstates the testimony.

He said it would be justified.

You can answer.

THE WITNESS: I did believe it would be justified, based on the totality of the circumstances. From the very beginning, him leaving the apartment, driving under the influence, trying to run over a police officer, leading officers on multiple pursuits at high speeds through the city, causing a danger to the public,

the phone calls, the threats that he made directly to me, individually, and to other officers.

And then showing up at the apartment with the scissors, shows an intent to follow through with the threats.

BY MR. LITTLE:

Q. Would you agree that neither you nor any other officer on the scene gave Mr. Sosa any clear communication about either whether to exit the apartment or what to do if he exited the apartment?

A. I don't believe so.

Q. So -- and we had some double negatives in there, and I just want to clarify it.

So there was never any clear communication to Mr. Sosa about whether or not to leave the apartment or what to do if he left the apartment?

MS. O'LINN: Counsel, argumentative, and lack of foundation as to the facts that were occurring at that time --

(Simultaneous speakers.)

MR. LITTLE: Okay. All right. Let's -- let's the officer testify.

BY MR. LITTLE:

Q. So I just want to clarify what you have already said, but I just want to make it clear for the record,

MS. O'LINN: Objection. Argumentative as to "needed" versus an opportunity.

You can answer.

MR. LITTLE: Let's let the witness answer.

THE WITNESS: It would have definitely been beneficial to have a CNT. I called Sergeant Oliver to see if he would try to get ahold of one; but, also to see what other resources Sergeant Oliver possibly would have wanted to deploy, if any.

MR. LITTLE: All right. Thank you, sir. I'm going to try to keep my promise and that will be my last question, and I'll give these five minutes to everyone else. Thank you.

THE WITNESS: Thank you, sir.

MS. O'LINN: Mr. Mayne?

FURTHER EXAMINATION

BY MR. MAYNE:

Q. Yes. Just a couple quick things. I'm going to try to share your statement, which we'll call an exhibit. We'll call it Exhibit 1.

(Exhibit Number 1 was marked.)

BY MR. MAYNE:

Q. Can you see the document that I have shared?

A. Yes.

Q. Can you see a document on the screen?

deadly force, but not warranted?

A. Yes.

Q. Okay. The last question was how far away from Officer Crockett was Mr. Sosa, when you fired your weapon?

A. It happened so fast. Approximately, less than a foot.

Q. Who was Mr. Sosa directing his movement towards at the time you fired?

A. Officer Crockett.

MS. O'LINN: Never believe a lawyer when they say they have one more question.

But, Counsel, are you done?

MR. MAYNE: Yeah, I am done.

MS. O'LINN: Mr. Little, I presume you're done?

MR. LITTLE: I don't have anything else. Thank you, sir.

MS. O'LINN: I have no questions.

THE VIDEOGRAPHER: Kimberly, would you like to get copy orders on the record?

THE CERTIFIED STENOGRAPHER: Yes, one moment.

Ms. O'Linn, are you ordering a copy?

MS. O'LINN: Yes. We'll take a full transcript, with a condensed and index. Please make sure you include my secretary, Delia Flores, on all

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of May, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR