# EXHIBIT 27

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JONATHAN ABRAHAM

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

Jonathan Abraham

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

NICHOLAS MILES LERMAN, ESQ.
6033 West Century Blvd., Ste 740
Los Angeles, CA 90045
nmlerman0@yahoo.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Officer Anthony Aguilar
Ms. Zepeda Olivares
Mr. Sosa, Senior
Jasmine Tanoury, Paralegal

Karen Torres-Corona, Videographer

--oOo--

# INDEX OF EXAMINATION

WITNESS: JONATHAN ABRAHAM


EXAMINATION BY PAGE

MR. MAYNE................................5

MR. LITTLE..............................65


## EXHIBITS FOR REFERENCE


EXHIBIT DESCRIPTION PAGE

3 - Video excerpt, Bates No. 690.................61


--oOo--

--oOo--

BE IT REMEMBERED, that set on Thursday, the 23rd day of April, 2026, commencing at the hour of 10:02 a.m., thereof, JONATHAN ABRAHAM appeared remotely in Fresno, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good morning. We are on the record at 10:01 a.m. Today's date is April 23rd, 2026. This is the recorded remote video deposition of Jonathan Abraham, in the matter of Sosa versus City of Fresno, et al.

This deposition is being held via Zoom. My name is Karen Torres-Corona. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will swear in the witness.

MR. MAYNE: Good morning. I'm Cooper Mayne.

I'm one of the attorneys for the plaintiffs in this case.

MR. LITTLE: Good morning. My name is Kevin Little. I'm also one of the plaintiff's attorneys. In attendance, as well, are my two clients, Marta Zepeda Olivares and Maximiliano Sosa, Senior. And also present from my office assisting me on this case is Paralegal Jasmine Tanoury.

MS. O'LINN: Good morning. Mildred O'Linn, on behalf of the defendants in this matter. I'm with Manning and Cass. Present, as well, is Defendant Officer Anthony Aguilar.

And further clarification, this deposition should be double captioned with the related case of Olivares.

(Whereby the oath was administered to the deponent by the Certified Shorthand Reporter.)

THE WITNESS: I do.

EXAMINATION

BY MR. MAYNE:

Q. Good morning, Officer Abraham. I'm Cooper Mayne, as you heard, one of the attorneys for the plaintiffs in this case.

Have you ever had your deposition taken before?

A. No, sir.

So is the reason that one officer would use non-lethal force and the other use lethal force, is the goal of that to try to resolve that situation without having to use lethal force?

A. Yes.

MS. O'LINN: I think the word "formation" throws him off, Counsel, because I don't think they use that term with regard to non-lethal cover. I'm not positive, but I think that's the issue.

BY MR. MAYNE:

Q. Were you trained that deadly force is the highest level of force an officer can use?

A. Well, the level of force use is objectively reasonable under the totality of the circumstances, sir.

Q. But is deadly force the highest level of force?

A. I'm sorry. Can you repeat that question?

Q. Were you trained that deadly force is the highest level of force?

A. Yes.

Q. Were you trained that deadly force should only be used when there is an immediate or imminent threat of death or serious bodily injury?

A. Yes.

Q. Were you trained if that threshold is not met, you should not use lethal force?

calls and remaining calm, to the best of the ability.

Q. Could you describe the training you've had related to responding to persons in mental health crisis?

A. Yeah. The training we received is from the academy, the six-month academy. The FTO experience, which is another six months. And then our in-service days as a solo officer. And then, of course, our day-to-day briefings we're trained in responding to those scenarios.

Q. Is some of the training classroom-based?

A. Within the basic academy, yes.

Q. What kind of materials were used; like, PowerPoints? Videos? That's what I'm asking about.

A. Yes. There -- it shows forms, like textbooks, the videos, and other examples, yes.

Q. What about outside of the academy? What -- did any of the training take place in a classroom setting?

A. I'm sorry. Can you repeat that?

Q. After the academy, did any of the training on responding to suspects in a mental crisis take place in a classroom setting?

MS. O'LINN: Lectures.

