# EXHIBIT 28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through
Guardian ad litem JENNIFER LOPEZ,
M.S. by and through guardian ad litem
JENNIFER LOPEZ, individually and
as successors-in-interest to
Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS,
BRANDON CROCKETT,
JONATHAN ABRAHAM, and
ANTHONY AGUILAR,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

BRANDON CROCKETT

WEDNESDAY, APRIL 22, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24521

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Said Hofiani, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: BRANDON CROCKETT

EXAMINATION BY PAGE

MR. MAYNE............................6, 81

MR. LITTLE.............................50

MS. O'LINN.............................77

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

Ex 2 - Video excerpt.............................47

--oOo--

--oOo--

BE IT REMEMBERED, that set on Wednesday, the 22nd day of April, 2026, commencing at the hour of 1:30 p.m., thereof, BRANDON CROCKETT, appeared remotely in Fresno, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good afternoon. We are on record at 1:32 p.m. Today's date is April 22nd, 2026. This is the recorded remote video deposition of Brandon Crockett, in the matter of Sosa versus City of Fresno, et al., Case Number 123-cv-01575-JLT-SAB.

This deposition is being held via web conference. My name is Said Hofiani. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will state her CSR license number and swear in the witness.

MR. MAYNE: Good afternoon. This is Cooper

A. Yes.

Q. Were you trained to give a verbal warning before using deadly force, when feasible?

A. When feasible, yes.

Q. What kind of training have you had related to responding to people in a mental health crisis?

A. My training began at the POST academy, which was approximately a thousand hours, spanned -- or spread out over the span of six months. After that I was released to field training, which was an additional six months; and then in-service training, as well, which involves perishable skills training and daily briefings, conversations, and debriefings.

Q. And was some of that training directly on the topic of responding to mental health crises?

A. Yes.

Q. So you had some training at the academy level. Did you also have some training on that topic from the Fresno Police Department?

MS. O'LINN: Objection. Asked and answered.

He said the FTO program, in-service, and daily debriefings. That would have been Fresno.

If you want him to run through it again, I'm happy to let him do it, but --

BY MR. MAYNE:

Q. That's just a yes-or-no question, so I guess the answer is yes?
A. Yes.
Q. In this situation, at what point did you learn that the subject was trying to commit suicide by cop?
A. It was relayed over the radio.
Q. Do you remember approximately when you learned that, relative to when you arrived at the apartment?
A. It was about midway through the call, from the duration from the initial call being 3:10, and the ending of the call being about 4:00 -- just after 4:30. It was probably, approximately, like, in the middle of that -- of that time.
Q. Sorry. About how many minutes before arriving would that have been?
MS. O'LINN: Counsel, you mean before arriving at the --
MR. MAYNE: Before arriving at the apartment.
MS. O'LINN: Thank you.
THE WITNESS: Approximately, 20 minutes.
BY MR. MAYNE:
Q. Did you call for a CNT or CIT response in this case?
A. No.
Q. Did you call a supervisor at any point to have

When did you learn that he had a pair of scissors in his hands, or that he was armed with scissors?

MS. O'LINN: Counsel, could you restate that? You're a little hard to hear. Sorry.

BY MR. MAYNE:

Q. When did you learn that the subject was armed with scissors?

A. When I arrived at the doorway of the apartment.

Q. So that was the first time that you heard anything indicating that he had scissors?

A. Yes.

Q. What was the nature of the call that brought you to the apartment itself? So I'm not talking about the initial call, but what was the -- the nature of the most proximate call that brought you to the location?

MS. O'LINN: What was the reason at that point he went to the apartment? Is that what you're asking, Counsel?

THE WITNESS: Yeah. Could you rephrase that question, sir?

BY MR. MAYNE:

Q. Yeah. I'm trying to narrow it down because it was a long night. So when you actually went to the apartment, just prior to the shooting, what was that

reason for that part of your response?

A. There was radio traffic from the officers at the apartment. Under duress, you could hear -- or they advised that the primary or the suspect has returned back to the apartment, and they were requesting assistance.

Q. Different police departments say different things; but in Fresno, is there a custom or practice of saying, "Officer needs help"? If an officer is in a fight or something, is that something that officers in Fresno say?

MS. O'LINN: Those expect words, Counsel?

MR. MAYNE: Yeah, different departments have different things they say. So the answer could be no.

THE WITNESS: No.

BY MR. MAYNE:

Q. Are there specific codes you're taught to put over dispatch if you're in a fight with a subject?

A. No.

Q. What about if you're -- you've been the victim of an assault, is there a code you would put out over dispatch to -- to make sure that that's been dispatched to the other officers?

A. Could you rephrase that question, sir?

Q. Yeah. According to your training, what's

MS. O'LINN: If your knowledge is based upon your review of materials or your personal knowledge, you may answer.

THE WITNESS: Not that I recall.

BY MR. MAYNE:

Q. When first saw Mr. Sosa, where was he?

A. Mr. Sosa was standing in between the kitchen counter and a dining room table.

Q. And could you describe the object he was holding?

A. He was holding kitchen shears in his right hand.

Q. What position was he holding the shears in?

A. So blade forward, in the dir- -- pointing towards where Officer Ayers and Mrs. Sosa were.

Q. About how close to Officer Abraham do you think he was at that point when you first saw him?

A. Approximately, 5 feet.

Q. When you first saw Mr. Sosa, did you think that he posed an immediate threat of death or severe bodily injury to anybody?

A. Could you rephrase that question, sir?

Q. Yeah. I can try to rephrase or repeat it.

So that moment when you come to the apartment and you first see Mr. Sosa, and you say he's got the

scissors down by his side, but pointed towards the direction of somebody, at that moment, did you think that he posed an immediate threat of death or severe bodily injury to anybody?

A. Yes.

Q. Who did you think he posed a threat of -- an immediate threat of death or severe bodily injury to?

A. Myself, Officer Abraham, Officer Ayers, and Mrs. Sosa.

Q. Was he approaching any of the individuals you just listed?

MS. O'LINN: At the moment he first saw him?

BY MR. MAYNE:

Q. At the moment we're talking about, that you're saying you perceived him as an immediate threat of death or severe bodily injury, was he approaching any of the people you just listed?

THE WITNESS: Mr. Sosa made small steps towards, kind of just like in his immediate area, going forward, to the side, to his sides, and diagonal, and back.

BY MR. MAYNE:

Q. And you thought he was an immediate threat to, it sounds like, everybody who was present? Is that what your testimony is?

A. Yes, sir.
Q. Was he an immediate threat of death or severe bodily injury throughout the entire interaction you had with him?
A. Could you rephrase that question, sir?
Q. Yeah. I'm talking about the period of time between when you first saw him and when the shots occurred, was he -- did he pose an immediate threat of death or severe bodily injury for that entire time period?
A. Yes.
Q. So according to your training, would you have been justified to use lethal force against him at any point during your interaction with him, between when you first saw him until he was shot?
MS. O'LINN: Objection. Argumentative as phrased.
You can explain.
THE WITNESS: Based off of the totality of the nature of the call for service and the events that occurred during the call, such as him being possibly under the influence of alcohol, him being suicidal, him attempting to strike an officer with his vehicle, taking officers on multiple pursuits, fleeing and eluding, in addition to being a danger to the public.

Making threats to himself, officers on the call for service, or Mrs. Sosa's partner, and arming himself with kitchen shears, returning to the residence where officers were located.

Q. Okay. My question, I think I'm trying to get at something more simple, which is -- I think we may have gone over this before, but is it true that if somebody poses an immediate threat of death or severe bodily injury to an officer or somebody else, then it is objectively reasonable to use lethal force against them?

MS. O'LINN: Objection. Incomplete hypothetical.

You can answer.

THE WITNESS: It'll be deemed objectively reasonable under the totality of the circumstances.

BY MR. MAYNE:

Q. Right. Just so we have a clear record, I guess I'll ask again, because it's kind of a yes-or-no question of: If you're in a situation where somebody poses an immediate threat of death or severe bodily injury, isn't it reasonable to use lethal force against that person to stop the threat?

A. Yes, sir.

Q. So in this situation, you testified that he posed an immediate threat of death or severe bodily

injury, from the moment you saw him until the moment he was shot. Is that right?

A. Yes, sir.

Q. So according to your training, it would have been reasonable to shoot him at any point in that time period; is that correct?

MS. O'LINN: Objection. Argumentative as phrased.

You're -- you're -- just let him answer.

Go ahead.

THE WITNESS: Could you restate the question? I don't need it rephrased.

BY MR. MAYNE:

Q. Yeah. Given that you testified that he was an immediate -- he posed an immediate threat of death or severe bodily injury for the entire time period from when you saw him to when he was shot, and that your training is that at that level of threat, it's reasonable to use lethal force.

I'm getting to the next question, which is: Would it have been reasonable, according to your training, to use lethal force against Mr. Sosa, at any point from when you first saw him to when he was shot?

A. So based on the totality of the circumstances, yes.

A. Yes.

Q. Were you trained to give a verbal warning before using deadly force, when feasible?

A. When feasible, yes.

Q. What kind of training have you had related to responding to people in a mental health crisis?

A. My training began at the POST academy, which was approximately a thousand hours, spanned -- or spread out over the span of six months. After that I was released to field training, which was an additional six months; and then in-service training, as well, which involves perishable skills training and daily briefings, conversations, and debriefings.

Q. And was some of that training directly on the topic of responding to mental health crises?

A. Yes.

Q. So you had some training at the academy level. Did you also have some training on that topic from the Fresno Police Department?

MS. O'LINN: Objection. Asked and answered.

He said the FTO program, in-service, and daily debriefings. That would have been Fresno.

If you want him to run through it again, I'm happy to let him do it, but --

BY MR. MAYNE:

Q. That's just a yes-or-no question, so I guess the answer is yes?
A. Yes.
Q. In this situation, at what point did you learn that the subject was trying to commit suicide by cop?
A. It was relayed over the radio.
Q. Do you remember approximately when you learned that, relative to when you arrived at the apartment?
A. It was about midway through the call, from the duration from the initial call being 3:10, and the ending of the call being about 4:00 -- just after 4:30. It was probably, approximately, like, in the middle of that -- of that time.
Q. Sorry. About how many minutes before arriving would that have been?
MS. O'LINN: Counsel, you mean before arriving at the --
MR. MAYNE: Before arriving at the apartment.
MS. O'LINN: Thank you.
THE WITNESS: Approximately, 20 minutes.
BY MR. MAYNE:
Q. Did you call for a CNT or CIT response in this case?
A. No.
Q. Did you call a supervisor at any point to have

When did you learn that he had a pair of scissors in his hands, or that he was armed with scissors?

MS. O'LINN: Counsel, could you restate that? You're a little hard to hear. Sorry.

BY MR. MAYNE:

Q. When did you learn that the subject was armed with scissors?

A. When I arrived at the doorway of the apartment.

Q. So that was the first time that you heard anything indicating that he had scissors?

A. Yes.

Q. What was the nature of the call that brought you to the apartment itself? So I'm not talking about the initial call, but what was the -- the nature of the most proximate call that brought you to the location?

MS. O'LINN: What was the reason at that point he went to the apartment? Is that what you're asking, Counsel?

THE WITNESS: Yeah. Could you rephrase that question, sir?

BY MR. MAYNE:

Q. Yeah. I'm trying to narrow it down because it was a long night. So when you actually went to the apartment, just prior to the shooting, what was that

reason for that part of your response?

A. There was radio traffic from the officers at the apartment. Under duress, you could hear -- or they advised that the primary or the suspect has returned back to the apartment, and they were requesting assistance.

Q. Different police departments say different things; but in Fresno, is there a custom or practice of saying, "Officer needs help"? If an officer is in a fight or something, is that something that officers in Fresno say?

MS. O'LINN: Those expect words, Counsel?

MR. MAYNE: Yeah, different departments have different things they say. So the answer could be no.

THE WITNESS: No.

BY MR. MAYNE:

Q. Are there specific codes you're taught to put over dispatch if you're in a fight with a subject?

A. No.

Q. What about if you're -- you've been the victim of an assault, is there a code you would put out over dispatch to -- to make sure that that's been dispatched to the other officers?

A. Could you rephrase that question, sir?

Q. Yeah. According to your training, what's

MS. O'LINN: If your knowledge is based upon your review of materials or your personal knowledge, you may answer.
THE WITNESS: Not that I recall.
BY MR. MAYNE:
Q. When first saw Mr. Sosa, where was he?
A. Mr. Sosa was standing in between the kitchen counter and a dining room table.
Q. And could you describe the object he was holding?
A. He was holding kitchen shears in his right hand.
Q. What position was he holding the shears in?
A. So blade forward, in the dir- -- pointing towards where Officer Ayers and Mrs. Sosa were.
Q. About how close to Officer Abraham do you think he was at that point when you first saw him?
A. Approximately, 5 feet.
Q. When you first saw Mr. Sosa, did you think that he posed an immediate threat of death or severe bodily injury to anybody?
A. Could you rephrase that question, sir?
Q. Yeah. I can try to rephrase or repeat it.
So that moment when you come to the apartment and you first see Mr. Sosa, and you say he's got the

scissors down by his side, but pointed towards the direction of somebody, at that moment, did you think that he posed an immediate threat of death or severe bodily injury to anybody?

A. Yes.

Q. Who did you think he posed a threat of -- an immediate threat of death or severe bodily injury to?

A. Myself, Officer Abraham, Officer Ayers, and Mrs. Sosa.

Q. Was he approaching any of the individuals you just listed?

MS. O'LINN: At the moment he first saw him?

BY MR. MAYNE:

Q. At the moment we're talking about, that you're saying you perceived him as an immediate threat of death or severe bodily injury, was he approaching any of the people you just listed?

THE WITNESS: Mr. Sosa made small steps towards, kind of just like in his immediate area, going forward, to the side, to his sides, and diagonal, and back.

BY MR. MAYNE:

Q. And you thought he was an immediate threat to, it sounds like, everybody who was present? Is that what your testimony is?

A. Yes, sir.
Q. Was he an immediate threat of death or severe bodily injury throughout the entire interaction you had with him?
A. Could you rephrase that question, sir?
Q. Yeah. I'm talking about the period of time between when you first saw him and when the shots occurred, was he -- did he pose an immediate threat of death or severe bodily injury for that entire time period?
A. Yes.
Q. So according to your training, would you have been justified to use lethal force against him at any point during your interaction with him, between when you first saw him until he was shot?
MS. O'LINN: Objection. Argumentative as phrased.
You can explain.
THE WITNESS: Based off of the totality of the nature of the call for service and the events that occurred during the call, such as him being possibly under the influence of alcohol, him being suicidal, him attempting to strike an officer with his vehicle, taking officers on multiple pursuits, fleeing and eluding, in addition to being a danger to the public.

Making threats to himself, officers on the call for service, or Mrs. Sosa's partner, and arming himself with kitchen shears, returning to the residence where officers were located.

Q. Okay. My question, I think I'm trying to get at something more simple, which is -- I think we may have gone over this before, but is it true that if somebody poses an immediate threat of death or severe bodily injury to an officer or somebody else, then it is objectively reasonable to use lethal force against them?

MS. O'LINN: Objection. Incomplete hypothetical.

You can answer.

THE WITNESS: It'll be deemed objectively reasonable under the totality of the circumstances.

BY MR. MAYNE:

Q. Right. Just so we have a clear record, I guess I'll ask again, because it's kind of a yes-or-no question of: If you're in a situation where somebody poses an immediate threat of death or severe bodily injury, isn't it reasonable to use lethal force against that person to stop the threat?

A. Yes, sir.

Q. So in this situation, you testified that he posed an immediate threat of death or severe bodily

injury, from the moment you saw him until the moment he was shot. Is that right?

A. Yes, sir.

Q. So according to your training, it would have been reasonable to shoot him at any point in that time period; is that correct?

MS. O'LINN: Objection. Argumentative as phrased.

You're -- you're -- just let him answer.

Go ahead.

THE WITNESS: Could you restate the question? I don't need it rephrased.

BY MR. MAYNE:

Q. Yeah. Given that you testified that he was an immediate -- he posed an immediate threat of death or severe bodily injury for the entire time period from when you saw him to when he was shot, and that your training is that at that level of threat, it's reasonable to use lethal force.

I'm getting to the next question, which is: Would it have been reasonable, according to your training, to use lethal force against Mr. Sosa, at any point from when you first saw him to when he was shot?

A. So based on the totality of the circumstances, yes.

intentionally, but the standard is not "severe bodily injury." It's "serious bodily injury." So I'm just cautioning you --

MR. MAYNE: Is that an objection?

MS. O'LINN: Yes. Argumentative. Misstates the law. Lack of foundation.

But there you go. Sorry.

BY MR. MAYNE:

Q. So Detective Crockett, I don't think --

MS. O'LINN: Can we have the question read back?

THE WITNESS: Yeah. Can you repeat the question now, sir? Sorry.

BY MR. MAYNE:

Q. Yes. We've gone over this once. I'm just trying to make sure we're clear.

Is it your testimony today, as I believe you said before, that in your view, Mr. Sosa posed an immediate threat of death or serious bodily injury from when you first saw him when you arrived at the apartment, to when he was shot?

A. Based on the totality of the circumstances, yes, sir.

Q. Okay. And it's your training that if somebody poses an immediate threat of death or severe bodily

injury, it's reasonable to use lethal force against them; is that correct?

MS. O'LINN: Objection. Misstates the law. But you can answer.

THE WITNESS: Yes, sir.

BY MR. MAYNE:

Q. When did you first draw your weapon?

A. When I observed that Mr. Sosa was armed with scissors.

Q. Did any other officers have their weapons drawn?

A. Yes.

Q. Did any officers have non-lethal force deployed?

A. Yes.

Q. And what type of non-lethal force was being used?

A. Officer Aguilar had equipped his department-issued Taser.

Q. Did you consider switching to a Taser at any point during this incident?

A. Yes.

Q. And when was that?

A. When Officer Aguilar had initially arrived.

Q. Was that before or after you had seen Mr. Sosa?

break here, and be back at 2:42, if that works for everybody.

MS. O'LINN: Sure.

MR. LITTLE: Thank you.

THE VIDEOGRAPHER: Going off record at 2:32 p.m.

(Break taken.)

THE VIDEOGRAPHER: Back on record at 2:42 p.m.

BY MR. MAYNE:

Q. Officer Aguilar deployed the Taser on Mr. Sosa at some point; is that correct?

A. Yes, sir.

Q. And did the Taser appear to have any effect?

A. Yes.

Q. What effect did it have?

A. It appeared that the Taser had temporarily caused pain to Mr. Sosa, not enough to cause neuromuscular incapacitation, but he definitely felt, to some capacity, the Taser prong.

Q. How long did the Taser effect last, in your view?

A. Approximately, a half a second to a second.

Q. Are you familiar with the model of Taser that was being used by Officer Aguilar?

A. Yes, sir.

made contact and embedded in the subject's skin and the device is on, meaning triggered, does that cause pain through the electricity going through the barb?

MS. O'LINN: Yes. I'm just suggesting that you don't guess.

THE WITNESS: Yeah. I'm not sure, sir.

BY MR. MAYNE:

Q. Okay. After -- so at some point, you saw the Taser effect dissipate. You estimated about half a second to one second. After that happened, what did you see Mr. Sosa do?

A. Mr. Sosa used his left hand to clutch, like, the right side of his torso, near, like, his breast and rib area. Mr. Sosa, then, took two side steps to his left, which would be getting closer to the opposing door of the primary apartment. Yeah.

Q. And shortly after that, did you hear somebody on your left fire their firearm?

MS. O'LINN: Objection. Vague as to time.

I'm sorry, Counsel. I don't understand the question.

THE WITNESS: Could you rephrase that? Sorry. I also do not understand the question.

BY MR. MAYNE:

Q. At some point after Mr. Sosa standard moving

towards you, did you hear a gunshot come from your left?
A. To my recollection, all the shots were simultaneous.
Q. So for -- according to your recollection, you're not sure whether you shot first?
A. No, sir.
Q. Do you recall hearing any sound that sounded like a gunshot before you pressed the trigger?
A. No, sir.
Q. Do you know who would have been to your immediate left at the time of the shots?
A. Officers Ayers and Aguilar.
Q. And who was closer to you?
A. I believe that was Officer Ayers.
Q. Did he have a firearm pointed at Mr. Sosa?
A. Yes.
Q. But at that point, did Aguilar still have his Taser out?
A. Yes.
Q. When you fired, where were you aiming?
A. To Mr. Sosa's center of mass.
Q. What position was he in?
A. Mr. Sosa was charging at me with his head lowered and shoulders and hips facing me.
Q. And when you say "center of mass," could you be

Brandon Crockett

more descriptive in terms of where on his body you were aiming?

A. The -- his torso.

Q. And how many rounds did you fire?

A. One, sir.

Q. How far away were you from Mr. Sosa when you fired?

A. From the point of my -- the end of my barrel to Mr. Sosa, approximately 1, 1 and 1/2 feet.

Q. Did you give any verbal warning before firing?

A. I yelled for Mr. Sosa to, "Chill out."

Q. Did you give anything else that you would consider a verbal warning that you were going to use lethal force?

A. No, sir.

Q. Did you hear any other officers give a verbal warning that they were going to use lethal force?

A. I heard an officer yell, "Stop."

Q. Anything beyond that that would have -- that you believed was a -- a verbal warning that officers were going to use lethal force?

A. No, sir.

Q. When he started moving in your direction, what did you do?

A. I began to continue facing Mr. Sosa, and I

backpedaled away from him, to create distance.
Q. Was there a clear path behind you?
A. Not entirely clear, but, yes.
Q. How far away was Mr. Sosa when he first started moving towards you?
A. Approximately, 3 to 5 feet.
Q. And is that from your body, or he's -- if I'm holding my arm out -- I'm a pretty tall guy, but that adds some distance. When you say he was "3 to 5 feet" away from you when he started moving towards you, was that from your chest, or from some other part of your body?
A. From my chest to Mr. Sosa, you know, approximately, 4 to 5 feet.
Q. And about how much time passed between when he started moving towards you to when you fired?
A. Could you rephrase that question, sir?
Q. About how much time passed from when he started moving towards you, after he was Tased, and when you fired?
A. Same, sir. Probably half a second to a second.
Q. Okay. I'm going to play a video quickly and then turn it over to Mr. Little. Bear with me while I try to get this up.
THE CERTIFIED STENOGRAPHER: Will this be

(Video being played.)

MR. MAYNE: I paused it 29 seconds.

BY MR. MAYNE:

Q. Do you see the object in his right hand?

A. Yes, sir.

Q. And are those the scissors you were talking about?

A. Yes, sir.

Q. So at this point, this is where we were talking about earlier that you would say he was a -- in your mind, he was an immediate threat of death or severe bodily injury to those around him?

A. Based on the totality of the circumstances, sir, yes.

Q. Okay.

MR. MAYNE: Kevin -- sorry. Mr. Little, you can go ahead. I'm done with my questions.

MS. O'LINN: Mr. Little, I'm going to need a quick break.

MR. MAYNE: Of course. Yeah.

MR. LITTLE: Okay.

MS. O'LINN: Five minutes.

THE VIDEOGRAPHER: Going off the record at 2:59 p.m.

(Break taken.)

that resulted in the south gate being closed?

A. Could you rephrase that question, sir?

Q. Sure. Early on in your response to the apartment complex, did you do something that resulted in the south gate of the apartment being closed so that there was only one way in and one way out of the complex?

MS. O'LINN: Do you understand the question?

THE WITNESS: No, sir.

MS. O'LINN: I don't either.

MR. LITTLE: All right. We'll just move on to something else.

BY MR. LITTLE:

Q. We've just seen the video that shows when you first saw Mr. Sosa and the scissors, he had scissors in his right hand, but they were down at his right side; true?

A. When I initially observed Mr. Sosa with the scissors, yes.

Q. Okay. Now, and at another point, you saw him banging the scissors on the counter, the kitchen counter; right?

A. Yes, sir.

Q. But while he was inside the apartment, you never saw him pointing those scissors at anyone; true?

A. That is not true. I did see him point the scissors, sir.
Q. Who did you see him point the scissors at?
A. At Officer Ayers and Mrs. Sosa, at their direction.
Q. Okay. You mean he waved them in their direction?
A. No, sir. He extended his arm, like fully extended his arm out, towards their direction.
Q. All right. He never harmed anyone with the scissors inside the apartment; true?
A. No, sir.
Q. Is that true?
A. That is -- I'm sorry. Could you repeat the question, sir?
Q. He never harmed anyone with the scissors inside the apartment complex?
A. He did not harm anybody with the scissors inside of the apartment, sir.
Q. Okay. Now, so as I understand it, you were the officer who suggested to Officer Ayers to get -- to take action to get Mrs. Sosa out of the apartment; is that true?
A. Yes, sir.
Q. Okay. And you mentioned earlier that you said

at some point, "Just chill." But from my reading of your statement, you made the, "Just chill" comment when Mr. Sosa was still inside the apartment; no?

A. It was at both times, sir.

Q. Okay. So you said, "Just chill" inside the apartment, but your recollection presently is that you also said it outside of the apartment?

A. After reviewing videos of the incident, sir, I then realized that I said it at both points that you're speaking of, which are when I'm at the threshold of the door of when I initially arrived, and prior to the -- of the shooting.

Q. Okay. So when Mr. Sosa was still inside the apartment, did you ever have your service weapon drawn?

A. Yes, sir.

Q. And I think you said you had it at what's called the "low ready"; right?

A. Yes, sir.

Q. Okay. And "low ready" means that your elbow is still pointing -- more or less, your arm is at a 90-degree angle, down by your side; true? But you're holding your gun?

MS. O'LINN: I'm not good at angles, Kevin, as far as -- Counsel, as far the geometry involved. So I'm not sure if the witness understands what you mean.

You can answer.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. Did you ever have any direct communication, other than, "Just chill," with Mr. Sosa?

A. No, sir.

Q. All right. While you were present on scene that evening, did you see any officers having direct communication with Mr. Sosa, in terms of giving him -- well, let me rephrase this.

Actually, I'll withdraw that question.

So is it fair to assume that since you didn't have any direct communication with Mr. Sosa, other than saying a couple of times, "Just chill," you did not engage in any de-escalation tactics with him?

MS. O'LINN: Objection. Argumentative.

BY MR. LITTLE:

Q. You can answer.

A. As far as de-escalation, I broadcast our circumstances over dispatch, advising that he we were out with the suspect who had armed himself with scissors, and that we, officers on scene, had a line of fire, broadcasting that for additional responding officers, as a form of de-escalation tactics, because that is -- additional resources and officers is a

de-escalation technique.
Q. Okay. You, yourself, never personally made any efforts to call any CNT personnel; true?
A. That is true.
Q. And in your presence, you didn't see or hear any other officers make a similar request?
A. That's true.
Q. Now, it wasn't your intention to have Mr. Sosa exit the apartment. You wanted Mrs. Sosa to exit the apartment; is that accurate?
A. Yes, sir.
Q. Were there reasons why you wanted to get Mrs. Sosa out of the apartment?
A. To eliminate the possibility of her receiving any potential harm in this -- in the hostile environment.
Q. Right. Was another reason because having her on scene is something that potentially could escalate the situation?
A. Yes.
Q. You had no reason to believe that Mrs. Sosa was trained in how to de-escalate a situation; right?
A. Could you repeat that question, sir?
Q. You had no reason to believe that Mrs. Sosa was trained in how to de-escalate a situation?

A. No, sir.
Q. Okay. Your -- in your mind, at least, you were asking -- the efforts you made to have Mrs. Sosa leave the apartment was with the intention that Mr. Sosa would stay inside the apartment; correct?
MS. O'LINN: Objection. Asked and answered at this point.
Go ahead.
THE WITNESS: I attempted to have Mrs. Sosa removed from the apartment just to separate herself, like I said from the hostile environment and close quarters situation.
BY MR. LITTLE:
Q. And the -- and with the intention that had she left, the only people in the apartment would have been the officers and Mr. Sosa; correct?
MS. O'LINN: Is that a statement or a question?
MR. LITTLE: I added a "correct" at the end.
THE WITNESS: Yes, sir.
BY MR. LITTLE:
Q. Okay. Is there -- did any of the officers ever give Mr. Sosa a command not to exit the apartment?
A. Yes.
Q. When?
A. As he began to walk out of the apartment,

officers yelled for him to stop.

Q. Okay. Well, I think my question is a little bit different, because by then, he's already out of the apartment. When he was still in the apartment, did anyone give him a command not to exit?

MS. O'LINN: Counsel, I'm going to object to the prelude to the question stated as fact as what you believe happened. Could you re-ask that question, please?

MR. LITTLE: Sure.

BY MR. LITTLE:

Q. While Mr. Sosa was still in the apartment and hadn't reached a threshold, had anyone given him a command to remain inside?

A. Yes. As I said, they -- prior to him breaking the threshold, officers yelled for him to stop.

Q. All right. And Mr. Sosa, when he -- in connection with your instructing Mrs. Sosa to exit the apartment, there wasn't, at the same time, an instruction for Mr. Sosa to stay inside the apartment; correct?

A. Could you repeat that again, sir?

Q. Sure. When an instruction was given to Mrs. Sosa to exit the apartment, there wasn't, at the same time, an instruction for Mr. Sosa to stay inside?

A. That is correct.
Q. Okay. As a matter of fact, the instruction that was given wasn't particularly directed at any single individual, to your recollection; isn't that true?
A. That is not true.
Q. Okay. What do you recall being said and by whom?
A. Starting with myself, I was facing Mrs. Sosa and she sat on the couch. I asked Officer Ayers for her first name. I then called Mrs. Sosa by her first name and waved for her to come my way to exit the apartment, and simul- -- shortly after that, Officer Abraham also ordered Mrs. Sosa to exit the apartment.
Q. Okay. So shortly after Mr. Sosa reached the threshold of his apartment or when he was in that general vicinity, one of the officers, to your recollection, said, "Stop" to him?
A. Yes.
Q. Was that Officer Abraham?
A. Yes.
Q. And then how long after that was Mr. Sosa Tased by Officer Aguilar?
A. Approximately, a second later.
Q. Okay. And at the time that Mr. Sosa was

A. Not that I believe so, sir.
Q. Okay. So -- so I wanted to ask you about how Mr. Sosa reacted after he was Tased. So in looking at your statement, it indicates that when Mr. Sosa was running forward, he was leaning forward, his head was down, and his scissors were at his side -- I'm assuming right side, right, because he had the scissors still in the right hand?
A. Yes, sir. They were in his right hand.
Q. Okay. And you also mention -- and I think this was in Rockwell's statement -- that you weren't even sure if the subject was fixated on you as he was running forward in that position?
A. Could you repeat that question, sir?
Q. Sir. Didn't you tell Officer Rockwell that you weren't sure if the subject was even fixated on you as he was running forward in the position that we just described?
A. I believe so, sir.
Q. Okay. And at no point did Mr. Sosa -- prior to your firing the one shot that you did, at no point did you ever say to either Sergeant Oliver or to Detective Rockwell, that he brought those scissors from his right side, up to a position where they were pointing at you; isn't that correct?

MS. O'LINN: Objection to the extent that it's argumentative whether he was asked or not.

But you can answer.

THE WITNESS: I believe I said that the scissors were pointed in -- towards me, at like -- pointed forward.

BY MR. LITTLE:

Q. Okay. So you believe that you said that the scissors were pointed forward, as opposed to at Mr. Sosa's side?

A. Could you rephrase that question, sir?

Q. Sure. And what I'm asking now is what you told the two folks that you spoke with -- that you spoke with about this incident. Did you tell either one of them, in your statements, that at any point in time that Mr. Sosa brought the scissors from his right side, up to a position where they were -- where he appeared to be pointing them at you?

A. The scissors were, yes, at his side, but the blade was pointed at me. I think that's where the confusion is.

Q. Okay. So you have an individual who is with his head down, running forward, who has just been Tased, who you don't even know if he's fixated on you, and that's the scenario we have before you shot?

MS. O'LINN: Objection. Argumentative. Misstates the testimony of the witness.

You can explain.

THE WITNESS: Mr. Sosa was looking -- had his head down, face up, looking at me, as he charged towards me and yelled, and made a grunting, yelling sound.

BY MR. LITTLE:

Q. All right. So at the time that you shot or fired the shot at Mr. Sosa -- and this is a yes-or-no question, sir -- you're not sure if he even knew that you were there?

A. Can you rephrase that question, sir?

Q. Sure. At the time that you fired the shot at Mr. Sosa's torso, you're not sure that he even knew you were there in front of him?

A. So, from my perspective, he knew that I was in front of him, yes.

Q. Well, the -- and I don't -- I'm not here to argue with you, but you told Detective Rockwell that he didn't appear to be even fixated on you?

MS. O'LINN: Objection. Argumentative.

Counsel, could you identify where you're reading from?

MR. LITTLE: Okay. I have my notes here. I don't have the summary, but this is straight from his

crossfire situation, a lethal crossfire situation from possibly Officer Ayers and more than likely Officer Abraham. And we also trained so that there is lethal coverage covering the less-lethal officer.

Q. What was the level of CNT training that you had at the time of this incident?

A. So my training reverts back to the POST academy, which was approximately a thousand hours over the span of six months. After that, I had field training, which was an additional six months.

After that was in-service training, such as perishable skills training, which I had gone through that course twice at that point in time in my career. And the daily briefings and debriefings that we held.

Q. Okay. I know you've already testified that you shot Mr. -- you fired your shot at Mr. Sosa's torso, and you shot when he was roughly a foot and a half away from you?

A. Yes, sir.

Q. Okay. So -- so at the time you shot him, he was -- you could have reached out and touched him, basically; right?

A. Yeah, for sure.

Q. And his -- I know you said he was leaning forward. I seem to remember reading somewhere that

Mr. Sosa's like 5-10 or was 5-10. Can you describe how he was leaning forward at the time you remember shooting?

MS. O'LINN: Counsel has made a statement in conjunction with his question. So that's not true. Argumentative. I object, Counsel, the 5-10 aspect. I'm not sure whether that's -- you're saying that as a fact with your question.

MR. LITTLE: No. No. I thought I remembered reading that somewhere. Maybe it was a different height. That's really immaterial for the purpose of my question. Let me just --

BY MR. LITTLE:

Q. How do you remember him leaning forward at the time that you fired your shot?

A. Mr. Sosa was a quite, like, tall and stocky, large individual. After the ineffective Taser deployment, as I said, he lowered his head and proceeded to charge at me at an angle, leaning forward, with his face facing up toward me.

Q. All right. And I'm trying to get a sense of how exactly he was -- he was bent over. I know we have video, but you were there firsthand. Sometimes video is not necessarily accurate.

The highest point of Mr. -- well, at what level

of your body was it your perception -- rephrase.

At what level of your body was Mr. Sosa's head at the time you shot?

A. Seeing as I'm roughly 6 foot 3, Mr. Sosa's head was at, I'd say about, like, the center of my chest.

Q. Okay. And you've already described in your prior statements where Mr. Sosa's hands were. And I think you said that his right hand was at his right side, but that the blade was pointed up; is that right?

A. Yes, sir.

Q. Okay. When say that his hand was at his right side, you mean extended all the way down?

A. No, sir.

Q. What do you mean?

A. So he had a bent arm. It would be a little bit easier to physically show you. But had a bent arm, still with the arm forward, near his bent over chest, with the scissors in his right hand, with the blade faced towards me.

Q. Okay.

A. I hope that helps.

MS. O'LINN: Would you like him to demonstrate it, Mr. Little?

MR. LITTLE: Well, I don't know how well we can capture that on Zoom, but if he feels like he can

demonstrate it.

MS. O'LINN: Please stand up and show him. Up a bit so they can see it.

Yeah, go ahead.

THE WITNESS: So like this, sir.

(Indicating.)

THE WITNESS: And this being my right hand.

MS. O'LINN: If you'll hold that position. It's similar to with a bent arm near your torso, and your hand out in front of your body with a thumb towards forward facing, indicating the blade would have been sticking out at that angle; is that correct?

THE WITNESS: Yes.

BY MR. LITTLE:

Q. So the way that you're saying, I guess you're significantly taller than he was. But the way that you're saying it, am I right, that the scissors would have been in the general area of your waist or maybe your upper thigh?

A. Yes.

Q. Okay. And this is when Mr. Sosa was roughly a foot and a half from you?

A. Yes, sir.

Q. Okay.

MS. O'LINN: Further estimate, Counsel, or

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of May, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR