# EXHIBIT 29

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through
Guardian ad litem JENNIFER LOPEZ,
M.S. by and through guardian ad litem
JENNIFER LOPEZ, individually and
as successors-in-interest to
Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS,
BRANDON CROCKETT,
JONATHAN ABRAHAM, and
ANTHONY AGUILAR,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

ANTHONY AGUILAR

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

NICHOLAS MILES LERMAN, ESQ.
6033 West Century Blvd., Ste 740
Los Angeles, CA 90045
nmlerman0@yahoo.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Officer Jonathan Abraham
Ms. Zepeda Olivares
Mr. Sosa, Senior
Jasmine Tanoury, Paralegal

Karen Torres-Corona, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: ANTHONY AGUILAR

EXAMINATION BY PAGE

MR. MAYNE................................5

MR. LITTLE..............................39

MS. O'LINN..............................57

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

(None marked.)

--oOo--

--oOo--

BE IT REMEMBERED, that set on Thursday, the 23rd day of April, 2026, commencing at the hour of 1:31 p.m., thereof, ANTHONY AGUILAR appeared remotely in Fresno, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good afternoon. We're on the record at 1:31 p.m. Today's date is April 23rd, 2026. This is the recorded remote video deposition Anthony Aguilar, in the matter of Sosa versus City of Fresno, et al.

This deposition is being held via Zoom. My name is Karen Torres-Corona. I'm the videographer with Focus Litigation Solution. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will swear in the witness.

MR. MAYNE: Good afternoon. I'm Cooper Mayne, one of the attorneys for some of the plaintiffs in this

Anthony Aguilar

still strike the subject, what's the result? You don't get NMI, but do you get pain?

MS. O'LINN: Objection. Calls for speculation. Unintelligible, I think.

But, go ahead. If you understand, you can answer.

THE WITNESS: I couldn't answer that question, sir.

BY MR. MAYNE:

Q. If you are deploying a Taser and the probes strike the subject, but you don't get NMI, do you still get pain? Does the subject still experience pain?

A. It's possible.

Q. In this case, based on your perception, was the Taser effective for any portion of time?

A. No.

Q. Based on Mr. Sosa's reaction, did the Taser cause him pain?

A. Yes.

Q. How could you tell?

A. When I deployed the Taser and pulled the trigger, he stumbled to his left, and it looked as if he was trying to swat the wires away from his chest.

Q. Besides that, was there anything that indicated to you that he was experiencing pain?

expressed intention to commit suicide by cop?

A. Yes.

Q. And how did you know that?

A. Officer Ayers had broadcast over the radio that he was on the phone with Mr. Sosa, and that Mr. Sosa also made statements that, "Tonight was either going to be his own life, an officer's life, or the male that Mrs. Sosa was talking to or seeing."

Q. Did your Taser -- well, first of all, I know this was a long time ago, but do you remember what model Taser you had?

A. It was a -- I know the brand was Axon. I think it was an X90 or T93X or 96X.

Q. Do you know whether it had a single cartridge or multiple cartridges?

A. It had two cartridges on it, itself. There was -- there was one loaded into the Taser itself, and then there's an extra cartridge at the bottom where the handle's at.

Q. Could you explain, you know, to somebody who's never used a Taser, how that works? Once you've deployed the Taser once, how would you deploy it a second time?

A. So the --

MS. O'LINN: Referring to probe deployment;

correct, Counsel?

MR. MAYNE: Yes.

THE WITNESS: So the Taser itself, once you use that cartridge and your two prongs are fired out of the Taser, if you don't get good NMI with those cart- -- I'm sorry -- with those prongs, there's no redeploying those same prongs, so you'd have to take out that cartridge and then insert a new one.

BY MR. MAYNE:

Q. I see. So how long does that process take to switch out the cartridges?

A. Depending on someone's training and experience, it could take up to three to four seconds.

Q. I've seen the video a few times, so I think I know the answer to this one, but did you have time to reload the Taser?

A. No.

Q. Did you attempt to reload the Taser?

A. No.

Q. To your knowledge, did any of the officers at the scene, at the time of the shooting, have any CIT training or any training in crisis negotiation?

A. Just the basic academy training that we received, and then during FTO, day-to-day trainings, and our perishable skills trainings, and in-service

trainings, along with some daily briefing topics.
Q. But to your knowledge, did any of the officers have, like, a special training in -- in crisis negotiation, other than the typical training that officers have?
A. Not to my knowledge.
Q. Did you call for a supervisor at any point before the shooting?
A. No.
Q. Do you know if anybody did call for a supervisor?
A. I don't know.
Q. At some point, there were some pursuits of Mr. Sosa; is that correct?
A. Yes.
Q. About how many pursuits were there, if you know?
A. Approximately, three. Three or four.
Q. Were you involved in any of those?
A. No, sir.
Q. But you heard about them over the dispatch; is that correct?
A. Yes, over our radio.
Q. At some point, did a sergeant call off the pursuits and instruct officers to no longer pursue

Mr. Sosa?

A. Yes.

Q. And did you learn that over dispatch radio, as well?

A. Yes.

Q. Approximately, how much time passed between when the pursuits were called off by the sergeant and when you arrived at the apartment?

A. I don't know an approximate time.

Q. When you arrived at the apartment, did you say at some point, "Does anybody have a Taser?"

A. Yes.

Q. Do you recall about what time or at what point in the events you said that?

A. Right as I got to the threshold of the door with Officer Crockett.

Q. And why did you say that?

A. Because I knew if we could have at least one less-than-lethal option, to give it a try at least.

Q. Were you surprised that nobody had a Taser deployed when you first approached and saw what was happening?

A. Can you rephrase your question, please? Sorry.

Q. When you first approached and saw Mr. Sosa and what was going on, were you surprised to learn that no

Taser was deployed?
A. Can you rephrase that, again? I'm sorry.
Q. We can -- we can move on.
So did you get a response when you asked if anybody had a Taser?
A. Yes.
Q. And what were you told?
A. No.
Q. And at some point, did you arm yourself with your Taser?
A. Yes.
Q. Did you consider using your firearm instead of your Taser?
A. Yes.
Q. And what made you decide to use your Taser instead of your firearm?
A. Can you rephrase that?
Q. Well, you mentioned that you considered using your firearm, but you eventually decided to use your Taser, and I'm just wondering why. Like, what factors made you decide to use your Taser instead of your firearm?
A. Because I had Officer Crockett as my lethal cover.
Q. How did you know that Officer Crockett was your

lethal cover -- and I guess I'll ask that a different way.

Did you and Officer Crockett ever discuss that you would be non-lethal and he would be your cover?

A. Yes.

Q. When did you discuss that?

A. Right after I pulled out my Taser.

Q. And how did you discuss that? What was said?

A. After I pulled out my Taser, I told him that he'll be my lethal.

Q. Did he respond or acknowledge that in some way?

A. Yes. He shook his head yes, like up and down.

Q. Before Mr. Sosa left the apartment, was there any point where you considered using your Taser?

A. Can you rephrase that? I'm sorry.

Q. Before Mr. Sosa left of the apartment, was there any point where you considered deploying your Taser, shooting him with your Taser?

A. No.

Q. When did you first consider deploying the Taser?

A. When I turned back around, after putting out a broadcast over the radio and I saw him walking through the threshold of the door.

Q. And so yes, let's make sure to clear that up.

You were at the apartment. You had a view of Mr. Sosa. At some point, you walked away from the door of the apartment. Could you describe that, why you walked away and what happened?

A. Yes. I walked away because the breezeway in which we were in, our radios had bad reception, so none of our radio traffic was going through to dispatch, so I walked out a couple feet out from underneath the breezeway to put out a broadcast.

Q. Did you successfully put out a broadcast?

A. Yes.

Q. And what did you broadcast?

A. I broadcast that Mr. Sosa was armed with scissors, and he was telling officers that we were going to have to shoot him.

Q. And then after you made the broadcast, what happened?

A. I turned around and walked back towards the door, and that's when I saw both Officers Ayers and Crockett standing outside of the -- the front door.

Q. So going back now -- and sorry for jumping around -- but going back now to when you were initially at the door of the apartment, and you did not consider using your Taser at that point, why is that? Why did you decide not to use your Taser at that point?

itself.
Q. After you used your Taser, did you hear gunshots?
A. Yes.
Q. From which direction did you first hear gunshots?
A. When I heard the gunshots, to me, they were all simultaneously.
Q. Were you surprised when you heard gunshots?
A. No.
Q. Were you trained that deadly force is the highest level of force?
A. Yes.
Q. Were you trained that deadly force should not be used unless there's an immediate threat of death or serious bodily injury?
A. Yes.
Q. Were you trained that you must control your fear when determining what level of force to use?
A. Yes.
Q. Were you trained that officers' subjective fear alone is not sufficient to justify deadly force?
A. Yes.
Q. Were you trained that giving a warning before using deadly force is appropriate, where feasible?

had the time to, I was going to use my Taser.

Q. Do you recall anybody ordering Mr. Sosa to stay in the apartment?

A. No.

MS. O'LINN: Objection. Argumentative as phrased.

THE WITNESS: No.

BY MR. MAYNE:

Q. Do you recall in the moments before you Tased Mr. Sosa, any officers giving him any orders?

A. Yes.

Q. What orders was he given?

A. To stop.

Q. Any other orders, besides to stop?

A. No.

Q. How many times was he ordered to stop?

A. I heard twice.

Q. Do you know who --

MS. O'LINN: Can we take a break after -- can we take a break, Counsel? I just need a personal break.

MR. MAYNE: Of course. Yeah. Let's take a break now. Is ten minutes good?

MS. O'LINN: Thank you. Yeah, absolutely.

THE VIDEOGRAPHER: We're off the record at 2:27 p.m.

Q. All right. And as far as I know, the -- you took it upon yourself to take over the communications and try to build a rapport with Mr. Sosa. Is that a fair accurate -- fair assessment of what you told Detective Rockwell?

MS. O'LINN: Objection. Argumentative as phrased.

You can go ahead and answer.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. All right. And you even addressed Mr. Sosa by his first name, Max, and told him who you were. Is that correct?

A. Yes.

Q. And that was -- and then after that, he responded something to the effect of: No, we can't effing talk; right?

A. Correct.

Q. But he was responding to what you were saying, maybe not in the way that you had hoped, but he was responsive?

A. Correct.

Q. All right. And during the time that you were speaking with him, that's when, as you testified already, he had the scissors in his right hand, pointing

A. Correct.
Q. And to your understanding, the other three officers who were on scene, they also -- you were unaware of any of them having any specialized training?
A. Correct.
Q. As a matter of fact, I think by maybe a year or two, you were the most experienced officer on scene?
A. Yes.
Q. And is that one of reasons why, a minute or so into arriving, that you decided to try to take over the communications?
A. No.
Q. What was the reason for that?
A. I tried taking over communications because I could already tell, just by hearing Mr. Sosa screaming and yelling at everyone who was inside, that maybe a -- a new face, a new person could possibly get him to calm down a little bit.
Q. And how many times before this incident had you responded to a scene where you were dealing with someone who appeared to be in mental distress?
MS. O'LINN: Prior to this.
THE WITNESS: Probably, approximately, I'd say 75 to 100 calls, probably.
BY MR. LITTLE:

BY MR. LITTLE:

Q. All right. When you communicated with Mr. Sosa, you actually said -- and I'm just going to look back here at the transcript. You told him, "Don't step toward me."

A. Yes.

Q. Right. So you didn't say just, "Stop." You actually spoke in a full sentence?

A. Yes.

Q. And the reason why you did that is that you wanted to make sure that he understood you?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: Correct.

BY MR. LITTLE:

Q. All right. Now, I just want to make sure I'm understanding this part, because had you already decided to deploy your Taser as Mr. Sosa was exiting the threshold of the apartment?

A. Can you rephrase that? I'm sorry.

Q. Sure. Had you already decided that you were going to deploy your Taser at the time that Mr. Sosa was crossing the threshold out of the apartment?

A. Yes.

Q. Can you explain to me all of the reasons why

you were deciding to deploy your Taser at that point?

A. Yeah. So I told -- like I said before, I told Officer Crockett that if Mr. Sosa had made his way from the kitchen, outside towards us, that I was going to deploy the Taser when he walked through the threshold, due to his behavior, due to him still holding the scissors, and the threats that he made towards Officer Ayers, specifically. The threats that he made towards a third-party individual, and the fact that he also even said it was going to be if not either their lives, it was going to be other officers' lives.

Q. Okay. So and you had overheard Mr. Sosa make those statements shortly after you arrived on scene?

A. Yes.

Q. All right. And that was roughly five to seven minutes before he exited the apartment?

A. Correct.

Q. All right. Okay. When Mr. Sosa exited the apartment, would you agree that he had the scissors in his right hand, his arms were straight down, and the scissor blades were pointed down?

A. Yes.

Q. Okay. What is the -- how many times have you deployed your Taser in your police career?

MS. O'LINN: Mr. Little, could you be clear

A. Yes.
Q. What was your understanding of the existence of probable cause to arrest him for any crime when you arrived at the apartment?
A. I knew that he was going to be arrestable for possibly driving under the influence. We have assault on a police officer. We had criminal threats. And then we also had -- that's all I can think of at the moment.
Q. So were you looking to give him an avenue of escape?
A. No.
Q. With regard to the interactions between Officer Ayers and Mr. Sosa, you've watched the body-worn camera footage; correct?
A. Yes.
Q. And his verbal interactions with Mr. Sosa on the phone and in person, you didn't observe those yourself, in person?
A. Correct.
Q. Did you -- when you watched the videos, did you observe Officer Ayers attempting to build rapport with Mr. Sosa?
A. Yes.
Q. Did you observe, in your review of the videos, Officer Abraham trying to build rapport with Mr. Sosa?

A. Yes.
Q. And did you ever observe Officer Crockett attempting to build a rapport with Mr. Sosa?
A. Yes.
Q. You were questioned multiple times about CNT and CIT. So under what circumstances is CNT typically requested by officers in patrol to respond to a location?
A. Usually, CNT is requested when we have a subject contained, to where he's not an actual threat to -- or not an imminent or immediate threat to another person or officer.
Q. Barricade situation?
A. Yes.
Q. And is that -- is CNT a classic hostage negotiator position?
A. Yes.
Q. Okay. And with regard to the questions about specialized CIT training, the amount of training that a Fresno Police Officer receives on CIT, it's not specialized, but it's extensive with regard to from the basic academy through daily briefings and the entire range in between; would you agree?
A. Yes.
Q. And the de-escalation that you are taught at

Fresno Police Department, could you describe how you're trained to attempt to de-escalate situations?

A. Yeah. So we attempt to -- we're trained to de-escalate by trying to build that rapport with the person. We try to get into a -- like I did, I called him by his name. So I try to get to, like, a personal level. Because at the end of the day, what we're wanting to do is we're wanting to end whatever problem or incident that we're at peacefully, with no one hurt.

Q. And is show of force one way to de-escalate?

A. Yes.

Q. And number of officers present at a scene, is that a tactic in trying to de-escalate a situation?

A. Yes.

Q. Is directing of weapons at an individual an attempt to de-escalate a situation?

A. Yes.

Q. To get them to comply with the de-escalation requires cooperation from the suspect; would that be accurate?

A. Correct.

Q. And you were questioned about the full sentences versus one-word commands. Are officers taught to give simple, clear, direct, one-word commands in circumstances that are tense and uncertain?

Q. And are you aware of scissors being used as weapons against police officers?
A. Yes.
Q. And against citizens?
A. Yes.
Q. And the significance of that potential injury, was that a concern for you that day?
A. Yes.
Q. At the time when you fired your Taser, you indicated you didn't think it was effective; is that correct?
A. Correct.
Q. And at that point, what was Mr. Sosa doing?
A. I'm sorry. Can you repeat that?
Q. After the Taser -- as you deployed it, as you observed it was ineffective, what did you see Mr. Sosa do?
A. He -- after the Taser was deployed, he took two steps to his left, and then as he was holding the scissors in his right hand, he -- and his body came upwards, his head was still down, but his face was facing up.
And with those shears in his hand -- the scissors in his hand still, was, started charging towards Officer Crockett and I.

Anthony Aguilar

Q. And did you -- how far away was he at the point that you believe you heard shots being fired?
A. Approximately, a foot, maybe less. He closed distance fairly quickly.
Q. And did you move back during that process, after the Tasing attempt?
A. Yes.
Q. So were you standing still or moving backwards when he was charging?
A. I was moving backwards.
Q. Do you know what was happening with Officer Crockett?
A. He was also moving backwards.
Q. Okay. And did you see where Officer Ayers was?
A. Officer Ayers was to my left. And when I backed up after using my Taser, he moved to his right, in doing a job covering me as -- as lethal, and pretty much took my spot where I was standing initially.
MS. O'LINN: Thank you. I have no further questions.
Any follow-up, gentlemen?
MR. MAYNE: Not from me.
Mr. Little?
MR. LITTLE: No.
MR. MAYNE: Thank you, Officer Aguilar, for

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR