# EXHIBIT 30

# Deposition Transcript

Case Number: 1:23-cv-01575-JLT-SAB
Date: June 9, 2026

In the matter of:

# MARTHA ZEPEDA OLIVARES, et al. v CITY OF FRESNO, et al.

# JOE RONALD ALVAREZ - PMK

CERTIFIED COPY

Reported by:
ANNETTE ARLEQUIN

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

____________________________

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Case No. 1:23-cv-01575 JLT-SAB

Plaintiffs,

v.

CITY OF FRESNO; UNKNOWN LAW ENFORCEMENT OFFICERS, and DOES1-30,

Defendants.

____________________________/

REMOTE VIDEOCONFERENCE DEPOSITION

OF

JOE RONALD ALVAREZ

(Person Most Knowledgeable)

City of Fresno

Tuesday, June 9, 2026

Stenographically reported by:
ANNETTE ARLEQUIN, CA CSR #15085, RPR, CRR, RSA
JOB NO. 2772300

June 9, 2026
3:00 p.m. (Pacific)

Remote videoconference deposition of JOE RONALD ALVAREZ, Person Most Knowledgeable for the City of Fresno, pursuant to Notice, before Annette Arlequin, a California Certified Shorthand Reporter #15085, a Registered Professional Reporter, a Certified Realtime Reporter, and a Realtime Systems Administrator.

A P P E A R A N C E S: (Remotely)

LAW OFFICES OF KEVIN G. LITTLE
Attorneys for Plaintiff Martha Zepeda Olivares,
individually and on behalf of the Estate
of Maximiliano Sosa, Jr. and Maximiliano
Sosa, Sr.
Post Office Box 8656
Fresno, California 93747
BY: KEVIN G. LITTLE, ESQ.
Email: service@kevinglittle.com
BY: MICHELLE L. TOSTENRUDE, ESQ.

MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
Attorneys for Defendants City of Fresno,
Unknown Law Enforcement Officers, and
Police Chief Paco Balderrama
801 S. Figueroa Street, 15th Floor
Los Angeles, California 90017
BY: MILDRED K. O'LINN, ESQ.,
Email: missy.olinn@manningkass.com
Email: delia.flores@manningkass.com
(Counsel requested copying Delia Flores
on all emails.)

A P P E A R A N C E S (Cont'd): (Remotely)

LAW OFFICES OF DALE K. GALIPO
Attorneys for Non-Party Maria Sosa
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
BY: COOPER MAYNE, ESQ.
Email: cmayne@galipolaw.com

ALSO PRESENT:

MARTHA ZEPEDA OLIVARES,
MAXIMILIANO SOSA, SR.

I N D E X


| WITNESS | PAGE |
| --- | --- |
| JOE RONALD ALVAREZ | |
| BY MR. LITTLE | 7 |


I N D E X O F E X H I B I T S


| DESCRIPTION | PAGE |
| --- | --- |

* NONE MARKED **

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- o0o -

COURT REPORTER: Hello everyone.
My name is Annette Arlequin, California Certified Shorthand Reporter number 15085.
The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.
At this time will the witness please raise your right hand to be placed under oath.
(Oath administered.)
THE WITNESS: I do.
* * *

J O E R O N A L D A L V A R E Z,
called as a witness, having been duly sworn testified as follows:

* EXAMINATION *

BY MR. LITTLE:
Q. Good afternoon, sir.
A. Hello.
Q. So I understand that you are here

one of the topics?

MS. O'LINN: Objection to the extent that "mental health crisis" is vague and ambiguous and overbroad, but you can answer.

A. So I reviewed seven incidents of deadly force, including this case, that dealt with an individual in crisis and utilized an edged weapon or stabbing implement.

Q. All right. So let me make sure that I'm understanding.

The seven cases that you reviewed, and we'll get you to delineate which ones they are, aside from our case, all involved persons that you understood to be having a mental health episode who were armed with bladed weapons?

MS. O'LINN: Objection. I believe misstates the testimony.

The witness, I believe he said seven including this one, as opposed to seven outside of this one.

MR. LITTLE: Okay.

MS. O'LINN: And I don't believe

When they went upstairs, attempt to make contact and help her, she through a hatchet at the door and the officers attempted to back out of the house.

As they were retreating, she retrieved the hatchet and charged at officers forcing them to defend themselves.

Q. There was an internal investigation of that case?

A. Yes.

Q. And the use of deadly force was determined to be justified, true?

A. True.

Q. All right. And there was also a DA's investigation that resulted in no charges being involved against either of the officers involved?

A. Yes, the DA's investigation found that the response by the officers was consistent with law.

Q. All right. So in the Arvizo case, did any -- was anyone else on seen prior to the use of deadly force who was specially trained in crisis intervention?

A. I do not know.

Firpo.

MR. LITTLE: Okay.

MS. O'LINN: And Damian, D-a-m-i-a-n, Herrera, did I get that right?

Yes, that's the officers involved in that one, Mr. Little.

MR. LITTLE: Okay.

BY MR. LITTLE:

Q. What was the information available to the officers in the Davidson-Rawlings case that indicated prior to the use of deadly force that the individual was having a mental health crisis?

MS. O'LINN: Overbroad. Vague. Go ahead.

A. I don't know.

Q. Okay. In that case, there was an Internal Affairs OIS review that found the shooting was justified?

A. Yes.

Q. And there was also a DA investigation and found that there was no criminal offense committed?

A. Yes.

Q. In that case, was anyone trained in crisis intervention either present at or summoned to the scene prior to the use of deadly force?

A. I do not know.

Q. In that case, did any officer on the scene request the assistance of a mental health professional prior to the use of deadly force?

A. I do not recall.

Q. Did you, when you were reviewing these documents, was that something that you were particularly looking for?

A. In regards to that, as I went through it because there was a lot of documents, I was focused on the investigation in regards to any violations of policy procedure or areas of concern.

I was also focused on the district attorney's analysis of the event and if it was legal and justified for that case.

Q. Okay.

MS. O'LINN: For the record,

being used?
A. I do not.
Q. It sounds like it's your understanding this was... officers were present at the scene of this residence for some time before deadly force was used; is that true?
A. Yes.
Q. Okay. All right. And again this is use of force was deemed justified both by the department and the DA's office?
A. It was justified by the department. It was found to be legal and justified by the DA's office.
Q. So let's talk about the Hernandez case.
MS. O'LINN: January 5thof 2019.
MR. LITTLE: All right.
BY MR. LITTLE:
Q. And you're familiar with the facts in the Hernandez case suggesting that the individuals was having a mental health crisis?
A. Confirm the officers.
MS. O'LINN: Hernandez. Wait a

A. If you are asking did officers attempt to utilize less lethal force and attempt to get him to cooperate, the answer is yes.

Q. Okay. Was less lethal force attempted even though officers knew that the person had a hatchet?

A. Actually, I'm sorry, now just so I answer correctly, Mr. Little, can I ask you to repeat the question or madam court reporter?

Q. I can repeat it. That's fine.

So the officers attempted to use less lethal force even though they knew that this individual had a hatchet?

A. Yes.

Q. Okay. And this shooting was deemed justified based on the OIS investigation and the DA found no crime had occurred?

A. Yes.

Q. All right. So the next incident is Mr. West, a retired police captain, correct?

A. Yes.

Q. And the date of that incident -- I don't have it. I do. It was 11/12/2018.

MS. O'LINN: Correct, Mr. Little. And the officer was Luke Taylor, T-a-y-l-o-r.

MR. LITTLE: Okay.

BY MR. LITTLE:

Q. And that was also based on the OIS investigation found to be within policy?

A. Yes.

Q. And it was also it was found by the DA's office to be a situation where no crime occurred?

A. It was deemed legal and justified, yes.

Q. Okay. And former Captain West, what was the information suggesting that at the time that deadly force was used on him that he was experiencing a mental health episode?

A. At the time deadly force was used on him, there was no information at that point. It was his violent assault against the officers that they responded to.

utilizing deadly force.

And then a majority of the information, I believe, came after the fact because our office only encountered him when the individual walked in the door without saying anything violently assaulting him.

MS. O'LINN: I don't think you mentioned the pen, what he did with the pen.

A. As I mentioned, he armed himself with the pen. The strikes to the head were with the pen.

The officer believed that he was being stabbed with a knife, of what he could feel, not because of what he could see, and the pen was recovered on scene, sir.

Q. Okay. And that was also found justified after the OIS investigation?

A. Yes, sir.

Q. And the DA also found that there was no crime?

A. They found it justified and appropriate under the law.

You can explain.

A. So there's a couple of issues here. I have not reviewed each of their training records, but the answer is yes. It depends upon which officer and it also depends upon the time frame because there was none specified.

Q. Okay. Those would be the six cases we talked about that happened between 2018 and 2024, I guess.

And do any of those, the officers who were involved in using deadly force, did they have advanced crisis intervention training?

MS. O'LINN: You can explain.

A. So the term you're using as far as "advanced crisis intervention training" is not necessarily a term we use.

So every officer had crisis intervention training starting at the academy. It's actually an entire learning domain.

As it continues, each and every one of them was trained through our orientation, the field training, as well as

different classes put on by the regional training center, and this varies per officer as we get into more advanced.

For the crisis intervention training, the 40-hour training, the crisis intervention, the 8-hour class, as well as different mental health updates, whether it be from roll call training bulletins, in-person classes, vendor classes, or classes where we would seek, as you had mentioned, other professionals outside of our organization to train, including but not limited, to different areas of updates, briefing trainings, utilizing programs, experts or other areas.

So depending upon the individual because some of them were on training and had the initial training, others had gone all the way up like on Hernandez, were a trained crisis negotiator and were attempting or have advanced training, as I think you're trying to reference.

Q. Okay. Now I wanted to ask about the two or three other cases where the persons were, to your understanding,

statement is there hasn't been a situation where there was a failure where it was needed in the way you're categorizing this.

Q. Okay. So since I believe 2021, state laws change where a deescalation is required, would you agree?

A. No.

Q. Why do you not agree with that? Efforts of deescalation are not required.

MS. O'LINN: Objection. First counsel, it's January 1st of 2020, but you can answer.

A. So outside the date, it's when reasonable and feasible and it's safe to do so. There is no mandate on to do something in regards to when it's unsafe, it's against the law, and the law takes into consideration the officer's need to take immediate action to protect them or others.

Q. So in the same five-year time frame that we are talking about, has the Fresno Police Department ever determined that in connection with a use of deadly force, that insufficient deescalation efforts were attempted?

A. No.
MS. O'LINN: Objection. Asked and answered.
THE WITNESS: I apologize.
MS. O'LINN: That's okay.
A. No.
Q. Okay. I'm going to go onto topic 2, which relates to training policies and procedures on deescalation.
I'm assuming that the Fresno Police Department has encouraged officers to attempt to deescalate situations prior to using force even before the 2020 change in the law, correct?
A. Yes.
Q. And when did the Fresno Police Department first adopt a written policy that specifically included guidance about deescalation?
MS. O'LINN: I suspect he can only go back to the date of his hire, but I don't know. So objection overbroad.
A. So this is a difficult question because prior to the actual policy, I

peaceful resolution of all calls.

Q. And what are some different deescalation techniques that currently -- well, not currently -- as of the date of this incident, November 2023, that the Fresno Police Department taught its officers to consider?

A. So this can vary. But from the start, all of our officers attend a basic police academy where deescalation is taught and the multiple LDs, including specifically LD 20, where it deals with the core concepts of self-control, effective communication, assessment of scene, management, as well as force options.

It provides them with a decision-making model called the CDM, which deals with how to collect information, assess the situation, take that information, evaluate it under policy and law, come up with the plan and a response.

It then deals with different areas of communication for active listening and understanding individuals in a medical crisis, a drug crisis, or other situations,

including to a definition of recognizing that this is for deescalation, to utilize strategies and techniques to lower the intensity of an event.

From there, they go into training at our agency before they even hit the street for several months. And all of our training builds on the core concepts of decision-making communication and proper responses.

In FTO this is reinforced over and over and over again. And our FTO is required to be trained in mental health, as well as crisis intervention so that they can teach these proper skills.

As it moves through, every in-service class that's taught, deals with these core concepts, as well as some advanced concepts of how to employ.

Now realistically, our policy is also an area of training because it gives guidelines on things to consider from information to gather before, during and after, for resources that can be considered, not should be used, but can be

considered based upon time, availability and safety.

Moving back through the policy and our roll call training bulletins, you then have in-service classes that are taught by department members with advanced training, as well as individuals from outside the organization that are deemed experts.

We utilize contracts for people to come in and teach post certified classes, as well as just areas of training, but within the medical realm, all the way through briefing training, which now has been and continues to be some formalized utilizing programs such as the Briefing Room, Power DMS or other official handouts because our number one goal is, one, the sanctity of human life and attempting to safely take everyone into custody.

Q. So it sounds like the Fresno Police Department recognizes exactly how important deescalation should be when you're dealing with subjects in the field?

A. Is that a question or statement,

A. Nice try. No.
Q. Okay. All right.
So now I'm going to go onto the next topic here, if I can pull my notes back up.
All right. So the next topic is post incident investigation and improvements.
MR. LITTLE: I'm sorry, what?
MS. O'LINN: We're on number three, right?
And I'm going to say that I think by way of efficiency, you may have covered a substantial remaining, you know, portion of the remaining topics, but I'll leave that to you to evaluate.
MR. LITTLE: Right.
I think we've covered 5 already.
MS. O'LINN: Yes.
MR. LITTLE: And 6 is.
BY MR. LITTLE:
Q. Of the cases, I think let's knock out 6 real quick.
The only civil settlement or judgment from the cases that you've --

these six cases that you have identified, I believe the Oliver Hernandez case settled in a settlement of a million dollars.
Are you aware of any other of those cases resulting in any settlements or verdicts?
A. Not to my knowledge, sir.
Q. Okay. All right.
So going back to topic 3, during any periodic policy review or performance review, has the administration of the Fresno Police Department identified any weaknesses in how its officers used deescalation in the field?
MS. O'LINN: Objection. Counsel, that is not Category 3.
MR. LITTLE: I think it is.
MS. O'LINN: The way you worded it is very different than you put in your PMK.
Can we start there and then --
MR. LITTLE: Sure.
Are we going -- I really only have a few questions in topic 3.
MS. O'LINN: I'm trying not to

Q. Okay. In terms of continuing officer training during that same five-year period, did the management of the Fresno Police Department identify any necessary training for officers to help them improve their deescalation skills?

MS. O'LINN: Same objection. Vague and ambiguous. Overbroad.

You can answer.

A. So this is difficult. I will say not to the negative part, but yes, our training is reviewed annually to ensure that we are meeting the needs of the organization and dealing with any trends or legal updates.

Part of the training plan is done by the training lieutenant. And in the past it has been submitted to the chief and sometimes it hasn't, depending upon the procedures at the time, but you're constantly under review and adjustment.

And during that time, you've had the adoption of the new Use of Force classes which deals with deescalation, you've had actual deescalation classes,

you've had the CIT classes which we've been dealing with mental health.

As an example, there's a book at our training center from the 1960s where we have constantly been training on mental health, people in crisis, and it was then called Compliance Deescalation.

As I've testified before, the term we used to use in law enforcement was compliance, those tools, techniques and strategies to gain compliance.

But to go back to Mr. Little's question and be a little more succinct, there is an annual review in training that staff can be involved in, not from a negative aspect, but for an update in techniques, from best practices, from legal updates.

And we are constantly changing, not only the existing classes that we have, but the new ones that we're develop and some of them, as I mentioned, have come about from the law, which include the use of force classes, as well as the changing of even basic academy in LD 20 with the

deescalation.

Q. All right. Thank you, sir.

So my next question is about the interplay between the CIT and the CRT.

Back in November of 2023, was there crisis intervention support after hours on weekends that was available to Fresno police officers?

A. Yes.

Q. And in what form of assistance was available after hours or on weekends during that time period?

A. So we had, for field response, you had the mental health units that were from the Department of Behavioral Health. You had contract mental health units from Kings View. You had phone support that you can contact through a dispatch if you needed assistance.

On a callout basis, obviously, we had access to our crisis intervention team, as well as our crisis negotiation team, if need and warranted.

These are just some. But I know there's more, but the answer is yes.

* CERTIFICATE OF REPORTER *

I, ANNETTE ARLEQUIN, CA CSR, CCR, do hereby declare:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

______ That the witness requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

______ Signature is waived.

______ The changes made by the witness are appended to the transcript.

______ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this 17th day of

June 2026.

Annette Arlequin
_____________________________________

ANNETTE ARLEQUIN, CA CSR #15085