**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs Maria Sosa, L.S., and M.S.*

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA SOSA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF FRESNO, et al.,<br><br>Defendants. | Case No.: 1:23-cv-01575-JLT-SAB<br>Honorable Jennifer L. Thurston<br><br>**SOSA PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 93)**<br><br>Date: November 20, 2026<br>Time: 9:00 a.m.<br>Court: Robert E. Coyle U.S. Courthouse<br>Crtrm: 4 |

## TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 7

II. STATEMENT OF FACTS .......... 7

III. LEGAL STANDARD .......... 10

IV. ARGUMENT .......... 11

A. The Sosa Plaintiffs Have Standing to Pursue Their Claims .......... 11

B. A Reasonable Jury Could Find That the Officers Used Excessive Force in Violation of the Fourth Amendment .......... 12

1. Mr. Sosa Did Not Pose an Immediate Threat of Death or Serious Bodily Injury When the Officers Fired .......... 12

2. The Remaining *Graham* Factors Weigh Against Deadly Force .......... 14

3. The Video Does Not Resolve the Disputed Facts .......... 16

4. Defendants' Authorities Are Distinguishable .......... 17

C. The Officers Are Not Entitled to Qualified Immunity .......... 18

1. Disputed Material Facts Preclude Qualified Immunity at Summary Judgment .......... 19

2. The Law Was Clearly Established on November 4, 2023 .......... 19

D. Triable Issues Preclude Summary Judgment on the State Law Claims .......... 22

1. Negligence .......... 22

2. Battery .......... 29

3. Bane Act .......... 30

E. Defendants' Damages Arguments Do Not Warrant Summary Adjudication .......... 31

V. CONCLUSION .......... 32


LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alves v. County of Riverside*, 135 F.4th 1161 (9th Cir. 2025) .......... 24, 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 10

*Arvizu v. Hammon*, No. 1:21-cv-00890-KES-SKO, 2024 WL 3758368 (E.D. Cal. Aug. 12, 2024) .......... 17

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .......... 20

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) .......... 30

*Branch III v. City of Torrance*, No. BC655480, 2021 WL 9949988 (Cal. Super. Ct. Sept. 15, 2021) .......... 24

*Calonge v. City of San Jose*, 104 F.4th 39 (9th Cir. 2024) .......... 10, 15

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) .......... 31

*Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) .......... 10, 15

*City & County of San Francisco v. Sheehan*, 575 U.S. 600 (2015) .......... 17

*Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766 (2017) .......... 30

*County of Los Angeles v. Mendez*, 581 U.S. 420 (2017) .......... 24

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014) .......... 10

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) .......... 31

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) .......... 14, 15

*Dillenbeck v. City of Los Angeles*, 69 Cal. 2d 472 (1968) .......... 24, 25

*Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) .......... 14, 22

*E.V. v. City of Covina*, No. 25-7151, 2026 WL 2334322 (9th Cir. Aug. 12, 2026) .......... 17

*Escobedo v. City of Los Angeles*, No. 19STCV43741, 2024 WL 7019084 (Cal. Super. Ct. Apr. 11, 2024) .......... 25, 26

*Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) .......... 12

*Estate of Aguirre v. County of Riverside*, 29 F.4th 624 (9th Cir. 2022) .......... 20

*Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) (en banc) .......... 18



LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

*Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017)........ 15, 19

*Estate of Lowe v. City of Huntington Park*, No. 23STCV11211, 2025 WL 1090211 (Cal. Super. Ct. Mar. 21, 2025)........ 27

*Estate of Strickland v. Nevada County*, 69 F.4th 614 (9th Cir. 2023)........ 17

*Garcia v. City of Tustin*, No. 24-2224, 2025 WL 2268253 (9th Cir. Aug. 8, 2025)........ 13, 19

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013)........ 20

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)........ 12, 13, 14, 21

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc)........ 10, 12, 15

*Gordon v. County of Orange*, 6 F.4th 961 (9th Cir. 2021)........ 20

*Graham v. Connor*, 490 U.S. 386 (1989)........ 12

*Grudt v. City of Los Angeles*, 2 Cal. 3d 575 (1970)........ 23, 24

*Handy v. Jones*, No. 25-5105, 2026 WL 2716416 (9th Cir. Sept. 15, 2026)........ 17

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997)........ 20

*Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013)........ 23, 24, 26, 27

*Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013)........ 28

*Hermosillo v. County of Orange*, 562 F. Supp. 3d 802 (C.D. Cal. 2021)........ 13

*Hope v. Pelzer*, 536 U.S. 730 (2002)........ 20

*Hughes v. Kisela*, 862 F.3d 775 (9th Cir. 2017), *rev'd on other grounds sub nom. Kisela v. Hughes*, 584 U.S. 100 (2018)........ 15, 18, 19, 21

*Johnson v. Jones*, 515 U.S. 304 (1995)........ 19

*Kelley v. Borg*, 60 F.3d 664 (9th Cir. 1995)........ 20

*Kisela v. Hughes*, 584 U.S. 100 (2018)........ 15, 18, 21

*Lal v. California*, 746 F.3d 1112 (9th Cir. 2014)........ 17

*Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017)........ 10, 17, 19

*Mendez v. County of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018)........ 24

*Penny v. Azmy*, Nos. 22-55572, 22-55579, 2024 WL 489287 (9th Cir. Feb. 8, 2024)........ 21

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)........ 16

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

*Price v. Sery*, 513 F.3d 962 (9th Cir. 2008) ........ 19

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ........ 30

*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc) ........ 30

*Ruiz v. City of Los Angeles*, No. 22STCV25856, 2025 WL 431857 (Cal. Super. Ct. Jan. 17, 2025) ........ 27

*S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017) ........ 21

*S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) ........ 16, 17

*Scott v. Harris*, 550 U.S. 372 (2007) ........ 10, 16

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) ........ 12

*Seidner v. de Vries*, 39 F.4th 591 (9th Cir. 2022) ........ 10

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc) ........ 10, 15

*Smith v. Wade*, 461 U.S. 30 (1983) ........ 31

*Szarowicz v. Birenbaum*, 58 Cal. App. 5th 146 (2020) ........ 31

*Tabares v. City of Huntington Beach*, 988 F.3d 1119 (9th Cir. 2021) ........ 23, 25

*Tennessee v. Garner*, 471 U.S. 1 (1985) ........ 12, 15, 20

*Tolan v. Cotton*, 572 U.S. 650 (2014) ........ 10, 13, 19

*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) ........ 12, 16

*United States v. Reese*, 2 F.3d 870 (9th Cir. 1993) ........ 30

*Valenzuela v. City of Anaheim*, 6 F.4th 1098 (9th Cir. 2021) ........ 31

*Ventura v. Rutledge*, 978 F.3d 1088 (9th Cir. 2020) ........ 18

*Villalobos v. City of Santa Maria*, 85 Cal. App. 5th 383 (2022) ........ 27

*Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) ........ passim

*Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023) ........ 18

*Wilkins v. City of Oakland*, 350 F.3d 949 (9th Cir. 2003) ........ 19

**Statutes**

42 U.S.C. § 1983 ........ 11

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

Cal. Civ. Code § 3294 .......... 29

Cal. Civ. Proc. Code § 377.34 .......... 11, 29

Cal. Civ. Proc. Code § 377.60 .......... 11

Cal. Gov't Code § 815.2 .......... 28

Cal. Gov't Code § 820.2 .......... 28

Cal. Penal Code § 835a .......... 27, 28

Cal. Prob. Code § 6401 .......... 11

Cal. Prob. Code § 6402 .......... 11

Stats. 2021, ch. 448 (S.B. 447) .......... 29

**Rules**

Fed. R. Civ. P. 56 .......... 9

**Other Authorities**

Judicial Council of California Civil Jury Instructions (CACI) No. 1305B .......... 28

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

For fifty-three minutes before they shot him, Fresno officers knew that Maximiliano Sosa, Jr. was suicidal and wanted police to kill him. Yet the officers surrounded him at close quarters in a narrow breezeway and Tased him without warning, knowing that he would likely try to move away from the pain and that every way he could move led toward an officer. Two seconds later, without warning, they shot a suicidal man who had hurt no one, who held a pair of kitchen scissors down at his side and had never struck, stabbed, or lunged at anyone with them, and who was moving away from the pain of the Taser. The Court should deny the motion as to the Fourth Amendment, battery, negligence, and Bane Act claims.

## II. STATEMENT OF FACTS

At 3:08 a.m. on November 4, 2023, Maria Sosa called 911 because her husband, Maximiliano Sosa, Jr., was suicidal. (JtSF 1; SUF 20.) Dispatch sent it as a mental health call: "SUICIDAL MALE, NO WEAPS." (PAMF 1–2.) Mr. Sosa had no criminal record and had never physically abused or threatened anyone. (PAMF 3–4.) At about 3:31 a.m., he drove past Officer Equihua in Ms. Sosa's apartment complex; Defendants say he tried to hit the officer, but the video shows his car turning away from the officer. (SUF 25; PAMF 5.) Dispatch broadcast that he intended suicide by cop, and the officers understood that was his intent. No officer had information that he had ever hurt anyone. (SUF 42; PAMF 6–8.)

Officers Ayers and Abraham waited about fifteen minutes in Ms. Sosa's apartment with her, believing it highly probable that Mr. Sosa would return. In that time they made no tactical plan, did not decide who would use less-lethal force, and did not move Ms. Sosa out of the living room. (PAMF 9–12.) No supervisor took part. No one called the Crisis Negotiation Team, which is requested when a subject is contained and is not an immediate threat, and none of the four officers had crisis negotiation or crisis intervention certification. (PAMF 13–17.) Officer Ayers, the primary officer, was nine months out of field training and agreed that "[i]t would have definitely been beneficial to have a CNT"; Officer Abraham told

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

investigators that someone "better at negotiating" "probably could talk him down." (PAMF 17–19.) The Department's Policy 417, on which Officer Abraham was trained, encourages de-escalation and tactical disengagement when officers respond to people in mental distress. (PAMF 20.)

At 4:35 a.m., the officers heard a car door and believed it was Mr. Sosa. (PAMF 21–22.) The officers opened the door and never considered closing it, although they admitted that with the door closed Mr. Sosa posed no immediate threat to anyone inside. (PAMF 22–25.) Mr. Sosa walked in holding a pair of kitchen scissors, and Officers Ayers and Abraham pointed their guns at him. Officer Crockett later joined them with his gun drawn, and Officer Aguilar, near the end, with his Taser. (PAMF 26–27; SUF 89.) He made statements inviting them to shoot him (SUF 107–108), but he made no lunging motion, never tried to injure anyone with the scissors, and harmed no one. He said he would not hurt his wife, and Officer Ayers believed him. (PAMF 28–29; JtSF 6.) When Officer Aguilar told him not to step toward him, he complied, holding the scissors pointed down, and less than a minute before the shooting he stood behind the kitchen counter with his hands resting on it. (PAMF 30–31.) A kitchen full of knives was at his back, and he never reached for one. (PAMF 27.) Officer Ayers told investigators that Mr. Sosa's movements inside were "not anything that would have warranted ... using deadly force," and Officer Abraham believed the better course was to keep him contained inside. (PAMF 32–33.)

At 4:39 a.m., the officers called Ms. Sosa out of the apartment without telling Mr. Sosa to stay inside or what to do. (SUF 128–130; PAMF 34.) Officer Ayers walked out ahead of him into the breezeway, where Officers Crockett and Aguilar stood, while Officer Abraham stayed in the apartment behind him. (PAMF 35–36.) Officer Aguilar had already decided to Tase Mr. Sosa when he crossed the threshold, even though he had considered that Mr. Sosa would likely move away from the pain and knew that the breezeway left him nowhere to go that did not lead toward an officer: it was a "very small, tight space" with "not enough room," the officers stood in it, a closed door and a wall faced the apartment door, and going back inside meant going toward Officer Abraham. (PAMF 36–38.) Mr. Sosa walked

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

out of the apartment at a normal pace with the scissors behind his back. He crossed the threshold at 4:39:25, and one second later Officer Aguilar Tased him without warning. (SUF 134–135; PAMF 39–40.) The Taser hurt him: he grunted, stumbled against the wall, and swatted at the wires on his chest. (PAMF 41.) Then, as Officer Aguilar had anticipated, he moved away from the pain along the only path leading away from the apartment, which ran through the breezeway where the officers stood, with his arm down at his side and the scissors not raised toward anyone. (PAMF 38, 42–43.) At 4:39:28, two seconds into the Taser's five-second cycle, Officers Ayers, Crockett, and Abraham fired without warning. (SUF 140; PAMF 40, 44–45.) Officer Abraham fired from behind Mr. Sosa, toward the other officers; one bullet entered his back and passed through his right lung and heart. (PAMF 46.) Mr. Sosa was pronounced dead at 4:58 a.m. (JtSF 7.)

Each officer was trained that deadly force is permitted only against an immediate threat of death or serious bodily injury, that fear alone is not enough, that a person may not be shot merely for holding a knife or scissors, that a warning should be given when feasible, and that in a crisis time is the officer's ally. (PAMF 47–49.) Officer Ayers told investigators that once he saw Mr. Sosa at the door, he "just knew that the only way that this incident was gonna end was, how it did." (PAMF 50.) Plaintiffs' police practices expert, Richard Bryce, a former Undersheriff of the Ventura County Sheriff's Department with more than thirty-three years in law enforcement, opines that the officers had ample time to de-escalate and did not, that they created the close-quarters confrontation in which Mr. Sosa was killed, that they fired before the Taser had a chance to work, that a warning was feasible, that safe alternatives were available at every stage and none was used, and that Mr. Sosa posed no imminent threat when he was shot. (PAMF 52–58.) He explains that POST trains officers responding to a person in crisis to slow the encounter, summon crisis negotiation resources, and form a plan before engaging, and that introducing pain to a person in crisis through a Taser can escalate the encounter rather than resolve it. (PAMF 59–60.) He also opines that, had the officers followed that training, the confrontation in the breezeway would not have

occurred, and that moving away from the pain of a Taser is a common reaction that officers are trained to expect. (PAMF 61–62.)

## III. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Three further rules govern a police shooting case. First, summary judgment "should be granted sparingly" in excessive force cases, because whether a particular use of force was reasonable "is rarely determinable as a matter of law." *Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc), and *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994)). Second, because "the person most likely to rebut the officers' version of events—the one killed—can't testify," the Court "cannot 'simply accept what may be a self-serving account by the police officer'" and must "carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts." *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014), and *Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. 2014) (en banc)). Third, video resolves a factual dispute only where it "blatantly contradict[s]" the non-movant's account "so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Short of that, "the mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage," and the record is viewed in the plaintiffs' favor. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018); *Longoria v. Pinal County*, 873 F.3d 699, 706 (9th Cir. 2017). Defendants argue that facts "captured on video" may be "deemed undisputed" (Mot. at 7), but that overstates *Scott*.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

## IV. ARGUMENT

The Court should deny Defendants' motion for four reasons. First, the Sosa Plaintiffs have standing to bring the claims they assert. Second, a reasonable jury could find that the officers used excessive force in violation of the Fourth Amendment. Third, the officers are not entitled to qualified immunity, because the material facts are disputed and the law was clearly established. Fourth, triable issues remain on the state law claims.[1]

### A. The Sosa Plaintiffs Have Standing to Pursue Their Claims

Defendants' standing argument turns on who represents the estate, and that question is being resolved. The Sosa Plaintiffs and the Olivares Plaintiffs have agreed that the Sosa Plaintiffs will prosecute Mr. Sosa's survival claims in this action, and Martha Zepeda Olivares, as administrator, has petitioned the Fresno County Superior Court to terminate the probate proceeding. (Mayne Decl. ¶¶ 13–14, Ex. K.) The petition is set for hearing on November 4, 2026, before this motion is heard. (*Id.* ¶ 14.) The Sosa Plaintiffs are Mr. Sosa's surviving spouse and children and are therefore the persons who succeed to his estate. Cal. Prob. Code §§ 6401, 6402(a), (b). Separate from the probate proceeding, the Sosa Plaintiffs are entitled to bring a wrongful death action under section 377.60(a), and their Seventh and Eighth Claims (battery and negligence) are pleaded both ways: as wrongful death claims seeking damages in their own right, and as survival claims brought as Mr. Sosa's successors in interest seeking his pre-death pain and suffering. (SAC ¶¶ 108, 118.) Because this action was filed within the window set by Code of Civil Procedure section 377.34(b), pre-death pain and suffering is recoverable on the survival claims. The Sosa Plaintiffs agree that the Fourth Amendment and Bane Act claims are survival claims brought on Mr. Sosa's behalf, and that they do not seek wrongful death damages under 42 U.S.C. § 1983 or the Bane Act.

---

[1] The Sosa Plaintiffs do not oppose summary judgment on their Second Claim for Relief (Fourteenth Amendment), their Third, Fourth, and Fifth Claims for Relief (municipal liability under 42 U.S.C. § 1983), their Sixth Claim for Relief (Americans with Disabilities Act), or their Ninth Claim for Relief (negligent infliction of emotional distress). This opposition addresses the remaining claims: the First (Fourth Amendment), Seventh (battery), Eighth (negligence), and Tenth (Bane Act) Claims for Relief. The Court therefore need not reach Parts V.C, V.D, and VII of Defendants' memorandum as to the Sosa Plaintiffs.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

**B. A Reasonable Jury Could Find That the Officers Used Excessive Force in Violation of the Fourth Amendment**

Fourth Amendment excessive force claims "are analyzed under an objective reasonableness standard." *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). The inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because "[t]he intrusiveness of a seizure by means of deadly force is unmatched," *Tennessee v. Garner*, 471 U.S. 1, 9 (1985), "[a]n officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Gonzalez*, 747 F.3d at 793 (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)). The government's interest is further measured by the severity of the crime at issue and whether he was actively resisting or attempting to evade arrest, *Graham*, 490 U.S. at 396, together with the availability of less intrusive alternatives, whether a warning was given, and whether the person was emotionally disturbed. *Glenn*, 673 F.3d at 872; *Vos*, 892 F.3d at 1031–34. The inquiry is "highly fact-intensive" and involves "no per se rules." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

1. <u>Mr. Sosa Did Not Pose an Immediate Threat of Death or Serious Bodily Injury When the Officers Fired</u>

On Plaintiffs' facts, Mr. Sosa did not pose an immediate threat of death or serious bodily injury when the officers fired. When he was shot, he was not charging. He was moving away from the pain of a Taser that hit him two seconds earlier, as Officer Aguilar expected he would, with the scissors down at his side. And he was a suicidal man in crisis who had attacked no one and never struck, stabbed, or lunged at anyone with the scissors. Defendants' contrary argument depends on resolving the factual disputes in their favor, which is not permitted on summary judgment.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

When the officers fired, Mr. Sosa was reacting to the Taser, as the officers expected he would. Officer Aguilar Tased him one second after he crossed the threshold, and the shots came two seconds later, while the Taser was still cycling. (SUF 134–135, 140; PAMF 44.) The Taser hurt him, and Officer Aguilar expected him to do what anyone would: move away from the pain. (PAMF 38, 41, 62.) But the officers had left him no room: Officer Abraham was behind him in the apartment, and the other three officers filled a breezeway Officer Aguilar described as "very small" and "tight." (PAMF 36.) So Mr. Sosa moved away from the pain along the only path leading away from the apartment, which ran through the breezeway where the officers stood, with the scissors down at his side. (PAMF 42.) Mr. Bryce will testify that officers are trained to let a Taser complete its roughly five-second cycle before escalating, and that a properly trained officer would have recognized Mr. Sosa's movement as a reaction to the Taser, not an attack. (PAMF 57.)

Defendants' motion rests on their characterization of this moment: that Mr. Sosa was not moving away from the pain of the Taser but was "charging" the officers. (SUF 138–139.) At summary judgment, that dispute must be resolved in Plaintiffs' favor, *Tolan*, 572 U.S. at 656–57, and courts have consistently held that whether a person struck by less-lethal force was attacking or reacting to it is a question for the jury. In *Glenn*, officers shot a suicidal young man after beanbag rounds caused him to move. The Ninth Circuit held that a jury could find his "movement in reaction to the beanbag fire" was "a predictable consequence of using the beanbag shotgun," and that "the jury must resolve these factual disputes." 673 F.3d at 878–80. In *Garcia v. City of Tustin*, No. 24-2224, 2025 WL 2268253 (9th Cir. Aug. 8, 2025) (mem.), the Ninth Circuit held that whether the decedent was advancing on or lunging at an officer when he was shot, or "whether the Taser caused him to move involuntarily," was a material fact for the jury. *Id.* at *1 n.4. And in *Hermosillo v. County of Orange*, 562 F. Supp. 3d 802 (C.D. Cal. 2021), the court denied summary judgment where a deputy shot a mentally ill man holding a knife less than two seconds after a Taser deployment: "Intermediate force can be an effective tool for law enforcement to de-escalate situations, but it must be given a chance to work. It should not simply be a brief stop on the way to firing

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

four shots and killing someone, especially when the officers know that they are confronting an individual suffering from mental illness." *Id.* at 816.

Other facts confirm that Mr. Sosa posed no immediate threat of death or serious bodily injury to anyone. The officers knew he was a suicidal man in mental crisis, not a violent criminal. (PAMF 1–2, 8; SUF 42.) "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *Glenn*, 673 F.3d at 876; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003). And his conduct showed that he did not intend to hurt anyone. For more than four minutes, with guns trained on him, he never struck, stabbed, or lunged at anyone with the scissors. (PAMF 26, 28.) He even went into the kitchen, which contained a variety of knives, yet he never tried to pick one up. (PAMF 27.)

Taking Plaintiffs' evidence as true, the officers shot a suicidal man who had hurt no one, who held a pair of kitchen scissors down at his side and had never struck, stabbed, or lunged at anyone with them, and who was moving away from the pain of a Taser that hit him two seconds earlier, without ever warning him that they would fire. A jury could find that he did not pose an immediate threat of death or serious bodily injury, and that whatever threat he posed did not justify killing him.

2. The Remaining *Graham* Factors Weigh Against Deadly Force

The remaining *Graham* factors, and the additional factors the Ninth Circuit considers, also weigh against deadly force.

The first *Graham* factor, the severity of the crime at issue, favors Plaintiffs. The officers were dispatched on a mental health call for a suicidal man with no reported weapons, not to arrest a violent felon. (JtSF 1–2; SUF 20; PAMF 1.) Where officers respond to a welfare or mental health call rather than a report of a crime, this factor favors the person shot. *Vos*, 892 F.3d at 1031 ("the officers were not responding to the report of a crime");

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

*Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2017) (factor favored the plaintiff where officers were "responding to a 'check welfare' call" and "[n]o crime was reported"), *rev'd on other grounds sub nom. Kisela v. Hughes*, 584 U.S. 100 (2018) (per curiam); *Deorle*, 272 F.3d at 1280.

The third *Graham* factor, whether Mr. Sosa was actively resisting or attempting to evade arrest by flight, also favors Plaintiffs. Mr. Sosa was not fleeing. He had come back to the apartment and stayed there. Moreover, a few seconds of noncompliance, "absent some other threat," does not justify deadly force. *Calonge*, 104 F.4th at 46 (citing *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1007, 1010–11 (9th Cir. 2017)).

Three additional factors also weigh in Plaintiffs' favor: (1) no officer warned Mr. Sosa before shooting him; (2) the officers had less intrusive alternatives and time to use them; and (3) the officers created the urgency they then resolved with deadly force.

First, no officer warned Mr. Sosa that he would be shot. Officers must give a warning before using deadly force "where feasible." *Garner*, 471 U.S. at 11–12. It is undisputed that no warning was given. And a warning was clearly feasible because the officers had time in the breezeway to say "stop" and "chill." (PAMF 40, 56; SUF 133.) An officer who has time to say something else has time to give a warning. *Calonge*, 104 F.4th at 47 (where the officer had time to tell his partners he was going to shoot and then waited three more seconds, "[a] warning was therefore clearly practicable"); *Gonzalez*, 747 F.3d at 794, 797 (officers must warn "whenever practicable"; whether a warning was practicable was for the jury).

Second, the officers had less intrusive alternatives and time to use them, and they used none until two seconds before they fired. "[T]he availability of alternative methods of capturing or subduing a suspect" is a relevant factor, *Smith*, 394 F.3d at 703; *Gonzalez*, 747 F.3d at 794, 797, and where officers had "time for deliberation and consultation with superiors," "[w]hat other tactics if any were available" is for the jury, *Chew*, 27 F.3d at 1443. The officers had fifty-three minutes' notice that Mr. Sosa was suicidal and likely to return. (PAMF 9; SUF 38, 42.) In that time they could have summoned the Crisis Negotiation Team or a supervisor, decided who would use less-lethal force, or simply kept the door closed,

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

behind which, as Officer Ayers conceded, Mr. Sosa threatened no one. (PAMF 11, 13–15, 25, 58.) Once he was inside, all four officers carried Tasers, but Officer Ayers, the officer in charge, admitted that using non-lethal force "didn't cross [his] mind." (PAMF 11–12.) And Officer Abraham told investigators that someone "better at negotiating" "probably could talk him down." (PAMF 19.) On this record, a jury could find that reasonable non-lethal alternatives were available and that the officers unreasonably chose not to use them.

Third, the officers created the urgency they then resolved with deadly force. Officers sometimes "unnecessarily creat[e] [their] own sense of urgency," and "[r]easonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, 'with undue haste.'" *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (quoting *Torres*, 648 F.3d at 1126–27, and citing *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.")). Here, the officers opened the door to Mr. Sosa when he returned to the apartment, even though they had no plan for handling the encounter safely. (PAMF 10–11, 21–23.) Then Officer Aguilar fired a Taser into him, knowing that he would likely try to move away from the pain and that there was nowhere for him to move that did not lead toward an officer. (PAMF 36–38, 55, 62.) A jury could find that the "immediate threat" on which Defendants rely was the product of those choices.

Every one of these factors weighs against deadly force. Together with the absence of any immediate threat of death to anyone, they would permit a jury to find that the shooting was unreasonable.

3. <u>The Video Does Not Resolve the Disputed Facts</u>

Defendants argue that the body-worn camera footage makes the final seconds undisputed. (Mot. at 7, 13–14.) It does not. Video controls only where it "blatantly contradict[s]" the non-movant's account "so that no reasonable jury could believe it," *Scott*, 550 U.S. at 380, and whether a person was advancing, how far away he was, and how he held an object remain jury questions even when the incident was recorded. *Vos*, 892 F.3d at

1028; *Nehad*, 929 F.3d at 1132–39; *Longoria*, 873 F.3d at 706 & n.5 (the "probative value of real-time videos and frozen frames is more appropriately a matter for a jury to view and evaluate, not a matter for a court to resolve on summary judgment"). The footage here does not blatantly contradict Plaintiffs' evidence that the Taser hurt Mr. Sosa and that he moved away from the pain with the scissors down at his side. (SUF 136, 138–139; PAMF 41–42.) If anything, it supports that account.

4. <u>Defendants' Authorities Are Distinguishable</u>

Defendants' lead case is *Lal v. California*, 746 F.3d 1112 (9th Cir. 2014). (Mot. at 15–16.) Lal had led officers on a 45-minute chase, thrown softball-sized rocks at them and their patrol car, and advanced on them with a football-sized rock after an officer warned, "we are going to have to shoot you if you don't drop that rock." *Id.* at 1114–15. Mr. Sosa never struck or tried to strike anyone, and no officer warned him. (PAMF 28, 40.) *Vos* rejected the same comparison to *Lal* because less-lethal means were available, Vos had not otherwise endangered anyone, and the officers had him surrounded. 892 F.3d at 1032–33. Each of those distinguishing facts is present here. (PAMF 12, 26, 28, 36.)

Defendants' other cases are further afield. Several involved firearms. *See Handy v. Jones*, No. 25-5105, 2026 WL 2716416, at *2–3, *6 (9th Cir. Sept. 15, 2026) (suspect had reportedly fired shots inside an apartment and advanced on officers waving a shotgun); *E.V. v. City of Covina*, No. 25-7151, 2026 WL 2334322, at *1–2 (9th Cir. Aug. 12, 2026) (mem.) (suspect pulled a gun from his pocket and moved it toward officers); *Estate of Strickland v. Nevada County*, 69 F.4th 614, 618–22 (9th Cir. 2023) (decedent pointed a replica rifle at officers). In others, the immediate threat was undisputed. *See City & County of San Francisco v. Sheehan*, 575 U.S. 600, 604–05 (2015) (plaintiff conceded "that it was her intent to resist arrest and to use the knife" on the officers); *Arvizu v. Hammon*, No. 1:21-cv-00890-KES-SKO, 2024 WL 3758368, at *4, *10 (E.D. Cal. Aug. 12, 2024) (court found it undisputed that the decedent, who seconds earlier had swung an axe through a door toward officers, charged them with a large kitchen knife).



LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

The remaining cases involved people who had already hurt or endangered others before the officers fired. That was an important factor for the en banc court in *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 799–800 (9th Cir. 2025) (en banc), where the decedent had caused a collision that "had likely already injured nearby motorists." It is not present here, because Mr. Sosa had hurt no one. *See also Waid v. County of Lyon*, 87 F.4th 383, 386 (9th Cir. 2023) (suspect had been fighting with his wife, who needed medical attention); *Ventura v. Rutledge*, 978 F.3d 1088, 1090 (9th Cir. 2020) (decedent had hit the 911 caller and his own mother and was advancing on the caller with a knife).[2]

For these reasons, a reasonable jury could find that the officers violated Mr. Sosa's Fourth Amendment right to be free from excessive force. On Plaintiffs' evidence, he was a suicidal man in crisis who had hurt no one, who held kitchen scissors down at his side, and who was moving away from the pain of a Taser when the officers shot him without warning. The remaining Graham factors, the officers' failure to warn, the alternatives they did not use, and the urgency they created all weigh against deadly force. The video does not blatantly contradict that account, and Defendants' authorities involved people who posed threats that Mr. Sosa did not. Whether the shooting was reasonable therefore turns on disputed facts that only a jury can resolve, and the Court should deny summary judgment on the First Claim for Relief.

**C. The Officers Are Not Entitled to Qualified Immunity**

The officers are not entitled to qualified immunity for two reasons. First, the material facts on which their claim of immunity depends are disputed, and the Court must resolve those disputes in Plaintiffs' favor at summary judgment. Second, on Plaintiffs' version of the

---

[2] Defendants also cite *Kisela* and *Vos* as though they approved the use of deadly force. (Mot. at 16 n.5.) They did not. In both cases the Ninth Circuit held that a jury could find the shooting unconstitutional. *Hughes*, 862 F.3d at 780–82; *Vos*, 892 F.3d at 1031–34. The officers received qualified immunity only because the law was not yet clearly established in 2010 and 2014, *Kisela*, 584 U.S. at 104–05; *Vos*, 892 F.3d at 1035–36, and the Supreme Court in *Kisela* did not decide whether the shooting was lawful, *Kisela*, 584 U.S. at 103–04. On the question before the Court here, both cases support Plaintiffs.



LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

facts, the law was clearly established by November 4, 2023, that officers may not shoot a suicidal man who poses no immediate threat of death or serious bodily injury.

1. <u>Disputed Material Facts Preclude Qualified Immunity at Summary Judgment</u>

In deciding qualified immunity at summary judgment, the Court must resolve all factual disputes and draw all reasonable inferences in Plaintiffs' favor. *Tolan*, 572 U.S. at 656–57. Qualified immunity cannot be granted where the officers' entitlement to it "depends on the resolution of disputed issues of fact in their favor." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003); *Johnson v. Jones*, 515 U.S. 304, 313 (1995); See also *Price v. Sery*, 513 F.3d 962, 972 (9th Cir. 2008) ("If a reasonable person could side with the plaintiff's interpretation of events, the issue must survive for trial."). Where, as here, the prong-one facts are disputed, whether the law was clearly established "depends upon how the jury resolves the disputed issues of material fact." *Garcia*, 2025 WL 2268253, at *1 (citing *Longoria*, 873 F.3d at 710–11); *Estate of Lopez*, 871 F.3d at 1021–22 (where the officer's perception of an imminent threat was disputed, qualified immunity "is not presently appropriate"); *Hughes*, 862 F.3d at 785 ("The application of qualified immunity in this case will depend upon the facts as determined by a jury."). Summary adjudication of qualified immunity is therefore inappropriate here, where the facts on which Defendants rely are disputed, including whether Mr. Sosa was charging or reacting to the Taser and whether the scissors were raised toward anyone or held down at his side. Defendants do not argue that any case holds that an officer may shoot a suicidal man, holding kitchen scissors down at his side, who had never struck, stabbed, or lunged at anyone, as he moved away from the pain of a Taser that hit him two seconds earlier, and without warning, after an hour of notice in which they did not summon crisis resources. On Plaintiffs' version of the facts, the officers violated clearly established law.

2. <u>The Law Was Clearly Established on November 4, 2023</u>

By November 2023, every reasonable officer knew that deadly force was unreasonable against a suicidal man, holding kitchen scissors down at his side, who had

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

never struck, stabbed, or lunged at anyone, as he moved away from the pain of a Taser that hit him two seconds earlier, and without warning, after an hour of notice in which they did not summon crisis resources. Long before 2023, the Ninth Circuit had held that shooting a person who does not pose an immediate threat of death or serious bodily injury violates the Fourth Amendment, even when the person is armed. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (the fact that a "suspect was armed with a deadly weapon" does not make the officers' response "per se reasonable"); *Harris v. Roderick*, 126 F.3d 1189, 1201, 1204 (9th Cir. 1997); *Garner*, 471 U.S. at 11; *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (precedent made it "clear to a reasonable officer" by 2016 "that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile"). Precedent need only give "reasonable warning," even with "notable factual distinctions." *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "[C]asting an allegedly violated right too particularly" would allow defendants "to define away all potential claims." *Gordon v. County of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (quoting *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995)).

In *Vos* officers responded to a mentally unstable man who had brandished scissors at a 7-Eleven, cut a clerk's hand, asked officers to shoot him, and simulated having a gun; when he charged the doorway with an object raised over his head, officers shot him. 892 F.3d at 1028–30. The Ninth Circuit held that a reasonable jury could find the force excessive. *Id.* at 1031–35. It rejected the argument that Vos "forced the confrontation," and it distinguished *Lal* because less-lethal means were present and available, Vos had not seriously endangered others, and the officers had the door surrounded. *Id.* at 1032–33. Each of those facts is present here: the officers carried Tasers; Mr. Sosa never struck, stabbed, or lunged at anyone with the scissors; and he was contained in an apartment with no avenue of escape, surrounded by four officers. (PAMF 12, 26, 28, 36, 43.) The Ninth Circuit has since held that *Vos* put officers on notice: "The decision in *Vos* confirms that as of 2018, a reasonable police officer would have understood that the use of deadly force against a possibly mentally ill

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

suspect when there were numerous officers present, multiple less intrusive options readily available, and no immediate threat of serious physical injury—even where the suspect held an object that officers could have perceived to be dangerous if used as a weapon—was excessive force and so a Fourth Amendment violation." *Penny v. Azmy*, Nos. 22-55572, 22-55579, 2024 WL 489287, at *2 (9th Cir. Feb. 8, 2024) (mem.) (citing *Vos*, 892 F.3d at 1034–35). Each element of that description is present here, and *Vos* was the harder case for the plaintiffs: Vos had cut a clerk and charged with an object raised over his head, while Mr. Sosa had hurt no one and held the kitchen scissors down at his side.

In *S.B.*, decided in 2017, a mentally ill, intoxicated man who had repeatedly said "just shoot me" grabbed a knife from his pocket after kneeling in response to commands, and a deputy shot him without warning when he was six to eight feet from a deputy and a Taser was available. *S.B. v. County of San Diego*, 864 F.3d 1010, 1011–14 (9th Cir. 2017). The court held that the deputy's "use of deadly force was not objectively reasonable, and therefore violated Brown's Fourth Amendment right against excessive force." *Id.* at 1014. In *Glenn*, decided in 2011, officers responding to a suicidal, intoxicated young man holding a knife to his own neck fired beanbag rounds within minutes of arriving and then shot him when the impacts caused him to move. 673 F.3d at 867–71. The court held that "a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence." *Id.* at 878.

And in *Hughes*, decided in 2016, the Ninth Circuit held that a jury could find excessive force where an officer shot a woman who had just been seen hacking at a tree with a large kitchen knife, walked toward an unarmed woman with the knife in hand, stopped no more than six feet from her, and ignored at least two commands to drop it. 862 F.3d at 778–80; *see Kisela*, 584 U.S. at 101–02. That threat was greater than the one here: a large knife rather than kitchen scissors, a report of erratic conduct with it, an unarmed bystander within a few feet, and repeated commands ignored. The Supreme Court reversed only because the law was not clearly established in May 2010, before *Glenn*, *S.B.*, and *Vos* were decided. *Kisela*, 584 U.S. at 103–05.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

Further, the officers' own training confirms that they were on notice. Training materials "are relevant not only to whether the force employed in this case was objectively unreasonable ... but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable." *Drummond*, 343 F.3d at 1062. Each officer was trained to use deadly force only against an immediate threat, that fear alone is not enough, that he could not shoot a person merely for holding a knife or scissors, to warn before shooting when feasible, and to avoid officer-created jeopardy. (PAMF 47–49.) POST also trains officers responding to a suicidal person in crisis to summon crisis negotiators and form a plan, which officers failed to do here. (PAMF 53, 58–59.)

Taken together, these cases and the officers' own training gave every reasonable officer fair notice by 2023 that he could not shoot a suicidal man, holding kitchen scissors down at his side, who had never struck, stabbed, or lunged at anyone, as he moved away from the pain of a Taser that hit him two seconds earlier, and without warning. The officers are not entitled to qualified immunity.

**D. Triable Issues Preclude Summary Judgment on the State Law Claims**

1. <u>Negligence</u>

The negligence claim rests on a broader theory of liability than the Fourth Amendment claim, and summary judgment should be denied for three reasons. First, California law imposes a duty that reaches the officers' tactical decisions leading up to a shooting, and a jury may find a shooting negligent even when it would appear justified if viewed in isolation. Second, the officers' training and the Department's own policy are evidence of the standard of care, and a jury could find that the officers departed from both at nearly every step. Third, a jury could find that those departures caused the close-quarters confrontation in which Mr. Sosa was killed. The claim also survives for the reasons stated in Part IV.B: on Plaintiffs' facts, Mr. Sosa posed no immediate threat when the officers shot him.

First, California negligence law is broader than the Fourth Amendment. An officer's "duty to act reasonably when using deadly force extends to preshooting conduct." *Hayes v.*

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

*County of San Diego*, 57 Cal. 4th 622, 632 (2013) (*Hayes II*). "[S]tate negligence law, which considers the totality of the circumstances surrounding any use of deadly force, . . . is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* at 639. The California Supreme Court put the point directly: "the state and federal standards are not the same, which we now confirm." *Id.* Under state law, "tactical conduct and decisions preceding the use of deadly force are relevant considerations," and liability can arise "if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.* Those decisions are not litigated one at a time. *Hayes II* described a single "continuum of circumstances" that ran from "the two deputies' decision not to call for a psychiatric expert before entering Shane's house" to "their decision to use deadly force." *Id.* at 637–38.

The rule traces to *Grudt v. City of Los Angeles*, 2 Cal. 3d 575 (1970). There, plainclothes officers shot a driver who accelerated his car toward one of them. *Hayes II*, 57 Cal. 4th at 629. "Significantly, the shooting in *Grudt* appeared justified if examined in isolation, because the driver was accelerating his car toward one of the officers just before the shooting. Nevertheless, we concluded that the totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent. In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." *Id.* at 629–30 (citation omitted). The tactics at issue in *Grudt* were the officers' decision not to let uniformed officers make the stop, the officer's approach to the car with a loaded shotgun, and the officers' reading of the circumstances as requiring deadly force when the driver was "hemmed in" by converging patrol cars. *Grudt*, 2 Cal. 3d at 587. Under these circumstances, the court held that a jury could find the officers negligent. Id. at 587–88.

The Ninth Circuit applies the rule the same way. "Under California law, the officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly force at the moment of shooting might be reasonable in isolation." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021).

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

"Federal law, however, generally focuses on the tactical conduct at the time of shooting." *Id.* A jury may therefore find officers negligent while finding no Fourth Amendment violation, and those verdicts can be reconciled. *Alves v. County of Riverside*, 135 F.4th 1161, 1173–74 (9th Cir. 2025). The difference matters in practice. In *Branch III v. City of Torrance*, the Ninth Circuit held that the shooting was objectively reasonable but it held that "[a] negligence claim thus could be based on negligent conduct preceding the use of force" because the record "contain[ed] evidence that the officers may have been negligent in positioning themselves and their vehicles so openly." No. BC655480, 2021 WL 9949988, at *1, *4 (Cal. Super. Ct. Sept. 15, 2021) (quoting the Ninth Circuit's memorandum disposition). On remand, the superior court denied summary judgment on that claim, finding triable issues where the plaintiff offered evidence that the officers violated department policy, formed no safe tactical plan, and left themselves in a poor tactical position that "unnecessarily escalated" the encounter. *Id.* at *4.[3]

Second, the officers' training and the Department's policy are evidence of what due care required, and a jury could find the officers disregarded both. An employer's safety rules "are . . . admissible as evidence that due care requires the course of conduct prescribed in the rule." *Dillenbeck v. City of Los Angeles*, 69 Cal. 2d 472, 478 (1968). Separately, "an employee's failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence." *Id.* at 481; *Grudt*, 2 Cal. 3d at 588 (applying *Dillenbeck* to the police department's tactical manual on the use of firearms). The rules in *Dillenbeck* were police training bulletins, and the court rejected the argument that only hard-and-fast directives count: a guideline that leaves room for judgment is a safety rule if it

---

[3] Defendants misread *Hayes II*. They argue that pre-shooting conduct is actionable only if it "unreasonably provoke[d] the suspect to take the very action that the officer, in turn, relies upon to justify his subsequent use of force." (Mot. at 27, citing *Hayes II*, 57 Cal. 4th at 638–40.) That appears to be the Fourth Amendment provocation rule, which the Supreme Court rejected in *County of Los Angeles v. Mendez*, 581 U.S. 420, 427–28 (2017). *Hayes II* contains no such requirement; it holds that pre-shooting conduct is evaluated as part of the totality of the circumstances. *Hayes II*, 57 Cal. 4th at 637–40. On remand from that Supreme Court decision, the Ninth Circuit directed judgment for the *Mendez* plaintiffs on their California negligence claim. *Mendez*, 897 F.3d at 1082–83.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

reflects, with sufficient specificity, the department's balance between operational needs and public safety. 69 Cal. 2d at 479–80. The Ninth Circuit applied these principles to police training on encounters with mentally ill people in *Tabares*, holding that "a juror could find Officer Esparza unreasonably failed to follow police protocol dealing with potentially mentally ill persons before using force," and that his "failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence." 988 F.3d at 1128 (quoting *Grudt*). Trial courts applying *Hayes II* reach the same result. *See Escobedo v. City of Los Angeles*, No. 19STCV43741, 2024 WL 7019084, at *4 (Cal. Super. Ct. Apr. 11, 2024) (violations of training 'do not per se show unreasonable conduct, [but] they can be instructive'; triable issue on battery claim under Hayes II where the officer's approach "contravened LAPD training and resulted in the precise danger that that training seeks to avoid").

The record here shows departures from the officers' training and the Department's policy at nearly every step. The Department's Policy 417 governs responses to people in mental distress and encourages de-escalation and tactical disengagement. (PAMF 20.) The officers were trained that in a crisis time is on their side, to avoid officer-created jeopardy, and to avoid a "fatal funnel" with no means of escape. (PAMF 49.) POST trains officers to slow an encounter with a person in crisis and to summon crisis negotiation resources, and to form a plan and contain the subject before engaging. (PAMF 59.) The officers did the opposite:

- They had fifty-three minutes' notice that a suicidal man who wanted police to kill him was likely to return, yet they formed no plan, assigned no less-lethal role, and left Ms. Sosa in the living room. (PAMF 8–12, 22; SUF 38, 42.)
- No officer summoned the Crisis Negotiation Team, which Officer Aguilar testified is usually requested when a subject is contained and is not an immediate threat, and no supervisor took part. (PAMF 13–16.) Officer Ayers, nine months out of field training, testified that the situation was outside the

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

scope of his training and that a negotiator "would have definitely been beneficial." (PAMF 17–18.)

- Officer Abraham opened the door without looking, although Officer Ayers agreed that with the door closed Mr. Sosa could not have threatened anyone, and although Officer Abraham himself believed the better course was to keep Mr. Sosa contained. (PAMF 21, 23–25, 32.)
- The officers called Ms. Sosa out past her husband without telling him what to do, and Officer Ayers walked out of the apartment ahead of him into the breezeway. (PAMF 34–35.)
- Officer Aguilar decided in advance to Tase Mr. Sosa as he crossed the threshold, into a breezeway where he had no avenue of escape, and the shots followed two seconds into the Taser's five-second cycle, without warning. (PAMF 36–37, 40, 44.)

Officer Aguilar's own testimony shows how closely this case tracks *Escobedo*. He was trained that it is human nature to move away from something causing pain, not to corner a person in crisis, and to leave an avenue of escape where safe. (PAMF 38.) When he decided to deploy the Taser, he considered that Mr. Sosa might move away from the pain. (PAMF 38.) He did it anyway, in a space where every way out led toward an officer. (PAMF 36.) Mr. Sosa then did what the training predicted, and the officers shot him as he did it. (PAMF 41–42.) A jury could find that this conduct "contravened [the officers'] training and resulted in the precise danger that that training seeks to avoid." *Escobedo*, 2024 WL 7019084, at *4. Plaintiffs' police practices expert, a former Undersheriff, will testify that these were departures from POST standards and generally accepted police practices, and that deadly force was not a last resort. (PAMF 53, 55, 57–60.)

Defendants cannot avoid a trial by invoking officer discretion. *Hayes II* cautioned that no "particular preshooting protocol . . . is always required," but it said in the same passage that summary judgment is appropriate only when, "viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." 57 Cal. 4th at 632. A reasonable juror

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

could find negligence on this record. Courts have found triable issues on far less. *See Ruiz v. City of Los Angeles*, No. 22STCV25856, 2025 WL 431857, at *2 (Cal. Super. Ct. Jan. 17, 2025) (man who said "Shoot me" and approached slowly with a knife held pointed down; triable negligence issue where, for about fifty seconds, officers "did nothing other than aim their firearms" and yell commands, despite having less-lethal weapons); *Estate of Lowe v. City of Huntington Park*, No. 23STCV11211, 2025 WL 1090211, at *7 (Cal. Super. Ct. Mar. 21, 2025) (triable issue where video showed the officers shot the decedent "within seconds of arriving on the scene" with "no measured attempt at de-escalation"). The officers in *Ruiz* had fifty seconds. These officers had fifty-three minutes.

Third, a jury could find that the officers' negligence caused Mr. Sosa's death. Mr. Bryce will testify that, had the officers followed their training by keeping the door closed and Mr. Sosa contained, summoning the Crisis Negotiation Team or a supervisor, forming a plan, and using time and distance, the confrontation in the breezeway would not have occurred. (PAMF 61.) He will also testify that moving away from the source of pain is a common reaction to a Taser that officers are trained to expect. (PAMF 62.) Officer Aguilar anticipated that reaction. (PAMF 38.) The California Supreme Court recognized this kind of theory in *Hayes II*: a claim that preshooting negligence "somehow caused Shane to seek his own death at their hands" is a "fact-based theory [that] falls within the totality of circumstances surrounding the shooting." 57 Cal. 4th at 637. That is evidence of both breach and causation.[4]

The Ninth Circuit's decision in *Hayes* shows how this claim is decided. Deputies answering a disturbance call were told by the decedent's girlfriend that he had tried to kill himself that night and that she was worried only that he would hurt himself. *Hayes v. County*

---

[4] Defendants' assertion that a different approach is "speculative" (Mot. at 28) disputes the causal inference; it does not eliminate it. *Villalobos v. City of Santa Maria*, 85 Cal. App. 5th 383 (2022), is not to the contrary. There, FBI-trained negotiators spoke with the decedent for twenty-two to forty minutes, and the officers "patiently waited" before using less-lethal weapons. *Id.* at 386, 391. The decedent then stabbed himself and "charge[d] full speed toward the officers." *Id.* at 387; *see Ruiz*, 2025 WL 431857, at *3 (distinguishing *Villalobos* on that ground). Here no one negotiated, and gunfire followed the Taser by two seconds as Mr. Sosa moved away from its pain.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

*of San Diego*, 736 F.3d 1223, 1227 (9th Cir. 2013). They did not request the county's psychiatric emergency response team, and they shot him from six to eight feet, without warning, four seconds after ordering him to show his hands, when he revealed a large knife. *Id.* at 1227–29, 1234. The deputy who fired first testified that he believed Hayes would keep coming at him with the knife "because he wasn't stopping." *Id.* at 1228. But Hayes's girlfriend said that he "was not charging" the deputy and described his expression as "clueless" as he walked toward them. *Id.* at 1234. The Ninth Circuit reversed summary judgment on the negligence claim. It held that possession of the knife "alone" was "not sufficient reason for the officers to employ deadly force," that the deputy's belief that Hayes's movement toward him made him a threat was not enough without objective factors to support it, and that "it is significant that Hayes was given no warning before the deputies shot him." *Id.* at 1233–35. It also held that the deputies' duty "extends to their pre-shooting conduct" and remanded the negligence claim for further proceedings. *Id.* at 1235–36.

This case is stronger. The Hayes deputies arrived on a domestic disturbance call, and no one told them Hayes wanted to die at their hands; the Fresno officers had fifty-three minutes' notice, knew Mr. Sosa wanted them to shoot him, and had been told he had no weapon. (PAMF 1–2, 8; SUF 42.) The *Hayes* deputies did not request a psychiatric team; here no officer sought the Department's Crisis Negotiation Team, and Officer Ayers agreed a negotiator "would have definitely been beneficial." (PAMF 14, 18.) The *Hayes* deputy treated his Taser as unavailable, 736 F.3d at 1233 n.5; here Officer Aguilar used his, and the shots followed two seconds later. (PAMF 12, 40, 44.) And Hayes held a large knife; Mr. Sosa held kitchen scissors. (PAMF 27.) The central dispute is also the same. The *Hayes* deputy said that Hayes kept coming at him with the knife, but the Ninth Circuit, viewing the evidence in the plaintiff's favor, concluded that "[a]lthough Hayes was walking towards the deputies, he was not charging them," and left the reasonableness of the shooting to the jury. 736 F.3d at 1233, 1236. Here, Defendants say Mr. Sosa "charged" the officers. (SUF 138–139.) On Plaintiffs' evidence, he was moving away from the pain of a Taser along the only

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

path leading away from the apartment, with the scissors down at his side. (PAMF 36, 38, 41–42.) That dispute is for the jury.

The Court should therefore deny summary judgment on the negligence claim. Under California law, the question is not only whether Mr. Sosa posed a threat in the last two seconds, but whether the officers acted reasonably over the fifty-three minutes that put him in the breezeway. A jury could find they did not.

2. Battery

Battery by a peace officer turns on the same reasonableness inquiry as the negligence claim, and it survives for the same reasons. Defendants describe the claim as "coextensive" with the Fourth Amendment claim (Mot. at 24, citing *Alves*, 135 F.4th at 1166 n.3), but California law is not a copy of *Graham*, and three differences matter here. First, the governing statute permits deadly force only when the officer reasonably believes it is "necessary" to "defend against an imminent threat of death or serious bodily injury," Cal. Penal Code § 835a(c)(1)(A); defines an imminent threat as one that "must be instantly confronted and addressed," not "merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm," *id.* § 835a(e)(2); and forbids deadly force "based on the danger that person poses to themselves" absent an imminent threat to the officer or another person, *id.* § 835a(c)(2). Second, the statute makes the officers' own conduct part of the inquiry. The totality of the circumstances includes "the conduct of the officer and the subject leading up to the use of deadly force," *id.* § 835a(e)(3), and officers must "use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer," *id.* § 835a(a)(2). Third, the jury will be instructed accordingly. CACI No. 1305B, the pattern instruction for battery by a peace officer using deadly force, tells the jury that in deciding whether deadly force was necessary it "must consider [the officer]'s tactical conduct and decisions before using deadly force" and "whether [the officer] used other available resources and techniques as alternatives to deadly force, if it was reasonably safe and feasible to do so." That is the rule of *Hayes II* applied to battery: the fifty-three minutes without a call to the Crisis Negotiation Team, the open door,

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

the decision to call Maria Sosa out past her husband, the walk into the breezeway, and the Taser are part of the question whether the shots were "necessary," not a separate claim. Because a jury could find on this record that Mr. Sosa posed no imminent threat when the officers fired, and that the officers did not summon the resources or use the techniques their training required, the battery claim survives for the reasons stated in Parts IV.B and IV.D.1. The City is liable for its officers' battery under Government Code § 815.2(a).[5]

3. Bane Act

A Bane Act claim requires a showing that the officer had "a specific intent to violate" the plaintiff's rights, *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801–02 (2017); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043–44 (9th Cir. 2018), but "it is not necessary for the defendants to have been 'thinking in constitutional or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" *Reese*, 888 F.3d at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). Reckless disregard is a jury question here. The officers knew Mr. Sosa was suicidal and wanted them to kill him; they were trained that they could not shoot him merely for holding scissors; he held kitchen scissors down at his side and never struck, stabbed, or lunged at anyone with them; and they shot him as he moved away from the pain of a Taser that hit him two seconds earlier, without the warning they were trained to give. (PAMF 8, 28, 40, 43–44, 47–48.) Officer Ayers told investigators that once he saw Mr. Sosa at the door, he "just knew that the only way that this incident was gonna end was, how it did." (PAMF 50.) A jury could find that the officers consciously disregarded Mr. Sosa's right to be free from deadly force absent an immediate threat. Defendants' only argument is that the officers intended "to defend themselves" (Mot. at 29), which assumes the answer to the disputed question.

---

[5] Government Code section 820.2 does not immunize either claim. "California denies immunity to police officers who use excessive force in arresting a suspect." *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc); *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007). *Villalobos*, the only case Defendants cite for the immunity (Mot. at 28), does not mention section 820.2.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

**E. Defendants' Damages Arguments Do Not Warrant Summary Adjudication**

Defendants' damages arguments (Mot. at 32–33) do not warrant summary adjudication. The Sosa Plaintiffs do not seek wrongful death damages on the § 1983 or Bane Act claims. On the § 1983 survival claim they seek Mr. Sosa's pre-death pain and suffering and the loss of his life, *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1103–05 (9th Cir. 2014); *Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1101–03 (9th Cir. 2021), and on the state survival claims his pre-death pain and suffering, which is recoverable because this action was filed within the window that Senate Bill 447 (Stats. 2021, ch. 448) opened for actions "filed on or after January 1, 2022, and before January 1, 2026." Cal. Civ. Proc. Code § 377.34(b).

Punitive damages are for the jury. Under § 1983 they may be awarded for "reckless or callous indifference to the federally protected rights of others," *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)), and under California law for "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others," Cal. Civ. Code § 3294(c)(1). *Szarowicz v. Birenbaum*, 58 Cal. App. 5th 146, 171–72 (2020), on which Defendants rely, *denied* summary adjudication of a punitive damages prayer because the defendant's conduct was intentional. The officers concede they intended to shoot, and the evidence that supports the Bane Act claim supports a finding of conscious disregard.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

## V. CONCLUSION

For these reasons, the Sosa Plaintiffs respectfully request that the Court deny Defendants' motion as to the First, Seventh, Eighth, and Tenth Claims for Relief, and deny Defendants' requests to strike punitive damages and to adjudicate standing on the present record.

Dated: October 30, 2026

**LAW OFFICES OF DALE K. GALIPO**

By: */s/ Cooper Mayne*
Dale K. Galipo
Cooper Mayne
*Attorneys for Plaintiffs Maria Sosa, L.S., and M.S.*