**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

*Attorneys for Plaintiffs Maria Sosa, L.S., and M.S.*

LAW OFFICES OF DALE K. GALIPO
CIVIL RIGHTS ATTORNEYS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA SOSA, et al.,<br>Plaintiffs,<br>vs.<br>CITY OF FRESNO, et al.,<br>Defendants. | Case No. 1:23-cv-01575-JLT-SAB<br>Honorable Jennifer L. Thurston<br><br>**DECLARATION OF COOPER MAYNE IN SUPPORT OF THE SOSA PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 20, 2026<br>Time: 9:00 a.m.<br>Court: Robert E. Coyle U.S. Courthouse<br>Crtrm: 4 |

I, Cooper Mayne, declare as follows:

1. I am an attorney licensed to practice in the State of California and admitted to practice before this Court. I am an associate with the Law Offices of Dale K. Galipo, counsel of record for Plaintiffs Maria Sosa, L.S., and M.S. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify to them.

2. I submit this declaration in support of the Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93).

3. Attached as Exhibit A are true and correct copies of excerpts from the certified transcript of the deposition of Plaintiff Maria Sosa, taken on July 28, 2025, including the cover page and the reporter's certification.

4. Attached as Exhibit B are true and correct copies of excerpts from the Fresno Police Department Computer-Aided Dispatch (CAD) report for this incident, produced by Defendants in this action and filed by Defendants as Exhibit 3 to their motion (Dkt. 93-6), consisting of the pages Bates-stamped FRESNO 000241, 000243, and 000264.

5. Attached as Exhibit C are true and correct copies of excerpts from Detective Rockwell's homicide supplemental report, produced by Defendants in this action and filed by Defendants as Exhibit 7 to their motion (Dkt. 93-10), consisting of the pages Bates-stamped FRESNO 000165, 000168, 000186-187, and 000196-197.

6. Attached as Exhibit D are true and correct copies of excerpts from the certified transcript of the deposition of Officer Anthony Aguilar, taken on April 23, 2026, including the cover page and the reporter's certification.

7. Attached as Exhibit E is a true and correct copy of the transcript of Maria Sosa's 3:44 a.m. call to 911 on November 4, 2023, filed by Defendants as Exhibit 2 to their motion (Dkt. 93-5).

8. Attached as Exhibit F are true and correct copies of excerpts from the certified transcript of the deposition of Officer John Ayers, taken on April 22, 2026, including the cover page and the reporter's certification.

9. Attached as Exhibit G are true and correct copies of excerpts from the certified transcript of the deposition of Officer Jonathan Abraham, taken on April 23, 2026, including the cover page and the reporter's certification.

10. Attached as Exhibit H are true and correct copies of excerpts from the certified transcript of the deposition of Officer Brandon Crockett, taken on April 22, 2026, including the cover page and the reporter's certification.

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS DKG

11. Attached as Exhibit I are true and correct copies of excerpts from the Fresno County Coroner's report for Maximiliano Sosa, Jr., produced by Defendants in this action and filed by Defendants as Exhibit 5 to their motion (Dkt. 93-8), consisting of the pages Bates-stamped FRESNO 000226, 000230, and 000234.

12. Attached as Exhibit J are true and correct copies of excerpts from the transcript of Officer John Ayers's November 6, 2023 interview with Fresno Police Department investigators, which Defendants produced in this action as FRESNO 000522 through FRESNO 000581 and which was marked as Exhibit 1 to Officer Ayers's deposition. The excerpts consist of the pages Bates-stamped FRESNO 000522 and 000566.

13. Attached as Exhibit K is a true and correct copy of the Petition for Termination of Proceedings and Discharge filed by Martha Zepeda Olivares, as administrator, in In re Estate of Maximiliano Sosa, Jr., Fresno County Superior Court Case No. 23CEPR01424, and served on my office on July 1, 2026. The petition reflects the agreement among the Sosa Plaintiffs and the Olivares Plaintiffs that Maria Sosa will represent the estate in this action and that any recovery on the estate's claims will be divided evenly among Maria Sosa, L.S., and M.S.

14. The hearing on the petition was continued and is currently set for November 4, 2026, at 11:00 a.m., in Department 402 of the Fresno County Superior Court.

15. The Sosa Plaintiffs also rely on the body-worn camera recordings that Defendants lodged with the Court as Exhibits 17 through 21 to their motion (Dkts. 93-20 to 93-24), and cite them by Defendants' exhibit numbers. Because those recordings are already before the Court, the Sosa Plaintiffs do not lodge them again. Where the Sosa Plaintiffs' responses to Defendants' separate statement address only the evidence Defendants cited for a fact, they cite Defendants' exhibits by Defendants' exhibit numbers.

16. For the Court's convenience, the portions of Exhibits A through J that the Sosa Plaintiffs cite are highlighted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2026, at Woodland Hills, California.

*/s/ Cooper Mayne*

Cooper Mayne

LAW OFFICES OF DALE K. GALIPO CIVIL RIGHTS ATTORNEYS

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT A

An exhibit to the Declaration of Cooper Mayne

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- o0o --

CERTIFIED COPY

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

vs. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

(CONTINUED ON PAGE 2)

______________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
MARIA DEL CARMEN SOSA

Fresno, California
Monday, July 28, 2025
10:10 a.m. to 4:17 p.m.

By: Gracie E. Becerra, CA CSR No. 13136
Our File No.: 8403

FRESNO DEPOSITION REPORTERS
516 WEST SHAW AVE., STE. 111, FRESNO, CALIFORNIA
P.O. BOX 755, WOODLAKE, CALIFORNIA 93286

Q. Okay. So do you recall the date that you decided to separate from Max?
A. I don't remember the exact date. I don't remember the exact date, but we talked about it and we both agreed.
Q. Okay. So it was a mutual decision?
A. It was.
Q. And do you believe it was in February of 2023?
A. I -- I want to say yes.
Q. Okay. So did you ever consult with a fam -- family law attorney around the time of your separation?
A. No. It was never a discussion.
Q. Okay. And then you at some point moved out of the home on Oak, correct?
A. Yes. Yes.
Q. And how long after you decided to separate did you do that?
A. I want to say a couple weeks after.
Q. And why -- or how was the decision arrived at that you would move out of the home rather than Max?
A. Because that home that we were living at was his best friend's. We were renting from his best friend, so it was natural for me to be the one to move out since it was his friend's home.
Q. Okay. And when you moved out, that was into the 5555 Dante Avenue or -- was that the right --

A. It was very brief. I don't remember the exact date. But what was a co-worker relationship had turned into a -- a friendship, and then one day it just was more than that. And it was the one time. But it was -- it was not something that was long-term or that I would define as an affair.

Q. Okay. But when you say it was more than a friendship, are you meaning that you were physically intimate with him?

A. Yes.

Q. Okay. And that was before you separated from Max, correct?

A. It was literally the night before we agreed to separate.

Q. Okay. Did Max find out about it?

A. He found out after we were already separated.

Q. I see. And did you continue to have a relationship or -- or some level of involvement with Mr. Lea after your separation?

A. We were still co-workers.

Q. Did you continue to be physically intimate with him?

A. At some point, yes.

Q. And then how often or frequently did that occur after the date of your separation from Max?

THE WITNESS: Do I answer?

BY MS. CARPENTER:

Q. You can answer. Yes.

A. Could you repeat that question again? I'm sorry.

Q. What did Max say to you about being sad or depressed about your separation?

A. Oh. I mean, he definitely wanted to preserve our marriage just as I did.

Q. Okay. And I understand that. But what did he say specifically about being sad or depressed?

A. Just that he was sad that we weren't together, like living together, because at that time I was living in that apartment.

Q. Okay. And even though you were separated, you continued to see Max very regularly due to the fact that you had a custody arrangement, right?

A. Uh-huh. Informal, but yes.

Q. And what was your informal custody arrangement as far as the care of your children were concerned?

A. We had agreed to do weekly Wednesday to Wednesday and we would alternate.

Q. And when you say "Wednesday to Wednesday," you mean one of you would take them from Wednesday to the following Wednesday and they would stay in the home with you, right?

park, just try to give the boys a sense of normalcy, I guess, taking them places.

Q. Okay. Was Max ever physically abusive to you or your children?

A. Never.

Q. Did he ever threaten you with physical violence?

A. Never.

Q. Did he ever threaten anyone else with physical violence to your knowledge?

A. No.

Q. Did you ever know Max to possess any weapons or firearms?

A. No. He did have, what are they called, the lower receivers, but no full weapon. I don't know if that makes sense.

Q. And when you say "lower receivers," can you be more specific?

A. I honestly don't know much about guns --

Q. Okay.

A. -- or anything like that, but I just remember talking --

Q. Okay.

A. -- and I think that's what he said it was.

Q. Okay. Prior to the incident on November 4th, 2023, to your knowledge, had Max ever had any other

to her truthful and accurate?

A. Yes.

MS. CARPENTER: Okay. Now I think it's time to take our first break. So if it's all right with you, we'll take a break for about 10 minutes.

THE WITNESS: Yes, please. Thank you.

THE VIDEOGRAPHER: We have reached the end of our first media. We are off the record at 11:17 a.m.

(Recess taken.)

THE VIDEOGRAPHER: This begins media number two in the continuing deposition of Maria Sosa. Today's date is July 28th, 2025. We are back on the record at 11:30 a.m.

BY MS. CARPENTER:

Q. So in the recording that you just listened to, which was the first 9-1-1 call for a police response on November 4th that I believe that you made, and that will be Exhibit 1 --

A. Yes.

Q. -- what was happening between you and Max before that call that caused you to request police assistance?

A. I was asleep and I was woken up by him. He was highly emotional. I saw that he had looked through my phone because it was open. He told me that I was still seeing Matt and he said that he wanted to hurt himself. He said he wanted to go look for him, for Matt, and his words were to

kill him and himself. I was really scared and worried for Max's well-being because I had never seen this side of him. I knew that he was experiencing a mental health crisis.

After, I tried to -- tried to, like, deescalate the situation, I tried to calm him down, but I realized that it was just making him more upset. I had initially tried to go out and stop him myself, but I couldn't. And then at one point he brought me back into the apartment and I fell back. At the time, because he had never acted this way, I wasn't sure if he had pushed me or if I fell because the apartment door has, like, that little, like, lip to prevent, like, air, I guess, to come in. So he brought me back into the apartment and he shut the door, and that's when I got really scared for him. And that's when I realized the severity of the situation, and that's when I called 9-1-1.

Q. Well, in that call you indicated that he was drunk and that you had been drinking.

A. Yes.

Q. Earlier in the evening you had been drinking at a place outside of your apartment, true?

A. Yes. Yes.

Q. You had gone out with some girlfriends --

A. Yes.

Q. -- and that's where you had consumed alcohol; is that right?

A. He has. It was very rare that I'd go out without him. But when we were separated, I went out with my friends, which he had met previously, and he was at a -- at a football game for his nephew that night.

Q. Okay. During the time of your separation, was there ever an occasion where he had picked you up after you had gone out drinking with your friends --

A. No.

Q. -- similar to the night of this incident?

A. No.

Q. Okay. So when he picked you up, do you remember what time that was?

A. It was -- it was close to the closing time, like last call for alcohol, because I remember that he wasn't able to get in. They had already stopped letting people in. So when he came, I told my friends that he was here. And since he couldn't come in, we left with him.

Q. And when Max arrived to pick you up, was he sober?

A. To me he looked sober. He's -- I've never seen him that intoxicated like that night when we were home.

Q. Okay. So did he drink any alcohol, like, on the way to your apartment?

A. With me, no.

Q. Did he drink alcohol after he got to your apartment?

A. I'm assuming, yes, because I noticed that when I woke up, he was intoxicated. And I did have a bottle of tequila that I had on my counter.

Q. And then what about his behavior or his speech made you believe that he was intoxicated at that point?

A. It's just the way -- the way that he was behaving, he was very emotional. I don't know. I guess I could just tell when he would drink, so I know what it was like when he was tipsy, I guess, where, like, he's -- you know, when you feel the drinks. So I knew that he was beyond that just because of how he -- emotional he was and how he was behaving.

Q. Did he appear to you to be out of control emotionally?

A. Emotionally, yes.

Q. And then when you were speaking to the 9-1-1 operator, you indicated that he discovered some communications on your phone and you said that you had been talking to this guy or he knew that you had been talking to this guy. Did you ever convey what specifically Max located on your phone?

A. I don't remember.

Q. And did Max ever talk to you about or express any emotion toward you about the specific nature of the messages he found on your phone?

(Exhibit 4 was marked and attached.)

BY MS. CARPENTER:

Q. In this particular transcript, there on line 22 you're explaining to the 9-1-1 caller and you said, "And I've been trying to get a hold of someone because he -- my ex, he called me and I just wanna say what's going on because he's talking crazy, and I know -- I'm just really worried about him. I know he doesn't have any kind of weapon on him, but I'm just really worried that he's gonna make it look like he does so that he can get, like, shot by the police or something."

So that statement, do you recall making that to the 9-1-1 operator in that recording you just heard?

A. I mean, that's my voice.

Q. Okay.

A. But I don't remember exactly what I said.

Q. Did Max tell you he wanted to incite the police to shoot him?

A. Uh-huh. I don't remember the exact words, but that's what I got from the conversation.

Q. So he did say that?

A. Yes.

Q. All right. And when you told the 9-1-1 operator, "I know he doesn't have any kind of weapon on him," I mean, what were you referring to?

Q. Is it your testimony, Ms. Sosa, that you never saw Max act physically aggressive toward the police at any time while he was in the apartment before the shooting?

A. Well, the only thing that I saw with him with the scissors was opening and closing them. I didn't see him -- in the apartment I didn't see him do anything that I would say was threatening.

Q. And have you ever watched the body camera footage from the officers of the incident insi -- so the portion of that inside of the apartment?

A. No. But, I mean, I was there and I relive that all the time.

Q. Okay. And I just want to make sure that this is your sworn testimony. You do not recall as you sit there today that Max was physically aggressive with the scissors in his hands?

A. Like I said, he was just opening them. I -- I didn't see that -- I don't see that as aggressive or threatening.

Q. And do --

A. Sorry.

Q. Do you recall Max making verbally aggressive statements to the police?

A. I don't remember what he said. I was -- when I say I remember everything, I remember, like, the scene play

Q. So at this point was he drinking more frequently?

A. I -- I wasn't aware of -- to what extent, like, that he was drinking, but he did mention -- excuse me. Sometime after that, maybe a couple months, he did mention that he was starting to drink more and he didn't like that. He felt like it was becoming a problem, so he -- he had stopped or wanted to stop drinking altogether.

Q. Okay. And then on the night of the incident you indicated that he looked like he was intoxicated, but you're not sure when he ingested or drank the alcohol, right?

A. Yes.

Q. All right.

A. That's correct.

Q. And is it correct that he did not ingest or drink the alcohol when he was in your presence?

A. I did not see him drink.

Q. Okay. Okay. So then on page 18, at the top it states:

"He went to his own therapist through I don't know who, but I went with my therapist at Family Therapy.

"Q: So he barely gave it a chance?

"A: Yes. He barely -- yeah. But he did tell me that his therapist

everything visually from that night.

Q. Okay. Do you believe you were intoxicated?

A. At some point in the night, yes.

Q. Okay. And, I mean, just knowing yourself and how you tolerate alcohol, you can say that you felt intoxicated at some point in the night, right?

A. Yes.

Q. Okay. Did you feel intoxicated when he woke you up when -- when you were in bed?

A. No. I just felt dazed, I guess, from just being woken up, not understanding what was happening.

Q. Okay. And then from your phone he texted Matt saying, "I want you to come fuck me. The door is unlocked," correct?

A. Yes. I don't remember. Like I said, yes, the -- everything that you're reading I -- I said. I recognize my voice and everything that I've said. But I was in so much shock that I don't remember specifics and I still don't remember specifics. But what I do remember from that specifically is that I -- I said that he texted Matt because I don't remember texting Matt that.

Q. Okay.

A. So I assumed that it was him that was --

Q. And did --

A. I'm sorry. The timestamp for that was before I

was woken up.

Q. I see. So from that you gathered that at some point before he woke you up that he had done that?

A. Right. Yes.

Q. Okay. And then did you ever have any voice or text communications yourself with Matt that night?

A. No.

Q. Did you ever speak to Matt after this incident?

A. He called me the next day because he had received calls from me at such an early hour in the morning and of a random phone number.

Q. Okay.

A. Yeah.

Q. Did you and Matt continue to have a relationship after this?

A. No.

Q. When was the last time that you spent any -- any time with Matt, just you two?

A. Gosh, I don't know.

Q. Was it before or after the incident date?

A. After. Because we still continued to work.

Q. Okay. But did you spend any time with Matt outside of work --

A. No.

Q. -- after the incident date? Okay.

And then when -- when did -- so when did the situation at work occur that they found out about your out-of-work relationship with Matt?
A. They told me about that sometime in January or February of last year.
Q. Okay. And did you have to go through some sort of an administrative process?
A. Yes.
Q. Okay. Was there like a -- a hearing or something?
A. No.
Q. Okay. Did they allow you to voluntarily leave or did they just fire you?
A. They asked -- I believe, if I remember correctly, they had asked, so they -- but they also let me just finish the year and not rehire me.
Q. Okay. So I'm going to fast-forward to page 65. So down at line 2697, you said, "Um, and that I was just scared and worried because he had made the statement that he wanted to go kill Matt and himself. And when I told Max on the phone that I had called the police, he, uh, made a comment, something like, 'I'm gonna take a cop with me' or 'take a pig with me.'"
Now, when you spoke to Max on the phone, was he driving his Tesla around?
A. Honestly, I -- I don't remember. Like I said,

these are my statements, but I don't remember in details specifically, so I -- I can't answer that question if he was driving or not.

Q. Were you aware on the night of the incident that Max was involved in a pursuit with the police?

A. I want to say at one point -- I don't know if somebody told me or I heard it between the officers, but I -- I do recall something about that.

Q. And do you -- okay. And do you recall the specific statement from Max that you said here in your interview, "I'm gonna take a cop with me" or "take a pig with me," because that's in quotes?

A. Right. Yeah. I -- today I -- I don't remember anything.

Q. But when you told the investigators, were you telling them the truth?

A. Yes. I -- I -- I was in shock. But when the officers came in, I was having so much anxiety and it's like adrenaline took over and I just -- I answered everything as it -- as I remembered from that night. So, yes, everything that I said was from what I remembered that night.

Q. Okay. And then from the way you're describing it, it sounds like the incident was fresher in your mind back then than it is now.

A. Yeah.

Q. Is that accurate?

A. Yes.

Q. Okay. And then on page 66, you also state down here at 2748, you're asked, "I mean, it sounds -- he's -- he's wanting to, you know, suicide by cop, is that what he's describing to you, right" -- or "is what he's describing to you, right?" Answer: "Yeah."

So when you're asked specifically by the investigator whether Max was indicating to you by his statements and his behavior he wanted to commit suicide by cop, there was no question in your mind, right?

A. That's what I felt from his actions, the way that he was just highly emotional.

Q. Okay. You also indicated in your interview that -- when you were asked about what the officers did in response to Max when he came in with the scissors, you said that they were, you know, saying we don't have to do this, you know, it doesn't need to -- you know, this doesn't need to happen or words to this effect. Did you believe that their response to him was appropriate given his -- the level of his -- you know, the level of his emotional -- just where he was at emotionally at that time?

A. No. I mean, they did say that, but I was -- I just kept waiting for the crisis response team to arrive. Having worked in mental health, I -- I -- I know that that's

or to appeal it?

A. My attorneys have been supporting me with all of that. I don't know the legalities of probate court.

Q. Okay. And the reason I -- I ask is that that order was issued, I believe, in March of -- of 2024, so it's been now over a year. Had -- did you appeal that order to your knowledge?

MR. MAYNE: Objection. Asked and answered.

MR. LITTLE: Okay.

BY MR. LITTLE:

Q. Now, if -- and I appreciate that you -- you tried to give us kind of all of the -- the reasons for this, but it sounds like you were concerned how Max would react if you told him we're done. You were worried that he might harm himself; is that true?

A. I didn't know what he could do because of his -- how -- his emotional state.

Q. And I think, as you stated in the interview with the detective, at least initially your motivation in telling -- in having reconciliation being a possibility was so that he wouldn't harm himself?

A. No, not necessarily. I did want reconciliation. What I meant by that and when I said about -- I don't remember the -- exactly what was said, but that was more hypothetical of if I were to say, like, we're done, that

what would he do. So that's why I was very insistent that we did individual therapy and then couples therapy, because I would have loved to reconcile, but, like I said, there was so many other factors affecting that.

Q. As of the date of Max's death, there was no specific plan or timeline for the two of you to reconcile. Would that be a correct statement?

A. Like I said, we -- the plan was to go to therapy so that we could then do couples therapy. I -- I -- I don't know the future. I don't know how long that would take to be able to address all of our individual issues as well as our marital issues.

Q. So at the time of his passing, you didn't know whether the two of you would reconcile as husband and wife or not, true?

A. I would have wanted to, yes, but like I said, the plan was to do therapy and address individual issues before we could address the marital issues, but it was always the intention.

Q. Okay. So -- so your intention was, at the time of Max's death, to reconcile with him?

A. Yes.

Q. And did you have any anticipated date by when -- by which that would occur?

A. I mean, I would have loved for us to work things

I, Gracie E. Becerra, CSR 13136, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn via video conference pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand via video conference and thereafter reduced to text under my direction.

X That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

No changes have been provided by the witness during the period allowed.

The changes made by the witness are appended to the transcript.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 12th day of August, 2025.

Gracie E. Becerra, CSR 13136

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT B

An exhibit to the Declaration of Cooper Mayne

**Fresno Police Dept - CA**
**2323 MARIPOSA ST.**
**Fresno, CA 93721**
**US**

**Event ID 2311040123**

## Metadata

| | |
|---|---|
| Event ID | **2311040123** |
| Created By | **CT23 - Worden, T (D3081) (23)** |
| Date Created | **11/04/23 03:10:30** |
| Date Closed | **11/04/23 17:28:37** |
| Status | **CLOSED** |
| Dispatch Area | **NW** |
| Beat, Juris, Zone, Corner | **5D, FRESNO, 1545** |
| Location | **5555 N Dante Ave, Fresno, California, 93722** |
| Location Details | **#124 .....DANTE APTS** |
| Type | **1M - HEALTH/SUICIDE** |
| Priority | **0 - Emergency / Presumed Life Threatening** |
| Source | **NEM - NON-EMERGENCY** |
| Synopsis | **SUICIDAL MALE, NO WEAPS, IS DK......SOZA,MATT [redacted] SALMON SHIRT, BLU JEANS.....NOW LEAVING IN DRK GRY TESLA 3.....GETTING FURTHER** |

## Narrative

NW - WIENS, K (D3154) 11/04/23 03:10:52
BC

NE - Barrientos, P (D3209) 11/04/23 03:10:54
BC

SE - Quintero, V (D3206) 11/04/23 03:10:59
BC

SW - Perches, A (D3218) 11/04/23 03:11:01
BC

CE - Padilla, D (D3219) 11/04/23 03:12:00
BC

CT23 - Worden, T (D3081) 11/04/23 03:12:27
MALE IS ESTRANGED HUSB, LIVES 5552 W OAK, HAS A BOTTLE TEQUILA W/HIM.....RP STILL SEES HIS VEH OUTSIDE, IF HE LEAVES, HE'S POSS ER TO VILLA LUCIA ON FIGARDEN

CT23 - Worden, T (D3081) 11/04/23 03:12:59
KEEPING RP ON LL....STILL SEES HIS VEH, PARKED IN HANDICAPPED STALL....

CT23 - Worden, T (D3081) 11/04/23 03:15:09
MALE NOW SITTING IN THE VEH, BUT IT'S NOT STARTED YET

CT23 - Worden, T (D3081) 11/04/23 03:15:56
MALE NOW BACKING OUT AND LEFT TOWARDS VILLA LUCIA APTS AT [illegible] RATE OF SPEED, HE DOESN'T KNOW

[5F32] BLEW STOPSIGN DANTE AND BULLARD.. CONT NB DANTE APPROACHING POLK

NW - WIENS, K (D3154) 11/04/23 03:33:48
[5F32] LOST SIGHT OF VEH.. LS NB DANTE/APPROACHING POLK

CE - Worden, T (D3081) 11/04/23 03:34:23
702L MONITORING

NW - Woofter, M (D3112) 11/04/23 03:34:36
[5D31] LGHT GRY TESLA 3 SUV

NW - Woofter, M (D3112) 11/04/23 03:34:44
[5G32] 245 ON AN OFCR

NW - WIENS, K (D3154) 11/04/23 03:34:53
[5D31] VEH IS LIGHT GREY TESLA MODEL 3 P/9DWR307

NE - O Grady, P (D3025) 11/04/23 03:35:59
BC

CE - Worden, T (D3081) 11/04/23 03:36:08
BC

NW - Woofter, M (D3112) 11/04/23 03:36:22
[5C32] ER TO RO ADDR

NW - WIENS, K (D3154) 11/04/23 03:36:26
SECURE

CE - Worden, T (D3081) 11/04/23 03:36:39
BC SECURE

NE - O Grady, P (D3025) 11/04/23 03:36:45
BC

SE - Barrientos, P (D3209) 11/04/23 03:36:54
BC SEC

5E30 - Sifuentes, V (P2218) 11/04/23 03:37:24
CANVASSING BULLARD ND WEST OF HERNDON

NW - Woofter, M (D3112) 11/04/23 03:37:41
[509S] PIT IS AUTHORIZED IF VEH IS LOCATED

NW - Woofter, M (D3112) 11/04/23 03:38:39
[5G32] ALL UNITS C4, NO INJURIES

NW - Woofter, M (D3112) 11/04/23 03:38:51
NEG ON PATROL VEH DAMAGE

NW - WIENS, K (D3154) 11/04/23 03:39:00
RO ADDR FOR THE TELSA = 5552 W OAK (NW/A BEAT)

5F32 - Abraham, J (P2122) 11/04/23 03:39:56
ON POLK/ALLUVIAL

NW - WIENS, K (D3154) 11/04/23 03:40:13
SOSA, MAXIMILIANO 05-20-1990 - DMV #1 ADDR LISTED 5632 S ZELKOVIA - DEL REY... #2 2533 W MCKINLEY (SW/A BEAT)

SW - Lanik, S (D3175) 11/04/23 03:40:13
BC SEC

NW - WIENS, K (D3154) 11/04/23 03:41:34
702L ADVD AND MONITORING

**Fresno Police Dept - CA** **Event ID 2311040123**

| | | | |
|---|---|---|---|
| 11/04/23 03:34:44 | NW - Woofter, M (D3112) | ADDCOM | [5G32] 245 ON AN OFCR |
| 11/04/23 03:34:51 | 5D32 - Crockett, B (P2102) | ENROUTE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5D32 - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:34:53 | NW - WIENS, K (D3154) | ADDCOM | [5D31] VEH IS LIGHT GREY TESLA MODEL 3 P/9DWR807 |
| 11/04/23 03:35:12 | 5B31 - Andrade, J (P2041) | ONSCENE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5B31 - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:35:37 | 5A32 - Urbina, B (P2244) | ONSCENE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5A32 - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:35:53 | 5E30 - Sifuentes, V (P2218) | ENROUTE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5E30 - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:35:55 | NW - Woofter, M (D3112) | UPDTL | UNIT: 5C32 - LOCATION: 5552 W OAK |
| 11/04/23 03:35:58 | 5E30 - Sifuentes, V (P2218) | ONSCENE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5E30 - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:35:59 | NE - O Grady, P (D3025) | ADDCOM | BC |
| 11/04/23 03:36:08 | CE - Worden, T (D3081) | ADDCOM | BC |
| 11/04/23 03:36:13 | NW - Woofter, M (D3112) | ENROUTE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5D32 - LOCATION: 5552 W OAK |
| 11/04/23 03:36:14 | NW - Woofter, M (D3112) | UPDTL | UNIT: 5D32 - LOCATION: 5552 W OAK |
| 11/04/23 03:36:16 | NW - WIENS, K (D3154) | ENROUTE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5C32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:16 | NW - WIENS, K (D3154) | ENROUTE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5D32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:17 | NW - WIENS, K (D3154) | UPDTL | UNIT: 5C32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:17 | NW - WIENS, K (D3154) | UPDTL | UNIT: 5D32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:20 | NW - WIENS, K (D3154) | CODE3 | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5C32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:20 | NW - WIENS, K (D3154) | CODE3 | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 5D32 - LOCATION: 5552 W OAK NW/A |
| 11/04/23 03:36:22 | NW - Woofter, M (D3112) | ADDCOM | [5C32] ER TO RO ADDR |
| 11/04/23 03:36:26 | 509S - Oliver, B (S263) | ONSCENE | PRIORITY: 0 - TYPE: 1M - HEALTH/SUICIDE - UNIT: 509S - LOCATION: 5555 N DANTE AVE, FRESNO |
| 11/04/23 03:36:26 | NW - WIENS, K (D3154) | ADDCOM | SECURE |
| 11/04/23 03:36:39 | CE - Worden, T (D3081) | ADDCOM | BC SECURE |

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT C

An exhibit to the Declaration of Cooper Mayne

| DATE | FRESNO POLICE DEPARTMENT | CASE NUMBER |
|---|---|---|
| 12/13/2023 | SUPPLEMENTAL REPORT | 2311040123 |

| Crime | Victims | Location of Occurrence | Date |
|---|---|---|---|
| PC664/187(a) Attempted Murder | Officer Angel Equihua<br>Officer John Ayers<br>Officer Brandon Crockett | 5555 N. Dante Ave. #124 (Dante Apartments) | 11/04/2023 |
| **Cleared by:** Exceptional Circumstances (the suspect was killed by the police). | | | |

## SUSPECT INFORMATION

SUS: Maximiliano Sosa Jr. [redacted] *DECEASED*
Alias: Max Sosa
Gender: Male Race: Hispanic
Height: 5-11 Weight: 230
Hair: Black Eyes: Brown
CDL: [redacted]
Address: 5552 W. Oak Ave. - Fresno, CA 93722
Phone: [redacted]

## ADDITIONAL WITNESSES & REPORTING PARTIES

WIT: Ofc. Jonathan Abraham #P2122, 2323 Mariposa Mall - Fresno, CA, 559-621-7000

WIT: Ofc. Anthony Aguilar Jr. #P2012, 2323 Mariposa Mall - Fresno, CA, 559-621-7000

RP: Maria Sosa [redacted] 5555 N. Dante Ave. #124 - Fresno, CA, [redacted]

OTH: Damian Rodriguez [redacted]

OTH: Cody McDivitt [redacted]

OTH: Christina Gutierrez [redacted]

## VEHICLES

SUS VEH: 2023 Tesla - Model 3 (gray)
Plate: California # 9DWR807
VIN: 5YJ3E1EA6PF410819
RO: Maximiliano Sosa Jr. (5552 W. Oak Ave. - Fresno, CA 93722)

| Reporting Officer | Badge | Unit | Assigned Date | Supervisor Approval | Approved |
|---|---|---|---|---|---|
| Det. Ryan Rockwell | P1479 | Homicide | 11/04/2023 | Sgt. Chris Serrano #S180 | 12/14/2023 |

3 times, and Officer Crockett and Officer Abraham both fired their weapons once. Officer Ayers and Officer Crockett shot in a northern direction, and Officer Abraham shot in a southeastern direction.

After talking to Sergeant Oliver and Sergeant Snow, we met with Detective Mendez and Detective Gregory who briefed us on preliminary information they developed about the incident up to this point. The following is a summary of the on-scene briefing provided by Detective Mendez and Detective Gregory.

**ON-SCENE BRIEFING**

Officer Ayers, Officer Abraham, and Officer Equihua responded to 5555 N. Dante Ave. #124 regarding a call-for-service that was generated on 11/04/2023 at 0310 hours. The reporting party was Maria Sosa who called the police requesting a welfare check of her husband Maximiliano Sosa [redacted] Maria reported that Maximiliano was intoxicated, and he was making suicidal statements.

Upon officers arriving at the Dante Apartments, they contacted Maria and learned that Maximiliano had left the location driving his gray Tesla - Model 3. After talking to Maria, the officers walked to their vehicles, and around this time, Maximiliano returned to the apartment complex driving his Tesla. Maximiliano drove his vehicle in the direction of Officer Equihua and swerved towards him. Officer Equihua had to jump out of the way to avoid being struck by Maximiliano's vehicle.

Maximiliano then drove his Tesla out of the apartment complex, and the three officers pursued him in their patrol vehicles, but they quickly lost sight of the Tesla. Over the course of the next hour, officers spotted Maximiliano's Tesla in the area of the Dante Apartments two more times. Officers pursued the Tesla both times, but they were unable to keep up with it.

At approximately 0340 hours, Maria called the police and reported that she had just received a call from Maximiliano who told her he was intent on committing suicide-by-cop.

After evading the police three times, Maximiliano returned to the Dante Apartments, and he confronted officers who were with Maria at her apartment (#124). Maximiliano was armed with a pair of kitchen shears. The confrontation resulted in three officers discharging their handguns at Maximiliano.

The three officers who discharged their weapons were Officer Ayers, Officer Crockett, and Officer Abraham. Officer Aguilar was also said to have discharged his ECD (Electronic Control Device) during the incident.

Maximiliano Sosa was pronounced deceased on-scene by Paramedic Narciso Espinosa (American Ambulance) at 0458 hours.

Eventually, Officer Ayers repositioned himself outside the front door of Maria's apartment with Officer Crockett who had just arrived at the location. About 30 seconds later, Max Sosa walked out the front door of Maria's apartment while armed with kitchen shears in his right hand, and he began advancing towards Officer Ayers and Officer Crockett.

An ECD was deployed at Max as soon as he stepped outside the front door. Max reacted to the ECD deployment by charging towards Officer Ayers and Officer Crockett while still armed with the kitchen shears in his right hand. Officer Abraham followed Max outside and discharged his handgun in the direction of Max's back at 0439 hours, as he came within just a few feet of Officer Ayers and Officer Crockett. Max fell to the ground and offered no more resistance after he was shot. – Approximately four seconds elapsed from Max exiting the apartment to the moment shots were fired.
END OF BWC VIDEO SUMMARIES

The following are summaries of the statements provided by Officer Ayers, Officer Crockett, and Officer Abraham. The interviews/statements were audio recorded. Marshall Hodgkins accompanied the officers during their interviews.

**STATEMENT OF OFFICER JOHN AYERS**
I contacted Officer John Ayers at 0948 hours and read him an admonishment advising him that he was going to be interviewed about this case. The admonishment also advised Officer Ayers that any statement he provided would be voluntary and no discipline would come to him for not talking to me. Officer Ayers agreed to provide a voluntary statement. He also confirmed that nobody pressured him into providing a statement and he had not spoken with anyone (other than his attorney) about this case.

Officer Ayers has been a sworn peace officer with the Fresno Police Department for about 1.5 years. He is currently assigned to the Patrol Division in the Northwest District, Watch-3. Officer Ayers was detailed as 5D31 (Five David Thirty-One) and was wearing a full police uniform when the OIS incident related to this case occurred. His assigned vehicle was unit #100762 which is a marked Fresno Police Department patrol vehicle.

Officer Ayers discharged his department issued 9mm Glock G45 handgun during the OIS incident. Said firearm is Officer Ayers' primary duty weapon and there have been no modifications made to it. Officer Ayers was issued this firearm approximately two years ago while he was attending the Police Academy.

On 11/04/2023 at approximately 0300-0345 hours, Officer Ayers responded to 5555 N. Dante Ave. #124 regarding the report of a suicidal male at the location named Max. Officer Abraham and Officer Equihua also responded to this location with Officer Ayers to assist him.

| DATE | FRESNO POLICE DEPARTMENT | CASE NUMBER |
|---|---|---|
| 12/13/2023 | SUPPLEMENTAL REPORT | 2311040123 |

Upon their arrival, Officer Ayers spoke with the reporting party Maria who is Max's wife. Maria told officers that she was separated from Max, and he became angry when he found text messages on Maria's phone between her and another male. Max left Maria's apartment driving his gray Tesla - Model 3. Max told Maria that he was going to kill himself and the male Maria had been communicating with. Maria told Officer Ayers that Max did not physically assault her prior to leaving her apartment.

After talking to Maria, Officer Ayers turned off his BWC and returned to his patrol vehicle that was parked outside. Officer Abraham and Officer Equihua followed Officer Ayers outside. Officer Ayers then sat in the driver seat of his patrol vehicle and called his supervisor to provide him with an update about the information Maria told him.

While sitting in the driver seat of his patrol vehicle, Officer Ayers heard Officer Equihua say that Max had returned to the apartment complex in his Tesla. Officer Ayers then stuck his head out his open driver door and looked behind him, towards the back of his vehicle where Officer Equihua had moved to. He saw a gray Tesla drive by Officer Equihua at a high rate of speed, and the Tesla swerved in Officer Equihua's direction as it passed by him. Officer Abraham made a radio broadcast advising the Tesla had almost struck Officer Equihua.

After almost striking Officer Equihua, the driver of the Tesla stopped, made a U-turn, and then drove back past the officers from the way he had just come. The driver said something like, "Fuck you guys", as he drove past the officers.

Officer Ayers, Officer Abraham, and Officer Equihua all got into their patrol vehicles and initiated a pursuit of the Tesla. Officer Ayers said his vehicle was the last car involved in the pursuit, and he never actually saw the Tesla by the time he exited the apartment complex. The pursuing officers lost sight of the Tesla a short time later.

Officers located, pursued, and lost sight of the Tesla about 4-5 more times prior to the OIS occurring. Officer Ayers was not involved in the subsequent pursuits.

After a while, Officer Ayers decided to recontact the reporting party Maria because he was worried about her safety. He was concerned Max might return to her location because the subsequent pursuits were initiated after Max's Tesla was spotted in the area of Maria's apartment complex.

Upon recontacting Maria at her apartment, Officer Ayers spoke with Max on the phone several times. Some of the calls to Max were made using Officer Ayers' department issued cell phone, and some were on Maria's phone because Max continued to call her. Max shouted obscenities at Officer Ayers and hung up on him during some of these phone conversations. Also, during these phone calls, Max told Officer Ayers that there was nothing the police could do to help him, and he said either him, the male

| Reporting Officer | Badge | Unit | Assigned Date | Supervisor Approval | Approved |
|---|---|---|---|---|---|
| Det. Ryan Rockwell | P1479 | Homicide | 11/04/2023 | Sgt. Chris Serrano #S180 | 12/14/2023 |

Max fell to the ground on his face/chest immediately after being shot. Officer Crockett then ran to Officer Ayers vehicle, retrieved a first-aid box, and then returned to Max to start rendering him with medical aid. Upon returning to Max, he noticed Officer Aguilar removing the scissors from Max's possession. Officer Crockett estimated that it took only about 20-30 seconds for officers to start rendering medical aid after he retrieved the first-aid equipment.

When asked if there was anything he wanted to tell me about that was not captured on video by his BWC, Officer Crockett told me there was not.

Prior to the OIS incident, Officer Crockett had no contacts with Max or Maria, nor had he handled any calls-for-service in their apartment complex.

**STATEMENT OF OFFICER JONATHAN ABRAHAM**

I contacted Officer Jonathan Abraham at 1327 hours and read him an admonishment advising him that he was going to be interviewed about this case. The admonishment also advised Officer Abraham that any statement he provided would be voluntary and no discipline would come to him for not talking to me. Officer Abraham agreed to provide a voluntary statement. He also confirmed that nobody pressured him into providing a statement and he had not spoken with anyone (other than his attorney) about this case.

Officer Abraham has been a sworn peace officer with the Fresno Police Department for a little more than one year. He is currently assigned to the Patrol Division in the Northwest District, Watch-3. Officer Abraham was detailed as 5F32 (Five Frank Thirty-Two) and was wearing a full police uniform when the OIS incident related to this case occurred. His assigned vehicle was unit #100824 which is a marked Fresno Police Department patrol vehicle.

Officer Abraham discharged his department issued 9mm Glock G45 handgun during the OIS incident. Said firearm is Officer Abraham's primary duty weapon and the only modifications made to it is a grip enhancement (grip tape). Officer Abraham was issued this firearm approximately 1.5 years ago while attending the Police Academy. It is worth noting that the magazines for Officer Abraham's handgun have a five-round extension.

Sometime during the last half of Officer Abraham's shift, on 11/04/2023, he responded to a call-for-service at the Dante Apartments near Dante & Bullard. The call was regarding the welfare check of a suicidal male named Max Sosa. The reporting party was Max's girlfriend, Maria Sosa. Maria reported that Max was making suicidal statements, and he was possibly drunk driving. Maria provided Max's identifying information and described his vehicle as a gray Tesla. The license plate for the Tesla was also provided, and Officer Abraham recalled the last three digits of the plate were 907.

Officer Abraham responded to the Dante Apartments to assist with handling said call-for-service. He was accompanied by Officer Ayers, who was the primary officer, and Officer Equihua. Upon their arrival, they spoke with Maria and learned that Max had left the location before they got there. Officer Ayers obtained preliminary information from Maria, who told them she was involved in a verbal disturbance with Max, and he left driving his Tesla after making suicidal statements.

After talking to Maria, the three officers walked outside to discuss how they were going to handle the incident. Officer Ayers sat in the driver seat of his patrol vehicle and made a phone call while Officer Abraham and Officer Equihua stood near his vehicle.

A short time later, Officer Abraham and Officer Equihua noticed a gray Tesla driving through the parking lot in the apartment complex. Officer Equihua walked towards the rear driver side of Officer Ayers vehicle as the Tesla drove closer to them, and Officer Abraham was standing about three yards behind him. The Tesla was moving at a high rate of speed, and it swerved in Officer Equihua's direction as it drove by him. Officer Abraham recalled hearing the tires on the Tesla screeching as it drove by Officer Equihua, and it came within inches of striking him.

The Tesla continued past Officer Equihua after almost striking him, and Officer Abraham noticed the rear plate on the vehicle matched the plate to Max's Tesla that was listed in the related call-for-service. The driver of the Tesla then made a U-turn and drove away in an eastern direction. Officer Abraham broadcast information on the radio advising the driver of the Tesla attempted to strike Officer Equihua with their vehicle, and he relayed information about the Tesla's direction of travel.

Officer Abraham then got into his patrol vehicle and drove out of the parking lot looking for the Tesla. Upon turning on to Dante Ave., Officer Abraham spotted the Tesla driving away northbound. He activated the Code-3 equipment on his patrol vehicle and pursued the Tesla but was unable to catch up to it. He quickly lost sight of the Tesla, somewhere near Polk Ave.

After losing sight of the Tesla, Officer Abraham canvassed the surrounding area looking for it. He heard officers on the radio saying they were responding to the address the Tesla is registered to, somewhere near Milburn & Alluvial. Officer Abraham drove to Alluvial Ave. and waited there for some time in case the Tesla showed up there, but it never did. During this time, Officer Abraham heard radio traffic regarding officers pursuing the Tesla again, but he did not get involved in the second pursuit.

After a while, Officer Abraham returned to the area of the Dante Apartments, and while there, he spotted the Tesla driving south on Dante from Bullard. Officer Abraham initiated a third pursuit of the Tesla, and he chased it to the area of Shaw & Marty where he lost sight of it again. The driver of the Tesla

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT D

An exhibit to the Declaration of Cooper Mayne

Anthony Aguilar

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

ANTHONY AGUILAR

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

Q. Approximately, when did you start at the police academy?

A. January of 2020.

Q. And when did you finish with your training at the police academy?

A. June -- the end of June, beginning of July. I believe it was July of 2020, sir.

Q. What -- did you continue to work for the Fresno P.D. after that?

A. Yes.

Q. What was your position with the Fresno P.D. after you finished with the academy?

A. I was an officer, just on patrol.

Q. And how long were you in that position of patrol officer?

A. For five, almost six years.

Q. So is that up until two weeks ago?

A. Yes.

Q. Before the date of the incident, did you have any special assignments, or were you part of any specialty teams within the department, besides your role as just -- as a patrol officer?

A. No, sir.

Q. Did you have any special training in crisis negotiation or crisis intervention?

A. Just back to what I got in the basic academy, and then during FTO, and my day-to-day trainings with our perishable skills training, and in-service training. Other than that, nothing special.

Q. Before working for Fresno P.D., did you have any law enforcement experience of any kind?

A. No, sir.

Q. Do you have any military experience?

A. No.

Q. After high school, did you go to any college?

A. No.

Q. When did you graduate high school?

A. 2014.

Q. Could you walk me through your -- your career, your -- the jobs you had between 2014 and when you started as a cadet in -- I think you said 2019?

A. Yes. I -- when I first graduated, I started working at FedEx, and I was pretty much loading up delivery trucks for approximately two years. And then I worked at Walmart. I worked in their Loss Prevention Department for approximately four, almost five years, where I was then hired as a police cadet for Fresno.

Q. And when you say you were in their "Loss Prevention Unit," were you a security guard of some sort?

still strike the subject, what's the result? You don't get NMI, but do you get pain?

MS. O'LINN: Objection. Calls for speculation. Unintelligible, I think.

But, go ahead. If you understand, you can answer.

THE WITNESS: I couldn't answer that question, sir.

BY MR. MAYNE:

Q. If you are deploying a Taser and the probes strike the subject, but you don't get NMI, do you still get pain? Does the subject still experience pain?

A. It's possible.

Q. In this case, based on your perception, was the Taser effective for any portion of time?

A. No.

Q. Based on Mr. Sosa's reaction, did the Taser cause him pain?

A. Yes.

Q. How could you tell?

A. When I deployed the Taser and pulled the trigger, he stumbled to his left, and it looked as if he was trying to swat the wires away from his chest.

Q. Besides that, was there anything that indicated to you that he was experiencing pain?

A. No.
Q. Did he kind of grunt after you deployed your Taser?
A. Yes.
Q. Could that have been an expression of pain?
A. It could have, yes.
Q. Do -- are you familiar with the concept of "fight or flight reaction"?
A. Can you repeat that? I'm sorry.
Q. Are you familiar with the concept of "flight or fight reaction"?
A. Yes.
Q. Could you describe that, in your words?
A. To me, fight or flight means is if someone feels as if they're threatened or attacked, or if they're focused on something, that they're going to fight as much as they can to achieve that goal, or they're just going to try and do whatever they can to get away from it.
Q. Have you had training on the use of a Taser?
A. Yes.
Q. What about other non-lethal weapons?
A. Yes.
Q. Which other non-lethal weapons have you had training on?

A. We've had -- I've had training on pepper spray, and also a less-lethal shotgun.

Q. Was part of your training -- did part of your training cover the idea that a subject may run away when they're struck by non-lethal force?

A. Can you rephrase the question?

Q. According to your training, is one possible reaction that a subject may have to being struck by non-lethal force, to run away or to flee from the force?

A. It's possible, yes.

Q. And that's natural, to some extent. It's human nature to move away from something that causing pain. Would you agree with that?

A. Yes.

Q. Do you have any training in dealing with people who are having a mental health crisis?

A. Yes.

Q. Was any portion of your training related to avoiding, creating a situation where they perceived that they're trapped, so avoiding cornering them or boxing them in? Is that part of your training?

A. Can you rephrase that question? I'm sorry.

Q. And for all my questions, "no" is a perfectly good answer, too. I just want you to know I'm not trying to trick you into saying anything.

Anthony Aguilar

I'm wondering whether part of the training for when you're dealing with somebody suffering from a mental health crisis is to avoid cornering them or boxing them in, because that can potentially escalate the situation; is that part of your training?

MS. O'LINN: Objection. Argumentative as phrased.

You can explain.

THE WITNESS: Yeah. I feel like it just depends on the circumstances of whatever you're dealing with, and the person you're dealing with.

BY MR. MAYNE:

Q. But is that concept covered -- was that concept covered in any part of your training, that that's something to consider, that you may not want to corner or box the person in?

MS. O'LINN: Same objection.

THE WITNESS: The consideration, yes.

BY MR. MAYNE:

Q. And do you know why that would be?

A. I feel like because sometimes if someone feels cornered, they might react to it.

Q. Have you heard of the concept of an "avenue of escape," of leaving a suspect an avenue of escape? Is that something that -- that's covered in your training?

MS. O'LINN: Objection. Overbroad. Vague and ambiguous. Incomplete hypothetical. Argumentative as phrased.

You can answer.

THE WITNESS: Yes, I've heard the phrase before.

BY MR. MAYNE:

Q. Could you describe what that concept means to a non-law enforcement individual, like myself?

A. Yeah. So depending on the circumstances of whatever call you're on, sometimes it's -- if feasible and if safe, you can leave a specific place or avenue, which you're calling it; right? So specific, I would say it would be more of like a way out of somewhere, so that "avenue," in quotes, is a specific way out for wanted individual.

Q. And I'm sure it's obvious to you, but not to me. But why would that be -- why would that ever be an appropriate tactic, to leave an avenue of escape for a suspect?

A. Because depending on the crimes your suspect's wanted for, and if, say, we're going and talking to this person, just based on -- we can say "mental health evaluation," and there's no active crimes this person is wanted for, then, if they have their way out, then they

can leave.

Q. So is part of it that the avenue of escape -- the avenue of escape is helpful to potentially prevent danger to the officers and the suspect?

A. Yes.

Q. Was there an avenue of escape for Mr. Sosa, during the period that you were there, prior to him being shot?

A. No. There was not enough room. It was a very small, tight space where we were at.

Q. Did you consider, when you decided to Tase Mr. Sosa, that one possibility would be that he would react by trying to move away from the source of pain?

A. I'm sorry. Can you rephrase that?

Q. Did you consider, when you decided to use your Taser against Mr. Sosa, that one possible outcome would be that he would move away from the source of pain?

A. Yes.

Q. What -- given the configuration of the apartment and the complex that you were in, what possible directions could he go, from where he was at the time he was Tased?

A. He could have gone back into the apartment.

Q. Is there another direction he could have gone?

A. He could have turned around, but he would have

ran into a wall.

Q. So there was a door across from the door of the apartment that Ms. Sosa was in?

A. Uh-huh.

Q. That door was closed; right?

A. Correct.

Q. The breezeway, could he have theoretically moved that way, as well?

A. He could have. That was exactly where we were standing.

Q. Were there officers standing in the apartment, as well?

A. At the time that I Tased him, no.

Q. Wasn't Officer Abraham still in the apartment?

A. Yes.

Q. So at the time that you Tased him, if he had run into the apartment, would he have been running towards Officer Abraham?

A. Yes.

Q. So now could we go back and -- when you were first responding to the apartment, what did you know about Mr. Sosa in the -- in the moments before your arriving there at the door of Ms. Sosa's apartment? What was your understanding of the situation you were about to face?

A. I knew that Mr. Sosa was upset because he found out that his wife was having an affair and was talking to another male. After that, I learned that he had attempted to run over an officer. After that, he had taken officers on multiple police pursuits. I think there was approximately three or four of them.

While doing that, he was driving at a high rate of speed, with no due regard to the public or the officers or himself, and that he had returned to the apartment where officers were at with Ms. Sosa.

Q. Did you have any information that he was armed?

A. No.

Q. Did you have any information that he had actually hurt anybody?

A. No.

Q. Did you know, in the moment before you arrived there, that he had expressed an intent to commit suicide by cop?

A. I'm sorry. Can you repeat the question? Just repeat it. Sorry.

Q. Yeah. In the moment -- I'm focusing your attention on the time when you first arrived at that apartment.

A. Uh-huh.

Q. And did you know at that time that he had

expressed intention to commit suicide by cop?
A. Yes.
Q. And how did you know that?
A. Officer Ayers had broadcast over the radio that he was on the phone with Mr. Sosa, and that Mr. Sosa also made statements that, "Tonight was either going to be his own life, an officer's life, or the male that Mrs. Sosa was talking to or seeing."
Q. Did your Taser -- well, first of all, I know this was a long time ago, but do you remember what model Taser you had?
A. It was a -- I know the brand was Axon. I think it was an X90 or T93X or 96X.
Q. Do you know whether it had a single cartridge or multiple cartridges?
A. It had two cartridges on it, itself. There was -- there was one loaded into the Taser itself, and then there's an extra cartridge at the bottom where the handle's at.
Q. Could you explain, you know, to somebody who's never used a Taser, how that works? Once you've deployed the Taser once, how would you deploy it a second time?
A. So the --
MS. O'LINNN: Referring to probe deployment;

trainings, along with some daily briefing topics.

Q. But to your knowledge, did any of the officers have, like, a special training in -- in crisis negotiation, other than the typical training that officers have?

A. Not to my knowledge.

Q. Did you call for a supervisor at any point before the shooting?

A. No.

Q. Do you know if anybody did call for a supervisor?

A. I don't know.

Q. At some point, there were some pursuits of Mr. Sosa; is that correct?

A. Yes.

Q. About how many pursuits were there, if you know?

A. Approximately, three. Three or four.

Q. Were you involved in any of those?

A. No, sir.

Q. But you heard about them over the dispatch; is that correct?

A. Yes, over our radio.

Q. At some point, did a sergeant call off the pursuits and instruct officers to no longer pursue

Anthony Aguilar

Taser was deployed?
A. Can you rephrase that, again? I'm sorry.
Q. We can -- we can move on.
So did you get a response when you asked if anybody had a Taser?
A. Yes.
Q. And what were you told?
A. No.
Q. And at some point, did you arm yourself with your Taser?
A. Yes.
Q. Did you consider using your firearm instead of your Taser?
A. Yes.
Q. And what made you decide to use your Taser instead of your firearm?
A. Can you rephrase that?
Q. Well, you mentioned that you considered using your firearm, but you eventually decided to use your Taser, and I'm just wondering why. Like, what factors made you decide to use your Taser instead of your firearm?
A. Because I had Officer Crockett as my lethal cover.
Q. How did you know that Officer Crockett was your

itself.

Q. After you used your Taser, did you hear gunshots?

A. Yes.

Q. From which direction did you first hear gunshots?

A. When I heard the gunshots, to me, they were all simultaneously.

Q. Were you surprised when you heard gunshots?

A. No.

Q. Were you trained that deadly force is the highest level of force?

A. Yes.

Q. Were you trained that deadly force should not be used unless there's an immediate threat of death or serious bodily injury?

A. Yes.

Q. Were you trained that you must control your fear when determining what level of force to use?

A. Yes.

Q. Were you trained that officers' subjective fear alone is not sufficient to justify deadly force?

A. Yes.

Q. Were you trained that giving a warning before using deadly force is appropriate, where feasible?

A. Where feasible, yes.
Q. Could you describe, in your words, the concept of officer-created jeopardy?
A. Yes. Pretty much that's when an officer puts him or herself inside of a -- pretty much inside of a situation that's going to cause them to have to use deadly force.
Q. And were you trained that, where feasible, where you can, you should avoid that?
A. Yes.
Q. Based on your training, can a police officer shoot someone merely because that person is holding a firearm?
A. No.
Q. Can they shoot someone merely because they're holding a knife?
A. No.
Q. Just prior to the moment when you Tased Mr. Sosa, could you describe how he was holding the scissors?
A. Yes. He had them in his right hand, with his hand wrapped around what I would call the "loops" of the scissors, and with the blade down the -- down towards his pinky, but facing downwards.
Q. As he came out from the apartment, would you

describe him as running, or walking, or jogging? How would you describe it?

A. I'd say he was walking very fast.

Q. Prior to being Tased, did you ever see Mr. Sosa lunge?

A. No.

Q. Did you ever see him try to strike anybody with the scissors?

A. No.

Q. Did you see him make a jabbing motion with the scissors of any kind?

A. Can you rephrase your question?

Q. Did you see him make a jabbing motion with the scissors?

A. No.

Q. Did you discuss with any other officers your plan to Tase Mr. Sosa?

A. Yes.

Q. Who did you discuss that with?

A. Officer Crockett.

Q. And could you describe that conversation?

A. Yes. I told him -- because initially, when I first got to the apartment door, I didn't know who was inside, so I told him to be my lethal cover. And if Mr. Sosa were to come out towards us quickly, that if I

had the time to, I was going to use my Taser.

Q. Do you recall anybody ordering Mr. Sosa to stay in the apartment?

A. No.

MS. O'LINN: Objection. Argumentative as phrased.

THE WITNESS: No.

BY MR. MAYNE:

Q. Do you recall in the moments before you Tased Mr. Sosa, any officers giving him any orders?

A. Yes.

Q. What orders was he given?

A. To stop.

Q. Any other orders, besides to stop?

A. No.

Q. How many times was he ordered to stop?

A. I heard twice.

Q. Do you know who --

MS. O'LINN: Can we take a break after -- can we take a break, Counsel? I just need a personal break.

MR. MAYNE: Of course. Yeah. Let's take a break now. Is ten minutes good?

MS. O'LINN: Thank you. Yeah, absolutely.

THE VIDEOGRAPHER: We're off the record at 2:27 p.m.

Anthony Aguilar

Q. All right. And as far as I know, the -- you took it upon yourself to take over the communications and try to build a rapport with Mr. Sosa. Is that a fair accurate -- fair assessment of what you told Detective Rockwell?

MS. O'LINN: Objection. Argumentative as phrased.

You can go ahead and answer.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. All right. And you even addressed Mr. Sosa by his first name, Max, and told him who you were. Is that correct?

A. Yes.

Q. And that was -- and then after that, he responded something to the effect of: No, we can't effing talk; right?

A. Correct.

Q. But he was responding to what you were saying, maybe not in the way that you had hoped, but he was responsive?

A. Correct.

Q. All right. And during the time that you were speaking with him, that's when, as you testified already, he had the scissors in his right hand, pointing

downward?
A. Yes.
Q. All right. And at one point, he appeared to come around the kitchen counter a little bit, and you told him not to step toward you?
A. Correct.
Q. And he responded by, at least at that instant, going back behind the counter?
A. Not behind the counter, no.
Q. He went back?
A. Yes.
Q. All right. So Mr. Sosa, while he was in the apartment, he was told specifically by you not to step towards you, and he appeared to comply with that command?
A. Yes.
Q. All right. Now, I think you've already testified about your training, dealing with subjects who appear to be in mental distress. And you -- essentially, you have the training that pretty much any officer who's gone through the academy and gone through POST has?
A. Yes.
Q. You do not have any specialized training beyond that?

A. Correct.
Q. And to your understanding, the other three officers who were on scene, they also -- you were unaware of any of them having any specialized training?
A. Correct.
Q. As a matter of fact, I think by maybe a year or two, you were the most experienced officer on scene?
A. Yes.
Q. And is that one of reasons why, a minute or so into arriving, that you decided to try to take over the communications?
A. No.
Q. What was the reason for that?
A. I tried taking over communications because I could already tell, just by hearing Mr. Sosa screaming and yelling at everyone who was inside, that maybe a -- a new face, a new person could possibly get him to calm down a little bit.
Q. And how many times before this incident had you responded to a scene where you were dealing with someone who appeared to be in mental distress?
MS. O'LINN: Prior to this.
THE WITNESS: Probably, approximately, I'd say 75 to 100 calls, probably.
BY MR. LITTLE:

Q. Okay. All right. Also, there were sergeants available; right?

A. Can you rephrase that?

Q. There were sergeants available; correct? Because we know that Sergeant Oliver was available; right?

A. I'm not sure if he was available, but he was working that night.

Q. Okay. How about Sergeant Snow?

A. Sergeant Snow wasn't a sergeant in our district at the time.

Q. Okay. Do you know if there were officers available that night who, even though they might not have been on CNT, had more crisis training than you had?

A. Not that I'm --

MS. O'LINN: Go ahead.

THE WITNESS: Not that I'm aware of, sir.

BY MR. LITTLE:

Q. Okay. Was there any effort made by anyone that you're aware of, on scene, to ascertain the availability of anyone from CNT or anyone with more crisis intervention training?

A. Can you just rephrase that? I'm sorry.

Q. Sure. As far as you know, did either you or any of the other three officers on scene ever seek to

have someone from CNT respond?

MS. O'LINN: Objection. Asked and answered multiple times.

You can answer.

THE WITNESS: Not that I'm aware of, sir.

BY MR. LITTLE:

Q. And did you or anyone else, to your knowledge, seek to have someone who was more experienced in crisis intervention respond?

MS. O'LINN: Objection.

You can answer.

THE WITNESS: Not that I'm aware of, sir.

BY MR. LITTLE:

Q. Okay. So -- all right. So we went over the fact that you, Mr. Sosa -- at least when you first attempted to engage him, he appeared to respond to your commands. And would you agree that your commands were not just one-word utterances; you actually spoke to him in sentences?

MS. O'LINN: Objection to the extent that's argumentative, implying others didn't, and his knowledge thereof.

MR. LITTLE: Okay. Let him answer the question, please.

THE WITNESS: Can you rephrase it? I'm sorry.

BY MR. LITTLE:
Q. All right. When you communicated with Mr. Sosa, you actually said -- and I'm just going to look back here at the transcript. You told him, "Don't step toward me."
A. Yes.
Q. Right. So you didn't say just, "Stop." You actually spoke in a full sentence?
A. Yes.
Q. And the reason why you did that is that you wanted to make sure that he understood you?
MS. O'LINN: Objection. Argumentative.
You can answer.
THE WITNESS: Correct.
BY MR. LITTLE:
Q. All right. Now, I just want to make sure I'm understanding this part, because had you already decided to deploy your Taser as Mr. Sosa was exiting the threshold of the apartment?
A. Can you rephrase that? I'm sorry.
Q. Sure. Had you already decided that you were going to deploy your Taser at the time that Mr. Sosa was crossing the threshold out of the apartment?
A. Yes.
Q. Can you explain to me all of the reasons why

you were deciding to deploy your Taser at that point?

A. Yeah. So I told -- like I said before, I told Officer Crockett that if Mr. Sosa had made his way from the kitchen, outside towards us, that I was going to deploy the Taser when he walked through the threshold, due to his behavior, due to him still holding the scissors, and the threats that he made towards Officer Ayers, specifically. The threats that he made towards a third-party individual, and the fact that he also even said it was going to be if not either their lives, it was going to be other officers' lives.

Q. Okay. So and you had overheard Mr. Sosa make those statements shortly after you arrived on scene?

A. Yes.

Q. All right. And that was roughly five to seven minutes before he exited the apartment?

A. Correct.

Q. All right. Okay. When Mr. Sosa exited the apartment, would you agree that he had the scissors in his right hand, his arms were straight down, and the scissor blades were pointed down?

A. Yes.

Q. Okay. What is the -- how many times have you deployed your Taser in your police career?

MS. O'LINN: Mr. Little, could you be clear

BY MR. LITTLE:

Q. Okay. Now, we talked a little bit about avenue of escape, and I think you agree there was no avenue of escape available to Mr. Sosa; right?

A. Correct.

Q. Neither in the apartment nor in the breezeway?

A. Correct.

Q. Okay. So would you agree that someone utilizing the Taser can be covered by other officers who are utilizing both -- I'm sorry. Let me rephrase.

Would you agree that an officer utilizing a Taser can be covered by officers with either less-lethal or lethal amu- -- weapons?

MS. O'LINN: Objection. Incomplete hypothetical. Argumentative. Calls for speculation.

THE WITNESS: Can you rephrase that, sir? I'm sorry.

BY MR. LITTLE:

Q. Sure. If you are using a Taser, you could be covered by multiple officers, some with less-lethal and some with lethal weapons?

MS. O'LINN: Same objection.

THE WITNESS: Correct.

BY MR. LITTLE:

Q. Okay. And an example of a less-lethal weapon

would be a bean bag shotgun?
A. Yes.
Q. Did you know what any of the other officers' strategic plans were?
A. I'm sorry. Can you repeat it?
Q. Yeah. At the time that you went to the apartment, did you know what any of the other officers' strategic plans were?
A. No.
Q. Did you ever have an opportunity to communicate with -- I know there was some communication between you and Officer Crockett. It sounds like you said something along the lines of, "Taser," and he knew by that that you were going to deploy Taser, which meant he need to deploy his firearm. Is that accurate?
A. Can you rephrase that?
Q. Sure. Other than the communication between you and Officer Crockett, something to the effect of, "Taser," was there any other communication where you had an opportunity to figure out what the other officers' strategic plans were?
A. No.
Q. Okay. Did you ever hear any of the other officers on scene give anything, other than one-word commands, to Mr. Sosa?

A. Yes.

Q. And did you ever observe Officer Crockett attempting to build a rapport with Mr. Sosa?

A. Yes.

Q. You were questioned multiple times about CNT and CIT. So under what circumstances is CNT typically requested by officers in patrol to respond to a location?

A. Usually, CNT is requested when we have a subject contained, to where he's not an actual threat to -- or not an imminent or immediate threat to another person or officer.

Q. Barricade situation?

A. Yes.

Q. And is that -- is CNT a classic hostage negotiator position?

A. Yes.

Q. Okay. And with regard to the questions about specialized CIT training, the amount of training that a Fresno Police Officer receives on CIT, it's not specialized, but it's extensive with regard to from the basic academy through daily briefings and the entire range in between; would you agree?

A. Yes.

Q. And the de-escalation that you are taught at

Fresno Police Department, could you describe how you're trained to attempt to de-escalate situations?

A. Yeah. So we attempt to -- we're trained to de-escalate by trying to build that rapport with the person. We try to get into a -- like I did, I called him by his name. So I try to get to, like, a personal level. Because at the end of the day, what we're wanting to do is we're wanting to end whatever problem or incident that we're at peacefully, with no one hurt.

Q. And is show of force one way to de-escalate?

A. Yes.

Q. And number of officers present at a scene, is that a tactic in trying to de-escalate a situation?

A. Yes.

Q. Is directing of weapons at an individual an attempt to de-escalate a situation?

A. Yes.

Q. To get them to comply with the de-escalation requires cooperation from the suspect; would that be accurate?

A. Correct.

Q. And you were questioned about the full sentences versus one-word commands. Are officers taught to give simple, clear, direct, one-word commands in circumstances that are tense and uncertain?

Q. And are you aware of scissors being used as weapons against police officers?
A. Yes.
Q. And against citizens?
A. Yes.
Q. And the significance of that potential injury, was that a concern for you that day?
A. Yes.
Q. At the time when you fired your Taser, you indicated you didn't think it was effective; is that correct?
A. Correct.
Q. And at that point, what was Mr. Sosa doing?
A. I'm sorry. Can you repeat that?
Q. After the Taser -- as you deployed it, as you observed it was ineffective, what did you see Mr. Sosa do?
A. He -- after the Taser was deployed, he took two steps to his left, and then as he was holding the scissors in his right hand, he -- and his body came upwards, his head was still down, but his face was facing up.
And with those shears in his hand -- the scissors in his hand still, was, started charging towards Officer Crockett and I.

Q. And did you -- how far away was he at the point that you believe you heard shots being fired?

A. Approximately, a foot, maybe less. He closed distance fairly quickly.

Q. And did you move back during that process, after the Tasing attempt?

A. Yes.

Q. So were you standing still or moving backwards when he was charging?

A. I was moving backwards.

Q. Do you know what was happening with Officer Crockett?

A. He was also moving backwards.

Q. Okay. And did you see where Officer Ayers was?

A. Officer Ayers was to my left. And when I backed up after using my Taser, he moved to his right, in doing a job covering me as -- as lethal, and pretty much took my spot where I was standing initially.

MS. O'LINN: Thank you. I have no further questions.

Any follow-up, gentlemen?

MR. MAYNE: Not from me.

Mr. Little?

MR. LITTLE: No.

MR. MAYNE: Thank you, Officer Aguilar, for

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

Kimberly D'Urso
_______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT E

An exhibit to the Declaration of Cooper Mayne

EXHIBIT
4
Depo of M. Sosa
July 28, 2025



**INTERVIEW WITH MARIA SOSA**
**Q=Woman**
**A=Maria Sosa**

Recording: Call one, call on Saturday, November 4th, 2023, 3:44 and 34 seconds am.

Q: 911 state your emergency.

A: Hi, I've been trying to get a hold of someone from Fresno PD. I called in several minutes ago about my ex he's - I think he's been drinking and driving, and he drove off, and I was just interviewed by police maybe 15 minutes ago.

Q: Uh-huh.

A: And I've been trying to get a hold of someone because he - my - my ex, he called me and I just wanna say what's going on because he's talking crazy, and I know - I'm just really worried about him. I know he doesn't have any kind of weapon on him, but I'm just really worried that he's gonna make it look like he does so that he can get, like, shot by the police or something.

Q: Okay ma'am, I understand. Um, they already made contact with you?

A: They did.

Q: Okay.

A: They interviewed me about ten, 15 minutes ago.

Q: Okay. We still have officers on the call, so I'll go ahead and make sure they get that update that he does not have any weapons.

A: He does not. I know for a fact...

Q: Right.

A: ...that he does not - he does not have any kind of weapon, and he's just talking crazy 'cause he's been drinking, but he's making comments about wanting to die and he - I think he wants to do something where he makes the police shoot him. I just want to...

Q: Okay, and has he mentioned anything like that?

A: Say that again.

Q: Did he mention anything like that?

A: He did.

Q: Okay. We still have units on the call. They're still trying to get to him.

A: Yeah, please just let them know he does not have any kind of weapon on him.

Q: Yes, I'll go ahead and note that

A: He might make it seem like it, but he doesn't.

Q: How long ago did he call again?

A: He called me about five minutes ago.

Q: Did he mention anywhere he was at?

A: No. He just said that he had lost the cops. I think they were following him, and he lost them.

Q: Okay - okay. I do have them updated. Um, we'll have someone contact you, uh, after they, uh, contact him...

A: Okay.

Q: ...and go from there. Okay.

A: Thank you.

Q: You're welcome. Uh-huh. Bye - bye.

This transcript has been reviewed with the audio recording submitted and it is an accurate transcription.

Signed ____________________________________________________________________

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT F

An exhibit to the Declaration of Cooper Mayne

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JOHN AYERS

WEDNESDAY, APRIL 22, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24521

A. No.

Q. So between the time of the shooting and the statement, you didn't discuss the incident with Officers Crockett, Aguilar, or Abraham?

MS. O'LINN: Objection. Asked and answered.

You can answer, if you know.

THE WITNESS: No.

BY MR. MAYNE:

Q. When did you attend the police academy?

A. 2021 to 2022.

Q. About how long was that program?

A. Six months.

Q. What type of work did you do before the academy?

A. I worked for Amazon.

Q. Any other work that you did before the academy?

MS. O'LINN: Objection, Counsel. Vague as to time, scope.

How far back would you like him to go in his life?

MR. MAYNE: Let's start with education, and we can go from there.

BY MR. MAYNE:

Q. Did you go to college, Mr. Ayers?

A. I did not.

academy, there's a field training program, which is normally, approximately, about six months.

Am I speaking too fast for you, Kimberly? I'm sorry.

THE CERTIFIED STENOGRAPHER: Yes. Please slow down just a little bit.

THE WITNESS: I'm sorry.

THE CERTIFIED STENOGRAPHER: Thank you.

BY MR. MAYNE:

Q. So approximately, when did that six-month training period end?

A. I believe it was -- I believe it was in, like, probably February.

Q. Of 2023?

A. Yes.

Q. At the time of the incident, which was in November of 2023, what was your title with the FPD?

A. Officer.

Q. Did you have any collateral assignments, like with SWAT, or CNT, or anything other than the department, the basic role of an officer?

MS. O'LINN: Objection.

Counsel, could you be specific as to the scope of time you're speaking about?

MR. MAYNE: Sorry. Before the date of the

incident.
BY MR. MAYNE:
Q. So in the time when you started at FPD, to the date of the incident, were you -- did you have any collateral assignments?
A. No.
Q. What's your position now at the FPD?
A. I do not work for Fresno.
Q. When did you stop working for Fresno?
A. June of 2024.
Q. What was your title when you stopped working for Fresno?
A. Officer.
MS. O'LINN: Slow down. Wait until he finishes speaking.
THE WITNESS: Sorry.
BY MR. MAYNE:
Q. And what were the circumstances of you leaving your job there at Fresno; meaning, you know, were you -- did you decide to leave? Were you let gp?
MS. O'LINN: Counsel, sorry. Do you just want him to just answer why did he leave?
MR. MAYNE: Yes.
MS. O'LINN: Go ahead.
THE WITNESS: I relocated to Texas.

A. Yes.

Q. And then there was also training on it once you were out of the academy, working for Fresno PD?

A. Yes.

Q. Did you receive any Crisis Intervention Team certification?

A. No certification.

Q. Did you receive any specific training about crisis intervention?

A. When I was in the basic academy, which is six months, field training, in-service, and also during briefings, we discussed crisis negotiation, when it comes to that kind of training.

Q. Do you know if your department had Crisis Intervention Team -- a Crisis Intervention Team available that officers could call, if necessary?

MS. O'LINN: Objection.

Counsel, do you mean the particular night of the incident or in general?

Scope.

MR. MAYNE: We can start with in general.

BY MR. MAYNE:

Q. Taking your mind back to the time of the incident, was that a service that was available? Could you guys call -- call in a team that specialized in

Q. Could you describe the nature of those calls?
A. Normally, the nature of the calls would be somebody barricaded, not mobile.
Q. Did any of the calls involve a suicide-by-cop situation?
MS. O'LINN: Objection. Calls for speculation. To the extent you know.
THE WITNESS: To the extent that I know, none of them ended that way.
BY MR. MAYNE:
Q. Did any of them involve a suicidal individual?
MS. O'LINN: If you know. Don't guess.
THE WITNESS: Not -- not that I recall.
BY MR. MAYNE:
Q. Were you trained that deadly force is the highest level of force an officer can use?
A. Yes.
Q. Would you -- were you trained that deadly force should only be used when there reasonably appears to be an immediate or imminent threat of death or serious bodily injury?
A. Yes.
Q. Were you trained that if that threshold is not met, you should not use deadly force?
A. Yes.

Q. Were you trained that you should give a verbal warning that deadly force is going to be used, where feasible?
A. Where feasible, yes.
Q. Were you trained that you must justify every shot?
A. Yes.
Q. Were you trained that subjective fear alone is not sufficient to justify the use of deadly force?
A. Yes.
Q. Were you trained that you should not overreact when you using force, that the situation must justify the use of force?
A. Yes.
Q. Were you trained to control your fear and anger in making a decision about how much force to use?
A. Yes.
Q. Were you trained about the concept of "tunnel vision"?
A. Yes.
Q. Could you describe what that means to you?
A. Tunnel vision, to me, is getting focused on one specific thing or the -- the threat.
Q. And were you trained that that's something that you should try to guard against or prevent from

subjects and how we would handle them in, like, tactical ways.

Q. Could you describe some of the -- the key parts of your training about suicide-by-cop situations?

MS. O'LINN: Objection. Vague. Overbroad.

BY MR. MAYNE:

Q. When you were trained about suicide-by-cop situations, what were you trained is the goal of resolving a situation like that?

A. To try and deescalate, using a calm tone, reassuring them, offering assistance.

Q. Is the goal to resolve the situation without anybody being hurt?

A. Yes.

Q. Did your training cover the concept of "officer-created jeopardy"?

A. Yes.

Q. Could you give an example of that, just so -- to give it some clarity? What would be an example of that?

A. Where an officer puts himself in the position that forces him to use some kind of force that may not be justifiable.

Q. And were you trained to try to avoid doing that?

A. Yes.
Q. Were you trained about the importance of creating distance from an armed subject?
A. Yes.
Q. Are you familiar with the concept of a "fatal funnel"?
A. Yes.
Q. I notice it came up in your statement, and I wasn't familiar with it. Could you describe what that concept means to you?
A. A fatal funnel would be, like, standing in a doorway or in a hallway where there's no other means for escape.
Q. And are officers trained to avoid positioning themselves in the fatal funnel, where feasible?
A. Where feasible, yes.
Q. Why is that, based on your understanding?
A. It's for officer safety.
Q. But why, in particular, is being positioned in the fatal funnel particularly dangerous?
A. Because it doesn't really give you an escape route.
Q. Are there any other reasons why being in that position would be dangerous?
MS. O'LINN: Objection. Incomplete

A. I'm not sure. More than ten.
Q. Had you ever responded to a mental health crisis call where the subject was armed, at any time prior to this incident?
A. I don't recall.
Q. Had you ever responded to a suicide-by-cop scenario before the date of this incident?
A. Yes.
Q. Approximately, how many?
A. I'm not sure.
Q. Is it more or less than five?
A. Probably less than five.
Q. In those situations, did the subject -- did the situation resolve without the suspect being killed?
A. Yes.
Q. Were any officers hurt in any of those situations?
A. Not that I'm aware of.
Q. Did the suspect in those situations, were any of them armed?
A. I'm not sure.
Q. Before the date of the incident, had you ever requested a crisis negotiator, in relation to previous calls?
MS. O'LINN: Yourself.

THE WITNESS: No, I don't believe I did.
BY MR. MAYNE:
Q. Had you ever personally called the CIT team, in relation to previous incidents, before -- before this?
A. I don't believe I did.
Q. And I think we went over this before, but in this incident, you didn't call a crisis negotiator or the CIT team; is that right?
MS. O'LINN: Yourself.
THE WITNESS: I do not believe it was me.
BY MR. MAYNE:
Q. Do you know who made that call that you're referring to?
MS. O'LINN: Objection. Asked and answered.
You can answer, again.
THE WITNESS: I do not.
BY MR. MAYNE:
Q. The initial dispatch code for this call was "1 Mary"; is that true?
A. I believe so, yes.
Q. What does that mean?
A. Normally, 1 Mary calls would be like a mental health call or a suicidal subject.
Q. And when did you learn that this call involved a suicidal male with no weapons reported?

MS. O'LINN: Objection.

Counsel, your voice trailed off on the end of that question. Could you repeat it?

BY MR. MAYNE:

Q. At some point did you learn that this call involved a suicidal male, with no weapons reported?

A. Yes. At some point during the incident, I did.

Q. Do you recall when that was?

A. Well, the dispatch call said that he was possibly suicidal.

Q. So would that have been before you made contact with -- with him -- with the suspect in any way?

A. Yes.

Q. At some point, did you learn that dispatch had checked on the suspect's criminal record?

A. I did.

Q. And what was the result of that check?

A. If I recall correctly, he did not have a criminal record.

Q. Did his record essentially come back clean?

A. Yes.

Q. Did you learn at any point whether he had hurt anybody on that night or any time previous?

A. I'm sorry. I don't understand the question.

Q. Did you have any information at the time of the

BY MR. MAYNE:

Q. When did you first learn that Mr. Sosa was -- had arrived at the apartment?

A. We heard a car door, and we went to check.

Q. So when you heard the car door, and you realized Mr. Sosa was at the apartment; is that correct?

MS. O'LINN: Objection. Argumentative. Misstates the testimony of the witness.

You can explain.

THE WITNESS: So when we heard the car door, we didn't know for a fact if it was him or not, so we went to check.

BY MR. MAYNE:

Q. Did you think there was a probability that it was him?

MS. O'LINN: Objection. Calls for speculation. Argumentative.

You can explain.

THE WITNESS: A possibility.

BY MR. MAYNE:

Q. How likely did you think that it was Mr. Sosa?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: A decent probability, I would say.

Q. And where did you go, after that?
A. I backed into the living room.
Q. And where did Officer Abraham go?
A. He backed into the hallway.
Q. And then, where did Mr. Sosa go?
A. He walked in the front door and was and pacing in front of the kitchen, back and forth.
Q. And did you maintain those relative positions for some time?
A. Yes.
Q. About how far from Officer Abraham was Mr. Sosa?
MS. O'LINN: Objection. Vague as to time. It also wasn't a static event, so please be specific.
BY MR. MAYNE:
Q. I understand from what you were saying that Mr. Sosa was moving back and forth, to some extent. At his closest, how close do you think he got to Officer Abraham?
MS. O'LINN: At any point in time, up to the shooting, Counsel?
BY MR. MAYNE:
Q. I'm talking about while you were in the room with Mr. Sosa. How close do you think Mr. Sosa got to

more follow-up on this point, and then let's take a break.

I just want to read from your statement on page 568. I'm reading, and it says: "He kept moving around a little bit, like he was taking a couple steps toward Abraham. He was taking a couple steps toward me, but not anything that would have warranted, you know, using deadly force or anything on him at the time."

BY MR. MAYNE:

Q. Do you recall making that statement?

A. Yes, I believe so.

Q. Do you believe that statement was accurate?

A. I do.

MR. MAYNE: Okay. We can take our first break now.

THE VIDEOGRAPHER: Going off record at 10:58 a.m.

(Break taken.)

THE VIDEOGRAPHER: Back on record -- wait, sorry. My software wasn't working. One moment.

Back on record at 11:12 a.m.

BY MR. MAYNE:

Q. In your statement, you said that the incident was outside the scope of your training. What did you mean by that?

A. Well, I'm not -- I'm not a certified crisis negotiator.
Q. And why did you believe this situation, in particular, required that sort of training?
MS. O'LINN: Objection. Argumentative as phrased as to "required."
You can respond.
THE WITNESS: Crisis negotiators typically have more tools, more in depth, advanced training, to be able to speak to individuals going through crisis.
BY MR. MAYNE:
Q. What kind of tools or training?
A. I'm not a certified crisis negotiator.
Q. Did you try to call Sergeant Oliver on the date of the incident, before the shooting occurred?
A. I did.
Q. How many times?
A. I called him once after I spoke to Maria, and then, I believe, twice during the incident.
Q. Did you also try to contact him over the radio?
A. I did.
Q. Before the shooting, were you able to reach Sergeant Oliver?
A. I was not.
Q. Why were you calling Sergeant Oliver?

A. We all play a role. My responsibility would be talking to the reporting party.

Q. Did you discuss a tactical plan with Officer Abraham about what you would do if Mr. Sosa arrived at the apartment?

A. In law enforcement, we go through the same kind of training. We have a lot of unspoken tactical plans that we both kind of -- that officers can kind of go based on each other's -- like, where they are standing, what their movements are and stuff, so --

Q. Did you have an explicit conversation about a plan for what would happen if Mr. Sosa arrived?

A. I don't believe there was an "explicit plan."

Q. Was anybody designated as contact officer or cover officer?

MS. O'LINN: Objection. Argumentative as phrased.

You can answer.

(Reporter clarification.)

THE WITNESS: So the primary officer would be the contact officer, since I'm the one that was speaking to Marie and Max. I spoke to him on the phone.

BY MR. MAYNE:

Q. Did you discuss, specifically, that if Mr. Sosa came, you would be the contact officer and Officer

Abraham would be the cover officer?
A. It was not spoken.
Q. Was that the understanding?
A. Yes.
Q. Did you discuss with Officer Abraham whether either one of you would be designated as less-lethal option?
A. No.
Q. Besides your firearm, what other weapons did you have on your person in those minutes before Mr. Sosa arrived?
A. I had a Taser and a baton.
Q. Did you have pepper spray?
A. I don't believe I had it on.
Q. Any other weapons, other than the firearm, the Taser, and the baton?
A. I had a pocketknife.
Q. Besides those, did you have any additional weapons?
A. No.
Q. What about in your vehicle? Did you have any additional lethal or non-lethal weapons in your vehicle?
A. I do not believe -- I -- I had my pepper spray in my bag, but I believe that was all I had.
Q. Do you know what lethal and non-lethal weapons

Q. And I'm just going off of your statement. So my understanding was that, based on your conversations with Mr. Sosa, you believed that there was a high probability that he would come back to the apartment, and that's why you called some backup resources?

A. Yes, based on multiple different aspects of things: Him trying to run over my partner. The pursuits staying in the same area as the apartment. Him threatening me, specifically, and other officers, whenever I was on the phone with him.

I felt like he was going to return to the apartment, just based on all of those.

Q. So now going to that moment when the door is closed. At that moment, you still held that belief that Max was very likely to come back to the apartment; is that correct?

A. Yes.

Q. And you believed, at that point, that he was intent on committing suicide by cop; is that correct?

A. Yes.

Q. Do you recall whether there was a window to the right of the door, looking from the inside?

A. I don't recall.

Q. Did you ever consider looking out the window to see who was outside, instead of opening the door?

A. No.
Q. Did you ever consider keeping the door closed?
A. No.
Q. Would Mr. Silva have been able to pose an immediate threat of death or severe bodily injury if the door had remained closed?
MS. O'LINN: Objection. Argumentative as phrased, assumes facts not in evidence, and incomplete hypothetical.
You can respond.
THE WITNESS: Mr. Sosa would, I would say, be a threat, not only to the officers that are there, but the other officers that would be responding to the apartment complex, and also any other civilians that might have been leaving their apartment, due to the previous threats that he had already made; his reckless driving, which showed no care for the public and other people on the road; and him trying to run over one of our police officers.
BY MR. MAYNE:
Q. With the door closed, do you think he could have posed an immediate threat of death or severe bodily injury to you, Officer Abraham, or Ms. Sosa?
A. With the door closed, no.
Q. Did you consider verifying the identity of the

person outside, by looking through the peephole of the door?

A. No.

Q. What about using verbal commands; like, keeping the door closed, but asking who was at the door, or ordering whoever was there to identify themselves? Did you consider that?

MS. O'LINN: Objection. Argumentative as to "keeping the door closed."

You can explain.

THE WITNESS: We weren't sure if it was him or not, and we weren't going to be sure if he was outside the door.

BY MR. MAYNE:

Q. Right. Yeah, I understand that. I'm just wondering whether you considered keeping the door closed and just asking who was outside?

MS. O'LINN: Counsel, argumentative as to "keeping the door closed." I presume you don't understand why I'm objecting, but "keeping the door closed" is argumentative, as in Mr. Sosa could have forced the door open.

So you're saying "keeping the door closed." I don't know if you're proposing they barricaded the door in some way, or -- you know, but "keeping the door

closed" is argumentative; he could have booted the door.

BY MR. MAYNE:

Q. Did you have anything to add, Officer Ayers, to your answer?

A. Like I said, we didn't know if it was him, and we didn't know if there was somebody else was at the door, so making commands would not have been feasible.

Q. So to answer my question, you did not consider leaving the door closed and asking who was outside?

A. We weren't aware that anybody was outside the door.

Q. Was there anything preventing you or keeping you from leaving the door closed and maintaining cover until additional officers could arrive at the scene?

MS. O'LINN: Objection. Argumentative as phrased.

You can respond.

THE WITNESS: We weren't sure if it was him or not.

BY MR. MAYNE:

Q. Based on your training, an officer cannot shoot someone merely for having a gun in their hand; is that correct?

A. Yes.

Q. Is the same thing true with a knife, that an

officer can't shoot somebody merely for seeing a knife in their hand?
A. Yes.
Q. And the same thing would be true for scissors, as well?
A. Yes.
Q. You described the object in Mr. Sosa's hands as "your standard junk drawer scissors." Is that still accurate, to your understanding, now?
A. They were kitchen scissors, now that I know that.
Q. Did you learn at any point whether Max had access to a gun?
A. Somebody ran an AFS on him, and it came back that there was a firearm registered to him.
Q. Do you recall when that happened?
A. I do not.
Q. Was it before the shooting or after?
A. I believe it was before.
Q. Do you recall anything more specific about what kind of gun was registered to him?
A. I know it was a rifle, but I'm not sure what -- what kind.
Q. At some point, when Mr. Sosa was inside the apartment, did he ever move towards the kitchen?

A. Yes.
Q. Could you describe that a little bit? First of all, maybe let's start with, just could you describe the layout of the kitchen, relative to where you were and where Officer Abraham was?
A. Yes. So I was in the living room, closer to the front of the residence. Abraham was to my left, in the hallway. Maximiliano was in front of the doorway, right there, that leads to the hallway. And then right behind him was a kitchen counter, the kitchen, and a -- like, a little dining room area.
Q. Did you notice that there was a knife block in the kitchen?
A. I did not.
Q. Would you expect that a kitchen would contain a variety of types of knives?
A. Yes.
Q. The location where Mr. Sosa was that you just described, was that close to kitchen drawers?
A. Not on the side that he was on at first.
Q. Did he ever appear to try to switch from the scissors to a knife?
A. Not that I observed.
Q. At some point towards the end of the time that you all were in the apartment, Max said about Maria

Sosa, "Why would I harm her? She's the mother of my son?"

In your statement, you said you believed him, that he wouldn't harm her. Is that accurate, to your understanding now?

A. Yes.

Q. What's the minimum distance for which a Taser is effective?

MS. O'LINN: "Minimum distance"?

You can answer.

BY MR. MAYNE:

Q. My understanding is that there is a range at which a Taser in probe mode is effective. We could start with the upper range of how -- what's the maximum distance?

A. So it depends on the Taser.

Q. Limiting our questions just to the Taser that you had that -- the day of the incident --

(Simultaneous speakers.)

A. Okay.

Q. -- could you answer?

A. I believe the Taser, if I'm not mistaken, the maximum for it is approximately 21 feet. But like, the range that you aim for, I believe, is like, 11 to 15 or something along those lines.

Dante Apartments; true?

A. Yes.

Q. And when you're dealing with crisis situations, that is the occasion on which it is most important to rely on your training. Would you agree?

MS. O'LINN: Objection. Argumentative as to "most important." Incomplete hypothetical. Calls for speculation.

You can answer.

THE WITNESS: You have to rely on your training on every call you go to.

BY MR. LITTLE:

Q. Right. But when it becomes a potential life-or-death situation, that's when it's most important to rely on your training?

MS. O'LINN: As to any life-or-death situation --

(Simultaneous speakers.)

THE WITNESS: As to any life-or-death situation, I would say, yes, you need to rely on your training.

BY MR. LITTLE:

Q. And you're taught when you're dealing with a crisis situation, generally speaking, that time is your ally; right?

A. Yes.
Q. You also are taught when you're dealing with a crisis situation, that it is very important to have clear communication with the individual who is in crisis; true?
A. Yes.
Q. And if time permits, you are supposed to establish what are called "rules of engagement" with that person; correct?
A. I'm not sure about that.
Q. Sure. If time permits, you're supposed to let the person who is in crisis know what you will allow and will not allow him to do?
A. I -- I -- in this particular incident, he was mobile, so I didn't have a choice as to what he could or could not do.
Q. Please listen to my question. I'm trying to get through this in the time that I have.
I'm asking you, based on your training, time permitting, are you supposed to give clear communication regarding rules of engagement to a suspect in crisis?
MS. O'LINN: Objection. Vague and ambiguous as to "rules of engagement," and incomplete hypothetical as to this situation.
You can answer.

THE WITNESS: I don't understand the question. I'm sorry.

MS. O'LINN: That's okay.

BY MR. LITTLE:

Q. But you would agree, clear communication is important in a crisis situation?

MS. O'LINN: Objection. Asked and answered.

You can answer, again.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. All right. And at the time of this incident, I'm assuming you were aware that the law had changed, where you were supposed to use the least intrusive level of force that was reasonable under the circumstances?

MS. O'LINN: Objection. Argumentative. Misstates the law. Calls for a legal conclusion as to "least intrusive." Misstates the law, frankly.

You can answer, if you know.

THE WITNESS: I -- I don't know.

BY MR. LITTLE:

Q. Was it your goal to use the least damaging level of force in this situation that was reasonable?

A. My goal was to try to de-escalate the situation without anybody being injured.

Q. Okay. So would you also agree that the force

BY MR. LITTLE:
Q. And that's a "yes" or a "no" question.
A. It is very important at the time; so, yes, I would assume.
Q. Okay. Now, you mentioned in response to Mr. Mayne's questions that you were hoping to be able to use some intermediate level of force in this situation when Mr. Sosa was in the apartment and you were speaking with him. Is that true?
A. I believe I said I wanted to de-escalate the situation to not have to use the force that we did.
Q. Okay.
A. I don't remember if I mentioned -- I -- I don't remember if I mentioned using non-lethal inside the apartment, because that didn't cross my mind.
Q. Now, don't most Fresno Police Officers have a Remington 12-gauge, less-lethal shotgun in their patrol cars?
A. I'm not sure about "most."
Q. Did you?
A. I do not believe I did.
Q. Is it your understanding that at least some officers are equipped with that equipment in their patrol cars?
A. Yes.

Q. Okay. Now, with respect to this incident, it's my understanding that there was some misunderstanding between you and Officer Abraham, where he was trying to signal for Ms. Sosa to leave the apartment, and you thought that he was signaling for you to leave?

A. Yes.

Q. Is that true?

Okay. Would you agree that when you're dealing with a crisis situation, clear communication is important, not just from officers to subjects, but between the officers who are involved?

A. It is important.

Q. You never asked -- you, yourself, never asked Mr. Sosa to leave the apartment; true?

A. I don't believe I did.

Q. And strategically speaking, you didn't want him to leave the apartment; true?

MS. O'LINN: Objection. Vague as to time.

Do you understand --

BY MR. LITTLE:

Q. At the time -- at the time that you left the apartment?

A. At the time I left the apartment? Well, we definitely didn't want to engage him inside of the apartment --

Q. Okay.
A. -- so I would say --
Q. Well, did you -- but you didn't ask Mr. Sosa to come out of the apartment?
A. No.
Q. And at the moment you walked out of the apartment, it was not your intention to have him follow you?
A. No.
Q. Did you give him any clear instructions not to follow you?
A. No.
Q. Now, have you seen any other officers' body-worn camera videos, and particularly the videos of the other officers who were inside the apartment, before the shooting incident?
A. Yes.
Q. Did -- do you recall whether an officer did, in fact, ask Mr. Sosa to come out of the apartment? I believe Officer Abraham.
A. I -- I don't recall him asking Mr. Sosa. I know that he asked Maria Sosa.
Q. Okay. And based on your training, if an officer is intending on speaking to a bystander and not the subject, there should be efforts made to have,

Q. Okay. Well, in the two or three minutes before the shooting incident, Mr. Sosa was in the vicinity of the kitchen counter and sink area; right?

A. Yes.

Q. And the counter in the apartment was such that Mr. Sosa would have had to walk all the way around it to get back to the exit of the apartment; true?

MS. O'LINN: Objection. Argumentative as phrased as to "all the way around it."

You can answer.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. So there was an opportunity when Mr. Sosa was on the other side of the apartment, on the other side of the kitchen counter, where Ms. Sosa could have been asked to leave?

MS. O'LINN: Objection. Argumentative as to "opportunity."

You can answer.

THE WITNESS: At that time when she went into the kitchen -- or when he went to the kitchen, she was asked to leave by Officer Abraham. That is also when he gestured for us to go.

BY MR. LITTLE:

Q. You're talking about the same occasion where

you thought that Officer Abraham was talking to you and asking you to leave?

A. Yes.

Q. Okay. Because, ideally, when you're dealing with a crisis situation, you don't want to have bystanders right in the middle of the situation; correct?

A. Yes.

Q. And that's because it poses a risk of escalation; right?

MS. O'LINN: Objection. Argumentative as phrased.

You can explain.

THE WITNESS: It -- it definitely can. It could also pose a risk to the bystander that is in there.

BY MR. LITTLE:

Q. Right.

MS. O'LINN: Let me know when you're ready, and we can take a break.

MR. LITTLE: Okay. Give me just a couple more minutes. It's five till noon. Let me see if we can get to noon.

MS. O'LINN: Okay.

BY MR. LITTLE:

Q. Would you agree that you have to base your

decision to use deadly force on what you know and not on speculation?

A. Yes.

Q. So, for instance, there was some information, apparently, that you had before this shooting that Mr. Sosa, at some time in his life, had owned a rifle. You didn't have any reason to believe he had that rifle on his person at the time; true?

A. Yes.

Q. Correct?

A. True. Yeah. Correct.

Q. All right. Would you agree that, at no point while you were inside the apartment, did Mr. Sosa attempt to injure you or any other officer with the scissors?

MS. O'LINN: Attempt.

THE WITNESS: Correct.

BY MR. LITTLE:

Q. Now, you were asked about, based on your training, whether you believed that you could shoot someone merely because they were in possession of a knife. And I think you answered no. Your -- your training is you can't shoot someone just because they are in possession of knife; correct?

A. Correct.

Q. And you have not only your academy training, but your continuing training after you become an officer that reinforced that; true?

A. Yes.

Q. And you were also taught, as part of your training, that there were -- and again, I'm asking about your training. I know you are not a lawyer; but you were trained that there were cases that said that you couldn't shoot someone just because he has knife or a gun in his possession?

A. Yes.

Q. So if I'm understanding your responses to Mr. Mayne's questions, when Mr. Sosa got outside of the apartment and started walking with the scissors, you believe that deadly force was appropriate at that point?

MS. O'LINN: Objection. Misstates the testimony.

He said it would be justified.

You can answer.

THE WITNESS: I did believe it would be justified, based on the totality of the circumstances. From the very beginning, him leaving the apartment, driving under the influence, trying to run over a police officer, leading officers on multiple pursuits at high speeds through the city, causing a danger to the public,

the phone calls, the threats that he made directly to me, individually, and to other officers.

And then showing up at the apartment with the scissors, shows an intent to follow through with the threats.

BY MR. LITTLE:

Q. Would you agree that neither you nor any other officer on the scene gave Mr. Sosa any clear communication about either whether to exit the apartment or what to do if he exited the apartment?

A. I don't believe so.

Q. So -- and we had some double negatives in there, and I just want to clarify it.

So there was never any clear communication to Mr. Sosa about whether or not to leave the apartment or what to do if he left the apartment?

MS. O'LINN: Counsel, argumentative, and lack of foundation as to the facts that were occurring at that time --

(Simultaneous speakers.)

MR. LITTLE: Okay. All right. Let's -- let's the officer testify.

BY MR. LITTLE:

Q. So I just want to clarify what you have already said, but I just want to make it clear for the record,

there was not any clear communication given to Mr. Sosa about whether or not to leave the apartment or what would be expected of him if he left the apartment; true?

MS. O'LINN: Objection. Argumentative as phrased.

You can explain.

THE WITNESS: I -- I don't believe so.

BY MR. LITTLE:

Q. Okay.

MS. O'LINN: Counsel, it's --

MR. LITTLE: Okay. We can take our break. It's 12 noon. I only have a few more minutes, but let's take a break.

MS. O'LINN: Let me get clarification from Mr. Mayne.

Mr. Mayne, do you think you have any follow-up?

MR. MAYNE: I don't believe so. Maybe, if I do, it's like two questions.

MS. O'LINN: Okay. Mr. Little, you think you have five minutes?

MR. LITTLE: Yeah, I'd say about five minute.

MS. O'LINN: So I'll agree to ten more minutes, otherwise, we're gonna take a -- we'll go another ten.

Do you think we can clean this up -- finish this up in ten minutes, Gentlemen? I just don't want to

take a break and keep everybody around if it's going to be done in ten minutes.

MR. LITTLE: I think we can finish in that time, or at least I can. And based on what we're saying, it sounds like it.

MS. O'LINN: Mr. Mayne, do you think that you can wrap it up? Otherwise, I just -- you know, it's lunchtime.

MR. MAYNE: Right. I think, yeah, we could probably get that done. Maybe, can we say 12:15, to give ourselves a little room.

MS. O'LINN: All right. 12:15. We'll go to 12:15. Let me just check with my client. We'll go to 12:15.

Madam Court Reporter, Mr. Videographer, is that good for you?

THE CERTIFIED STENOGRAPHER: Yes, that's fine.

THE VIDEOGRAPHER: Yes.

Going off record at 12:01 p.m.

(Off the record.)

THE VIDEOGRAPHER: Going back on the record at 12:02 p.m.

BY MR. LITTLE:

Q. Officer Ayers, are you familiar with the concept of tactical disengagement?

A. Yes, sir.

Q. And I think there -- back in November of 2023, there was both a policy regarding tactical disengagement, and at least one rollcall built bulletin that you had read regarding that concept; true?

A. I believe so.

Q. All right. And you were familiar with those and had those in mind at the -- on the night of this incident?

A. I did not think about tactical disengagement the night of the incident.

Q. Okay. But you were familiar with that training --

(Simultaneous speakers.)

A. Yes.

Q. -- at the time of the incident?

So when you're dealing with someone -- and I think you characterized this earlier -- about being a potential suicide-by-cop situation, the goal is for everyone to -- for that situation to end without any loss of life on any side; true?

A. Yes.

Q. And in your experience, many times that objective is achieved?

A. Yes.

Q. And one important factor in achieving that objective is not to engage in any unjustified escalation of the incident; correct?
A. Yes.
Q. Did -- and this follows up on another one of Mr. Mayne's questions about there being a tactical plan. At the time that Mr. Sosa was shot, who would you say was in charge of this scene?
A. I was the primary officer, so I would say me.
Q. Okay. And had you had any explicit communication with the other three officers, who were in the immediate vicinity, about what the tactical objective was?
MS. O'LINN: Objection. Asked and answered. You can answer, again.
THE WITNESS: No, I did not. We did not have the time to.
BY MR. LITTLE:
Q. Okay. And that's one of the reasons that you're trained that time is your ally in these situations, so that you can develop a tactical plan; right?
A. When feasible.
Q. You -- as I understand it, you admit that you were not, in your own mind, sufficiently trained in

crisis negotiation at the time of this incident?

MS. O'LINN: Objection. Argumentative. "Admit" and "sufficiently trained," argumentative.

You can explain.

THE WITNESS: I've got the training for dealing with people in crisis from the academy, field training, in-service, and also briefing trainings we have discussed it. I do not have the advanced crisis negotiation training, which I felt like could have been beneficial.

So, no, I -- since I don't have the advanced training, I did not feel like I was trained enough in that aspect.

BY MR. LITTLE:

Q. Trained enough for this incident; right?

A. Yes.

Q. Okay. Was anyone who was on scene in the immediate vicinity, were you aware of any of them having any greater crisis intervention training than you had at the time?

A. I'm not aware of others' training.

Q. Okay. If someone had been on scene with more crisis intervention training than you, it would have been appropriate for that person to take the lead; true?

MS. O'LINN: Counsel, argumentative.

You switched from crisis negotiations training

Q. Okay. So this incident on November 4th, 2023 -- and this happened the early hours of November 4th, that was a Saturday; right?

A. Yes, sir.

Q. And you were aware, were you not, that at least back in 2023, the Fresno Police Department did not have scheduled access to the CIT team on weekends; isn't that correct?

MS. O'LINN: CIT? Not CNT?

MR. LITTLE: CNT. Whatever it's called.

MS. O'LINN: Right. Let's be careful.

Can you restate that question, Mr. Little?

MR. LITTLE: Sure. Let me make it more simple.

BY MR. LITTLE:

Q. Back in 2023, November of 2023, there were no CNT team members working on weekends?

MS. O'LINN: If you know.

THE WITNESS: I -- I was not aware of that.

BY MR. LITTLE:

Q. Okay. You wanted to reach someone, but you couldn't; right?

A. Yes.

Q. And that's why you called Sergeant Oliver, because you thought this situation needed someone from CNT; right?

MS. O'LINN: Objection. Argumentative as to "needed" versus an opportunity.

You can answer.

MR. LITTLE: Let's let the witness answer.

THE WITNESS: It would have definitely been beneficial to have a CNT. I called Sergeant Oliver to see if he would try to get ahold of one; but, also to see what other resources Sergeant Oliver possibly would have wanted to deploy, if any.

MR. LITTLE: All right. Thank you, sir. I'm going to try to keep my promise and that will be my last question, and I'll give these five minutes to everyone else. Thank you.

THE WITNESS: Thank you, sir.

MS. O'LINN: Mr. Mayne?

FURTHER EXAMINATION

BY MR. MAYNE:

Q. Yes. Just a couple quick things. I'm going to try to share your statement, which we'll call an exhibit. We'll call it Exhibit 1.

(Exhibit Number 1 was marked.)

BY MR. MAYNE:

Q. Can you see the document that I have shared?

A. Yes.

Q. Can you see a document on the screen?

your statement?

A. Yes.

Q. So what I'm trying to understand is, it seems like your testimony here to today is different from the statement. And I'm just hoping to give you an opportunity to explain maybe it isn't, or maybe there's a reason it is.

But was your testimony, essentially, that when you were in the apartment and Mr. Sosa was taking steps towards the officer, or you, it wasn't anything that would have warranted deadly force?

A. Yes.

Q. Is that your same opinion today?

A. Yes. There's a difference between "warranted" and "justified." So warranted could be my opinion as to what I thought at the time, whether or not it was warranted for me to use deadly force; but that's regardless on if it was justified.

So what I was saying earlier is that it would have been justified; but at the time, I didn't feel like it was warranted to use deadly force outside of the apartment.

Q. So your testimony today is that inside the apartment, it may have been warranted to use deadly force, but it would -- it may have been justified to use

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of May, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

Maria Sosa, et al. v. City of Fresno, et al.
Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT G

An exhibit to the Declaration of Cooper Mayne

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JONATHAN ABRAHAM

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

So is the reason that one officer would use non-lethal force and the other use lethal force, is the goal of that to try to resolve that situation without having to use lethal force?

A. Yes.

MS. O'LINN: I think the word "formation" throws him off, Counsel, because I don't think they use that term with regard to non-lethal cover. I'm not positive, but I think that's the issue.

BY MR. MAYNE:

Q. Were you trained that deadly force is the highest level of force an officer can use?

A. Well, the level of force use is objectively reasonable under the totality of the circumstances, sir.

Q. But is deadly force the highest level of force?

A. I'm sorry. Can you repeat that question?

Q. Were you trained that deadly force is the highest level of force?

A. Yes.

Q. Were you trained that deadly force should only be used when there is an immediate or imminent threat of death or serious bodily injury?

A. Yes.

Q. Were you trained if that threshold is not met, you should not use lethal force?

A. Yes.
Q. Were you trained to give a verbal warning before using deadly force, when feasible?
A. Yes.
Q. Were you trained that you must justify every shot?
A. Yes.
Q. Was part of your training that you should control your fear when deciding how much force to use against the suspect?
A. I'm sorry. Can you repeat that question?
Q. Let me start with a different question.
Were you trained that subjective fear alone is not sufficient to justify deadly force?
A. Yes.
Q. Were you trained to control your fear while you were in the field?
A. Yes.
Q. What's your understanding of the concept of the tunnel vision?
A. To the best of my ability, tunnel vision is when your eyesight is focused on one thing, and it's sole focus is on that one thing.
Q. And how do you guard against tunnel vision?
A. I would have to say through training, going to

Q. But some form of attendance was taken?
A. Yes, sir.
Q. Before the date of this incident, had you received any crisis intervention certification?
A. I'm sorry. Can you repeat that?
Q. Have you received any certification in crisis intervention or crisis negotiation?
A. I'm sorry. I don't understand.
MS. O'LINN: Certifications is what he's saying. Certifications. Did you receive CIT or CNT certifications?
THE WITNESS: No, sir.
BY MR. MAYNE:
Q. What about after the date of the incident?
A. No, sir.
Q. At the time of the incident, did Fresno P.D. have a CIT team or a CNT team?
A. At the date of the incident, yes, they did.
Q. What would you refer to it as, so we're on the same page, CIT or CNT, or something else?
MS. O'LINN: Counsel, it's two different things; so you're asking an either/or question, but there's both.
MR. MAYNE: Okay.
BY MR. MAYNE:

A. No, sir.
Q. Were you trained in the concept of officer-created jeopardy?
A. Yes, I'm familiar with it.
Q. Could you describe that concept, in your words?
A. It's when an officer places himself to create an exigent circumstance.
Q. So were you trained that that's something to avoid?
A. Yes.
Q. Were you trained about crossfire risks?
A. Yes.
Q. Could you describe your -- your training on that point?
A. So our training in crossfire, we learned from the basic academy. We learned during our FTO, and as well as our days as patrol officer.
And then, of course, with our briefings, we learned to try to avoid it as best as possible.
Q. Were you trained to consider your backdrop when you're using your firearm?
A. Yes.
Q. And what are you looking for when you consider your backdrop?
A. Can you repeat the question? I'm sorry.

Q. What are you trained to consider when you're thinking about your backdrop?

A. Things to consider on the backdrop, it's like if it's safe, just in case if the instance of a bullet were to go through a subject, the bullet would impact something like an object instead of a person. A backdrop is when, in the event, no one else gets hurt.

Q. Based on your training, can a police officer shoot somebody merely for having a gun in their hand?

A. I'm sorry. Can you speak a little louder? I apologize.

Q. No, don't apologize. I'll speak louder.

Based on your training, can a police officer shoot somebody merely for having a gun in their hand?

A. No, sir.

Q. What about a knife?

A. No, sir.

Q. At some point before Mr. Sosa arrived at the apartment, were you and Officer Ayers in the apartment, along with Ms. Sosa, for some period of time?

A. Yes, sir.

Q. During that period, did you and Mr. Ayers discuss any tactical plan or what to do if Mr. Sosa arrived at the apartment?

A. No, sir.

Q. Did you discuss whether non-lethal force would be deployed and, if so, who would be the one deploying non-lethal and who would be the cover officer?
A. No, sir.
Q. Was there a senior officer between the two of you?
A. I would have to say Officer Ayers. He has a higher badge number than me -- well, lower badge number.
Q. Were either of you designated in any way to be the contact officer versus the cover officer?
A. At that time, it was an unspoken role. Usually, since he is the primary officer, he's usually the contact officer. And I would be the cover officer, in this instance.
Q. Could you describe the differences in those roles when you're facing -- when you're doing your work as an officer? What's the difference between taking the role of the contact officer versus the cover officer?
A. The contact officer usually gains as much information from the reporting party and/or victim. The cover officer is watching the surroundings and making sure no other harm comes to the officer and to the victim and/or the reporting party.
Q. In a situation where you're going to make an arrest, does that contact or cover officer, do those

cover officer play into, you know, how -- which officer takes which role?

A. Depending on the circumstance, no.

Q. Okay. So you're not trained that, for example, when -- when you have a contact officer and cover officer, and the situation calls for non-lethal, that the contact officer is the one who should use the non-lethal weapon, and the cover officer should cover him with lethal? That's not part of your training?

MS. O'LINN: Explicitly.

THE WITNESS: I would have to say part of our training, we read the need for the scenario and the circumstance.

BY MR. MAYNE:

Q. Okay. I'll -- I'll move on.

In the several minutes before Mr. Sosa arrived at the apartment, was it your understanding that there was a high probability that he would be coming to the apartment?

A. Yes.

Q. And at some point, moments before you opened the door, did you hear a door closing?

A. Yes.

Q. Did you hear any sirens at that point?

A. No, sir.

Q. Did you see any siren lights, like, coming through the window?
MS. O'LINN: I'm sorry. "See siren lights"?
MR. MAYNE: Sorry.
BY MR. MAYNE:
Q. The lights that you have on the top of a police vehicle, did you see any of those illuminating the area around you?
A. At the time, no, sir. I don't recall.
Q. Did you hear any radio traffic indicating that a police officer was arriving at the scene?
MS. O'LINN: Objection. Scope. Vague.
At what point, Counsel?
BY MR. MAYNE:
Q. We're still talking about that time before you opened the door and you heard a door close. And I'm just wondering, about that time, had you heard on the radio that somebody -- another officer was arriving at the scene?
A. No, sir.
Q. Did you look through the window next to the door to try to ascertain who was arriving at the scene when the door -- when you heard the vehicle door close?
A. No, sir.
Q. Did you try looking through the peephole to see

if you could determine who was arriving?
A. No, sir.
Q. Did you use your voice, by giving orders or asking questions, to try to find out who was outside the door before you opened it?
A. No, sir.
Q. Before you opened the door, did you have your gun holstered?
A. Yes, sir.
Q. And your Taser holstered?
A. Yes, sir.
Q. Did you feel, at that point, that you were facing a serious threat?
MS. O'LINN: When he opened the door? Before he opened door?
BY MR. MAYNE:
Q. Before you opened the door.
A. No, not a serious threat.
Q. Could you elaborate? "Not a serious threat." But it sounds like you're saying you thought you faced some threat?
A. Yes.
Q. What level of threat do you think you faced?
A. Well, the threat of Mr. Sosa coming back. Because early on in the call for service, he was

need a break early, we can always do that.

So would you like to take a break?

MS. O'LINN: It's 10:56. I was just -- top of the hour or so. I said let us know. So just reach a point and take a break, is all I was asking.

MR. MAYNE: Okay. I mean, I'll definitely let you know when we're going to take a break, because then we wouldn't -- without me letting you know, we wouldn't be able to take a break. But if you need a break at any point, just let us know.

MS. O'LINN: Let's just go ahead and take a break now, Counsel. That's fine.

MR. MAYNE: Okay. Sounds good.

THE VIDEOGRAPHER: We're off the record at 10:56 a.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 11:08 a.m.

BY MR. MAYNE:

Q. On the date of the incident, what weapons, both lethal and non-lethal, did you have on your person?

A. I had my department-issued firearm, my department-issued baton, and a Taser. And I believe I had my multi-tool, as well.

Q. Did you have a pocketknife, as well?

A. No, my multi-tool had a -- had a knife in it.
Q. Did you have pepper spray?
A. No, sir.
Q. What about in your vehicle? Did you have any other weapons, either lethal or non-lethal, in your vehicle?
A. I had my pepper ball [sic] in my patrol bag, and then I also had my duty -- my duty-issued fire -- or rifle.
Q. Did you say "pepper ball"?
A. No, pepper spray.
Q. Oh, pepper spray. Sorry.
So in your vehicle, the only additional weapons you had would be pepper spray and then your rifle?
A. Yes.
Q. In your statement, you said at one point you considered barricading yourself. Do you recall that?
A. Yes.
Q. Can you describe what you meant by that, and at what time in the incident that was something you considered?
A. It was during that time when Mr. Sosa, he was banging his head on the kitchen -- like, the kitchen area, and he was on the other side of the kitchen -- well, I don't want to say island, but kitchen counter.

considering using the door to put the door between you and Mr. Sosa, did you think that would reduce the threat he posed?

A. At the time, I was hoping, especially since we had Mrs. Sosa with the plan -- the plan with Mrs. Sosa, Officer Ayers, and myself would be out of the apartment, leaving him inside. But the threat was still there.

Q. If you had been able to get him enclosed in the space and have a door closed with everybody on the outside, would the goal be to keep those doors closed?

A. Yes.

Q. And why is that?

A. Because if he is alone in the apartment, there is no other -- there is no other victims, or he's alone in the apartment, he's armed with the scissors, and at that point, it would be more of a better way for a de-escalation. And it would be more of a barricaded subject and him alone in the apartment.

Q. Are you familiar with a formula that's sometimes discussed in police training, I think it's "distance plus cover equals time"?

A. I've heard of some formula similar to that.

Q. Could you describe, you know, the concept you're thinking of that's similar to this?

A. It would be distance, options, time.

Q. Could you describe what that means and what the training is on that concept?

A. Usually, whenever we have more of a bigger distance, it gives us more time, more feasible resources, any available resources and time and reactions that could safely be conducted. And then with that time, we're able to later formulate a plan, as compared to a threat in front of everyone else.

Q. So generally, according to your training, is time on your side? If you can extend the time of an encounter, there's a higher likelihood of a better outcome?

MS. O'LINN: Objection. Vague. Ambiguous. Incomplete hypothetical. Argumentative as phrased.

You can explain.

THE WITNESS: Well, based on the training that I received, it's -- it -- it depends on the circumstances, sir. With time, it could be -- it could be on our side, yes.

BY MR. MAYNE:

Q. When Mr. Sosa entered the apartment, could you describe -- well, just take me chronologically through when he got to the door and then -- let's just say, what did he do next?

A. So after I opened the door and I realized he

was there, he -- he punched out with the scissors and saying, "Hey, are you ready for this?"

I reacted by, "Hey, bro, you don't want to do this," and I retreated back into the apartment to create that distance, that option, that time available.

And then as soon as he went through the threshold of the -- of the apartment, he directed his attention to Officer Ayers and Ms. Sosa.

I remember even Mrs. Sosa saying, "Max, stop. Max, stop," but he just -- he just wasn't stopping. He continue to yell. He continued to bounce his attention from me, Ayers -- or Officer Ayers, and Mrs. Sosa.

Q. Did you consider closing the door at any point after you had opened it and before he entered the apartment?

A. No, sir.

Q. Was there any specific reason why closing the door was not feasible?

A. It wasn't feasible because, after I opened the door, one second later, he was already advancing toward me, really fast. He was walking toward me, really fast.

He had a very long -- he had very long arms. He appeared very tall. He had the look in his eye --

(Reporter clarification.)

THE WITNESS: He had -- he a had very -- like, a certain look in his eye, looking directly at me. He was closing in on me about 1 or 2 yards and enclosing. And with him punching out the scissors, it was -- I just I didn't have the time to close that door safely.

BY MR. MAYNE:

Q. If you had had the time to close the door safely, would you have done that?

A. I mean, at this time, I would have not known, because at that time, he continued to advance toward me. That was the only option at that time, is to retreat backwards.

Q. But if closing the door were an option, if you had time to close it, would you have done that to make sure that you're putting cover between you and a subject with a metal weapon?

MS. O'LINN: Objection. Calls for speculation.

You can answer again.

THE WITNESS: At that time, it's still -- I would have not known had I done that, because that's a different scenario. That's a different circumstance. In this circumstance, he was still advancing toward me with the pair of scissors, still punching out, and he -- he still advanced toward me, walking very fast.

BY MR. MAYNE:

MS. O'LINN: Make sure you keep your voice up.

THE WITNESS: Oh.

MS. O'LINN: And slow down for the court reporter.

THE WITNESS: Okay.

BY MR. MAYNE:

Q. At that time, based on your conversations with Officer Ayers, and what you heard on the cell phone, was it your understanding that Mr. Sosa was expressing an intent to force a confrontation with officers?

A. Yes.

Q. And that he was expressing an intent to commit suicide by cop?

A. Yes.

Q. But knowing that, you would have still considered opening the door, even if you had known he was right outside the door?

A. Yes.

Q. And why would you consider opening the door, knowing that that would create the confrontation that Mr. Sosa was expressing an intent to create?

MS. O'LINN: Objection. Argumentative as to "create the confrontation."

Do you understand the question?

THE WITNESS: Yes. I -- I still opened the

door, because just based on his overall actions he had done that night, he -- he still tried striking officers. He fled officers. He was recklessly driving. He endangered the public.

He -- I believe even on the phone with Officer Ayers, he -- he made threats to the male subject, Mrs. Sosa's partner, I believe. He still posed a threat, whether he was outside, to others, as well.

BY MR. MAYNE:

Q. In the time period when Mr. Sosa was in the apartment, did he ever make any lunging motions towards anybody?

MS. O'LINN: Objection. Argumentative.

You can answer.

THE WITNESS: He was taking steps toward me, Officer Ayers, and Mrs. Sosa, with the pair of scissors in his hands, still.

BY MR. MAYNE:

Q. Did he make any lunging motions?

MS. O'LINN: Ever, Counsel, or at this point where you're asking? Because he's already testified as to his initial actions.

BY MR. MAYNE:

Q. I can re-ask it. During the portion of time when Mr. Sosa was in the apartment, did he make any

lunging motions?

A. No, sir.

Q. At some point, did he go into the kitchen area of the apartment?

A. Yes, sir.

Q. Did you see a -- a knife block, a container for knives on the kitchen table?

A. No, sir. I don't recall. I was mainly focused on him.

Q. Is it your understanding that, typically, a kitchen will have an assortment of knives in it?

A. Yes.

Q. Did you see him, at any point, attempt to arm himself with a knife?

A. No. He was already armed with a -- a sharp pair of scissors, sir.

Q. But you never saw him attempt or try to switch to a kitchen knife or a butcher knife or anything like that?

A. No, sir.

Q. At any point when you were inside the apartment with Mr. Sosa, did you consider using your Taser against him?

A. No, sir.

Q. Why is that?

And then not only that, if he overcame the Taser, the Taser would have triggered him even more to attack that person and/or officer. And then if he attacks me, I would have no cover -- no lethal cover, giving me -- potentially him harming me, potentially killing me.

Q. At any point in the -- when you were in the apartment with Mr. Sosa, while he was still in the apartment, did you think he was an immediate threat of death or severe bodily injury to anybody?

A. Yes. He was an immediate threat to me, Officer Ayers, and Mrs. Sosa.

Q. At what point?

A. I would have to say, it goes back to the initial call for service, because he -- he went out drunk driving. He's still -- he was a threat to the officers and an endangerment of the public.

And then upon coming into the apartment, he -- he still had that threat. He had the -- he had that ability. He had every opportunity. He -- he already explicit [sic] that intent, that he wanted to come after us, so he was an immediate threat throughout the whole duration of the call for service.

Q. So are you saying he -- he was an immediate threat of death or severe bodily injury throughout the

entire call for service, or just a threat?

A. He was a threat. He did -- he did have that immediate threat for that, the serious bodily injury, just pertaining to him trying to strike one of the officers with his vehicle. He recklessly drove.

He caused an officer to crash his vehicle, which can cause serious bodily injury, while trying to affect an arrest. And then he was also driving recklessly. I, myself, pursued him two times --

(Reporter clarification.)

THE WITNESS: I, myself, pursued him two times; and each time, he was driving well above the speed limit, to the point where all I could see is his taillights, especially on Shaw, a busy intersection, a busy street in Fresno, California.

So he did pose a great threat throughout the -- throughout the duration of the call for service.

Q. Okay. I understand. I think I understand your answer.

What I'm getting at is a little more specific of, at some point when he was inside the apartment, did you think he posed an immediate threat of death or severe bodily injury to anybody?

A. Yes, to myself, Officer Ayers, and Mrs. Sosa.

Q. And then, at what point or at what points did

he pose such a threat?

A. I would have to say, he -- he imposed that threat throughout the duration still, sir. He -- even when he came to the apartment, he was still a threat.

He was still a threat to other officers on scene, to a point where we still had to station officers throughout the duration of the city. So he still posed that threat, sir.

Q. Okay. So would it be accurate to say that you think, for the entire time, for every moment that he was inside the apartment, he posed an immediate threat of death or severe bodily injury to somebody?

A. Yes. He imposed that against me, Officer Ayers, and Mrs. Sosa.

Q. For the entire duration of the time he was inside apartment?

MS. O'LINN: Objection. Asked and answered. You can answer again.

THE WITNESS: Yes, just because of his prior actions and his behavior at the time, too, as well.

BY MR. MAYNE:

Q. And I think we covered this earlier, but is it your training that it is -- it would be reasonable to use lethal force when facing a threat, an immediate threat of death or severe bodily injury?

with his Taser?

A. No, sir.

Q. Could you describe your memory of what happened in the moments after Mr. Sosa left -- walked out of the apartment?

A. From my recollection, I remember prior to him leaving, I tried to --

(Reporter clarification.)

THE WITNESS: I tried to gesture Officer Ayers and Mrs. Sosa to leave. Mrs. Sosa did not. Officer Ayers managed to. He even said -- I think he noticed Officer Ayers, and I think he -- I'm pretty sure he noticed me trying to have Mrs. Sosa leave.

He -- he even said, "Oh, I'm not going to hurt her. She's the mother of my child. But you can go out there with him."

And I tried reasoning with him. He's like, "Well, she has to leave with me." But he refused.

He continue to walk out. He had the scissors still in his hand. I told him, "Stop."

(Reporter clarification.)

THE WITNESS: But he continued through the threshold, outside the apartment.

BY MR. MAYNE:

Q. And what happened after he continued past the

threshold?

A. From my perspective, I observed Officer Aguilar, he employed his Taser, but it didn't -- it didn't get the full neuromuscular incapacitation. He winced, he stumbled to his left -- or Mr. Sosa stumbled to his left, against the adjacent wall of the opposing apartment.

And then he -- from my perspective, he did some type of swiping motion. It appeared to me that he was trying to get, like, at least the wires off or the prongs off. And then he took two large steps, advancing toward Officer Crockett, Officer Ayers, and Officer Aguilar, with the pair of scissors still in his hand, like, he -- I think at one point I remember he was in arm's reaching distance to even grab Officer Crockett's muzzle of the gun --

(Reporter clarification.)

THE WITNESS: -- and Officer Ayers's muzzle of the gun.

MS. O'LINN: Are you going to ask him another question?

MR. MAYNE: Yes. I'm about done, and then I'll turn it over to Mr. Little.

BY MR. MAYNE:

Q. During the time Mr. Sosa was in the apartment,

how close did he get to you, at the closest? What was the closest he got to you?

A. From the -- from my perspective, from my chest to even the pair of scissors when he punched out, it was approximately 1 yard from my chest to his chest. It was, at the most, 3 yards, 2 to 3 yards.

Q. But at some point, he got within 3 feet of you measuring from your chest to his chest?

A. Yes.

MS. O'LINN: That's the closest he got, is what the question was, ever.

THE WITNESS: I would have to say the closest would be 2 yards from my chest to his chest.

BY MR. MAYNE:

Q. Oh, I thought you said 1 yard?

MS. O'LINN: The question is what's the closest he ever got to you, inside.

THE WITNESS: From inside, it would be from his chest to my chest, would be two to three.

BY MR. MAYNE:

Q. Two to three what?

A. Yards.

Q. Yards.

MS. O'LINN: Counsel, I need to take a break.

MR. MAYNE: Okay.

MS. O'LINN: We can just take 5 minutes.

MR. MAYNE: Let's do 5. We'll be back at 46 after.

MS. O'LINN: We're off the record at 11:41 a.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 11:45 a.m.

BY MR. MAYNE:

Q. Okay. I wanted to give you a chance to clear up an answer to a previous question. So during the period of time that Mr. Sosa was in the apartment, what was the closest he got to you?

A. I would have to say, approximately, 1 yard.

Q. And is that measured between your chest and his chest?

A. I would have to say, it's from my chest to the scissors.

Q. Okay. Thank you.

And I'm going to share an exhibit now, a short video that we'll play, and then I'll ask a couple questions about that, and we'll turn it over to Mr. Little after that.

(Exhibit Number 3 was marked.)

MS. O'LINN: Is it the same video, Mr. Mayne?

MR. MAYNE: No. It's a different video.

testimony that Mr. Sosa, your belief at the time was that he was possibly armed; is that right?

A. Yes.

Q. Okay. So you spent approximately 15 or so minutes speaking with Maria Sosa in the apartment, prior to Max's arrival. Isn't that accurate?

A. Yes.

Q. And during that time, didn't you ask her about the "hit," I'll call it, that came back showing that there was a firearm registered to Max?

A. Yes, I did ask about that.

Q. And didn't she tell you that was -- and this is a paraphrase -- I could find her exact words. But basically, she told you that that was a gun that wasn't even functional. It was some sort of a kit or something that he ordered that he never actually put together?

A. Paraphrasing, she -- from what I recall, she mentioned it was unfinished. She -- she knew of knowledge of it. From what I recall, she doesn't know if it was completed or not, sir.

Q. Okay. So -- and you said that that was an MK -- to your understanding, an MK .223?

A. It was MK -- the brand was MK, semi-automatic rifle, 223 chambered.

Q. Right. So I'm going to share my screen.

I stated.

MS. O'LINN: Sure. Okay.

THE WITNESS: Depending on the circumstances, if it calls for it, it would still need a -- like in this case, we would still need a lethal force coverage. And depending on circum- -- certain circumstances, a less-lethal option would be more feasible.

BY MR. LITTLE:

Q. All right. So you recall the statement you gave to Detective Rockwell?

A. Yes.

Q. A couple of days after this incident?

A. Yes.

Q. All right. So in that statement -- and I'm just going to read it.

It says: "I even requested city-wide Code 3, canine Code 3, cause this guy wasn't listening to us. If people come, if we have a canine there, if we have someone there, like, with, like, a less-lethal, or someone who's better at negotiating, they probably could talk him down."

Do you recall saying that?

A. Yes.

Q. Okay. So there were, to your understanding, persons on scene who did have less-lethal shotguns

A. Can you repeat that? I think --

Q. Sure. So you weren't entirely surprised when someone knocked on the door and it turned out to be him?

A. Well, no one knocked on the door, sir. I heard the -- like a car door slam, so that's why I opened the door.

Q. Okay. All right. Now, in that apartment, there's actually a window that if you're facing the door from the inside, it would be to the right of the front door of the apartment; correct?

A. From what I recall, yes.

Q. Did it ever occur to you, after you heard the car door slam, to check through that window who it was that was arriving?

A. No, sir.

MS. O'LINN: This was asked and answered.

But you can answer again.

THE WITNESS: No, sir.

BY MR. LITTLE:

Q. Okay. And if I was in la-la-land when that was asked by Mr. Mayne, I apologize.

So during the 15 or so minutes that you had in the apartment with Ms. Sosa, when you, yourself, viewed it as a possibility that Mr. Sosa might return, is there a reason why she wasn't moved to a patrol vehicle or

MS. O'LINN: Objection. Calls for speculation as to the safety of the other rooms.

You can answer.

THE WITNESS: I -- even if he were to get past the officers, he still had the scissors. He still had his behavior, his actions. It still -- she was still a potential risk for him or high potential risk for injury for her still.

BY MR. LITTLE:

Q. Okay. I understand that, but I don't think that's an answer to my question.

Ultimately, you did try to get Ms. Sosa out of the living room where Mr. Sosa was; true?

A. Yes.

Q. But there weren't any efforts to made to get her out of that living room before Mr. Sosa arrived?

MS. O'LINN: To your knowledge.

THE WITNESS: To my knowledge, no.

BY MR. LITTLE:

Q. All right. I think this kind of dovetails with some of Mr. Mayne's questions, but you're trained in a crisis situation, such as what you were confront with on November 4th, 2023, that time, if you can buy time, is your ally?

MS. O'LINN: Objection. Asked and answered.

You can answer again.

THE WITNESS: Yes. When feasible, if time presented itself, yes, it would be an ally.

BY MR. LITTLE:

Q. Okay. You also mentioned that it was your plan, as I understand it, to have Officer Ayers get Ms. Sosa out of the front door, which would then have enabled you go to back through the bedroom, close the door, and then get out of the bedroom window?

A. Yes.

Q. Okay. Was that plan ever communicated to anyone else?

A. No. Because each plan is -- it's a -- it was a dynamic situation. It was a dynamic circumstance, sir.

Q. Okay. And did you ever ascertain whether Officer Ayers had a different plan?

A. No, sir.

Q. Or Officer Aguilar?

A. No, sir.

Q. Or Officer Crockett?

A. No, sir.

Q. So, as far as you know, the four of you could have had completely different plans on how to address the situation?

MS. O'LINN: Objection. Argumentative to some

I realize it was dynamic situation. I realize that you developed a plan, but you don't know if the other three officers had different plans?

A. At the time, possibly. But during that time, we had to react to what we were given, sir.

Q. Okay. You did -- before you arrived at the apartment, you received dispatch indicating that Mr. Sosa was unarmed; right?

A. No, sir.

Q. Okay. Now, so I wanted to talk a little bit about the -- how Mr. Sosa got out of the apartment. It sounds like that wasn't your plan.

A. No. It was not my plan for him to leave the apartment.

Q. Do you know if that was one of the other three officers' plan?

A. No, sir.

Q. And strategically, at least to you, it was important that Mr. Sosa stay in the apartment?

A. Yes.

Q. Why was that?

A. Because in -- within the apartment, if Mrs. Sosa were to leave with Officer Ayers and he were to remain inside the apartment, we could keep him contained. Because his actions throughout, he was

driving recklessly, he got us into pursuits. He was -- we lost him multiple times.

So he was -- it would be better -- it would be the better solution to keep him inside the apartment at that time.

Q. I've seen your body-worn camera video. Would you agree with me, at no point after Mr. Sosa entered the apartment, did anyone ever instruct him, "You need to stay in here until we tell you you can leave"?

MS. O'LINN: Objection. Argumentative.

With regard to those specific words, you're asking if that's what he said to him?

MR. LITTLE: Or anything to that effect.

MS. O'LINN: Counsel, he's testified he told him to stop, so I'm not sure I can resolve that with the way your question is phrased.

MR. LITTLE: Well, "Stop" is not what I'm asking. I'm asking if anyone told Mr. Sosa -- whatever words they used -- not just, "Stop, but, "Sir, you cannot leave this apartment until we tell you you can"?

THE WITNESS: No words were used, because he was -- his behavior, the way he was talking to us. He continued to ignore our commands. He was speaking over us. After multiple attempts at me trying to reason with him, me trying to talk to him, me being empathetic.

We also had other officers -- like, I remember we called and if he doesn't want to talk to me, he could talk to Officer Aguilar, but he refused all types of communication. He just -- he had a very elevated -- he was very elevated, very emotional at that time. So those commands weren't given.

BY MR. LITTLE:

Q. And even though he was very elevated and very emotional, would you agree that, at least to your knowledge, neither you nor any other officer on scene never called anyone from the CNT to come out to the scene.

A. No, not to my knowledge, no.

Q. All right. And even if they weren't technically members of the CNT, would you agree that there were, to your understanding, other officers who were part of your department who had negotiation training that you did note?

MS. O'LINN: Counsel, I don't understand that question.

MR. LITTLE: Let me rephrase it.

BY MR. LITTLE:

Q. Did you ever call someone out who had what you understood to have -- rephrase, again.

Did you ever call an officer that you believed

had negotiation training to the scene?

MS. O'LINN: Objection. Asked and answered, multiple times.

You can answer, again.

THE WITNESS: No, sir.

BY MR. LITTLE:

Q. Okay. So negotiators don't necessarily even have to come to the scene. Sometimes when you have a person's phone number, you can have a negotiator attempt to contact that person telephonically; true?

A. Depending on the circumstance, sir.

Q. Was that ever attempted?

A. No, sir.

Q. Okay. Under the verse of Fresno Police Policy 417 that was in effect at the time, it encouraged, when possible, for officers to engage in de-escalation tactics.

A. I'm sorry. Can you repeat that one more time? I apologize.

Q. Sure. Under the version of 417, Fresno Police Policy 417, that was in effect at the time, it encouraged officers to engage in de-escalation tactics?

MS. O'LINN: If you know. Do you know?

THE WITNESS: I'm sorry. Can you repeat that one more time? I apologize.

BY MR. LITTLE:

Q. Sure. You're aware of what Policy 417 is; correct?

A. Yes.

Q. That's the Crisis Intervention Policy that your department has?

A. Yes.

Q. And under that policy, as it existed at the time of this incident, it encouraged officers to engage in de-escalation tactics, where possible?

A. If possible.

Q. All right. Now, that policy also encouraged, where possible, for officers to -- and there is a term for it --

MR. LITTLE: -- and, Cooper, help me out because my brain's not working at the moment, but where essentially, you would withdraw partially from the scene, again, if possible, in an effort to de-escalate?

THE WITNESS: I don't understand the question, sir.

BY MR. LITTLE:

Q. Okay. All right. You had -- Policy 417, you had been trained in that prior to this incident; true?

A. Yes.

Q. Okay. Now, would you agree that the presence

of additional officers can also, at times, be a de-escalation tactic?

A. Yes.

Q. Were you aware that there were additional officers on-site at the Dante Apartment complex at the time that you were interacting with Mr. Sosa?

A. Yes.

Q. How many other officers were on scene at the apartment complex, to your understanding?

A. At the time when me and Mr. Sosa were interacting, Officer Aguilar and Officer Crockett showed up.

Q. Okay. But weren't there also additional backup officers?

MS. O'LINN: Objection. Scope. Where?

BY MR. LITTLE:

Q. To your knowledge, at the apartment complex, weren't there additional backup officers on scene?

MS. O'LINN: Objection. Time.

BY MR. LITTLE:

Q. When you were dealing with Mr. Sosa.

A. When dealing with Mr. Sosa, to my knowledge, no. It was only myself, Officer Ayers, Officer Crockett, and Officer Aguilar, sir.

(Reporter clarification.)

MS. O'LINN: Counsel, time estimate?
MR. LITTLE: I'm going into my last part, so I think I'm good with my 12:30 estimate.
MS. O'LINN: Okay. Thank you.
BY MR. LITTLE:
Q. Okay. Now, I wanted to talk a little bit about the shooting outside. It's my understanding that you were behind Mr. Sosa, with his back facing you, more or less at the time that you fired your shot; is that true?
A. I was more at a -- I was behind him, at an angle, sir.
Q. You could see his back, but not his front?
A. I could partially see his front, but majority of his back.
Q. All right. And so you would have been somewhere in the general location of the area underneath the staircase that led up to the second floor?
A. Yes. I was at the threshold of the door, sir.
Q. Okay. And I think you said that at the time you fired your shot -- and this is where I think the 2 to 3 yards came in -- Mr. Sosa was 2 to 3 yards away from you at the time you fired your shot?
A. Yes.
Q. Okay. And then, there were -- in the general vicinity where Mr. Sosa was at the time you fired your

shot, that's where Officers Crockett, Ayers, and Aguilar were?

A. Yes. He was running towards them, sir.

Q. Okay. What does -- just based on your training and experiences at the time, what does it tell you about shooting in a direction where officers are in the general vicinity?

A. It would -- it would be -- try our best to try to avoid that situ- -- that situation, due to a crossfire.

Q. Right. Now, would you agree that the officers who could better see Mr. Sosa's front had a better opportunity to assess what sort of a threat he presented?

MS. O'LINN: Objection. Argumentative as phrased. Calls for speculation.

You can answer.

THE WITNESS: Can you repeat that question, sir?

BY MR. LITTLE:

Q. Sure. At the time, did you believe that the officers who actually saw Mr. Sosa's face had a better opportunity to assess what sort of a threat he presented?

MS. O'LINN: Same objections.

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

Kimberly D'Urso
______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT H

An exhibit to the Declaration of Cooper Mayne

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
_______________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

BRANDON CROCKETT

WEDNESDAY, APRIL 22, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24521

A. I do not recall.
Q. Did all of those situations resolve without the use of lethal force against those subjects?
A. Yes.
Q. Did any of those subjects have a firearm?
A. I do not recall.
Q. Did any of them have a knife?
A. I do not recall.
Q. Were you trained that deadly force should only be used when there's an immediate or imminent threat of death or severe bodily injury?
A. I was trained that we are able to use force when it's objectively reasonable under the totality of the circumstances.
Q. But for deadly force specifically, were you trained that that should only be used when there's an immediate threat of death or serious bodily injury?
A. We were trained to use force when it's objectively reasonable under the totality of the circumstances.
Q. I understand that's the general standard that you're trained to. So I'm asking just a yes-or-no question really, about is it your training that deadly force should only be used when there's an immediate or imminent threat of death or serious bodily injury?

A. Yes.

Q. Were you trained to give a verbal warning before using deadly force, when feasible?

A. When feasible, yes.

Q. What kind of training have you had related to responding to people in a mental health crisis?

A. My training began at the POST academy, which was approximately a thousand hours, spanned -- or spread out over the span of six months. After that I was released to field training, which was an additional six months; and then in-service training, as well, which involves perishable skills training and daily briefings, conversations, and debriefings.

Q. And was some of that training directly on the topic of responding to mental health crises?

A. Yes.

Q. So you had some training at the academy level. Did you also have some training on that topic from the Fresno Police Department?

MS. O'LINN: Objection. Asked and answered.

He said the FTO program, in-service, and daily debriefings. That would have been Fresno.

If you want him to run through it again, I'm happy to let him do it, but --

BY MR. MAYNE:

Q. That's just a yes-or-no question, so I guess the answer is yes?
A. Yes.
Q. In this situation, at what point did you learn that the subject was trying to commit suicide by cop?
A. It was relayed over the radio.
Q. Do you remember approximately when you learned that, relative to when you arrived at the apartment?
A. It was about midway through the call, from the duration from the initial call being 3:10, and the ending of the call being about 4:00 -- just after 4:30. It was probably, approximately, like, in the middle of that -- of that time.
Q. Sorry. About how many minutes before arriving would that have been?
MS. O'LINN: Counsel, you mean before arriving at the --
MR. MAYNE: Before arriving at the apartment.
MS. O'LINN: Thank you.
THE WITNESS: Approximately, 20 minutes.
BY MR. MAYNE:
Q. Did you call for a CNT or CIT response in this case?
A. No.
Q. Did you call a supervisor at any point to have

them assist?

A. No.

Q. Do you know if any other officers either called a CIT or CNT team or called a supervisor to have them assist with the situation?

MS. O'LINN: Objection to the extent that calls for attorney-client privileged communication.

Other than that, he can answer.

Did you have any personal knowledge that night or learn subsequently from materials that you reviewed outside of meetings with Counsel, was the question there.

THE WITNESS: Yes.

BY MR. MAYNE:

Q. And which officer was that?

A. Officer Ayers.

Q. Any other officers?

A. Not that I know of.

Q. Were you trained in the concept of tactical disengagement?

A. Yes.

Q. Could you describe, in your words, what that means?

A. Tactical disengagement is either repositioning or completely disengaging from a situation or a subject, which typically requires supervisory approval.

Q. Did that occur in this case?
A. No.
Q. So prior to arriving at the apartment itself, when you entered the complex, were you aware that the subject wanted to commit suicide by cop?
A. Could you rephrase that question, sir?
Q. When you first arrived at the apartment, before even seeing the officers in the apartment, did you know that the subject wanted to commit suicide by cop?
A. Yes.
Q. What weapons did you have on your person, including lethal and non-lethal weapons, at the time of the incident?
A. I had my department-issued firearm, my department-issued baton, my department-issued Taser, and a --
MS. O'LINN: On your person.
THE WITNESS: And I believe I had a pocketknife.
BY MR. MAYNE:
Q. What about in your vehicle?
A. In my vehicle, I had a less-lethal bean bag shotgun.
Q. Did you have any other weapons, lethal or non-lethal, in your vehicle?

Q. Did you drive or just -- or walk or run?
A. I drove to the northern entrance of the Dante Apartment complex.
Q. Okay. About how much time between when you got to that northern part of the complex to when you arrived at the apartment itself?
MS. O'LINN: You can explain.
(Reporter clarification.)
THE WITNESS: From the northern gate to me reaching the threshold of the apartment, approximately 10 to 15 seconds.
BY MR. MAYNE:
Q. Did you consider bringing your bean bag shotgun from your vehicle?
A. No.
Q. Did you have any information that Mr. Sosa had attacked or harmed anybody?
A. Yes.
Q. Did you have any information indicating that he had actually injured anybody?
MS. O'LINN: As he was running towards the apartment?
MR. MAYNE: Yeah.
BY MR. MAYNE:
Q. Prior to the shooting, did you have any

information, at any point, that Mr. Sosa had ever hurt anybody?

MS. O'LINN: Not threat. "Hurt" is what he's asking.

THE WITNESS: No.

BY MR. MAYNE:

Q. Did you have any information indicating that Mr. Sosa had a firearm?

A. He -- at that time, I knew he had a firearm registered to him.

Q. Did you have any specific information that he was armed with the firearm or had possession of the firearm?

A. No.

Q. Did you have any specific information that he was armed with any weapon, other than scissors?

A. No.

Q. When did you --

A. Oh.

(Simultaneous speakers.)

BY MR. MAYNE:

Q. When did -- oh, sorry. Continue, if you had more.

A. I was going to say, excluding his vehicle, no.

Q. Understood.

Q. And did you have a partner that day?
A. No, sir.
Q. And where did you position yourself when you arrived at the apartment?
A. When I arrived at the apartment, I stopped at the threshold of the front door.
Q. Before taking that position, did you discuss with anybody any tactical plan for how you would approach the situation?
A. No.
Q. And at that point, do you know whether a supervisor had been called or not?
MS. O'LINN: At the point where he arrived at the front door?
MR. MAYNE: Yes.
MS. O'LINN: Thank you.
Objection.
Counsel, do you mean whether he knew at the time, or he knows now?
MR. MAYNE: Whether he knows now is fine.
MS. O'LINN: Okay.
To the extent that calls for attorney-client privileged communication, you're instructed not to answer.
(Reporter clarification.)

scissors down by his side, but pointed towards the direction of somebody, at that moment, did you think that he posed an immediate threat of death or severe bodily injury to anybody?

A. Yes.

Q. Who did you think he posed a threat of -- an immediate threat of death or severe bodily injury to?

A. Myself, Officer Abraham, Officer Ayers, and Mrs. Sosa.

Q. Was he approaching any of the individuals you just listed?

MS. O'LINN: At the moment he first saw him?

BY MR. MAYNE:

Q. At the moment we're talking about, that you're saying you perceived him as an immediate threat of death or severe bodily injury, was he approaching any of the people you just listed?

THE WITNESS: Mr. Sosa made small steps towards, kind of just like in his immediate area, going forward, to the side, to his sides, and diagonal, and back.

BY MR. MAYNE:

Q. And you thought he was an immediate threat to, it sounds like, everybody who was present? Is that what your testimony is?

A. Yes, sir.

Q. Was he an immediate threat of death or severe bodily injury throughout the entire interaction you had with him?

A. Could you rephrase that question, sir?

Q. Yeah. I'm talking about the period of time between when you first saw him and when the shots occurred, was he -- did he pose an immediate threat of death or severe bodily injury for that entire time period?

A. Yes.

Q. So according to your training, would you have been justified to use lethal force against him at any point during your interaction with him, between when you first saw him until he was shot?

MS. O'LINN: Objection. Argumentative as phrased.

You can explain.

THE WITNESS: Based off of the totality of the nature of the call for service and the events that occurred during the call, such as him being possibly under the influence of alcohol, him being suicidal, him attempting to strike an officer with his vehicle, taking officers on multiple pursuits, fleeing and eluding, in addition to being a danger to the public.

Making threats to himself, officers on the call for service, or Mrs. Sosa's partner, and arming himself with kitchen shears, returning to the residence where officers were located.

Q. Okay. My question, I think I'm trying to get at something more simple, which is -- I think we may have gone over this before, but is it true that if somebody poses an immediate threat of death or severe bodily injury to an officer or somebody else, then it is objectively reasonable to use lethal force against them?

MS. O'LINN: Objection. Incomplete hypothetical.

You can answer.

THE WITNESS: It'll be deemed objectively reasonable under the totality of the circumstances.

BY MR. MAYNE:

Q. Right. Just so we have a clear record, I guess I'll ask again, because it's kind of a yes-or-no question of: If you're in a situation where somebody poses an immediate threat of death or severe bodily injury, isn't it reasonable to use lethal force against that person to stop the threat?

A. Yes, sir.

Q. So in this situation, you testified that he posed an immediate threat of death or severe bodily

A. After.

Q. And what made you consider switching to non-lethal force?

A. When an additional -- or with an additional officer arriving on scene, there were -- Officer Ayers and Officer Abraham had their department-issued firearms drawn. I had my department-issued firearm drawn.

When Officer Aguilar arrived, we discussed who had any less -- or who had any Tasers equipped and drawn.

Q. So -- sorry. I think I missed part of that. Was there a discussion? Did you say you had a discussion?

A. Yes.

Q. Who did you have a discussion with?

A. Officer Aguilar.

Q. And could you summarize the discussion for us?

A. Officer Aguilar approached behind me, and asked if anybody had a Taser drawn. I advised that we did not. I -- and yeah.

Q. And did you decided to draw your Taser at any point?

A. I initially was going to holster my department-issued firearm, to then draw my department-issued Taser, but then Officer Aguilar

break here, and be back at 2:42, if that works for everybody.

MS. O'LINN: Sure.

MR. LITTLE: Thank you.

THE VIDEOGRAPHER: Going off record at 2:32 p.m.

(Break taken.)

THE VIDEOGRAPHER: Back on record at 2:42 p.m.

BY MR. MAYNE:

Q. Officer Aguilar deployed the Taser on Mr. Sosa at some point; is that correct?

A. Yes, sir.

Q. And did the Taser appear to have any effect?

A. Yes.

Q. What effect did it have?

A. It appeared that the Taser had temporarily caused pain to Mr. Sosa, not enough to cause neuromuscular incapacitation, but he definitely felt, to some capacity, the Taser prong.

Q. How long did the Taser effect last, in your view?

A. Approximately, a half a second to a second.

Q. Are you familiar with the model of Taser that was being used by Officer Aguilar?

A. Yes, sir.

Q. Does that model have a five-second time period where the Taser is active once you pull the trigger?

A. Yes.

Q. I think you're a lot more familiar with these weapons than I am. So could you describe how that works? Your understanding, of when you pull the trigger of the Taser, do you have to hold it down, or once you pull it, is it activated for five seconds?

A. It is activated. You do not have to hold it. It's just one, like, depress.

Q. And then for those five seconds, if a probe is in contact with the person's skin, what happens?

MS. O'LINN: Objection. Argumentative as phrased.

I believe you said "a probe"; correct, Mr. Mayne?

MR. MAYNE: Right.

MS. O'LINN: Is that what you said, "a probe"?

Okay. You can answer.

THE WITNESS: Those Tasers require two probes to be considered effective.

BY MR. MAYNE:

Q. So if one probe has made effective contact, what happens? Is there no effect, or is there pain compliance effect?

made contact and embedded in the subject's skin and the device is on, meaning triggered, does that cause pain through the electricity going through the barb?

MS. O'LINN: Yes. I'm just suggesting that you don't guess.

THE WITNESS: Yeah. I'm not sure, sir.

BY MR. MAYNE:

Q. Okay. After -- so at some point, you saw the Taser effect dissipate. You estimated about half a second to one second. After that happened, what did you see Mr. Sosa do?

A. Mr. Sosa used his left hand to clutch, like, the right side of his torso, near, like, his breast and rib area. Mr. Sosa, then, took two side steps to his left, which would be getting closer to the opposing door of the primary apartment. Yeah.

Q. And shortly after that, did you hear somebody on your left fire their firearm?

MS. O'LINN: Objection. Vague as to time.

I'm sorry, Counsel. I don't understand the question.

THE WITNESS: Could you rephrase that? Sorry. I also do not understand the question.

BY MR. MAYNE:

Q. At some point after Mr. Sosa standard moving

more descriptive in terms of where on his body you were aiming?

A. The -- his torso.

Q. And how many rounds did you fire?

A. One, sir.

Q. How far away were you from Mr. Sosa when you fired?

A. From the point of my -- the end of my barrel to Mr. Sosa, approximately 1, 1 and 1/2 feet.

Q. Did you give any verbal warning before firing?

A. I yelled for Mr. Sosa to, "Chill out."

Q. Did you give anything else that you would consider a verbal warning that you were going to use lethal force?

A. No, sir.

Q. Did you hear any other officers give a verbal warning that they were going to use lethal force?

A. I heard an officer yell, "Stop."

Q. Anything beyond that that would have -- that you believed was a -- a verbal warning that officers were going to use lethal force?

A. No, sir.

Q. When he started moving in your direction, what did you do?

A. I began to continue facing Mr. Sosa, and I

backpedaled away from him, to create distance.

Q. Was there a clear path behind you?

A. Not entirely clear, but, yes.

Q. How far away was Mr. Sosa when he first started moving towards you?

A. Approximately, 3 to 5 feet.

Q. And is that from your body, or he's -- if I'm holding my arm out -- I'm a pretty tall guy, but that adds some distance. When you say he was "3 to 5 feet" away from you when he started moving towards you, was that from your chest, or from some other part of your body?

A. From my chest to Mr. Sosa, you know, approximately, 4 to 5 feet.

Q. And about how much time passed between when he started moving towards you to when you fired?

A. Could you rephrase that question, sir?

Q. About how much time passed from when he started moving towards you, after he was Tased, and when you fired?

A. Same, sir. Probably half a second to a second.

Q. Okay. I'm going to play a video quickly and then turn it over to Mr. Little. Bear with me while I try to get this up.

THE CERTIFIED STENOGRAPHER: Will this be

THE VIDEOGRAPHER: Back on record at 3:06 p.m.

EXAMINATION

BY MR. LITTLE:

Q. All right. Good afternoon, sir.

A. Good afternoon, sir.

Q. I'm Kevin Little. I'm the lawyer for Mr. Sosa's parents, and the estate, as well.

So if I'm understanding correctly, when you were -- first became aware of the incident that was going on at the Dante Apartments, you heard about a possible 245 on an officer; right?

A. That is correct.

Q. But also contemporaneous or nearly contemporaneous with that, you learned this was an M call; right? A call involving a potentially mentally distressed individual?

A. Yes, sir.

Q. Okay. And your department has a policy regarding how to deal with responses involving people who appear to be in mental distress, and that's your Policy No. 417?

A. Yes, sir.

Q. Okay. So as I understand it, when you first responded to the property, you responded to the south, southwest area of the apartment complex and took action

that resulted in the south gate being closed?

A. Could you rephrase that question, sir?

Q. Sure. Early on in your response to the apartment complex, did you do something that resulted in the south gate of the apartment being closed so that there was only one way in and one way out of the complex?

MS. O'LINN: Do you understand the question?

THE WITNESS: No, sir.

MS. O'LINN: I don't either.

MR. LITTLE: All right. We'll just move on to something else.

BY MR. LITTLE:

Q. We've just seen the video that shows when you first saw Mr. Sosa and the scissors, he had scissors in his right hand, but they were down at his right side; true?

A. When I initially observed Mr. Sosa with the scissors, yes.

Q. Okay. Now, and at another point, you saw him banging the scissors on the counter, the kitchen counter; right?

A. Yes, sir.

Q. But while he was inside the apartment, you never saw him pointing those scissors at anyone; true?

A. That is not true. I did see him point the scissors, sir.
Q. Who did you see him point the scissors at?
A. At Officer Ayers and Mrs. Sosa, at their direction.
Q. Okay. You mean he waved them in their direction?
A. No, sir. He extended his arm, like fully extended his arm out, towards their direction.
Q. All right. He never harmed anyone with the scissors inside the apartment; true?
A. No, sir.
Q. Is that true?
A. That is -- I'm sorry. Could you repeat the question, sir?
Q. He never harmed anyone with the scissors inside the apartment complex?
A. He did not harm anybody with the scissors inside of the apartment, sir.
Q. Okay. Now, so as I understand it, you were the officer who suggested to Officer Ayers to get -- to take action to get Mrs. Sosa out of the apartment; is that true?
A. Yes, sir.
Q. Okay. And you mentioned earlier that you said

BY MR. LITTLE:

Q. You describe what you mean by the "low ready," if you could, sir.

A. So I drew my department-issued firearm, and I had it compressed close to my chest, at a downward angle.

Q. Okay. When you first got to the apartment, did you receive information from another officer on scene that the apartment had been cleared, and that all of the -- the only occupants of the apartment that night were Mrs. Sosa and Mr. Sosa?

A. Could you rephrase that, sir?

Q. Sure. To the best of your knowledge, when you were on scene, the only occupants of the apartment, other than the officers, were Mr. and Mrs. Sosa?

A. Yes, I believe so.

Q. Okay. You received no information suggesting that there were children present or any other persons present; true?

A. That is true.

Q. Okay. Now, doesn't Policy 417, that I mentioned a few minutes ago, encourage what's called "tactical disengagement"?

MS. O'LINN: Objection. Argumentative as to "encourage."

You can answer.

THE WITNESS: Yes.

BY MR. LITTLE:

Q. Did you ever have any direct communication, other than, "Just chill," with Mr. Sosa?

A. No, sir.

Q. All right. While you were present on scene that evening, did you see any officers having direct communication with Mr. Sosa, in terms of giving him -- well, let me rephrase this.

Actually, I'll withdraw that question.

So is it fair to assume that since you didn't have any direct communication with Mr. Sosa, other than saying a couple of times, "Just chill," you did not engage in any de-escalation tactics with him?

MS. O'LINN: Objection. Argumentative.

BY MR. LITTLE:

Q. You can answer.

A. As far as de-escalation, I broadcast our circumstances over dispatch, advising that he we were out with the suspect who had armed himself with scissors, and that we, officers on scene, had a line of fire, broadcasting that for additional responding officers, as a form of de-escalation tactics, because that is -- additional resources and officers is a

de-escalation technique.

Q. Okay. You, yourself, never personally made any efforts to call any CNT personnel; true?

A. That is true.

Q. And in your presence, you didn't see or hear any other officers make a similar request?

A. That's true.

Q. Now, it wasn't your intention to have Mr. Sosa exit the apartment. You wanted Mrs. Sosa to exit the apartment; is that accurate?

A. Yes, sir.

Q. Were there reasons why you wanted to get Mrs. Sosa out of the apartment?

A. To eliminate the possibility of her receiving any potential harm in this -- in the hostile environment.

Q. Right. Was another reason because having her on scene is something that potentially could escalate the situation?

A. Yes.

Q. You had no reason to believe that Mrs. Sosa was trained in how to de-escalate a situation; right?

A. Could you repeat that question, sir?

Q. You had no reason to believe that Mrs. Sosa was trained in how to de-escalate a situation?

officers yelled for him to stop.

Q. Okay. Well, I think my question is a little bit different, because by then, he's already out of the apartment. When he was still in the apartment, did anyone give him a command not to exit?

MS. O'LINN: Counsel, I'm going to object to the prelude to the question stated as fact as what you believe happened. Could you re-ask that question, please?

MR. LITTLE: Sure.

BY MR. LITTLE:

Q. While Mr. Sosa was still in the apartment and hadn't reached a threshold, had anyone given him a command to remain inside?

A. Yes. As I said, they -- prior to him breaking the threshold, officers yelled for him to stop.

Q. All right. And Mr. Sosa, when he -- in connection with your instructing Mrs. Sosa to exit the apartment, there wasn't, at the same time, an instruction for Mr. Sosa to stay inside the apartment; correct?

A. Could you repeat that again, sir?

Q. Sure. When an instruction was given to Mrs. Sosa to exit the apartment, there wasn't, at the same time, an instruction for Mr. Sosa to stay inside?

A. That is correct.

Q. Okay. As a matter of fact, the instruction that was given wasn't particularly directed at any single individual, to your recollection; isn't that true?

A. That is not true.

Q. Okay. What do you recall being said and by whom?

A. Starting with myself, I was facing Mrs. Sosa and she sat on the couch. I asked Officer Ayers for her first name. I then called Mrs. Sosa by her first name and waved for her to come my way to exit the apartment, and simul- -- shortly after that, Officer Abraham also ordered Mrs. Sosa to exit the apartment.

Q. Okay. So shortly after Mr. Sosa reached the threshold of his apartment or when he was in that general vicinity, one of the officers, to your recollection, said, "Stop" to him?

A. Yes.

Q. Was that Officer Abraham?

A. Yes.

Q. And then how long after that was Mr. Sosa Tased by Officer Aguilar?

A. Approximately, a second later.

Q. Okay. And at the time that Mr. Sosa was

Tased -- I mean, based on the video, you were there, but what was he? Maybe a foot, or a foot and half outside of the threshold of the apartment?

A. Mr. Sosa was approximately 2 to 3 feet out of the threshold of the apartment.

Q. Okay. All right. So before I go to what happened during the shooting itself, I wanted to circle back to the less-lethal shotgun that you had in the trunk of your patrol vehicle.

When you were arriving on scene, were you already aware that you were dealing with someone who seemed to be distressed?

A. Yes, sir.

Q. Okay. And that was before you got to the apartment and saw that he had scissors in his right hand; is that correct?

A. Yes, sir.

Q. So when you left your patrol vehicle, at least to the best of the information that you had, you were dealing with a mentally distressed, unarmed individual, with no prior record?

MS. O'LINN: Is all of that true?

THE WITNESS: Yes, sir.

BY MR. LITTLE:

Q. Okay. Have you been at scenes on other

A. Not that I believe so, sir.
Q. Okay. So -- so I wanted to ask you about how Mr. Sosa reacted after he was Tased. So in looking at your statement, it indicates that when Mr. Sosa was running forward, he was leaning forward, his head was down, and his scissors were at his side -- I'm assuming right side, right, because he had the scissors still in the right hand?
A. Yes, sir. They were in his right hand.
Q. Okay. And you also mention -- and I think this was in Rockwell's statement -- that you weren't even sure if the subject was fixated on you as he was running forward in that position?
A. Could you repeat that question, sir?
Q. Sir. Didn't you tell Officer Rockwell that you weren't sure if the subject was even fixated on you as he was running forward in the position that we just described?
A. I believe so, sir.
Q. Okay. And at no point did Mr. Sosa -- prior to your firing the one shot that you did, at no point did you ever say to either Sergeant Oliver or to Detective Rockwell, that he brought those scissors from his right side, up to a position where they were pointing at you; isn't that correct?

statement.

BY MR. LITTLE:

Q. Are you saying that you didn't tell Detective Rockwell that the subject -- let me see here.

Didn't you tell Detective Rockwell that you weren't sure if the subject was fixated on you?

MS. O'LINN: Counsel, I think you're quoting from -- would you like me to cite to it?

MR. LITTLE: Yes.

MS. O'LINN: Line 15, 50: "I don't know a hundred percent if he's fixated on me per se, but definitely facing me. Looking at me, he's, like, yelling like, at least he or at least looking in my general direction, I'm the only person, like, hugged up against this wall."

Is that what you're referring to, Counsel?

MR. LITTLE: Yes, ma'am. Yes --

(Simultaneous speakers.)

MS. O'LINN: "I don't know a hundred percent if he's fixated on me per se."

Is that what you testified to in your interview?

THE WITNESS: Yes.

BY MR. LITTLE:

Q. Okay. I think you were asked by Mr. Mayne if

THE WITNESS: I also do not recall that, sir.

BY MR. LITTLE:

Q. Okay. Did you have any protective equipment on that night, like your vest?

A. Yes, sir.

Q. What did you have?

A. I had my outer carry load-bearing vest that covers the majority of the front and back of my torso and leaves my extremities and head and neck and legs exposed.

Q. When you're dealing with a distressed individual -- and this is just based on your training and experience -- generally, are you trained that time is your ally? In other words, the longer you can drag the situation out, typically the more peacefully it resolves?

A. Yes, sir.

Q. You mentioned in response to one of Mr. Mayne's questions that you did not holster your weapon and withdraw your Taser because Officer Aguilar had his Taser out. Can you explain more fully why? What the reason for that was?

A. Yes. So -- and I'll try to remain speaking slower. So, if Officer Aguilar and I both withdrew our Tasers, from our perspective, we would have been in a

of your body was it your perception -- rephrase.
At what level of your body was Mr. Sosa's head at the time you shot?
A. Seeing as I'm roughly 6 foot 3, Mr. Sosa's head was at, I'd say about, like, the center of my chest.
Q. Okay. And you've already described in your prior statements where Mr. Sosa's hands were. And I think you said that his right hand was at his right side, but that the blade was pointed up; is that right?
A. Yes, sir.
Q. Okay. When say that his hand was at his right side, you mean extended all the way down?
A. No, sir.
Q. What do you mean?
A. So he had a bent arm. It would be a little bit easier to physically show you. But had a bent arm, still with the arm forward, near his bent over chest, with the scissors in his right hand, with the blade faced towards me.
Q. Okay.
A. I hope that helps.
MS. O'LINN: Would you like him to demonstrate it, Mr. Little?
MR. LITTLE: Well, I don't know how well we can capture that on Zoom, but if he feels like he can

demonstrate it.

MS. O'LINN: Please stand up and show him. Up a bit so they can see it.

Yeah, go ahead.

THE WITNESS: So like this, sir.

(Indicating.)

THE WITNESS: And this being my right hand.

MS. O'LINN: If you'll hold that position. It's similar to with a bent arm near your torso, and your hand out in front of your body with a thumb towards forward facing, indicating the blade would have been sticking out at that angle; is that correct?

THE WITNESS: Yes.

BY MR. LITTLE:

Q. So the way that you're saying, I guess you're significantly taller than he was. But the way that you're saying it, am I right, that the scissors would have been in the general area of your waist or maybe your upper thigh?

A. Yes.

Q. Okay. And this is when Mr. Sosa was roughly a foot and a half from you?

A. Yes, sir.

Q. Okay.

MS. O'LINN: Further estimate, Counsel, or

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of May, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT I

An exhibit to the Declaration of Cooper Mayne

**JOHN ZANONI, SHERIFF**
**CORONER UNIT**
**3333 E. AMERICAN AVENUE, SUITE G**
**FRESNO, CA 93725**

# # 23-11-0032

| Section | | | | |
|---|---|---|---|---|
| DECEDENT | NAME OF DECEASED (LAST, FIRST MIDDLE)<br>**Sosa, Jr, Maximiliano** | MANNER OF DEATH<br>**Homicide** | MANNER TYPE<br>**Officer Involved** | |
| DECEDENT | DATE OF DEATH<br>11/04/2023 | TIME OF DEATH<br>04:58 | AGE<br>[redacted] | GENDER<br>Male |
| DECEDENT | RACE<br>Mexican American | | | |
| DECEDENT | IDENTIFICATION METHOD<br>Law Enforcement | DATE<br>11/04/2023 | FOUND<br>No | |
| REPORTED BY | CALL DATE<br>11/04/2023 | CALL TIME<br>12:04 | Deputy Coroner<br>Strong, Jenny | |
| REPORTED BY | REPORTED BY<br>Rockwell, Ryan | REPORTED BY AGENCY<br>Fresno Police Department | | |
| PLACE OF DEATH | LOCATION OF DEATH<br>Apartment Complex | PLACE OF DEATH<br>-- | | |
| PLACE OF DEATH | ADDRESS (STREET, CITY, COUNTY, STATE, ZIP)<br>[redacted] | | | |
| NOK | LEGAL NEXT OF KIN<br>[redacted] | RELATIONSHIP<br>Wife | TELEPHONE NO.<br>Home Phone: [redacted] | |
| COD | Cause A | GUNSHOT WOUNDS TO CHEST | | |
| COD | Other Conditions | NONE | | |
| INCIDENT | LOCATION OF INJURY<br>Apartment Complex | AT WORK<br>No | | |
| INCIDENT | ADDRESS (STREET, CITY, COUNTY, STATE, ZIP)<br>[redacted] | DATE AND TIME OF INCIDENT<br>11/04/2023 04:30 | | |
| INCIDENT | INVESTIGATING AGENCY<br>Fresno Police Department | AGENCY CASE #<br>2311040123 | OFFICER<br>Rockwell, Ryan (P1479) | |
| DISP | FUNERAL HOME<br>Wallin's Sanger Funeral Home | | | |
| DISP | EXAM TYPE<br>Autopsy | CAUSE OF DEATH PROVIDED BY<br>Dr. Bennett, Thomas | | |

**Cause of Death**: Gunshot wounds to chest (minutes).

## Summary and Comment

From the history available at the start of the autopsy, this man was involved with an argument with his estranged wife at her apartment, he leaving and then returning while officers had responded. He apparently tried to hit officers with his Tesla as he left. When he returned, he threatened the officers with scissors and also made statements of hurting himself. The officers tazed him but he reportedly continued to charge the officers, with the officers firing shots, four shots reportedly fired by the three officers, reportedly fired while two officers were standing together, and one officer was off to one side. The decedent collapsed, with resuscitation efforts started "immediately", but upon arrival of EMS no signs of life were found, the decedent pronounced dead at the scene. Due to the violent nature of this death associated with law enforcement, jurisdiction was assumed by the Coroner with autopsy authorized.

Toxicology studies were performed by Adventist Labs, reporting only noting a trace of alcohol (BAC = 0.01%) in his liver, with no other drugs found at levels that reached their thresholds for detection or significance.

At the postmortem examination, he had sustained four penetrating gunshot wounds to his torso, all four bullets remaining in his torso (see the Lodox films below), with the bullets recovered during the autopsy. I will use the letter designations of "A" thru "D" to describe each wound, arbitrarily assigning these letters as the entrance wounds descend from the top of his head, and will use the anatomic position (i.e., a body standing upright with palms open and facing forwards) as the basis for describing the wounds and bullet paths, this just for purposes of description, and not to infer either this "anatomic position" is the order the wounds were received or the position his body was in when the shot(s) were sustained. No soot, stippling, gunpowder residue, searing or muzzle imprints are seen on the skin surfaces surrounding the entrance holes, so the wounds are each designated as "distant/indeterminate-range". As a brief summary, the four bullet paths are as follows:

A – from right upper shoulder down and back through the right lung to the mid-back soft tissues.
B – from the right outer shoulder down and to the left through the right chest and lung, the mediastinum and esophagus, the stomach fundus and into the left chest cavity.
C – from the right breast back, down and to the midline through the right chest and lung to the T6 spine.
D – from his mid-back forwards and upwards through the right chest and lung, through the heart and into the mid-sternum.




**Forensic Medicine and Pathology, PLLC**
4205 Solace Street, Las Vegas, NV 89135
Office and cell phone: 406-855-5447 Fax: 307-316-0663
Email: doctor4n6@gmail.com

**C - GUNSHOT WOUND TO RIGHT ANTERIOR CHEST**: This penetrating gunshot wound enters his right anterior chest through a hole centered 2-inches above and lateral to his right nipple. The entrance hole measures ~¼ x ½-inches in diameters with a large and irregular abrasion collar measuring ~1 x 1¼-inches in diameters (see photos below). No soot, stippling or gunpowder is found on the skin surfaces surrounding the wound or seen in the wound depths. The bullet path is **to the left, slightly backwards and downwards**, through his right anterior rib cartilages, entering the right chest cavity, perforating the right lung lower lobe, then penetrating into the right side of the T6 vertebra body, where the bullet is recovered. Massive hemorrhage is present into the right chest cavity and into the lung parenchyma surrounding the bullet wound path.






**D - GUNSHOT WOUND TO RIGHT MID-BACK**: This penetrating gunshot wound enters his midback ~2-inches right of the posterior midline and 5-inches above his beltline. The entrance hole measures ~¼-inch diameter with a concentric ~3/8th-inch diameter abrasion collar. No soot, stippling or gunpowder is found on the skin surfaces surrounding the wound or seen in the wound depths. The bullet path is **forwards, slightly upwards and to the midline/left**, through his right chest cavity, perforating the right lung lower lobe medial portion, perforating the inferior vena cava and right atrial junction, perforating the heart and exiting the right ventricular anterior wall to penetrate the posterior surface of the mid-sternal body, where the bullet was recovered. Massive hemorrhage is present along the wound path, filling the right pleural cavity and pericardial sac with blood (see photos below).



Entrance D




**Forensic Medicine and Pathology, PLLC**
4205 Solace Street, Las Vegas, NV 89135
Office and cell phone: 406-855-5447 Fax: 307-316-0663
Email: doctor4n6@gmail.com

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT J

An exhibit to the Declaration of Cooper Mayne

**INTERVIEW WITH OFC. JOHN AYERS**
**Q=Det. Ryan Rockwell**
**Q1=Det. Martin Moreno**
**A=Ofc. John Ayers**
**A1=Marshall Hodgkins**

Q: I'm Detective Ryan Rockwell with the Fresno Police Department. Today is November 6, 2023, and the time is 0948 hours. Following is criminal investigative interview of Officer John Ayers in connection with Fresno PD case number 2311040123 which is an officer involved shooting incident. Present with me during this interview is, uh, Detective Martin Moreno and also, uh, Officer John Ayers who's being represented by attorney Marshall Hodgkins who's present. This interview's related to a criminal investigation and will be submitted to the District Attorney's Office. The purpose of this interview is to obtain a voluntary statement from you regarding your involvement in the officer involved shooting incident. If you choose not to provide a voluntary statement, no discipline can come to you for not speaking to us. Has anyone ordered or pressured you to provide a statement today other than the public state - safety statement?

A: No, sir.

Q: Are you willing to provide a voluntary statement at this time?

A: Yes, sir.

Q: Have you spoken to anyone about this incident other than your legal representative?

A: No, sir.

Q: All right. So I'm just gonna start with basic info, uh, your first and last name. How do you spell it?

A: Uh, my first name is John, J-O-H-N. My last name is Ayers, A-Y-E-R-S.

Q: Both of you.

A: Both of us. Yes, sir.

Q: Okay. What are you doing with those guns?

A: Uh, we had them pointed at him.

Q: 'Kay. And as you're doing this a- w- what kinda things is he saying? What kinda things are you saying?

A: I'm saying basically like, "Don't make us do this, (Max).

Q: Okay.

A: Let us help you." Um, he's saying things like, "Fuck you. You guys can't help me." He's saying things like, uh, "Have you ever killed somebody? Have you ever killed somebody? You're about to'." Um, like, things like that.

Q: Mm-hm.

A: So tho- that - that was our interaction. He was refusing the whole entire time to put down the scissors and I'm telling you at - at that point as soon as I saw him at the door I, um, I - I know I said this already. You know how it was the scariest thing in my life. I was so scared I was literally, like, my whole body was shaking. Like, my - my legs, my arms, my hands, because I - I don't know how - well I guess I know how after explaining everything to you guys I'm sure you'd understand it too but once we saw him at the front door it's the - it - it - it seemed like I just knew that the only way that this incident was gonna end was, how it did. Um...

Q: So w- the things you're saying to him what are you trying to - what are you trying to do? Like, what...

A: We're trying to calm him down.

Q: Okay.

A: We're trying to calm him down. We're trying to have him drop the scissors. We told him multiple times to drop the scissors. Uh, we - and me and (Abraham) both told him multiple times, "Let us help you. Don't make us do this." Um, it even got to the point where when (Crockett) showed up at the

Maria Sosa, et al. v. City of Fresno, et al.

Case No. 1:23-cv-01575-JLT-SAB

Sosa Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 93)

# EXHIBIT K

An exhibit to the Declaration of Cooper Mayne

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Kevin G. Little, SBN 149818
LAW OFFICE OF KEVIN G. LITTLE
Post Office Box 8656
Fresno, CA 93747
TELEPHONE NO.: (559) 342-5800 FAX NO. (Optional): (559) 242-2400
EMAIL: kevin@kevinglittle.com
ATTORNEY FOR (Name): ESTATE OF MAXIMILIANO SOSA, JR., Martha Zepeda Olivares, Administrator

FOR COURT USE ONLY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**
PROBATE DIVISION, 1130 O STREET, FRESNO, CA 93721

ESTATE OF ESTATE OF MAXIMILIANO SOSA, JR.

# PETITION FOR TERMINATION OF PROCEEDINGS AND DISCHARGE

CASE NUMBER
23CEPR01424

INFORMATION TO THE PERSONAL REPRESENTATIVE OF THE ESTATE:

Notice of this petition must be given to all interested persons using the Notice of Hearing – (Decedent's Estate or Trust, JC Form #DE-120), including those listed in Probate Code section 11000.

1. Petitioner: Marta Zepeda Olivares (name), is the Personal Representative of the estate of the decedent.
2. The decedent's date of death: November 4, 2023 (date).
3. Letters and Bond.
   a. ☒ Letters were first issued on: June 21, 2024 (date).
   b. ☐ No letters were issued.
   c. ☐ Bond was posted in the amount of $______________ or ☐ No Bond was required. Hearing
4. There is no property of any kind subject to administration (check all of the following that apply):
   a. ☐ All of the decedent's property is held in a revocable living trust, held in joint tenancy, held as community property with right of survivorship, or is subject to a beneficiary or payable on death (POD) designation.
   b. ☐ All of the decedent's property has passed to the decedent's surviving spouse or registered domestic partner. Attached is a copy of the Spousal or Domestic Partner Property Order (JC Form #DE-226).
   c. ☐ The value of all of the decedent's property is less than the amount prescribed under Probate Code section 13050. (Check all that apply):
      i. ☐ The property has been distributed pursuant to an affidavit or declaration under Probate Code section 13100. Attached is a copy of the affidavit or declaration.
      ii. ☐ Attached is a copy of the Order Determining Succession to Real Property (JC Form #DE-315) distributing the decedent's property.
   d. ☐ The value of all of the decedent's property does not exceed the amount prescribed under Probate code section 13100. (Check all that apply):
      i. ☐ The property has been distributed pursuant to an affidavit under Probate Code section 13100.
      ii. ☐ Attached is a copy of the Order Determining Succession to Real Property (JC Form #DE-315) distributing the decedent's property.
   e. ☐ The value of all of the decedent's property qualifies for Small Estate Set-Aside prescribed under Probate Code section 6600 et seq. Attached is a copy of the Order under Probate Code section 6600 et seq.
   f. ☐ The value of decedent's interest in all real property located in California does not exceed the amount prescribed under Probate Code section 13200. Attached is the Affidavit re: Real Property of Small Value (JC Form #DE-305).
   g. ☐ The decedent owned an interest in real property that was lost to foreclosure, and no surplus is due to the decedent. Attached is a copy of the Notice of Default, Notice of Trustee's Sale, and Trustee's Deed.
   h. ☒ Other (explain): The only potential asset of the decedent estate is a pending civil lawsuit, EDCA Case No. 1:23-cv-01575 JLT SAB, which can be addressed fully outside of the probate court. Decedent died intestate, and the civil courts are equally obligated to adhere to the Probate Code regarding any estate or survival claim proceeds in the best interests of the heirs and justice. Civil courts are also obligated to ensure that any minor's compromise is in the best interests of the two minors who are plaintiffs. The parties have agreed that Ms. Sosa is capable of representing the interests of the estate in the civil proceedings, subject to the parties' agreement that any compensation for the estate or survival claims will be distributed evenly between Ms. Sosa and her two minor children. The parties have also come to related agreements regarding the division of any potential legal fees and expenses related to the estate and survival claims. Given the parties' agreements, the continuation of the current probate litigation would be superfluous, inefficient, and unduly costly. Accordingly, the administrator requests that the Court issue an order terminating this estate, with no compensation paid to the administrator, and no further reporting required.
5. ☐ All costs of administration have been paid, including cost of publication and the probate referee's fees.

6. Creditor's Claims.
a. [x] No creditor's claim has been filed with the court.
b. [ ] The following creditor's claims were filed with the court:
i. Name of claimant: ______
Date claim filed: ______ Amount of claim: $______
Claim was [ ] allowed for $______ [ ] rejected for $______
ii. Name of claimant: ______
Date claim filed: ______ Amount of claim: $______
Claim was [ ] allowed for $______ [ ] rejected for $______
iii. Name of claimant: ______
Date claim filed: ______ Amount of claim: $______
Claim was [ ] allowed for $______ [ ] rejected for $______
[ ] Continued in Attachment 6.b.

7. Requests for Special Notice.
a. [x] No requests for special notice have been filed in this proceeding.
b. [ ] The following requests for special notice have been filed in this proceeding:

| Name | Date Filed | Relationship |
|---|---|---|
| | | |
| | | |
| | | |

[ ] Continued in Attachment 7.

8. The name(s) and address(es) of parties entitled to notice are as follows:

| Name | Address |
|---|---|
| See Attachment | |
| | |
| | |
| | |
| | |
| | |

[x] Continued in Attachment 8.

9. Petitioner requests that the court make an order terminating the administration of the estate, exonerating bond if any, and discharging the personal representative.

Date: July 1, 2026

Kevin G. Little
Type or print name

Kevin G Little
Signature of Attorney

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: July 1, 2026

Martha Zepeda Olivares
Type or print name

Martha Zepeda Olivares
Signature of Petitioner

Date: ______

______
Type or print name

______
Signature of Petitioner

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco

# PROOF OF SERVICE

My business address is 1225 E. Divisadero Street, Fresno, CA 93721. I am employed in Fresno County, California. I am over the age of 18 years and am not a party to this case.

On the date indicated below, I served the foregoing document(s) described as STIPULATION FOR TERMINATION OR PROCEEDINGS AND DISCHARGE to all interested parties in this action as indicated in the attached service list and in the manner as described below:

☒ (BY MAIL) I am readily familiar with the business' practice for collection and processing of correspondence for mailing, and that correspondence, with postage thereon fully prepaid, will be deposited with the United States Postal Service on the date noted below in the ordinary course of business at Fresno, California.

☐ (BY PERSONAL SERVICE) I caused delivery of such envelope(s) by hand, to the office(s) of the address(es) on the proceeding page.

☒ (BY ELECTRONIC MAIL) I caused such documents to be scanned into PDF format and sent via electronic mail to the electronic mail address(es) of the address(es) designated on the proceeding page.

☐ (BY FACSIMILE) I caused the above-referenced document to be delivered by facsimile to the facsimile number(s) of the address(es) on the proceeding page.

☐ (BY OVERNIGHT COURIER) I caused the above-referenced envelope(s) to be delivered to an overnight courier service for delivery to the address(es) on the proceeding page.

**EXECUTED ON July 1, 2026 at Fresno, California.**

☒ (STATE) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐ (FEDERAL) I declare that I am employed in this office of a member of the bar of this court at whose direction this service was made.

JASMINE TANOURY

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco

**PROOF OF SERVICE - SERVICE LIST**

Dale Galipo
Cooper Alison-Mayne
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: 818-347-3333
dalekgalipo@yahoo.com, cmayne@galipolaw.com, dgilbert@galipolaw.com
*Attorney for Petitioners Maria Sosa, L.S., M.S.*

**PROOF OF SERVICE - SERVICE LIST**

Dale Galipo
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: 818-347-3333
dalekgalipo@yahoo.com, cmayne@galipolaw.com, dgilbert@galipolaw.com
*Attorney for Maria Sosa, L.S., M.S.*

| Name and Relationship to Decedent | Age | Address |
|---|---|---|
| Maximiliano Sosa Sr., father | 62 | 2533 W. McKinley Ave, Spc. 65, Fresno, CA 93728 |
| Selise Estrella Sosa, sister | 38 | 1806 Catherine Ave, Sanger, CA 93657 |
| Lucero Sosa, half-sibling | 41 | 2062 N. Fresno St #301, Fresno, CA 93703 |
| Brenda Mendez, half-sibling | 40 | 290 S. Crawford Ave, Dinuba, CA 93618 |
| Erick Piña Zepeda, half-sibling | 26 | 2206 Floral Ave, Selma, CA 93662 |
| Eunice Sosa, half-sibling | 24 | 3302 E. Weldon Ave, Fresno, CA 93703 |
| Raquel Piña Zepeda, half-sibling | 22 | 366 River Oak's Ln, Canton, TX 75103 |
| Denise Sosa, half-sibling | 21 | 3302 E. Weldon Ave, Fresno, CA 93703 |
| Maria Sosa, separated spouse | 35 | LAW OFFICES OF DALE K. GALIPO<br>21800 Burbank Boulevard, Suite 310<br>Woodland Hills, CA 91367 |
| M.S., child | 6 | LAW OFFICES OF DALE K. GALIPO<br>21800 Burbank Boulevard, Suite 310<br>Woodland Hills, CA 91367 |
| L.S., child | 4 | LAW OFFICES OF DALE K. GALIPO<br>21800 Burbank Boulevard, Suite 310<br>Woodland Hills, CA 91367 |