**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA SOSA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF FRESNO, et al.,<br><br>Defendants. | Case No.: 1:23-cv-01575-JLT-SAB<br>Honorable Jennifer L. Thurston<br><br>**DECLARATION OF RICHARD S. BRYCE IN SUPPORT OF THE SOSA PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, Richard S. Bryce, declare as follows:

1. I am a police practices consultant retained by counsel for Plaintiffs Maria Sosa, L.S., and M.S. in this action. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify to them.

2. I served for more than thirty-three years in the Ventura County Sheriff's Department, rising from patrol deputy to Undersheriff, the position from which I retired in 1999. As Undersheriff I was responsible for the administration of a department of 1,355 employees that provided police services to five contract cities. I hold a Master of Public Administration from the University of La Verne and the POST Basic, Intermediate, Advanced, Supervisory, and Management Certificates. Since my retirement I have worked as a criminal justice consultant for law enforcement agencies and as an expert witness on police practices. My qualifications and prior testimony are set out in my report.

3. In forming my opinions I reviewed the materials listed in my report, including the body-worn camera recordings of Officers Ayers, Crockett, Abraham, and Aguilar; the depositions of those four officers; Officer Ayers's recorded interview with investigators; the 911 recordings and the Fresno Police Department CAD report; the Department's incident, supplemental, and property reports; the coroner's and toxicology reports; the scene and evidence photographs; and POST Learning Domains 20, 21, 22, 23, and 37.

4. Based on my training and experience, California peace officers are trained through the POST Basic Course that the force an officer may use is governed by the subject's conduct and the totality of the circumstances, and that officers must continuously reassess and use only the force reasonably necessary as conditions change. (See POST Learning Domain 20.) Officers are trained that a subject's conduct falls along a continuum, from cooperative, to passively non-compliant, to actively resistant, to assaultive, to life-threatening, and that only assaultive or life-threatening conduct will support significant or deadly force; officers are trained to

select the option appropriate to the conduct actually presented and to transition to a lower level of force as the subject's conduct changes. (See POST Learning Domain 20.) Officers are trained that deadly force is the most consequential decision an officer can make; that it may be used only when other reasonable means have been exhausted or are unavailable, and only on an objectively reasonable belief in an immediate threat of death or serious bodily injury; that subjective fear alone can never justify it; that an overreaction in the use of force is excessive force; and that, when feasible, a verbal warning must be given before deadly force is used. (See POST Learning Domain 20.) Officers are trained to distinguish reasonable fear, a controlled and legitimate fear based on actual perceived circumstances, from unreasonable fear, which is fear generated in the officer's mind with no direct correlation to the facts and situation, and that deadly force may never rest on unreasonable fear. (*See id.*) These standards are codified in Penal Code section 835a, which permits deadly force only when "necessary" to defend against an "imminent" threat, one that "must be instantly confronted and addressed," and which declares the policy of this state that officers use available de-escalation techniques and other resources when reasonably safe and feasible and exercise special care with persons in mental health crisis. Each of the four officers acknowledged being trained that deadly force may be used only in response to an immediate threat of death or serious bodily injury. (Ayers Dep. 19:15-20:16; Crockett Dep. 14:22-15:1; Abraham Dep. 18:13-19:15; Aguilar Dep. 35:11-36:17.)

5. Officers are also trained how to respond to persons who are suicidal or in mental health crisis. Officers are trained to recognize a person in crisis, to slow the encounter down, to create time and distance, and to summon specialized resources, including crisis negotiation and crisis intervention personnel, rather than to escalate. Officers are trained to recognize "suicide by cop," in which a suicidal person deliberately behaves in a threatening manner to provoke a lethal response, and to respond with de-escalation rather than force. (See POST Learning Domains

20 and 37.) Recognized crisis-intervention principles teach that time, distance, and communication are an officer's most effective tools, and that introducing pain to a person in emotional crisis, for example through a partially effective electronic control weapon, can escalate rather than resolve the encounter. (See POST Learning Domain 37.) Officers are further trained to formulate a plan before engaging a subject; to establish perimeters and contain the subject; to identify and use cover; to keep distance and a position of advantage; to request backup and wait for it; and not to rush, because time is ordinarily on the officers' side. Rushing into a situation without a plan is a recognized hallmark of poor planning. When more than one officer is present, the contact and cover officers are trained to communicate with one another and to avoid giving conflicting directions, and officers responding to a person who is suicidal or emotionally disturbed are trained to move slowly and methodically, to use available cover and a position of advantage, and to guard against impatience; moving to a position of cover itself allows officers to slow the encounter and to de-escalate through verbal strategies. (See POST Learning Domains 21, 22, and 23.)

6. Based on my review of the record and my training and experience, I hold the following opinions, each to a reasonable degree of professional certainty.

7. First, the officers had ample time and opportunity to use de-escalation techniques and did not. Over roughly ninety minutes, no crisis negotiator, Crisis Negotiation Team member, Crisis Intervention Team member, or mental health professional was brought to the scene, and no supervisor responded or directed resources before the shooting. Officer Ayers testified that he was not a crisis negotiator, that the situation was "outside the scope of [his] training," that he "did not feel like [he] was trained enough" for it, and that a CNT "would have definitely been beneficial." Mr. Sosa was inside the apartment for more than four minutes, which gave the officers time to deploy less-lethal force to detain him; Officer

Ayers testified that using non-lethal force inside the apartment "didn't cross [his] mind." All four officers carried Tasers.

8. Second, Mr. Sosa did not pose an imminent threat of death or serious bodily injury to the officers when they shot him. Mr. Sosa was armed only with a pair of household kitchen scissors, not a knife and not a firearm. The body-worn camera recordings show that he held the scissors behind his back or down at his side as he exited the apartment, and that he did not raise them toward the officers or make any stabbing, cutting, or jabbing motion with them before or while he was shot. Officer Ayers agreed that at no point inside the apartment did Mr. Sosa attempt to injure him or any other officer with the scissors, and the officers confirmed that Mr. Sosa never stabbed, cut, or injured anyone with them. Officers Ayers, Abraham, and Aguilar each acknowledged being trained that an officer may not use deadly force against a person merely because the person is holding a knife, and Officer Ayers confirmed that the same is true of scissors. The officers also had no information that Mr. Sosa had ever injured anyone. Officer Ayers ran a records check that came back clean, and he conceded that before the shooting he had no information that Mr. Sosa "had actually hurt anybody," that night or at any time. Officer Ayers's own explanation for why deadly force was justified rested on the events earlier in the night and Mr. Sosa's statements on the phone, together with his arrival at the apartment holding the scissors, which Officer Ayers said showed an intent to follow through with the threats. Officer Ayers did not point to any attack or attempted attack with the scissors. Events an hour old, statements made by a man the officers knew to be suicidal and asking to be killed, and the mere possession of scissors do not supply the imminent threat that POST and Penal Code section 835a require at the moment deadly force is used. In my opinion a reasonable, properly trained officer would not have perceived an imminent threat of death or serious bodily injury at the time the shots were fired.

9. Third, the officers knew they were dealing with a man in mental health crisis who was asking them to kill him. Officers Ayers, Crockett, Aguilar, and Abraham each knew before the confrontation in the apartment that Mr. Sosa intended to commit suicide by cop. Officer Ayers told investigators that Mr. Sosa's movements inside the apartment were "not anything that would have warranted ... using deadly force." Generally accepted police practices and POST training required the officers to treat Mr. Sosa as a person to be taken into protective custody for care, not as a criminal suspect, and to respond with time, distance, communication, and specialized resources.

10. Fourth, the officers created the close-quarters confrontation in which Mr. Sosa was killed, contrary to their training on officer-created jeopardy, the "fatal funnel," and containment. Officer Abraham opened the apartment door after hearing a car door, without knocking, announcing, or looking through the window, and testified that he would have considered opening the door even had he known Mr. Sosa was outside. Officer Ayers never considered looking through the peephole, checking the window, or keeping the door closed, and agreed that with the door closed Mr. Sosa could not have posed an immediate threat to anyone inside. The officers discussed no tactical plan. Officer Abraham believed the better course was to keep Mr. Sosa contained inside the apartment but never communicated that plan and it was never carried out. Instead, the officers directed Ms. Sosa to leave without ever instructing Mr. Sosa to remain, and Officer Ayers, who had misread a hand signal, walked out of the apartment ahead of Mr. Sosa into a narrow breezeway. Officer Aguilar testified that Mr. Sosa had no avenue of escape in the apartment or in the "very small, tight" breezeway, where three officers were crowded together with him. Officers Ayers, Abraham, and Aguilar each acknowledged training to avoid officer-created jeopardy, and Officer Ayers acknowledged training on the "fatal funnel." The officers established no perimeter or containment plan for Mr. Sosa's anticipated return, discussed no plan before

engaging him, failed to use cover or to maintain distance and a position of advantage, and neither summoned nor waited for the resources that officer safety and de-escalation required. These were failures of basic, well-established tactical principles.

11. The officers also placed themselves in a crossfire, which is among the most basic tactical errors POST training addresses. Officers are trained from the academy forward to avoid crossfire and to consider their backdrop before firing, so that a round that misses or passes through the subject does not strike another officer or a bystander; Officers Abraham and Crockett each acknowledged that training. When the shots were fired, Officer Abraham was at the threshold of the apartment door and Officers Ayers, Crockett, and Aguilar were in the breezeway on the other side of Mr. Sosa, so that Mr. Sosa stood between the officers who fired. Officers Ayers and Crockett fired from the breezeway; Officer Aguilar fired only his Taser. Officer Abraham fired from the doorway in the direction of his three fellow officers, and acknowledged that officers try their best to avoid shooting toward other officers "due to a crossfire." Officer Crockett testified that he kept his firearm, rather than his Taser, in hand in part because of the "lethal crossfire situation" the officers' positions created. Officers firing from opposite sides of a confined breezeway at a man standing between them is a crossfire by definition. It is very poor tactics; it endangered the officers themselves as well as Ms. Sosa and the neighbors in the complex; and it was the direct product of the officers' failure to form a plan, to contain Mr. Sosa inside the apartment, and to establish positions of cover and advantage before engaging him.

12. Moving away from the source of the pain is a common reaction to a Taser, and officers are trained to expect it. Officer Aguilar also acknowledged that, in deciding to deploy his Taser, he understood that one likely result was that Mr. Sosa would react to the pain by moving away from its source. Because the officers had left Mr. Sosa no avenue of escape, any movement away from the pain of the

Taser would necessarily carry him toward an officer, either back into the apartment toward Officer Abraham or out into the breezeway where the other officers stood. Deploying a Taser against a person who has been boxed in, so that the predictable pain response drives him into the officers themselves, is a foreseeably dangerous tactic. It is the kind of officer-created jeopardy that produced the close-quarters confrontation the officers then resolved with deadly force. The timing of the shots compounds the error. Officers are trained that an electronic control weapon delivers its charge over a standard cycle of approximately five seconds, that a subject struck by the probes will commonly react with involuntary movement, and that the deploying officer and the cover officers should allow the cycle to run and assess its effect before escalating. Here the officers fired approximately two seconds after the Taser struck Mr. Sosa, while the cycle was still running, and the only movement Defendants describe in that interval is that Mr. Sosa "stumbled briefly and swatted the air." That is a reaction to a Taser, not an attack, and a reasonable, properly trained officer would have recognized it as such and allowed the less-lethal option already in use to take effect before resorting to deadly force. It is also my opinion that, had the officers followed their training, by keeping the door closed and Mr. Sosa contained, summoning the Crisis Negotiation Team or a supervisor during the hour they had, forming a plan, and using time and distance, the confrontation in the breezeway would not have occurred.

13. Fifth, no officer gave a warning that deadly force was about to be used, although a warning was feasible. Each officer acknowledged being trained to give a verbal warning before using deadly force when feasible. The only words directed at Mr. Sosa in the final moments were "stop" and "chill"; no officer warned him that he would be shot. Because there was time to say "stop" and "chill," there was time to give a clear warning that deadly force would be used. The failure to do so was contrary to the officers' training and to generally accepted police practices.

14. Sixth, deadly force was not a last resort, because reasonable alternatives were available to the officers at every stage and none was used. Officers are trained that deadly force may be used only when other reasonable means have been exhausted or are unavailable. (See POST Learning Domain 20.) The reasonable alternatives available here included: (a) summoning the Crisis Negotiation Team, a crisis intervention officer, or a mental health professional during the roughly ninety minutes before the shooting; (b) reaching a supervisor by radio or telephone, or asking dispatch to do so, so that a supervisor could direct resources to the scene; (c) formulating and communicating a tactical plan for Mr. Sosa's anticipated return, including who would speak to him, who would provide less-lethal coverage, and where each officer would stand; (d) looking through the peephole or window before opening the door, and keeping the door closed so that Mr. Sosa remained contained outside; (e) once Mr. Sosa was inside the apartment, instructing him to stay where he was, keeping Ms. Sosa and the officers behind cover, and using the time to talk with him rather than directing Ms. Sosa to walk past him and following her out; (f) establishing positions of cover and distance in the breezeway rather than crowding three officers into a confined space on one side of the doorway and one officer on the other; (g) giving a clear warning that deadly force would be used, and a command to drop the scissors, before any shot was fired; and (h) allowing the Taser already deployed to complete its cycle and assessing its effect before firing. Each of these alternatives was reasonably safe and feasible for an objectively reasonable officer in the officers' position, and each is the kind of "other available resource[] and technique[]" that Penal Code section 835a and POST training direct officers to use before resorting to deadly force. The officers used none of them.

15. For these reasons, it is my opinion that the officers' use of deadly force against Mr. Sosa was contrary to POST standards and generally accepted police practices, that the officers' pre-shooting tactical decisions departed from their

training and unnecessarily produced the confrontation in which deadly force was used, and that a reasonable, properly trained officer in the officers' position would not have used deadly force at the time the shots were fired. In summary: (a) Mr. Sosa did not pose an imminent threat of death or serious bodily injury when he was shot; he held a pair of household scissors at his side or behind his back and made no stabbing, cutting, or jabbing motion toward anyone (¶ 8). (b) The officers had no information that Mr. Sosa had ever injured anyone, and the events earlier in the night, an hour old when he was shot, did not supply an imminent threat (¶ 8). (c) The officers could not use deadly force against Mr. Sosa merely because he held scissors, as they acknowledged being trained (¶ 8). (d) The officers knew they were dealing with a suicidal man asking to be killed, and their training required a response of time, distance, communication, and specialized resources (¶¶ 5, 7, 9). (e) The officers' tactical decisions, including opening the door without looking, declining to contain Mr. Sosa, directing Ms. Sosa past him and walking out ahead of him, crowding the breezeway, positioning themselves in a crossfire, and deploying a Taser against a man with no avenue of escape, created the close-quarters confrontation in which deadly force was used (¶¶ 10-12). (f) Reasonable alternatives to deadly force were available at every stage and none was used (¶ 14). (g) No warning that deadly force would be used was given, although one was feasible (¶ 13). (h) The officers' subjective fear, resting on events an hour old, on the statements of a man they knew to be suicidal, and on his possession of scissors, cannot justify deadly force under POST training or Penal Code section 835a (¶¶ 4, 8).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2026, at Utah County, Utah.

Richard S. Bryce
Richard S. Bryce (Oct 30, 2026 15:41:00 MDT)

Richard S. Bryce

# 5 - Bryce Declaration FINAL

Final Audit Report 2026-10-30

| | |
|---|---|
| Created: | 2026-10-30 |
| By: | Darci Gilbert (dgilbert@galipolaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAnBYrCpF2doxsKGgcSrZkFb8tyDGWSoFq |

## "5 - Bryce Declaration FINAL" History

Document created by Darci Gilbert (dgilbert@galipolaw.com)
2026-10-30 - 9:35:37 PM GMT

Document emailed to richard.scott.bryce@gmail.com for signature
2026-10-30 - 9:35:59 PM GMT

Email viewed by richard.scott.bryce@gmail.com
2026-10-30 - 9:39:44 PM GMT

Signer richard.scott.bryce@gmail.com entered name at signing as Richard S. Bryce
2026-10-30 - 9:40:58 PM GMT

Document e-signed by Richard S. Bryce (richard.scott.bryce@gmail.com)
Signature Date: 2026-10-30 - 9:41:00 PM GMT - Time Source: server - Signature Appearance Selected: TYPE

Agreement completed.
2026-10-30 - 9:41:00 PM GMT