Kevin G. Little, SBN 149818
LAW OFFICE OF KEVIN G. LITTLE
P.O. Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
Email: service@kevinglittle.com

Attorney for Plaintiffs MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR., and MAXIMILIANO SOSA, SR.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

| | |
|---|---|
| MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,<br><br>Plaintiffs,<br>v.<br>CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,<br>Defendants.<br><br>MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,<br>Plaintiffs,<br>v.<br>CITY OF FRESNO and DOES 1-5,<br>Defendants. | Case No. 1:23-cv-01575-JLT-SAB<br><br>District Judge: Hon. Jennifer L. Thurston<br>Magistrate Judge: Hon. Stanley A. Boone<br><br>**PLAINTIFFS MARTHA ZEPEDA OLIVARES AND MAXIMILIANO SOSA, SR.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 93]**<br><br>[Filed concurrently with Response to Separate Statement of Undisputed Facts; Statement of Additional Disputed Facts; Declarations of Kevin G. Little, Martha Zepeda Olivares and Maximiliano Sosa, Sr.; Request for Judicial Notice; Evidentiary Objections]<br><br>Date: November 20, 2026<br>Time: 9:00 a.m.<br>Crtrm.: 4 |

Plaintiffs Martha Zepeda Olivares, individually and as administrator of the Estate of Maximiliano Sosa, Jr., and Maximiliano Sosa, Sr. ("Olivares Plaintiffs") submit this Memorandum of Points and Authorities in opposition to the Motion for Summary Judgment filed by Defendants City of Fresno, Police Chief Paco Balderrama and the individual officer defendants (together, "Defendants") [Dkt. 93].



KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

## TABLE OF CONTENTS

Page

I. INTRODUCTION AND SCOPE OF THIS OPPOSITION .......... 1

II. STATEMENT OF GENUINELY DISPUTED FACTS .......... 2

- A. The Officers Had Been Told What Max Intended and Waited Roughly Forty Minutes for Him .......... 2
- B. The Door, and the Absence of Any Negotiator .......... 3
- C. Max Sr. and His Son's Work in the Family Business .......... 4
- D. Martha and Her Plans to Move to Fresno .......... 5
- E. The Estate and the Probate Proceedings .......... 6

III. LEGAL STANDARD .......... 6

IV. ARGUMENT .......... 6

- A. The Estate and Martha Have Standing (Mot. Part IV) .......... 6
  - 1. Martha is the Estate's representative and may oppose on its behalf until the probate court acts. .......... 6
  - 2. If the probate court terminates the administration, the Estate's claims continue with the Sosa Plaintiffs. .......... 7
  - 3. Martha and Max Sr. have standing to sue in their own right. .......... 8
- B. Max Sr. and Martha Have Standing to Pursue Wrongful Death Damages Because the Evidence Raises a Triable Issue of Dependence (Mot. Part IV.B) .......... 8
  - 1. Section 377.60(b)(1) asks only whether the parent depended on the decedent "to some extent." .......... 8
  - 2. Max Sr. depended on his son's work to produce the income that supports him. .......... 10
  - 3. Martha was already relying on Max for shelter and support when he died. .......... 11
- C. The Olivares Plaintiffs Join in the Sosa Plaintiffs' Opposition on the Fourth Amendment, Qualified Immunity, State-Law and Damages Issues .......... 13
- D. The Olivares Plaintiffs' Fourteenth Amendment Claim Survives Summary Judgment (Mot. Part V.C) .......... 14
  - 1. The parents' interest is protected, and Defendants do not contend otherwise. .......... 14

2. Whether the conduct shocks the conscience turns on whether deliberation was practical, and the record shows it was. .......................... 14

3. Alternatively, a jury could infer a purpose to harm. ................................ 18

4. The officers are not entitled to qualified immunity................................. 22

E. Damages (Mot. Part VIII) ....................................................................... 23

V. CONCLUSION ........................................................................................... 23


KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

# TABLE OF AUTHORITIES

Page

**Cases**

*A.B. v. City of Santa Ana*, 2019 WL 1578380 (C.D. Cal. Feb. 11, 2019) .......... 23

*A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) .......... 20, 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 6

*Chavez v. Carpenter*, 91 Cal. App. 4th 1433 (2001) .......... 8–13

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .......... 14, 17

*E.V. v. City of Covina*, No. 25-7151, 2026 WL 2334322 (9th Cir. Aug. 12, 2026) (mem.) .......... 18, 22

*Hawatmeh v. City of Henderson*, 159 F.4th 591 (9th Cir. 2025) .......... 18

*Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013) .......... 13

*Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013) .......... 18

*Hazelwood v. Hazelwood*, 57 Cal. App. 3d 693 (1976) .......... 8, 9, 12

*Inzunza v. Naranjo*, 94 Cal. App. 5th 736 (2023) .......... 8, 11

*Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159 (9th Cir. 2013) .......... 14

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) .......... 12

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .......... 14

*Lemire v. Cal. Dep’t of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013) .......... 14

*Norgart v. Upjohn Co.*, 21 Cal. 4th 383 (1999) .......... 13

*Perry v. Medina*, 192 Cal. App. 3d 603 (1987) .......... 8, 9, 12

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) .......... 14, 18, 21, 22

*Smith v. Cimmet*, 199 Cal. App. 4th 1381 (2011) .......... 7

*Tolan v. Cotton*, 572 U.S. 650 (2014) .......... 6

*Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023) .......... 18

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) .......... 14

*Wolcott v. County of Orange*, 2023 WL 3984215 (C.D. Cal. June 7, 2023) .......... 23

*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) .......... 12

**Statutes**

42 U.S.C. § 1983 .......... 23
Cal. Civ. Proc. Code § 369 .......... 7
Cal. Civ. Proc. Code § 377.30 .......... 7
Cal. Civ. Proc. Code § 377.60 .......... 1, 8, 12, 13
Cal. Civ. Proc. Code § 377.61 .......... 11
Cal. Prob. Code § 9820 .......... 7

**Rules**

Fed. R. Civ. P. 17 .......... 7
Fed. R. Civ. P. 25 .......... 7
Fed. R. Civ. P. 37 .......... 12
Fed. R. Civ. P. 56 .......... 6

**Constitutional Provisions**

U.S. Const. amend. XIV .......... passim

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION AND SCOPE OF THIS OPPOSITION

Plaintiffs Martha Zepeda Olivares, individually and as administrator of the Estate of Maximiliano Sosa, Jr., and Maximiliano Sosa, Sr. (the "Olivares Plaintiffs") oppose Defendants' omnibus motion for summary judgment. The Sosa Plaintiffs, who are separately represented, oppose the motion on the Estate's claims and on the issues common to all plaintiffs. So that the Olivares Plaintiffs do not repeat or contradict that showing, they join in and incorporate the Sosa Plaintiffs' opposition (Dkt. 99), its Response to Defendants' Separate Statement (Dkt. 99-1), its Statement of Additional Material Facts (Dkt. 99-2), and the Declarations of Cooper Mayne (Dkt. 99-3) and Richard S. Bryce (Dkt. 99-4) except as stated below. Martha joins in her representative capacity as to the Estate's claims and in her individual capacity as to her own. Max Sr. joins individually.

The Olivares Plaintiffs write separately on four matters that affect them individually. First, the Estate's standing while the probate proceedings are pending, and Martha's standing to sue in her own right (Part IV.A). Second, the standing of Martha and Max Sr. to pursue wrongful death damages under California Code of Civil Procedure section 377.60(b)(1), on which only they can speak (Part IV.B). Third, their Fourteenth Amendment claim, on which Defendants' own statement of facts and the officers' testimony show that a jury could find the officers' conduct shocked the conscience, and on which the officers are not entitled to qualified immunity (Part IV.D). Fourth, damages (Part IV.E). On the remaining parts of the motion they join the Sosa Plaintiffs (Part IV.C).

The Olivares Plaintiffs' individual claims are the Second Cause of Action (Fourteenth Amendment, interference with familial relationship) and the Seventh Cause of Action (wrongful death), together with the *Monell* claims to the extent they rest on the Fourteenth Amendment violation. Dkt. 85. The remaining causes of action belong to the Estate, and Martha asserts those in her representative capacity.

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

## II. STATEMENT OF GENUINELY DISPUTED FACTS

This statement is limited to the facts that bear on the issues the Olivares Plaintiffs brief separately. The Sosa Plaintiffs' statement of facts (Dkt. 99 at 7–10) and their Statement of Additional Material Facts (Dkt. 99-2), which the Olivares Plaintiffs incorporate, addresses the rest. Citations to "SUF" are to Defendants' Separate Statement of Undisputed Facts (Dkt. 93-1). Deposition testimony is cited by transcript page and line. Each transcript is before the Court as Defendants' Exhibits 23 through 29 (Dkt. 93-26 through 93-32); additional pages are in Exhibits A, B, D, F, G, H, I and J to the Mayne Declaration (Dkt. 99-3) and in Exhibits A through D, G and H to the Declaration of Kevin G. Little, filed concurrently. The Olivares Plaintiffs' Statement of Additional Disputed Facts, filed concurrently, sets out the record on the Fourteenth Amendment claim at Nos. 9–32 and the dependence and companionship evidence at Nos. 1–8.

### A. The Officers Had Been Told What Max Intended and Waited Roughly Forty Minutes for Him

Defendants' own statement fixes the timeline. At 3:46 a.m., dispatch broadcast that Max Sosa intended to commit suicide by cop. SUF 42. Officer Ayers was back at Maria Sosa's apartment by 3:55 a.m. SUF 43. Officer Abraham arrived at 4:12 a.m. SUF 65. Max did not reach the apartment door until 4:35 a.m. SUF 86. Ayers therefore had about forty minutes, and Abraham more than twenty, in which they knew what Max had said he intended and were waiting at the apartment. Abraham agreed that he spent approximately fifteen minutes speaking with Maria in the apartment before Max returned. Abraham Dep. 69:4-7; *see id.* 76:13-21. Sosa SAMF No. 10 (Dkt. 99-2).

Both officers considered it likely that Max would come back. Abraham called it highly probable (Abraham Dep. 35:16-20), understood that Max might provoke a fatal police response (*id.* 50:7-14), and had no plan for what to do if he returned (*id.* 30:22–31:4). The plan he did have, to leave through the bedroom window, was never communicated to the other officers. *Id.* 78:5-21, 80:2-5. Ayers likewise testified to "a decent probability" that Max would return (Ayers Dep. 36:21-25), and agreed that he believed Max was "very likely" to return and intent on

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

suicide by cop (*id.* 47:13-20), and testified that there was no "explicit plan" and that who would make contact and who would cover was "not spoken" (*id.* 44:11-13, 44:24–45:4). He and the other officers had no explicit communication about a tactical objective, because, he said, "[w]e did not have the time to." *Id.* 77:10-17. No one tried to move Maria out of the apartment before Max returned. Abraham Dep. 75:22–77:18. Sosa SAMF Nos. 9–11 (Dkt. 99-2).

**B. The Door, and the Absence of Any Negotiator**

Dispatch had said Max was possibly suicidal (Ayers Dep. 30:5-13), the "1 Mary" code was used (*id.* 29:18-23), and a crisis-intervention officer was requested over the radio (*id.* 18:8-19). Ayers tried to reach his sergeant so that a crisis negotiator might be sent, but he never reached him before the shooting. *Id.* 42:14-24, 43:3-11. He acknowledged it "would have definitely been beneficial to have a CNT." *Id.* 81:5-9. No officer called a negotiator, or anyone with negotiation training, to the scene (Abraham Dep. 82:8-13, 83:1-5; Crockett Dep. 56:2-7), and no one tried to have a negotiator reach Max by telephone. Abraham Dep. 83:7-13. Days after the shooting Abraham told a detective that if there had been "someone who's better at negotiating, they probably could talk him down." *Id.* 72:14-21. Sosa SAMF Nos. 13–19 (Dkt. 99-2).

With the apartment door closed, Max could not have posed an immediate threat of death or serious bodily injury to Ayers, Abraham or Maria. Ayers Dep. 48:21-24. Ayers never considered keeping it closed (*id.* 48:2-3). Abraham opened the door without looking through the window or peephole, without announcing himself, and with his firearm and Taser holstered (Abraham Dep. 36:21–37:18), and he testified that he would still have considered opening it even had he known Max was right outside. *Id.* 50:7-18. Crockett's only words to Max were "just chill." Crockett Dep. 55:4-6. The de-escalation Crockett identified was a radio broadcast asking for more officers. *Id.* 55:12–56:1. Ayers testified that he had not received the advanced crisis-negotiation training, which "could have been beneficial," and that he did not feel trained enough for this incident. Ayers Dep. 78:5-15. Sosa SAMF Nos. 17–18, 23–25, 40 (Dkt. 99-2).

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

The officers had other tools and did not use them. All four carried Tasers. Crockett had a bean bag shotgun in his vehicle and did not consider bringing it (Crockett Dep. 18:11-23, 20:13-15), and Abraham believed at least one responding officer had a less-lethal shotgun in his vehicle, with his own patrol car parked about a hundred feet away (Abraham Dep. 73:12–74:16). Ayers said that using less-lethal force inside the apartment "didn't cross [his] mind" (Ayers Dep. 65:10-15), and Abraham never considered using his Taser (Abraham Dep. 52:21-24). Neither Ayers nor Abraham discussed who would use less-lethal force (Abraham Dep. 31:1-4; Ayers Dep. 45:5-8), and Abraham later acknowledged that "a less-lethal option would be more feasible" depending on the circumstances. Abraham Dep. 72:3-7. Sosa SAMF No. 12 (Dkt. 99-2).

Defendants say each officer believed that Max posed an immediate threat of death or serious bodily injury at all times. SUF 172–175. The record is not so uniform. Ayers gave a prior statement that Max's movements inside the apartment were "not anything that would have warranted . . . deadly force," and testified that the statement was accurate. Ayers Dep. 40:6-10, 41:3-13 (page 41 omitted from Defendants' Exhibit 26). Abraham testified that before he opened the door Max was "not a serious threat." Abraham Dep. 37:12-18. Aguilar testified that when he arrived he had no information that Max was armed or had hurt anyone (Aguilar Dep. 25:11-15), that his cited testimony explains why he planned to use the Taser rather than a belief that Max posed an imminent deadly threat (*id.* 49:21–50:11), and that the scissors were pointed down when Max exited (*id.* 50:18-22). Sosa SAMF Nos. 30, 33 (Dkt. 99-2); see Dkt. 99-1, SUF Nos. 172–175.

### C. Max Sr. and His Son's Work in the Family Business

Max Sr. has run his own diesel-mechanic business since 2006. Sosa Sr. Dep. 16:11-18. Max worked in it from 2010 to 2014 (*id.* 27:12-14) and, in the years before his death, helped his father with the harder jobs after his own day job, one or two times a week. *Id.* 41:25–42:3. Max Sr. saw him two to four times a week. *Id.* 29:17-20. The work was computer-diagnostic work on engines and motors, and Max "was the only one who knew what I knew." *Id.* 41:5-14. When

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

Max died, Max Sr. "had to let go of accounts that he used to help me with," because no one else could do the work. He has looked for a replacement and still has not found one. *Id.* 40:21–41:4, 41:15-24. He described the loss as a "double impact": the work Max used to do and the work Max Sr. could no longer do. *Id.* 42:7-16. ADF Nos. 1–2.

Defendants agree that Max helped with the business, that Max Sr. planned to have Max take it over, and that Max Sr. was relying on the business to support him after he retired. SUF 164–165; Sosa Sr. Dep. 45:24–46:9. Max Sr. agreed that although his son was not supporting him financially, "he was helping [him] in business that [he] use[s] to support [himself]," and, when asked who would take over the business, answered: "He was my beneficiary." *Id.* 45:24–46:6. Plaintiffs' interrogatory responses are consistent. Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), Nos. 13, 22. Sosa Sr. Decl. ¶¶ 3, 6–9. ADF Nos. 3–4.

### D. Martha and Her Plans to Move to Fresno

Martha lived in Eureka, California (the deposition transcript spells it "Yreka"). Olivares Decl. ¶ 2; Olivares Dep. 19:17–20:10 (Little Decl. Ex. D; Dkt. 93-27). Max saw how much she helped when she stayed with him in September and October 2023 and asked her to come live with him in Fresno and help with his two sons, and that he would support her in return. They had "definite plans" to move her in December 2023, and the plan "was to remain permanently." Olivares Dep. 34:12–35:4. She slept at Max's house for two to three weeks and did the work of a live-in caregiver while he worked. *Id.* 37:12-24; Olivares Decl. ¶ 6. While she was in Fresno Max gave her $200 in cash once or twice a month, and he gave her about $750 in cash to move out of her month-to-month apartment and move to Fresno. She gave notice on her tenancy, and the move came to nothing because Max died. Olivares Decl. ¶¶ 7–8. At home she lives modestly on her disability benefit and her partner's partial support, but in Fresno she had no means of support of her own and Max supported her. Olivares Decl. ¶ 9. Plaintiffs' interrogatory response states that she "had been promised to move in with and be supported by the decedent and had already acted in reliance on that promise." Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), No. 13. ADF No. 5.

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

### E. The Estate and the Probate Proceedings

Martha is the court-appointed administrator of the Estate in Fresno Superior Court Case No. 23CEPR01424. Her petition to terminate the proceedings and be discharged, filed July 1, 2026, is pending, and the hearing has been continued to November 4, 2026. Mayne Decl. Ex. K (Dkt. 99-3); Little Decl. Ex. F; Request for Judicial Notice ("RJN"). This Court has ruled that Martha is the Estate's legal representative, and Defendants acknowledge that the ruling is the law of the case. Dkt. 84 at 5; Mot. at 7–8. Defendants also acknowledge that no stipulation or court order has been entered that affects Martha's status. Mot. at 10 n.3. ADF No. 6.

## III. LEGAL STANDARD

Summary judgment is appropriate only where the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that a fact is, or is genuinely disputed, must support the assertion by citing particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In deciding the motion, the Court must view the evidence in the light most favorable to the non-moving party and draw reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). Credibility determinations and the weighing of evidence are for the jury.

## IV. ARGUMENT

### A. The Estate and Martha Have Standing (Mot. Part IV)

#### 1. Martha is the Estate's representative and may oppose on its behalf until the probate court acts.

Defendants acknowledge that this Court has ruled Martha is the Estate's legal representative and that the ruling is the law of the case. Mot. at 7–8 (citing Dkt. 84 at 5). Nothing has changed her status. A petition for termination of proceedings and discharge is pending and has been continued by the examiner to November 4, 2026. Mayne Decl. Ex. K; Little Decl. Ex. F; RJN. Defendants themselves note that the parties agreed Maria Sosa would bring Max's

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

survival claims and that a petition on the subject is pending, and that "no stipulation or court order has been entered that affects Martha's status." Mot. at 10 n.3. Until the probate court rules, Martha remains the Estate's administrator, and counsel for the Olivares Plaintiffs therefore technically continues to represent the Estate. *See Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1390 (2011); Cal. Prob. Code § 9820; Cal. Civ. Proc. Code §§ 369(a), 377.30; Fed. R. Civ. P. 17(a)(1). Because the Sosa Plaintiffs are the ones prosecuting the Estate's survival claims, and because the parties anticipate that the probate court will soon formally pass that role to them, the Estate does not brief those claims separately. It incorporates the Sosa Plaintiffs' opposition on them. Dkt. 99 at 11; Mayne Decl. ¶¶ 13–14, Ex. K (Dkt. 99-3).

**2. If the probate court terminates the administration, the Estate's claims continue with the Sosa Plaintiffs.**

Defendants argue in the alternative that if "the Sosa Plaintiffs are the designated representatives," Martha can no longer pursue survival claims and her claims must be dismissed. Mot. at 10. That argument supports continuation, not dismissal. If the administration is terminated, the Sosa Plaintiffs are positioned to continue the same survival claims, and the Olivares Plaintiffs do not dispute their standing to do so. Martha's petition, signed under penalty of perjury, states that "[t]he parties have agreed that Ms. Sosa is capable of representing the interests of the estate in the civil proceedings." Mayne Decl. Ex. K at 1 (item 4.h). Nothing in the statute Defendants cite requires dismissal in the interval; it assigns the claims to the representative or the successors, and either is before the Court. Rule 17(a)(3) also provides that a court may not dismiss an action for failure to prosecute in the name of the real party in interest until a reasonable time has been allowed for ratification, joinder or substitution. Fed. R. Civ. P. 17(a)(3). To the extent the Court considers it necessary, the Olivares Plaintiffs request that time, and leave under Rule 25 to substitute the successor on the Estate's claims once the probate court rules. Fed. R. Civ. P. 25.

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

**3. Martha and Max Sr. have standing to sue in their own right.**

Defendants' standing argument about the survival claims (Mot. Part IV.A) does not reach the claims the Olivares Plaintiffs assert as individuals. Their Fourteenth Amendment claim protects their own liberty interest in the companionship of their son, and their wrongful death claim is the statutory claim of persons who were dependent on him. Neither is a survival claim, and Defendants do not argue otherwise. Defendants' only challenge to the parents' standing is the dependency argument in Part IV.B of their motion, addressed next.

**B. Max Sr. and Martha Have Standing to Pursue Wrongful Death Damages Because the Evidence Raises a Triable Issue of Dependence (Mot. Part IV.B)**

**1. Section 377.60(b)(1) asks only whether the parent depended on the decedent "to some extent."**

A decedent's parents may sue for wrongful death "[w]hether or not qualified under subdivision (a), if they were dependent on the decedent." Cal. Civ. Proc. Code § 377.60(b)(1). The courts have never required that a parent be wholly supported by the child. Parents qualify if they were "actually dependent, to some extent, upon the decedent for the necessaries of life." *Hazelwood v. Hazelwood*, 57 Cal. App. 3d 693, 698 (1976); *Perry v. Medina*, 192 Cal. App. 3d 603, 610 (1987). Dependence means financial dependence, not emotional dependence. *Perry*, 192 Cal. App. 3d at 608; *Chavez v. Carpenter*, 91 Cal. App. 4th 1433, 1445–46 (2001). In *Chavez* the court found a triable issue where the evidence showed the parents relied on the 24-year-old decedent's weekly payments of about $100, groceries, and household services, including yard work and car maintenance, and where he sometimes helped with his father's cleaning business. *Id.* at 1447 . The relevant period is not limited to the day of death: dependence "refers to financial support at the time of decedent's death, or at most, two years before the decedent's death." *Inzunza v. Naranjo*, 94 Cal. App. 5th 736, 746–47 (2023).

The operative words are "to some extent." The statute does not ask whether the parent was wholly dependent, whether the parent could have managed without the child, or whether the child's help was the parent's main support. It asks whether the parent relied on the decedent for any part of the necessaries of life. *Hazelwood*, 57 Cal. App. 3d at 698; *Perry*, 192 Cal. App. 3d at

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

610; *Chavez*, 91 Cal. App. 4th at 1446. *Hazelwood* itself described the parents who qualify as those "actually dependent, at least in part, upon the decedent for support." 57 Cal. App. 3d at 698. It rejected the parents' claim only because the trial court found, on substantial evidence, that the decedent "did not, during his lifetime, contribute to the support of appellants," who were gainfully employed and self-supporting. *Id.* at 696. It also rejected reliance on "support and pecuniary advantages to which they might be entitled in the future." *Id.* at 697. The Olivares Plaintiffs claim neither of those. Max Sr. was helped, and Martha was already receiving help, when Max died. In *Perry* the amounts were small. In *Chavez* the defendant argued that the parents' own income was sufficient without the decedent's help. In both cases, the court found a triable issue. Because the threshold is low and the inquiry turns on the particular family's circumstances, dependence is ordinarily a question of fact, and summary judgment is proper only if no reasonable jury could find even partial dependence. *Id.* at 1445–48.

*Perry* itself shows how little is required. The decedent there had moved out of his mother's apartment, and he brought her about $100 worth of groceries a month, which they both ate, and gave her $50 a month toward surgery she never had. She lived on $400 a month, $200 of which went to rent. 192 Cal. App. 3d at 610. The Court of Appeal held that although $50 a month and some food "may seem like a very small amount, its value is greatly increased when viewed in the perspective" of her income, and it reversed summary judgment because there was a factual question whether she was dependent. *Id.* Defendants invoke *Perry*'s statement that a parent is not dependent if the child's support "merely makes available to them some of the niceties of life." *Id.* But the same sentence of *Perry* draws the line between niceties and "the things, such as shelter, clothing, food and medical treatment, which one cannot and should not do without." *Id.* Support that "aids them in obtaining" those things makes the parent dependent, and the child's death "results in a distinct pecuniary loss to the parent which requires the parent to find aid elsewhere for the basic things we all need." *Id.* "Dependency should be determined on a case-by-case basis," and "[n]o strict formula can be applied." *Id.* The question is which side of the line Max Sr.'s evidence and Martha's fall on, and that is a question of fact.

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

**2. Max Sr. depended on his son's work to produce the income that supports him.**

Defendants' own Separate Statement establishes the core of this showing. They state as undisputed that Max helped his father with his business, that Max Sr. planned to have Max take over the business, and that Max Sr. was relying on the business to support him after he retired. SUF 164–165. They cite Max Sr.'s deposition at 45:24–46:9 for each fact. That passage is the redirect, in which Max Sr. confirmed that although his son was not "supporting [him] financially" in the sense of giving him money, "he was helping [him] in business that [he] use[s] to support [himself]." Sosa Sr. Dep. 45:24–46:3. Defendants rely on the first half of that exchange (SUF 163) while treating the rest as beside the point. The rest is the point.

Max Sr. testified to the nature and size of that dependence. His son was "the only one who knew what I knew" and the only person who could help with a category of work, diagnosing engines and motors with computer problems. *Id.* 41:5-14. Max worked on those accounts with him one or two times a week after work. *Id.* 41:25–42:3. When Max died, Max Sr. had to let the accounts go because no one else could do the work, and he has not found a replacement. *Id.* 40:21–41:4, 41:15-24. Plaintiffs' interrogatory responses are consistent: the decedent "helped his father . . . manage client accounts and other work related issues that only the Decedent and his father knew how to handle," and "was supporting him in his business and was the person that managed the more difficult jobs that enabled the business to keep its clientele." Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), Nos. 22, 13. Sosa Sr. Decl. ¶¶ 3, 6–7.

That evidence connects Max's labor to the income Max Sr. lives on, and the income to his necessities. A parent need not show that the child handed him cash. In *Chavez* the child's services, including occasional help in his father's business, were considered together with money and groceries, and the question was whether the parents relied on the child's contributions "to make ends meet." 91 Cal. App. 4th at 1447–48. Max Sr.'s testimony, and his declaration, are that Max's work was part of what made his business, and so his livelihood, viable. Sosa Decl. ¶¶ 5–7. Under a statute that requires dependence only "to some extent," that is enough to require a trial.

Defendants argue that there is no authority for treating a child's help in a parent's business as support, and that Max Sr. has not shown the business has failed. Mot. at 11. Neither point answers the statute. The statute asks whether the parent was dependent "to some extent" on the child for the necessaries of life, not whether the parent has been reduced to destitution. In *Chavez* the child's contributions included household services, not only money. A child's unpaid skilled labor that generates income the parent uses for food, shelter and medical care is support in the same sense. Whether Max's help made the difference between keeping and losing the accounts that fund Max Sr.'s livelihood is a factual question the motion does not resolve. Nor is the claim "speculative" in the sense Defendants suggest (Mot. at 11, citing Model Instruction 5.1). That instruction concerns the amount of damages. The question here is standing, and the amount of loss is for the jury. *See* Cal. Civ. Proc. Code § 377.61.

**3. Martha was already relying on Max for shelter and support when he died.**

Martha's claim of dependence rests on an arrangement that was being carried out when Max died, not on a promise about the future. Max and Martha had agreed that she would move into his home as the live-in caregiver for his two young sons and that he would support her in return. In September and October 2023 Max gave her cash, including money to pay for the move, and she was in the process of moving in when he died. Olivares Decl. ¶¶ 5–9. Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), No. 13 (Martha "had been promised to move in with and be supported by the decedent and had already acted in reliance on that promise"). Martha testified that these were "definite plans" to move permanently to Fresno, and that Max told her his situation as a single father was "temporary." Olivares Dep. 34:1-25, 35:1-4. She had spent two to three weeks in Max's home that fall caring for the boys while he worked. *Id.* 31:5-8, 37:12-24. Olivares Decl. ¶ 6.

The statute looks to dependence at the time of death, or at most two years before. *Inzunza*, 94 Cal. App. 5th at 746–47. It requires dependence only "to some extent," for "the necessaries of life," and neither a promise nor a plan is the test. The test is whether support was

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

actually being given and relied on. *Hazelwood*, 57 Cal. App. 3d at 698; *Chavez*, 91 Cal. App. 4th at 1446. Shelter is a necessity, and a child who pays his mother's moving costs, houses her, feeds her and takes her in under an agreement to support her is supplying it. *See Perry*, 192 Cal. App. 3d at 610. Martha's part of the bargain, serving as the boys' live-in caregiver, does not make her any less dependent. In *Chavez* the court counted the decedent's services together with his money and groceries, and nothing in section 377.60(b)(1) asks whether the parent gave something back.

Defendants' only evidence is Martha's answer that Max did not support her "when he was still alive" (SUF 166, citing Olivares Dep. 37:5-11), and her statement that he "would always talk about supporting me whenever I became old" (SUF 167). Those answers do not address what Max was paying for and providing in the weeks before his death. A fair reading of the question and answer in context is that Martha was asked whether Max had supported her completely, throughout his adult life, and answered that he had not. Olivares Decl. ¶ 10. The Olivares Plaintiffs do not contend otherwise. Their point is that by November 2023 the support arrangement had begun, and a jury could so find. Reliance of that kind, even if partial, is dependence "to some extent," and it is enough to require a trial. Defendants' own witness confirms that Max helped his family financially: Maria Sosa testified that Max felt obligated to help his parents financially when they asked. Maria Dep. 20:17–21:1 (Little Decl. Ex. A).

Nor can Defendants claim surprise or invoke the sham-affidavit rule. That rule bars a declaration that flatly contradicts prior sworn testimony without explanation. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). A declaration that supplies facts the deposition did not reach does not contradict it. Defendants took Martha's deposition on August 5, 2025 and chose how far to question her about the arrangement. Plaintiffs' interrogatory response disclosing her reliance was served on June 3, 2026, and the Fourth Amended Complaint, filed July 12, 2026, alleged it. Dkt. 85 ¶ 3. Defendants served no further discovery and did not ask to reopen her deposition. Any failure to disclose was therefore harmless. Fed. R. Civ. P. 37(c)(1).

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

In any event the Court need not reach Martha's showing to deny summary judgment on the wrongful death cause of action. Max Sr. is a plaintiff on that claim, and for the reasons above he has raised a triable issue as to his dependence. Defendants' request for judgment on the wrongful death claim as to both parents should be denied.

### C. The Olivares Plaintiffs Join in the Sosa Plaintiffs' Opposition on the Fourth Amendment, Qualified Immunity, State-Law and Damages Issues

The Olivares Plaintiffs join in and incorporate the Sosa Plaintiffs' opposition (Dkt. 99) on the Fourth Amendment excessive-force claim (id. at 12–18); qualified immunity on that claim (id. at 18–22); the state-law claims for negligence, including the officers' pre-force tactical conduct, and battery (id. at 22–30), and the Estate's survival claim under the Bane Act (id. at 30); and Defendants' damages arguments (id. at 31). Those issues correspond to Parts V.A–B and VI of the Motion. The reasonableness of the officers' conduct is the same question for every plaintiff, and the Olivares Plaintiffs' wrongful death claim depends on it. The Sosa Plaintiffs do not oppose summary judgment on their own Fourteenth Amendment, municipal liability and negligent-infliction claims. Dkt. 99 at 11 n.1. That position is theirs alone; it does not reach the Olivares Plaintiffs' separate Fourteenth Amendment claim, which Part IV.D addresses. The Olivares Plaintiffs limit this opposition to the issues addressed here and in Parts IV.A, IV.B and IV.D.

Defendants' argument that "no Plaintiff can pursue a claim for battery or negligence in their individual capacities" (Mot. at 28–29) mistakes the nature of the wrongful death cause of action. It is the heirs' and dependents' own statutory claim, based on the defendant's wrongful act or neglect, and the plaintiff need not have been the person injured. Cal. Civ. Proc. Code § 377.60; *see Chavez v. Carpenter*, 91 Cal. App. 4th 1433, 1445–48 (2001) (standing of dependents under § 377.60); cf. *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999) (elements of wrongful death; cited at Mot. at 29). The Olivares Plaintiffs rely on the Sosa Plaintiffs' showing (Dkt. 99 at 22–29) that triable issues exist on the officers' pre-shooting conduct under *Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013) , and add the evidence cited in Part II.A–B above.

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

**D. The Olivares Plaintiffs' Fourteenth Amendment Claim Survives Summary Judgment (Mot. Part V.C)**

**1. The parents' interest is protected, and Defendants do not contend otherwise.**

Parents of an adult child hold a Fourteenth Amendment liberty interest in the companionship and society of that child. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1169, 1172 (9th Cir. 2013) ("we have recognized a parent's right to a child's companionship without regard to the child's age") ; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ; *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (cited by Defendants, Mot. at 17). Defendants do not dispute that Martha and Max Sr. hold that interest. They argue only that the officers' conduct did not shock the conscience and that the officers are immune.

**2. Whether the conduct shocks the conscience turns on whether deliberation was practical, and the record shows it was.**

Conduct shocks the conscience if it reflects deliberate indifference where "actual deliberation is practical," and only if it reflects a purpose to harm where the officer must make a snap judgment in a rapidly escalating situation. *County of Sacramento v. Lewis*, 523 U.S. 833, 851–54 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137–40 (9th Cir. 2008); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Defendants assume the lower standard applies because the encounter at the door lasted about four minutes. Mot. at 13, 17. But the Olivares Plaintiffs do not challenge only what happened in those minutes. They challenge decisions the officers made beforehand, when there was time to think and nothing forced a choice.

Deliberation was not merely practical here. It was what the officers were doing for the better part of an hour, and it is what they chose to stop doing. Dispatch put the call out as a suicidal male, and at 3:46 a.m. broadcast that Max intended to commit suicide by cop. SUF 42. Ayers, the officer in charge, agreed that Max was "very likely" to come back and "intent on committing suicide by cop." Ayers Dep. 47:13-20. Abraham agreed that Max's return was highly probable and that Max was expressing an intent to force a confrontation with officers. Abraham

Dep. 35:16-20, 50:7-14. Nobody was guessing. By the times in Defendants' own statement, Ayers had about forty minutes and Abraham more than twenty in which to prepare for an event they predicted and understood to be one that Max wanted to end in his own death. SUF 43, 65, 86; ADF Nos. 9–10.

They used that time on nothing. Ayers and Abraham were together in the apartment with Maria for roughly fifteen minutes before Max returned. Abraham Dep. 69:4-7, 76:13-21. In those fifteen minutes they did not discuss a tactical plan or what to do if Max arrived, did not discuss whether non-lethal force would be used or who would use it, and did not decide who would be the cover officer. Abraham Dep. 30:22–31:4. Ayers agreed: there was no "explicit plan," who would make contact and who would cover was "not spoken," and he and Abraham never discussed which of them would be the less-lethal option. Ayers Dep. 44:11-13, 44:24–45:8. Asked whether he had communicated the tactical objective to the other officers on scene, Ayers answered, "We did not have the time to." *Id.* 77:10-17. A jury may weigh that answer against forty minutes. To Abraham's knowledge, no one tried to move Maria out of the living room before Max returned. Abraham Dep. 77:12-18. The one plan Abraham did have, to leave through the bedroom window, was never shared with the other officers. *Id.* 78:5-21, 80:2-5. Sosa SAMF Nos. 9–11 (Dkt. 99-2); ADF Nos. 11–13.

Nor was this a failure to think of something. The officers knew what they lacked. The call was dispatched as a "1 Mary," a mental-health call, and a crisis-intervention officer was requested over the radio. Ayers Dep. 29:18-23, 18:8-19. Ayers had not received advanced crisis-negotiation training and did not feel trained enough for this incident, and he tried to reach his sergeant so that a crisis negotiator might be sent. *Id.* 78:5-15, 42:14-24, 43:3-11. He never reached him before the shooting, and he conceded that "[i]t would have definitely been beneficial to have a CNT." *Id.* 81:5-9. So the officer in charge of a suicide-by-cop call recognized that he needed a negotiator, made one call that did not connect, and went on waiting. No officer called a negotiator, or anyone with negotiation training, to the scene. Abraham Dep. 82:8-13, 83:1-5; Crockett Dep. 56:2-7. No one tried to have a negotiator reach Max by



KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

telephone, although Ayers had spoken to Max by telephone himself that night. Abraham Dep. 83:7-13; Ayers Dep. 44:20-22. Days afterward Abraham told a detective that if there had been "someone who's better at negotiating, they probably could talk him down." Abraham Dep. 72:14-21. Sosa SAMF Nos. 13–19 (Dkt. 99-2); ADF Nos. 14–17.

The officers also had the tools, and they left them where they were. All four carried Tasers, and Ayers, Abraham and Crockett carried batons. Ayers Dep. 45:9-12; Abraham Dep. 39:20-24; Crockett Dep. 18:11-16; Sosa SAMF No. 12. Crockett had a less-lethal bean bag shotgun in his vehicle. Crockett Dep. 18:21-23. He knew when he arrived that Max wanted to commit suicide by cop, *id.* 18:7-10, and when he was asked whether he considered bringing the shotgun from his vehicle, he answered, "No." *Id.* 20:13-15. Abraham believed that at least one of the responding officers had a less-lethal shotgun in his vehicle, and his own patrol car was parked about a hundred feet from the apartment. Abraham Dep. 73:12–74:16. None was on any officer's person when Max returned, *id.* 73:5-11, and the record contains no evidence that anyone went to get one. Ayers, who commanded the scene, carried a Taser and a baton and had pepper spray in his bag, and when asked about less-lethal force inside the apartment he said, "that didn't cross my mind." Ayers Dep. 45:9-24, 65:10-15. Abraham, asked whether he considered using his Taser at any point while he was inside with Max, answered, "No, sir." Abraham Dep. 52:21-24. The officers did not weigh less-lethal force and reject it. They never got that far. Abraham conceded that, depending on the circumstances, "a less-lethal option would be more feasible." Abraham Dep. 72:3-7. Aguilar agreed that an officer using a Taser can be covered by officers with less-lethal or lethal weapons, and that a bean bag shotgun is a less-lethal weapon. Aguilar Dep. 55:8-23, 55:24–56:2. The officers who had waited the longest never discussed who would deploy less-lethal force and who would cover them. Abraham Dep. 31:1-4; Ayers Dep. 45:5-8. Sosa SAMF No. 12 (Dkt. 99-2); ADF Nos. 18–20.

Then came the decision that mattered most, and it was made at a closed door. When the officers heard a car door at 4:35 a.m. and believed Max had returned, the apartment door was shut, and Ayers agreed that with it shut Max could not have posed an immediate threat of death

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

or serious bodily injury to Ayers, Abraham or Maria. Ayers Dep. 48:21-24. Until the door was opened, Ayers and Abraham had their firearms holstered and Ayers agreed that they were not facing an imminent threat. *Id.* 46:8-16. Ayers never considered keeping it closed. *Id.* 48:2-3. Abraham opened it without looking through the window or the peephole, without using his voice to find out who was outside, and with his gun and Taser holstered. Abraham Dep. 36:21–37:11. He testified that, understanding Max intended to force a confrontation and to commit suicide by cop, he would still have considered opening the door even if he had known Max was standing right outside it. *Id.* 50:7-18. The door was the officers' only barrier and the only thing keeping time on their side, and they removed it themselves. ADF Nos. 21–22.

These were not reflexes. Each was a decision made while the officers had time to think and nothing forced their hand, and each ran against what they had been trained to do: that in a crisis time is the officer's ally, that clear communication with the person in crisis is very important, and that unjustified escalation is to be avoided. Ayers Dep. 60:23–61:6, 77:1-4; Sosa SAMF No. 49; ADF No. 23. The Sosa Plaintiffs rely on the same choices to show that the shooting was unreasonable, because the officers created the emergency they then answered with deadly force. Dkt. 99 at 15–16. The Olivares Plaintiffs rely on them for something further, which is what they reveal about the officers' state of mind. An officer who has not noticed a danger may be negligent. These officers had been told of the danger, had predicted it themselves, and understood that what Max wanted was to be killed by police. They recognized that a negotiator would help, chose to do without one, made no plan, and then opened the one barrier that kept the encounter from happening. That is deliberate indifference. The inference a jury may draw from it is the plain one, that the officers did not care whether Max lived. They had the time, they had Tasers on their belts and less-lethal weapons in their cars, they had a request in for a negotiator, and they used none of it. *Lewis* describes the case in which "extended opportunities to do better are teamed with protracted failure even to care," and holds that "indifference is truly shocking." 523 U.S. at 853. A jury could find that this is that case.

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

*Porter* does not hold otherwise, though Defendants will rely on it. It applied the purpose-to-harm standard because the confrontation there was "rapidly escalating," "in constant flux, with much yelling, confusion and a driver who was refusing to exit or stop his car," and it rejected the view that five minutes of that encounter was enough time for deliberation, because "'deliberation' for purposes of the shocks the conscience test is not so literal a concept." 546 F.3d at 1137–40. But *Porter* concerned decisions made during a live confrontation. It did not address decisions made earlier, with no suspect present and no pressure to act, and here for most of the forty minutes Max was not at the scene at all and nothing was in flux. Nor do the Ninth Circuit's later decisions control. In *Hawatmeh v. City of Henderson*, 159 F.4th 591, 602–03 (9th Cir. 2025), decided on the pleaded facts, the officers fired less than a minute after hearing the suspect's latest threat to a child hostage, in a situation "in constant flux," and the court held that the purpose-to-harm standard applied. The question here is not whether the last seconds permitted deliberation, but whether the earlier decisions did. Defendants' own cases, *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), and *Waid v. County of Lyon*, 87 F.4th 383 (9th Cir. 2023), applied the purpose-to-harm standard to snap decisions made as a suspect charged at the officers. Neither addressed claims based on earlier decisions made without time pressure.

**3. Alternatively, a jury could infer a purpose to harm.**

If the Court concludes that only the last minutes matter, the claim still survives, because a jury could find that the officers acted with a purpose to harm unrelated to any legitimate law enforcement objective. The question is what the officers perceived and what they did about it, and on both points the best evidence is the officers' own. Defendants assert that each officer believed Max posed an immediate and deadly threat. Mot. at 17 (citing SUF 172–175 and *E.V. v. City of Covina*, No. 25-7151, 2026 WL 2334322 (9th Cir. Aug. 12, 2026) (mem.)). That assertion is disputed, and much of the dispute comes from the officers.

Start with what Max actually did. For roughly four minutes inside the apartment he held a pair of kitchen scissors and made statements inviting the officers to shoot him, SUF 107–108,

and he made no lunging motion, never tried to injure anyone, and harmed no one. Ayers believed him when he said he would not hurt his wife. When Aguilar told him not to step toward him, he complied, holding the scissors pointed down, and less than a minute before the shooting he stood behind the kitchen counter with his hands resting on it. Dkt. 99 at 8; Sosa SAMF Nos. 27–31. Ayers told investigators that Max's movements inside were "not anything that would have warranted, you know, using deadly force or anything on him at the time," and he testified that the statement was accurate. Ayers Dep. 40:6-10, 41:3-13. Abraham, asked about the moment before he opened the door, said Max was "not a serious threat." Abraham Dep. 37:12-18. Crockett's only words to Max were "just chill." Crockett Dep. 55:4-6. When the officers explained why they believed deadly force was justified, they pointed to events earlier in the night and to Max's return with the scissors, and none of them pointed to any attempt to stab or strike anyone. Sosa SAMF No. 51; ADF Nos. 24–26.

Then the officers changed the scene. At 4:39 they called Maria out of the apartment without telling Max to stay inside or what to do. SUF 128–130; Sosa SAMF No. 34. That ran against Abraham's own judgment that the better course was to keep Max contained inside the apartment, where, alone, "it would be more of a better way for a de-escalation." Abraham Dep. 44:8-18, 80:18–81:5. Ayers walked out ahead of him into the breezeway, where Crockett and Aguilar stood, and Abraham stayed in the apartment behind him. Sosa SAMF Nos. 35–36. Aguilar had already decided, and had told Crockett, that he would Tase Max the moment he crossed the threshold. Aguilar Dep. 49:21–50:11. He was trained, and agreed, that it is human nature to move away from something that causes pain, and he considered that Max would do exactly that. *Id.* 20:7-14, 23:11-18. He also knew there was no room for it. *Id.* 23:6-10 ("a very small, tight space" with "not enough room"). The only ways out of the Taser's reach led toward officers: the breezeway where he and the others were standing, or back into the apartment toward Abraham. *Id.* 23:19–24:19. Sosa SAMF Nos. 36–38; ADF Nos. 27–28. The officers had built a space in which the predictable reaction to the Taser would carry Max into their guns.



KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

Max crossed the threshold at 4:39:25 at a normal pace, with his arm down and the scissors pointed down. Aguilar Dep. 50:18-22. One second later Aguilar Tased him, without warning. SUF 134–135; Sosa SAMF Nos. 39–40. The Taser hurt. Max grunted, stumbled against the wall and swatted at the wires, and then did what Aguilar had expected: he moved away from the pain, along the only path that led away from the apartment, which ran through the officers. Sosa SAMF Nos. 41–43. At 4:39:28, two seconds into a Taser cycle that lasts five, Ayers, Crockett and Abraham fired, again without warning. SUF 140; Sosa SAMF Nos. 44–45. Abraham, behind Max and seeing mostly his back, fired toward the other officers, which he agreed his training told him to avoid because of crossfire. Abraham Dep. 86:6–87:10. His bullet entered Max's mid-back and passed through his right lung and heart. Sosa SAMF No. 46. Crockett agreed that the scissors were at Max's side in his right hand, and that he had told an investigator he was not sure Max was even fixated on him. Crockett Dep. 66:2-19; ADF Nos. 29–31.

Defendants say the body-worn camera footage makes these seconds undisputed. It does not, for the reasons the Sosa Plaintiffs give. Dkt. 99 at 16–17. But the Olivares Plaintiffs rely on the footage for a narrower point that Defendants cannot dispute, which is the clock. Max crossed the threshold at 4:39:25, the Taser struck at 4:39:26, and three officers fired at 4:39:28. SUF 134–135, 140. That is one second from the threshold to the Taser and two more to gunfire, with the Taser still running. Nothing in the footage blatantly contradicts the testimony that Max was moving away from the Taser's pain with the scissors down at his side. Dkt. 99 at 17. A jury watching it can ask what threat three officers perceived in two seconds that the officer who chose the Taser did not, and why the weapon chosen to avoid deadly force was abandoned before it could do its work.

That is the evidence from which a jury may infer a purpose to harm. A jury may find a purpose to harm, unrelated to any legitimate law enforcement objective, from evidence that the officer did not perceive an immediate threat when he used deadly force. *A.D. v. California Highway Patrol*, 712 F.3d 446, 449–50, 458 (9th Cir. 2013) (affirming denial of judgment as a

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

matter of law where evidence included that other officers "did not feel threatened nor did they perceive an immediate threat," five other officers had guns drawn but only the defendant fired, and he fired twelve times). Illegitimate objectives include "bully[ing] a suspect or get[ting] even." *Id.* at 453. *Porter* identifies the kind of evidence from which such a purpose may be inferred. The officer there "appear[ed] to have helped create and even exacerbate the confrontation he then ended by deadly force"; he and the other trooper drew their guns although the other trooper "did not feel threatened"; and, as the court put it, "[t]hird and most important" was "[the officer's] severe and sudden escalation of the situation." 546 F.3d at 1133, 1141–42. *Porter* remanded for the district court to apply the purpose-to-harm standard to those facts and did not itself decide whether a jury could so find. *Id.* at 1140, 1142. Every one of those markers is here. The officers helped create the confrontation: they opened a door that was keeping Max inside, with no plan and no negotiator, and then brought him out into a space with no way to go but toward them. They had other choices and made none of them: four Tasers, a bean bag shotgun in Crockett's vehicle and at least one more less-lethal shotgun among the responding officers' cars, and a negotiator they had asked for and never got. Apart from Aguilar's single Taser, none was tried before the first shot. The escalation was severe and sudden, from a man who had stood with his hands on a counter to a Taser and three firearms within three seconds of stepping through the door. The officers who fired had said, in their own words, that Max's movements inside did not warrant deadly force or that he was not a serious threat. And Ayers, who commanded the scene, told investigators that once he saw Max at the door he "just knew that the only way that this incident was gonna end was, how it did." Sosa SAMF No. 50; ADF No. 32. A jury could hear in those words an officer who expected the shooting, did nothing to prevent it, and then took part in it.

Defendants answer that the officers feared Max because of what he had said and done earlier that night, and Aguilar pointed to those statements when he explained his Taser plan. Aguilar Dep. 50:1-11. But fear built from earlier words is not a perception of an immediate threat in the breezeway, and Defendants' own list of "de-escalation" efforts includes "showing force"

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

and "training a weapon." SUF 169. The point also cuts the other way. Officers who feared Max that much, and who expected him to return, had every reason to plan, to keep the door closed, and to put a negotiator on the line, and they did none of those things. *E.V.* does not help Defendants. It is a non-precedential memorandum, Ninth Cir. R. 36-3, and it applied the purpose-to-harm standard to a suspect who, after being ordered not to touch his gun, retrieved it from his pocket and moved it in the direction of the officers. It did not address deliberate indifference, and it did not involve a man holding scissors pointed down. Aguilar Dep. 50:18-22; Abraham Dep. 37:12-18; Ayers Dep. 40:6-10. The Sosa Plaintiffs distinguish *E.V.* on the same ground. Dkt. 99 at 17. A reasonable juror could find a purpose to harm here.

**4. The officers are not entitled to qualified immunity.**

Defendants argue the Olivares Plaintiffs cannot identify controlling precedent that put the officers on notice that deadly force against Max would violate his parents' right to his companionship. Mot. at 18. The Ninth Circuit has answered that argument. "Since 1998, clear precedent has established that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective." *A.D.*, 712 F.3d at 450. A reasonable officer "would have known that acting with a purpose to harm unrelated to a legitimate law enforcement objective (such as arrest, self-defense, or the defense of others) violates due process." *Id.* at 455. *A.D.* rejected the argument that the standard is too general to be clearly established, and in *Porter* the parties agreed it was clearly established by 2003. *Id.* at 454–55; 546 F.3d at 1140. *A.D.* did not hold that whatever shocks the conscience is clearly established, and the Olivares Plaintiffs do not argue otherwise. Their argument is the one *A.D.* approved: if a jury could find that the officers acted with a purpose to harm unrelated to a legitimate law enforcement objective (Part IV.D.3), the officers are not entitled to qualified immunity. The parents' interest in the companionship of their child is likewise long settled. *Id.* at 453; *see* Part IV.D.1.

**E. Damages (Mot. Part VIII)**

Defendants contend that "no plaintiff is entitled to recover wrongful death damages." Mot. at 32–33 (citing Wolcott v. County of Orange, 2023 WL 3984215 (C.D. Cal. June 7, 2023), and A.B. v. City of Santa Ana, 2019 WL 1578380 (C.D. Cal. Feb. 11, 2019)), both unpublished district court decisions that do not bind this Court. The Estate's Fourth Amendment and Bane Act claims are survival claims, and no one seeks wrongful death damages on them. Dkt. 99 at 11, 31. The Olivares Plaintiffs oppose Defendants' request only insofar as it would limit the compensatory damages they may recover under 42 U.S.C. § 1983, on their own Fourteenth Amendment claim, for the loss of Max's companionship and society. The Sosa Plaintiffs do not pursue a Fourteenth Amendment claim, so that issue is the Olivares Plaintiffs' alone. Those are the parents' own damages, not a statutory wrongful death award, and they are recoverable under § 1983. The same loss of companionship is also recoverable on the parents' state-law wrongful death claim, and Defendants' damages argument does not challenge that claim or those damages. The record on those damages is substantial. Martha described her relationship with her son as "[t]he best": he "was always calling" and "always had plans for me and his children." They spoke by video call two to four times a week, he traveled the eight hours to see her on her birthday, at Christmas and on other special dates, and she drove to Fresno four or five times a year to see him and her grandsons. Olivares Dep. 28:3–29:7. Since his death, "it's not the same." Id. 43:11-12; see id. 42:11–43:12. Max Sr. saw his son two, three or four times a week in the year before his death, often with the grandsons, for at least three hours and sometimes half a day. Sosa Sr. Dep. 29:17-20, 30:1-10; Sosa Sr. Decl. ¶ 10. Asked how the loss affects him, he answered: "He was always there. . . . He's just not in my life anymore." Id. 37:3-4, 37:11-16. ADF Nos. 7–8. As to the Estate's survival damages and punitive damages, the Olivares Plaintiffs join the Sosa Plaintiffs' opposition. Dkt. 99 at 31.

## V. CONCLUSION

For these reasons the Olivares Plaintiffs respectfully request that the Court deny Defendants' motion as to the Estate's claims, for the reasons stated in the Sosa Plaintiffs'

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

opposition and in Part IV.A above; as to the wrongful death claim of Martha Zepeda Olivares and Maximiliano Sosa, Sr.; as to their Fourteenth Amendment claim, including qualified immunity; and as to Defendants' request for a ruling on damages.

DATED: October 30, 2026

LAW OFFICE OF KEVIN G. LITTLE

By: */s/ Kevin G. Little*
Kevin G. Little
Attorney for Plaintiffs MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR., and MAXIMILIANO SOSA, SR.

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*