Kevin G. Little, SBN 149818
LAW OFFICE OF KEVIN G. LITTLE
P.O. Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
Email: service@kevinglittle.com

Attorney for Plaintiffs MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR., and MAXIMILIANO SOSA, SR.

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

v.

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

---

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,

Plaintiffs,

v.

CITY OF FRESNO and DOES 1-5,

Defendants.

Case No. 1:23-cv-01575-JLT-SAB

District Judge: Hon. Jennifer L. Thurston
Magistrate Judge: Hon. Stanley A. Boone

**PLAINTIFFS MARTHA ZEPEDA OLIVARES AND MAXIMILIANO SOSA, SR.'S STATEMENT OF ADDITIONAL DISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [L.R. 260(b)]**

[Filed concurrently with Response to Separate Statement of Undisputed Facts; Memorandum of Points and Authorities; Declarations of Kevin G. Little, Martha Zepeda Olivares and Maximiliano Sosa, Sr.; Request for Judicial Notice; Evidentiary Objections]

Date: November 20, 2026
Time: 9:00 a.m.
Crtrm.: 4

TO THE HONORABLE COURT, DEFENDANTS, AND THEIR COUNSEL OF RECORD:

KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

Pursuant to Local Rule 260(b) and Federal Rule of Civil Procedure 56(c), Plaintiffs MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR., and MAXIMILIANO SOSA, SR. (the "Olivares Plaintiffs") submit the following Statement of Additional Disputed Facts in opposition to Defendants' Motion for Summary Judgment (Dkt. 93). The Olivares Plaintiffs incorporate by reference the Sosa Plaintiffs' Statement of Additional Material Facts (Dkt. 99-2), Nos. 1–66, and the evidence cited in it, including the Declaration of Cooper Mayne and its exhibits (Dkt. 99-3) and the Declaration of Richard S. Bryce (Dkt. 99-4), and rely on those facts in support of their Fourteenth Amendment claim. The facts below are in addition to those facts and to the facts addressed in the Olivares Plaintiffs' Response to Defendants' Separate Statement of Undisputed Facts, filed concurrently. They are limited to the facts material to the issues the Olivares Plaintiffs brief separately: the wrongful death dependence showing of Martha Zepeda Olivares and Maximiliano Sosa, Sr., their loss of companionship, the Estate's representation (Nos. 1–8), and the officers' knowledge, preparation and conduct bearing on the Olivares Plaintiffs' Fourteenth Amendment claim (Nos. 9–32). Deposition testimony is cited by transcript page and line. Each transcript is before the Court as Defendants' Exhibits 23 through 29 (Dkt. 93-26 through 93-32); additional pages are in Exhibits A, B, D, F, G, H, I and J to the Mayne Declaration (Dkt. 99-3) and in Exhibits A through D, G and H to the Declaration of Kevin G. Little, filed concurrently.

**PLAINTIFFS' STATEMENT OF ADDITIONAL DISPUTED FACTS**

| **ADF NO.** | **ADDITIONAL DISPUTED MATERIAL FACT** | **SUPPORTING EVIDENCE** |
|---|---|---|
| 1. | Max Sr. has owned and operated a diesel-mechanic business since 2006. In the years before his death he saw Max two to four times a week, and Max helped him with the more difficult jobs, one or two times a week after work, work on engines and motors with computer problems. Max Sr. testified that Max "was the only one who knew what I knew." | Exs. 25, C (Sosa Sr. Dep.) 16:11-18, 29:17-20, 41:5-14, 41:25–42:3. Decl. of Maximiliano Sosa, Sr. ("Sosa Sr. Decl.") ¶¶ 2, 4–5. Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), Nos. 13, 22. |

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 2. | Max helped Max Sr. keep his larger clients, which were vital to the business and to Max Sr.'s ability to support himself. After Max died, Max Sr. had to let go of the accounts Max used to help him with because no one else could do the work, he has not found anyone who can, and the business has suffered failures. | Exs. 25, C (Sosa Sr. Dep.) 40:21–41:4, 41:15-24, 42:7-16. Sosa Sr. Decl. ¶¶ 6–7. |
| 3. | Max Sr. owns his business and his income depends on it. He takes no regular salary or draw and receives no Social Security or pension. He relies on the business to support himself, planned to have Max take it over when he became too old to work and to support him, and was relying on it to support him in retirement. [Undisputed in part; SUF 164–165.] | Exs. 25, C (Sosa Sr. Dep.) 45:24–46:9; Defs.' SUF Nos. 164, 165. Sosa Sr. Decl. ¶¶ 3, 9. |
| 4. | Max helped Max Sr. from time to time when he needed it, but not regularly. Most of the help Max gave him was helping him keep his business running. Max Sr.'s deposition answer that Max did not provide financial support was an answer about regular support. | Sosa Sr. Decl. ¶ 8. Exs. 25, C (Sosa Sr. Dep.) 29:14-16, 45:24–46:3. Maria Sosa Dep. 20:17–21:1 (Little Decl. Ex. A). |
| 5. | Max saw how much Martha helped when she stayed with him in September and October 2023 and asked her to move into his home in Fresno as the live-in caregiver for his two young sons, and he agreed to support her. She slept in his home for two to three weeks and did the work of a live-in caregiver. While she was in Fresno Max gave her $200 in cash once or twice a month, and he gave her about $750 in cash to move out of her month-to-month apartment and move to Fresno. She gave notice on her tenancy, and the move came to nothing because Max died. At home she lives modestly on her disability benefit and her partner's partial support, but in Fresno she had no means of support of her own and Max supported her. | Exs. 24, D (Olivares Dep.) 34:12–35:4, 31:5-8, 37:12-24.<br>Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), No. 13.<br>Decl. of Martha Zepeda Olivares ("Olivares Decl.") ¶¶ 4–9. |
| 6. | Martha Zepeda Olivares is the court-appointed administrator of the Estate of Maximiliano Sosa, Jr., Fresno Superior Court No. 23CEPR01424. Her petition to terminate the proceedings and be discharged, filed July 1, 2026 and signed under penalty of perjury, states that "[t]he parties have agreed that Ms. Sosa is capable of representing the interests of the estate in the civil proceedings." The probate examiner has continued the hearing on | Dkt. 84 at 5; Defs.' Mot. at 7–8, 10 n.3.<br>Mayne Decl. Ex. K (Petition for Termination of Proceedings and Discharge) at 1 (item 4.h), 2.<br>Little Decl. Ex. F (Probate Examiner Notes, reviewed Sept. 28, 2026). |



KGL
LAW OFFICE OF KEVIN G. LITTLE
Fresno | San Francisco | San Diego

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | the petition to November 4, 2026. No order has been entered affecting Martha's status. | |
| 7. | Martha and her son Max were very close. He called her often, spoke with her by video call two to four times a week, traveled the eight hours to visit her on her birthday, at Christmas and on other special dates, and had plans for her and his children. She drove to Fresno four or five times a year to see him and her grandsons. Since his death "it's not the same." | Exs. 24, D (Olivares Dep.) 28:3–29:7, 42:11–43:12.<br>Olivares Decl. ¶ 3. |
| 8. | Max Sr. saw his son in person two, three or four times a week in the year before he died, often with his grandsons, for at least three hours and sometimes half a day. Since his son's death, "He's just not in my life anymore." | Exs. 25, C (Sosa Sr. Dep.) 29:17-20, 30:1-10, 37:3-4, 37:11-16; Sosa Sr. Decl. ¶ 10. |
| 9. | At 3:46 a.m. on November 4, 2023, dispatch broadcast that Max intended to commit suicide by cop. Ayers returned to Maria Sosa's apartment at 3:55 a.m., Abraham arrived at 4:12 a.m., and the officers heard a door at 4:35 a.m. The officers had been at the apartment for roughly forty minutes (Ayers) and more than twenty (Abraham) when Max returned. | Defs.' SUF Nos. 42, 43, 65, 86 (Dkt. 93-1) (undisputed in Dkt. 99-1) |
| 10. | Ayers and Abraham regarded Max's return as likely. Ayers described "a decent probability" and agreed that he believed Max was "very likely" to come back and intent on suicide by cop; Abraham agreed that there was a high probability Max would come to the apartment and that Max was expressing an intent to force a confrontation with officers and to commit suicide by cop. | Ex. 26 (Ayers Dep.) 36:21-25; Mayne Decl. Ex. F (Ayers Dep.) 47:13-20; Ex. 27 (Abraham Dep.) 35:16-20, 50:7-14; Sosa SAMF Nos. 8–9 (Dkt. 99-2) |
| 11. | For approximately fifteen minutes before Max returned, Ayers and Abraham were together in the apartment with Maria Sosa. | Mayne Decl. Ex. G (Abraham Dep.) 69:4-7; Little Decl. Ex. B (Abraham Dep.) 76:13-21; Sosa SAMF No. 10 (Dkt. 99-2) |
| 12. | In that time Ayers and Abraham did not discuss a tactical plan or what to do if Max arrived, whether non-lethal force would be used or by whom, or who would act as cover officer. Ayers testified there was no "explicit plan," that who would be contact and cover was "not spoken," and that they never discussed which of them would be the less-lethal option. Asked whether he had communicated the tactical objective to the | Mayne Decl. Ex. G (Abraham Dep.) 30:22–31:4; Mayne Decl. Ex. F (Ayers Dep.) 44:11-13, 44:24–45:8, 77:10-17; Sosa SAMF Nos. 10–11 (Dkt. 99-2) |

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | other officers, Ayers answered, "We did not have the time to." | |
| 13. | To Abraham's knowledge, no effort was made to move Maria out of the living room before Max returned. The one plan Abraham had, to leave through the bedroom window, was not communicated to the other officers. | Mayne Decl. Ex. G (Abraham Dep.) 77:12-18, 78:5-21, 80:2-5; Sosa SAMF No. 10 (Dkt. 99-2) |
| 14. | The call was dispatched as a "1 Mary," which denotes a mental-health call or a suicidal subject, and the dispatch entry read "SUICIDAL MALE, NO WEAPS." A crisis-intervention officer was requested over the radio. | Mayne Decl. Ex. F (Ayers Dep.) 29:18-23; Ex. 26 (Ayers Dep.) 18:8-19; Mayne Decl. Ex. B (CAD Report) at FRESNO 000241; Sosa SAMF No. 1 (Dkt. 99-2) |
| 15. | Ayers tried to reach his sergeant so that a crisis negotiator might be sent, and did not reach him before the shooting. Ayers agreed that "[i]t would have definitely been beneficial to have a CNT." Ayers had not received advanced crisis-negotiation training and did not feel trained enough for this incident. | Ex. 26 (Ayers Dep.) 42:14-24, 43:3-11, 81:5-9; Mayne Decl. Ex. F (Ayers Dep.) 78:5-15; Defs.' SUF No. 170 (Dkt. 93-1); Sosa SAMF Nos. 17–18 (Dkt. 99-2) |
| 16. | No officer called a negotiator, or anyone with negotiation training, to the scene, and no one tried to have a negotiator reach Max by telephone, although Ayers had spoken to Max by telephone that night. | Ex. 27 (Abraham Dep.) 82:8-13; Mayne Decl. Ex. G (Abraham Dep.) 83:1-13; Ex. 28 (Crockett Dep.) 56:2-7; Mayne Decl. Ex. F (Ayers Dep.) 44:20-22; Sosa SAMF Nos. 14, 16 (Dkt. 99-2) |
| 17. | Days after the shooting Abraham told a detective that if there had been "someone who's better at negotiating, they probably could talk him down." | Mayne Decl. Ex. G (Abraham Dep.) 72:14-21; Sosa SAMF No. 19 (Dkt. 99-2) |
| 18. | All four officers carried Tasers. Ayers, Abraham and Crockett also carried batons, and Ayers had pepper spray in his bag. Crockett had a less-lethal bean bag shotgun in his vehicle; he knew when he arrived that Max wanted to commit suicide by cop, and he did not consider bringing the shotgun from his vehicle. Abraham believed at least one responding officer had a less-lethal shotgun in his vehicle, and his own patrol car was parked about a hundred feet from the apartment. No officer had a less-lethal shotgun on his person when Max returned. | Mayne Decl. Ex. F (Ayers Dep.) 45:9-24; Mayne Decl. Ex. G (Abraham Dep.) 39:20-24; Little Decl. Ex. B (Abraham Dep.) 73:5-16, 74:7-16; Mayne Decl. Ex. H (Crockett Dep.) 18:7-23, 20:13-15; Sosa SAMF No. 12 (Dkt. 99-2) |
| 19. | Ayers testified that using less-lethal force inside the apartment "didn't cross my mind," and Abraham did not consider using his Taser against Max at any point while he was inside. Abraham testified that, depending on the | Mayne Decl. Ex. F (Ayers Dep.) 65:10-15; Ex. 27 (Abraham Dep.) 52:21-24; Mayne Decl. Ex. G (Abraham Dep.) 72:3-7; Sosa SAMF No. 12 (Dkt. 99-2) |

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | circumstances, "a less-lethal option would be more feasible." | |
| 20. | Aguilar agreed that an officer using a Taser can be covered by officers with less-lethal or lethal weapons, and that a bean bag shotgun is a less-lethal weapon. | Mayne Decl. Ex. D (Aguilar Dep.) 55:8-23, 55:24–56:2 |
| 21. | When the officers heard a car door at 4:35 a.m. and believed Max had returned, the apartment door was closed. Ayers and Abraham had their firearms holstered and, until the door was opened, Ayers agreed they were not facing an imminent threat. Ayers agreed that with the door closed Max could not have posed an immediate threat of death or serious bodily injury to him, Abraham or Maria, and never considered keeping it closed. | Little Decl. Ex. G (Ayers Dep.) 46:8-16; Ex. 26 (Ayers Dep.) 48:2-3, 48:21-24; Sosa SAMF Nos. 21–25 (Dkt. 99-2) |
| 22. | Abraham opened the door without looking through the window or the peephole, without using his voice to ask who was outside, and with his firearm and Taser holstered. He testified that, knowing Max intended to force a confrontation and to commit suicide by cop, he would still have considered opening the door even if he had known Max was right outside. | Mayne Decl. Ex. G (Abraham Dep.) 36:21–37:11; Ex. 27 (Abraham Dep.) 50:7-18; Sosa SAMF Nos. 23–24 (Dkt. 99-2) |
| 23. | The officers were trained that in a crisis time is the officer's ally, that clear communication with a person in crisis is very important, and that unjustified escalation of an incident is to be avoided. | Mayne Decl. Ex. F (Ayers Dep.) 60:23–61:6, 77:1-4; Sosa SAMF No. 49 (Dkt. 99-2) |
| 24. | Inside the apartment Max held a pair of kitchen scissors. He made no lunging motion, never tried to injure anyone, and harmed no one. Ayers believed him when he said he would not hurt his wife. When Aguilar told him not to step toward him he complied, holding the scissors pointed down, and less than a minute before the shooting he stood behind the kitchen counter with his hands resting on it. | Sosa SAMF Nos. 27–31 (Dkt. 99-2) and the evidence cited there |
| 25. | Ayers told investigators that Max's movements inside the apartment were "not anything that would have warranted, you know, using deadly force or anything on him at the time," and testified that the statement was accurate. Abraham testified that before he opened the door Max was "not a serious threat." Crockett's only words to Max were | Ex. 26 (Ayers Dep.) 40:6-10; Mayne Decl. Ex. F (Ayers Dep.) 41:3-13; Mayne Decl. Ex. G (Abraham Dep.) 37:12-18; Ex. 28 (Crockett Dep.) 55:4-6, 55:12–56:1; Sosa SAMF No. 33 (Dkt. 99-2); Dkt. 99-1, SUF Nos. 172–175 |

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| | "just chill," and the de-escalation he identified was a radio broadcast asking for more officers. | |
| 26. | Ayers, Abraham and Crockett each based their belief that deadly force was justified on events earlier in the night and on Max's return with the scissors, and none of them pointed to any attempt to stab or strike anyone with the scissors. | Sosa SAMF No. 51 (Dkt. 99-2) and the evidence cited there |
| 27. | At about 4:39 a.m. the officers called Maria out of the apartment without telling Max to stay inside or what to do. Ayers walked out ahead of Max into the breezeway, where Crockett and Aguilar were standing, and Abraham stayed in the apartment behind him. | Defs.' SUF Nos. 128–130 (Dkt. 93-1); Sosa SAMF Nos. 34–35 (Dkt. 99-2) |
| 28. | Before Max crossed the threshold Aguilar had decided to Tase him there and had told Crockett so. Aguilar was trained, and agreed, that it is human nature to move away from something that causes pain, and he considered that Max would move away from the Taser. The breezeway was "a very small, tight space" with "not enough room," there was no avenue of escape, and the only directions Max could go led toward officers: the breezeway where the officers stood, or back into the apartment toward Abraham. | Ex. 29 (Aguilar Dep.) 49:21–50:11, 30:23–31:12; Mayne Decl. Ex. D (Aguilar Dep.) 20:7-14, 23:6-24:19, 55:2-7; Sosa SAMF Nos. 36–38 (Dkt. 99-2) |
| 29. | Max crossed the threshold at 4:39:25 a.m. with the scissors pointed down. Aguilar Tased him one second later, at 4:39:26, without warning. Max moved away from the Taser's pain along the only path leading away from the apartment, through the officers. At 4:39:28, two seconds into the Taser's five-second cycle, Ayers, Crockett and Abraham fired without warning. | Defs.' SUF Nos. 134, 135, 140 (Dkt. 93-1); Ex. 29 (Aguilar Dep.) 50:18-22; Sosa SAMF Nos. 39–44 (Dkt. 99-2); Dkt. 99-1, SUF Nos. 134–140 |
| 30. | Abraham fired from behind Max, seeing mostly his back, toward the area where Crockett, Ayers and Aguilar were standing, although he was trained to avoid firing in the direction of other officers because of crossfire. One bullet entered Max's mid-back and passed through his right lung and heart. | Ex. 27 (Abraham Dep.) 86:6–87:10; Mayne Decl. Ex. I (Coroner's Report) at FRESNO 000230, 000234; Sosa SAMF No. 46 (Dkt. 99-2) |
| 31. | Crockett agreed that the scissors were in Max's right hand at his side, and that he had told an investigator he was not sure Max was even fixated on him. | Ex. 28 (Crockett Dep.) 66:2-19 |

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*

| ADF NO. | ADDITIONAL DISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 32. | Ayers told investigators that once he saw Max at the door, "it seemed like I just knew that the only way that this incident was gonna end was, how it did." | Mayne Decl. Ex. J (Ayers Interview) at FRESNO 000566; Sosa SAMF No. 50 (Dkt. 99-2) |

Dated: October 30, 2026

LAW OFFICE OF KEVIN G. LITTLE

By: */s/ Kevin G. Little*
Kevin G. Little
Attorney for Plaintiffs MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR., and MAXIMILIANO SOSA, SR.

KGL
LAW OFFICE OF KEVIN G. LITTLE
*Fresno | San Francisco | San Diego*