THE WITNESS: Yes. In our day-to-day briefings. And then we also have something called

you to the Dante Apartment complex?
A. It was a suicidal subject. He was possibly -- and he was possibly drunk driving.
Q. The term "zero priority" came up in -- in your entire with the Homicide detectives. Is that the lowest priority a call can be when it's zero, zero priority?
A. No, sir. It's the highest priority.
Q. It's good that I asked that, then.
How many levels of priority are there?
A. They stem from zero priority to 7 priority, to 8 priority and telephonic calls.
Q. When did you first learn that Mr. Sosa was in possession of scissors?
A. I don't understand the question, sir.
Q. At some point did you learn that Mr. Sosa had scissors in his hand?
A. I'm sorry. Can you rephrase the question, sir?
Q. Yes. I --
MS. O'LINN: Did you at some point --
(Simultaneous speakers.)
MS. O'LINN: You need to keep your voice up, Mr. Mayne, Counsel. If you could keep your voice up, please.
BY MR. MAYNE:
Q. Okay. On the date of the incident, Mr. Sosa

was armed with scissors at some point; is that right?
A. Yes.
Q. When did you first learn that he was armed with scissors?
A. When he arrived back at the location, sir.
Q. So --
MS. O'LINN: Counsel, if I could just comment. Your voice is dropping towards the end of your question. So I don't know that he heard the word "scissors." I think it's just dropping off.
BY MR. MAYNE:
Q. Officer Abraham, you know that you can tell me if you don't understand my question; right?
A. Yes, sir.
MR. MAYNE: Okay. Ms. O'Linn, I think he gets that. He can ask me if he can't hear my question.
MS. O'LINN: When he didn't understand the scissors question, I think that's what happened. So, thank you.
BY MR. MAYNE:
Q. Did you have any information before that, indicating that Mr. Sosa was armed with any type of weapon?
A. Yes, we received some information.
Q. That he was armed with a weapon?

cover officer play into, you know, how -- which officer takes which role?

A. Depending on the circumstance, no.

Q. Okay. So you're not trained that, for example, when -- when you have a contact officer and cover officer, and the situation calls for non-lethal, that the contact officer is the one who should use the non-lethal weapon, and the cover officer should cover him with lethal? That's not part of your training?

MS. O'LINN: Explicitly.

THE WITNESS: I would have to say part of our training, we read the need for the scenario and the circumstance.

BY MR. MAYNE:

Q. Okay. I'll -- I'll move on.

In the several minutes before Mr. Sosa arrived at the apartment, was it your understanding that there was a high probability that he would be coming to the apartment?

A. Yes.

Q. And at some point, moments before you opened the door, did you hear a door closing?

A. Yes.

Q. Did you hear any sirens at that point?

A. No, sir.

possibly drunk driving; he tried striking one of my officers that came inches away from him. He fled. He evaded police.

He ran through stop signs. He ran -- he disregarded the public safety. He was driving recklessly. He kept -- he made repeated attempts of coming back to the apartment.

I think -- I believe it was at least three pursuits. And then, overall, even when Officer Ayers is on the phone, he was making direct threats to Officer Ayers and to the male subject. I believe Mrs. Sosa was seen, so there was still a threat of him coming back.

Q. And when you did open the door, how far away was Mr. Sosa from you?

A. I remember opening the door, standing at the threshold. He was walking -- he was quickly walking toward me, I would say from my chest to his chest, about 1 to 2 yards away, but he was still closing in on me.

MS. O'LINN: Will you let me know when you're ready to take our first break?

MR. MAYNE: Sure. I didn't hear that, Ms. O'Linn. You said you want to take a break?

MS. O'LINN: I said let us know when we can take our first break.

MR. MAYNE: Well, I was saying earlier if you

Jonathan Abraham

death or severe bodily injury through the door, given that he only had scissors in his hands?

MS. O'LINN: Objection. Incomplete hypothetical. Calls for speculation.

If you know.

THE WITNESS: I don't understand the question, sir.

BY MR. MAYNE:

Q. Could -- do you think that Mr. Sosa could pose a serious threat of death or severe bodily injury through a door, if somebody was on the other side of a door?

A. In this circumstance, yes.

Q. How is that?

A. Because with that door, he still had the aggressive, erratic behavior. He still had the propensity of violence. He had -- he tried striking my officers. He was recklessly driving.

He was evading police. He was running through stop signs. Running through stop lights. He threatened an officer through a door with a scissor in hand. He could have -- with his size, his strength, and determination, he could easily kick that door down, especially with the pair of scissors still in his hand.

Q. But given that your plan at one point, you were

Q. Could you describe what that means and what the training is on that concept?

A. Usually, whenever we have more of a bigger distance, it gives us more time, more feasible resources, any available resources and time and reactions that could safely be conducted. And then with that time, we're able to later formulate a plan, as compared to a threat in front of everyone else.

Q. So generally, according to your training, is time on your side? If you can extend the time of an encounter, there's a higher likelihood of a better outcome?

MS. O'LINN: Objection. Vague. Ambiguous. Incomplete hypothetical. Argumentative as phrased.

You can explain.

THE WITNESS: Well, based on the training that I received, it's -- it -- it depends on the circumstances, sir. With time, it could be -- it could be on our side, yes.

BY MR. MAYNE:

Q. When Mr. Sosa entered the apartment, could you describe -- well, just take me chronologically through when he got to the door and then -- let's just say, what did he do next?

A. So after I opened the door and I realized he

was there, he -- he punched out with the scissors and saying, "Hey, are you ready for this?"

I reacted by, "Hey, bro, you don't want to do this," and I retreated back into the apartment to create that distance, that option, that time available.

And then as soon as he went through the threshold of the -- of the apartment, he directed his attention to Officer Ayers and Ms. Sosa.

I remember even Mrs. Sosa saying, "Max, stop. Max, stop," but he just -- he just wasn't stopping. He continue to yell. He continued to bounce his attention from me, Ayers -- or Officer Ayers, and Mrs. Sosa.

Q. Did you consider closing the door at any point after you had opened it and before he entered the apartment?

A. No, sir.

Q. Was there any specific reason why closing the door was not feasible?

A. It wasn't feasible because, after I opened the door, one second later, he was already advancing toward me, really fast. He was walking toward me, really fast.

He had a very long -- he had very long arms. He appeared very tall. He had the look in his eye --

(Reporter clarification.)

THE WITNESS: He had -- he a had very -- like, a certain look in his eye, looking directly at me. He was closing in on me about 1 or 2 yards and enclosing. And with him punching out the scissors, it was -- I just I didn't have the time to close that door safely.

BY MR. MAYNE:

Q. If you had had the time to close the door safely, would you have done that?

A. I mean, at this time, I would have not known, because at that time, he continued to advance toward me. That was the only option at that time, is to retreat backwards.

Q. But if closing the door were an option, if you had time to close it, would you have done that to make sure that you're putting cover between you and a subject with a metal weapon?

MS. O'LINN: Objection. Calls for speculation.

You can answer again.

THE WITNESS: At that time, it's still -- I would have not known had I done that, because that's a different scenario. That's a different circumstance. In this circumstance, he was still advancing toward me with the pair of scissors, still punching out, and he -- he still advanced toward me, walking very fast.

BY MR. MAYNE:

Q. So even if you had plenty of time to close the door, you -- you would have left it open?

MS. O'LINN: Objection. Calls for speculation on the part of the witness. Asked and answered.

You can answer again.

THE WITNESS: That wasn't the circumstance, sir. I would have -- even if that circumstance were to appear, I don't know what I would have done. Because at that time, he still had the pair of scissors. He still advanced toward me. He still presented that -- that-- that threat, so I had to keep the door open to retreat back.

BY MR. MAYNE:

Q. Okay. Besides it not being feasible, because you didn't have enough time, what other reasons did you have for not closing the door?

A. Well, he still advanced toward me, given his behavior and given everything what happened prior. He had the pair of scissors. He still punched out. That -- I think at one point, the scissors to my chest, it was maybe 1 yard away, if that. Very close to me.

THE WITNESS: I'm blurring out.

Am I blurring out?

THE CERTIFIED STENOGRAPHER: Yes.

MS. O'LINN: Yes.

THE VIDEOGRAPHER: Do we want to go off record?
MR. MAYNE: Sure. We can go off record.
THE VIDEOGRAPHER: We're off the record at 11:22 a.m.
(Off the record.)
THE VIDEOGRAPHER: We're back on the record at 11:24 a.m.
BY MR. MAYNE:
Q. I think you mentioned earlier that you were not sure that it was Mr. Sosa outside the apartment before you opened the door. Did I get that right?
A. Yes.
Q. If you had been sure that it was him, would you have opened the door?
MS. O'LINN: Objection. Calls for speculation. But you can answer.
THE WITNESS: If that circumstances were to happen, I -- to this day, I would not know what I would have done. Because during that time, he still was going in and out of the apartment complex or coming around the apartment complex. He was still -- he still evaded officers. He still was striking one of my officers.
So at that time, I heard a door open or a door close, in this instance, I had to go check, just for officer safety.

MS. O'LINN: Make sure you keep your voice up.

THE WITNESS: Oh.

MS. O'LINN: And slow down for the court reporter.

THE WITNESS: Okay.

BY MR. MAYNE:

Q. At that time, based on your conversations with Officer Ayers, and what you heard on the cell phone, was it your understanding that Mr. Sosa was expressing an intent to force a confrontation with officers?

A. Yes.

Q. And that he was expressing an intent to commit suicide by cop?

A. Yes.

Q. But knowing that, you would have still considered opening the door, even if you had known he was right outside the door?

A. Yes.

Q. And why would you consider opening the door, knowing that that would create the confrontation that Mr. Sosa was expressing an intent to create?

MS. O'LINN: Objection. Argumentative as to "create the confrontation."

Do you understand the question?

THE WITNESS: Yes. I -- I still opened the

door, because just based on his overall actions he had done that night, he -- he still tried striking officers. He fled officers. He was recklessly driving. He endangered the public.

He -- I believe even on the phone with Officer Ayers, he -- he made threats to the male subject, Mrs. Sosa's partner, I believe. He still posed a threat, whether he was outside, to others, as well.

BY MR. MAYNE:

Q. In the time period when Mr. Sosa was in the apartment, did he ever make any lunging motions towards anybody?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: He was taking steps toward me, Officer Ayers, and Mrs. Sosa, with the pair of scissors in his hands, still.

BY MR. MAYNE:

Q. Did he make any lunging motions?

MS. O'LINN: Ever, Counsel, or at this point where you're asking? Because he's already testified as to his initial actions.

BY MR. MAYNE:

Q. I can re-ask it. During the portion of time when Mr. Sosa was in the apartment, did he make any

lunging motions?
A. No, sir.
Q. At some point, did he go into the kitchen area of the apartment?
A. Yes, sir.
Q. Did you see a -- a knife block, a container for knives on the kitchen table?
A. No, sir. I don't recall. I was mainly focused on him.
Q. Is it your understanding that, typically, a kitchen will have an assortment of knives in it?
A. Yes.
Q. Did you see him, at any point, attempt to arm himself with a knife?
A. No. He was already armed with a -- a sharp pair of scissors, sir.
Q. But you never saw him attempt or try to switch to a kitchen knife or a butcher knife or anything like that?
A. No, sir.
Q. At any point when you were inside the apartment with Mr. Sosa, did you consider using your Taser against him?
A. No, sir.
Q. Why is that?

A. Because at that time, given everything that happened prior to him, with him still -- he still tried striking one of my officers. He still evaded officers. He was recklessly driving.

He made multiple pursuits, one evening lead for a canine officer to crash his vehicle. He was still making threats. And at that time, he came in with a pair of scissors saying, "Hey, are you ready for this?"

And he was still 1 or 2 yards away from me. He still posed that -- that threatened. He had that pair of scissors in his hand. He was only 1 or 2 yards away from me, from my chest to his chest.

But then he continued to bounce his attention from me to Officer Ayers, with a highly elevated behavior.

Q. You mentioned much earlier in our conversation that sometimes a Taser is used against an armed subject; is that right?

A. Yes.

Q. So what made it inappropriate in this situation, where it would be appropriate elsewhere?

A. It wouldn't have been appropriate because he was so close in vicinity between me, Officer Ayers, Mrs. Sosa. And with a Taser, it's -- it would have been too close.

And then not only that, if he overcame the Taser, the Taser would have triggered him even more to attack that person and/or officer. And then if he attacks me, I would have no cover -- no lethal cover, giving me -- potentially him harming me, potentially killing me.

Q. At any point in the -- when you were in the apartment with Mr. Sosa, while he was still in the apartment, did you think he was an immediate threat of death or severe bodily injury to anybody?

A. Yes. He was an immediate threat to me, Officer Ayers, and Mrs. Sosa.

Q. At what point?

A. I would have to say, it goes back to the initial call for service, because he -- he went out drunk driving. He's still -- he was a threat to the officers and an endangerment of the public.

And then upon coming into the apartment, he -- he still had that threat. He had the -- he had that ability. He had every opportunity. He -- he already explicit [sic] that intent, that he wanted to come after us, so he was an immediate threat throughout the whole duration of the call for service.

Q. So are you saying he -- he was an immediate threat of death or severe bodily injury throughout the

entire call for service, or just a threat?

A. He was a threat. He did -- he did have that immediate threat for that, the serious bodily injury, just pertaining to him trying to strike one of the officers with his vehicle. He recklessly drove.

He caused an officer to crash his vehicle, which can cause serious bodily injury, while trying to affect an arrest. And then he was also driving recklessly. I, myself, pursued him two times --

(Reporter clarification.)

THE WITNESS: I, myself, pursued him two times; and each time, he was driving well above the speed limit, to the point where all I could see is his taillights, especially on Shaw, a busy intersection, a busy street in Fresno, California.

So he did pose a great threat throughout the -- throughout the duration of the call for service.

Q. Okay. I understand. I think I understand your answer.

What I'm getting at is a little more specific of, at some point when he was inside the apartment, did you think he posed an immediate threat of death or severe bodily injury to anybody?

A. Yes, to myself, Officer Ayers, and Mrs. Sosa.

Q. And then, at what point or at what points did

he pose such a threat?

A. I would have to say, he -- he imposed that threat throughout the duration still, sir. He -- even when he came to the apartment, he was still a threat.

He was still a threat to other officers on scene, to a point where we still had to station officers throughout the duration of the city. So he still posed that threat, sir.

Q. Okay. So would it be accurate to say that you think, for the entire time, for every moment that he was inside the apartment, he posed an immediate threat of death or severe bodily injury to somebody?

A. Yes. He imposed that against me, Officer Ayers, and Mrs. Sosa.

Q. For the entire duration of the time he was inside apartment?

MS. O'LINN: Objection. Asked and answered. You can answer again.

THE WITNESS: Yes, just because of his prior actions and his behavior at the time, too, as well.

BY MR. MAYNE:

Q. And I think we covered this earlier, but is it your training that it is -- it would be reasonable to use lethal force when facing a threat, an immediate threat of death or severe bodily injury?

A. Yes.
Q. So in -- according to your training, would it have been reasonable to use lethal force on Mr. Sosa at any point during the time he was in the apartment?
MS. O'LINN: Objection. Argumentative. Incomplete hypothetical. Calls for speculation.
THE WITNESS: Yes.
BY MR. MAYNE:
Q. At some point, did other officers arrive at the apartment, other than you and Mr. Ayers?
A. Yes, sir.
Q. And which officers were they?
A. I believe it was Officer Crockett that arrived first, and then Officer Aguilar arrived shortly after.
Q. And were either of them armed with non-lethal force?
A. Yes.
Q. Which one of them?
A. They were both armed with non-lethal force.
Q. Did both of them have Tasers?
A. Yes.
Q. Did either of them have their Tasers pointed at Mr. Sosa at any point?
A. Yes. Officer Aguilar did at some point.
Q. Did you see Officer Crockett ever arm himself

with his Taser?

A. No, sir.

Q. Could you describe your memory of what happened in the moments after Mr. Sosa left -- walked out of the apartment?

A. From my recollection, I remember prior to him leaving, I tried to --

(Reporter clarification.)

THE WITNESS: I tried to gesture Officer Ayers and Mrs. Sosa to leave. Mrs. Sosa did not. Officer Ayers managed to. He even said -- I think he noticed Officer Ayers, and I think he -- I'm pretty sure he noticed me trying to have Mrs. Sosa leave.

He -- he even said, "Oh, I'm not going to hurt her. She's the mother of my child. But you can go out there with him."

And I tried reasoning with him. He's like, "Well, she has to leave with me." But he refused.

He continue to walk out. He had the scissors still in his hand. I told him, "Stop."

(Reporter clarification.)

THE WITNESS: But he continued through the threshold, outside the apartment.

BY MR. MAYNE:

Q. And what happened after he continued past the

threshold?

A. From my perspective, I observed Officer Aguilar, he employed his Taser, but it didn't -- it didn't get the full neuromuscular incapacitation. He winced, he stumbled to his left -- or Mr. Sosa stumbled to his left, against the adjacent wall of the opposing apartment.

And then he -- from my perspective, he did some type of swiping motion. It appeared to me that he was trying to get, like, at least the wires off or the prongs off. And then he took two large steps, advancing toward Officer Crockett, Officer Ayers, and Officer Aguilar, with the pair of scissors still in his hand, like, he -- I think at one point I remember he was in arm's reaching distance to even grab Officer Crockett's muzzle of the gun --

(Reporter clarification.)

THE WITNESS: -- and Officer Ayers's muzzle of the gun.

MS. O'LINN: Are you going to ask him another question?

MR. MAYNE: Yes. I'm about done, and then I'll turn it over to Mr. Little.

BY MR. MAYNE:

Q. During the time Mr. Sosa was in the apartment,

MS. O'LINN: We can just take 5 minutes.
MR. MAYNE: Let's do 5. We'll be back at 46 after.
MS. O'LINN: We're off the record at 11:41 a.m.
(Break taken.)
THE VIDEOGRAPHER: We're back on the record at 11:45 a.m.
BY MR. MAYNE:
Q. Okay. I wanted to give you a chance to clear up an answer to a previous question. So during the period of time that Mr. Sosa was in the apartment, what was the closest he got to you?
A. I would have to say, approximately, 1 yard.
Q. And is that measured between your chest and his chest?
A. I would have to say, it's from my chest to the scissors.
Q. Okay. Thank you.
And I'm going to share an exhibit now, a short video that we'll play, and then I'll ask a couple questions about that, and we'll turn it over to Mr. Little after that.
(Exhibit Number 3 was marked.)
MS. O'LINN: Is it the same video, Mr. Mayne?
MR. MAYNE: No. It's a different video.

BY MR. MAYNE:

Q. Yes. Could you identify who's in the frame here?

A. In this frame it's Officer Aguilar, Mrs. Sosa. And then walking away is Officer -- well, walking away is Officer Aguilar, and there's Officer Ayers, and Mrs. Sosa.

Q. Okay. And we covered this earlier, but just having seen the video, I wanted to confirm that, you know, during this portion that we watched of the video, do you believe that Mr. Sosa posed an immediate threat of death or severe bodily injury to someone throughout this duration?

A. Yes.

Q. Okay. I'm just going to show one more still, and then turn it over to Mr. Little. Give me one second to try to line it up.

MR. MAYNE: I'm sharing again. I rewind it a little bit to the same Exhibit 3, but we're at 27 minutes and 0 seconds.

BY MR. MAYNE:

Q. So this is during that same portion. Is it your testimony that he posed an immediate threat of death or severe body injury to somebody at this point?

A. Yes, sir.

Q. Who did he pose an immediate threat of death or severe bodily injury to?
A. He still posed that threat to myself, Officer Ayers, Mrs. Sosa, and now at this point, it's also Officer Aguilar.
Q. Was he -- was Mr. Sosa wearing glasses throughout most of the incident?
A. Yes, I believe so.
MR. MAYNE: Okay. I don't have any further questions for the moment.
So, Mr. Little, would you like to ask some questions?
MR. LITTLE: Yes, sir. Thank you.
MR. MAYNE: Okay.
MS. O'LINN: Counsel, could you stop the share for me?
MR. MAYNE: Yes.
MS. O'LINN: And then, Mr. Little, can I get a time frame for how long you think have you to go? Because we're just about at the top of an hour, and --
MR. LITTLE: I probably have 30 minutes, maybe a little bit less.
MS. O'LINN: Okay. In anticipation of full day of deposition, you know, we have a lunch issue, so we just had lunch delivered, so I think 30 minutes.

A. Can you repeat that? I think --
Q. Sure. So you weren't entirely surprised when someone knocked on the door and it turned out to be him?
A. Well, no one knocked on the door, sir. I heard the -- like a car door slam, so that's why I opened the door.
Q. Okay. All right. Now, in that apartment, there's actually a window that if you're facing the door from the inside, it would be to the right of the front door of the apartment; correct?
A. From what I recall, yes.
Q. Did it ever occur to you, after you heard the car door slam, to check through that window who it was that was arriving?
A. No, sir.
MS. O'LINN: This was asked and answered.
But you can answer again.
THE WITNESS: No, sir.
BY MR. LITTLE:
Q. Okay. And if I was in la-la-land when that was asked by Mr. Mayne, I apologize.
So during the 15 or so minutes that you had in the apartment with Ms. Sosa, when you, yourself, viewed it as a possibility that Mr. Sosa might return, is there a reason why she wasn't moved to a patrol vehicle or

driving recklessly, he got us into pursuits. He was -- we lost him multiple times.

So he was -- it would be better -- it would be the better solution to keep him inside the apartment at that time.

Q. I've seen your body-worn camera video. Would you agree with me, at no point after Mr. Sosa entered the apartment, did anyone ever instruct him, "You need to stay in here until we tell you you can leave"?

MS. O'LINN: Objection. Argumentative.

With regard to those specific words, you're asking if that's what he said to him?

MR. LITTLE: Or anything to that effect.

MS. O'LINN: Counsel, he's testified he told him to stop, so I'm not sure I can resolve that with the way your question is phrased.

MR. LITTLE: Well, "Stop" is not what I'm asking. I'm asking if anyone told Mr. Sosa -- whatever words they used -- not just, "Stop, but, "Sir, you cannot leave this apartment until we tell you you can"?

THE WITNESS: No words were used, because he was -- his behavior, the way he was talking to us. He continued to ignore our commands. He was speaking over us. After multiple attempts at me trying to reason with him, me trying to talk to him, me being empathetic.

We also had other officers -- like, I remember we called and if he doesn't want to talk to me, he could talk to Officer Aguilar, but he refused all types of communication. He just -- he had a very elevated -- he was very elevated, very emotional at that time. So those commands weren't given.

BY MR. LITTLE:

Q. And even though he was very elevated and very emotional, would you agree that, at least to your knowledge, neither you nor any other officer on scene never called anyone from the CNT to come out to the scene.

A. No, not to my knowledge, no.

Q. All right. And even if they weren't technically members of the CNT, would you agree that there were, to your understanding, other officers who were part of your department who had negotiation training that you did note?

MS. O'LINN: Counsel, I don't understand that question.

MR. LITTLE: Let me rephrase it.

BY MR. LITTLE:

Q. Did you ever call someone out who had what you understood to have -- rephrase, again.

Did you ever call an officer that you believed

BY MR. LITTLE:
Q. Sure. You're aware of what Policy 417 is; correct?
A. Yes.
Q. That's the Crisis Intervention Policy that your department has?
A. Yes.
Q. And under that policy, as it existed at the time of this incident, it encouraged officers to engage in de-escalation tactics, where possible?
A. If possible.
Q. All right. Now, that policy also encouraged, where possible, for officers to -- and there is a term for it --
MR. LITTLE: -- and, Cooper, help me out because my brain's not working at the moment, but where essentially, you would withdraw partially from the scene, again, if possible, in an effort to de-escalate?
THE WITNESS: I don't understand the question, sir.
BY MR. LITTLE:
Q. Okay. All right. You had -- Policy 417, you had been trained in that prior to this incident; true?
A. Yes.
Q. Okay. Now, would you agree that the presence

of additional officers can also, at times, be a de-escalation tactic?

A. Yes.

Q. Were you aware that there were additional officers on-site at the Dante Apartment complex at the time that you were interacting with Mr. Sosa?

A. Yes.

Q. How many other officers were on scene at the apartment complex, to your understanding?

A. At the time when me and Mr. Sosa were interacting, Officer Aguilar and Officer Crockett showed up.

Q. Okay. But weren't there also additional backup officers?

MS. O'LINN: Objection. Scope. Where?

BY MR. LITTLE:

Q. To your knowledge, at the apartment complex, weren't there additional backup officers on scene?

MS. O'LINN: Objection. Time.

BY MR. LITTLE:

Q. When you were dealing with Mr. Sosa.

A. When dealing with Mr. Sosa, to my knowledge, no. It was only myself, Officer Ayers, Officer Crockett, and Officer Aguilar, sir.

(Reporter clarification.)

MS. O'LINN: Counsel, time estimate?

MR. LITTLE: I'm going into my last part, so I think I'm good with my 12:30 estimate.

MS. O'LINN: Okay. Thank you.

BY MR. LITTLE:

Q. Okay. Now, I wanted to talk a little bit about the shooting outside. It's my understanding that you were behind Mr. Sosa, with his back facing you, more or less at the time that you fired your shot; is that true?

A. I was more at a -- I was behind him, at an angle, sir.

Q. You could see his back, but not his front?

A. I could partially see his front, but majority of his back.

Q. All right. And so you would have been somewhere in the general location of the area underneath the staircase that led up to the second floor?

A. Yes. I was at the threshold of the door, sir.

Q. Okay. And I think you said that at the time you fired your shot -- and this is where I think the 2 to 3 yards came in -- Mr. Sosa was 2 to 3 yards away from you at the time you fired your shot?

A. Yes.

Q. Okay. And then, there were -- in the general vicinity where Mr. Sosa was at the time you fired your

shot, that's where Officers Crockett, Ayers, and Aguilar were?
A. Yes. He was running towards them, sir.
Q. Okay. What does -- just based on your training and experiences at the time, what does it tell you about shooting in a direction where officers are in the general vicinity?
A. It would -- it would be -- try our best to try to avoid that situ- -- that situation, due to a crossfire.
Q. Right. Now, would you agree that the officers who could better see Mr. Sosa's front had a better opportunity to assess what sort of a threat he presented?
MS. O'LINN: Objection. Argumentative as phrased. Calls for speculation.
You can answer.
THE WITNESS: Can you repeat that question, sir?
BY MR. LITTLE:
Q. Sure. At the time, did you believe that the officers who actually saw Mr. Sosa's face had a better opportunity to assess what sort of a threat he presented?
MS. O'LINN: Same objections.

THE WITNESS: Well, I believe that all of us were able to assess the situation, sir.

BY MR. LITTLE:

Q. Okay. I appreciate that, but that's not my question.

Do you believe that the officers who could see his face had a better opportunity to assess what sort of a threat he presented?

MS. O'LINN: Objection. Asked and answered argumentative. Calls for speculation.

You can answer.

THE WITNESS: Well, again, at that time, with that situation, him charging, we were all able to assess that he overcame the Taser, and he was still charging us or charging officers with the scissors in his hands. So we were all able to assess that situation, sir.

Q. All right. If you'd had available to you at the time your less-lethal shotgun, would you have considered deploying that instead of your firearm?

A. At that time, I would have not known, because we weren't given that circumstance, sir. We weren't given than situation, sir.

Q. Okay. So based on the circumstances that you recall confronting you at the time, if you had had available to you your less-lethal shotgun, can you tell

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR