Mildred K. O'Linn (State Bar No. 159055)
*missy.olinn@manningkass.com*
Maya Sorensen (State Bar No. 250722)
*Maya.Sorensen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

v.

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

---

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,

Plaintiffs,

v.

CITY OF FRESNO and DOES 1-5,

Defendants.

Case No. 1:23-cv-01575-JLT-SAB

District Judge: Jennifer L. Thurston
Magistrate Judge: Stanley A. Boone

**DEFENDANTS' RESPONSE TO SOSA PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Judge: Hon. Jennifer L. Thurston
Date: November 20, 2026
Time: 9:00 a.m.
Crtrm.: 4

Pursuant to Local Rule 260(b) and Federal Rule of Civil Procedure 56(c), defendants respond to plaintiffs' additional material facts in opposition.

| No. | Sosa Plaintiff's Additional Material Fact | Defendants' Response And Supporting Evidence |
|---|---|---|
| 1 | The call was dispatched as "1 Mary," which normally denotes a mental health call or a suicidal subject, and the dispatch entry read: "SUICIDAL MALE, NO WEAPS."<br><br>Declaration of Cooper Mayne ("Mayne Decl.") ¶ 8, Ex. F (Deposition of Officer John Ayers, Apr. 22, 2026) ("Ayers Depo") 29:18-23; Mayne Decl. 114, Ex. B (Fresno Police Department CAD Report) ("CAD Report") at FRESNO 000241. | Undisputed |
| 2 | In her 3:44 a.m. call, Ms. Sosa told the dispatcher, "I know he doesn't have any kind of weapon on him," and the dispatcher said officers would be told "he does not have any weapons."<br><br>Mayne Decl. ¶ 7, Ex. E (Transcript of Maria Sosa's 3:44 a.m. 911 Call) ("911 Call Tr.") at 1-2; Mayne Decl. ¶ 3, Ex. A (Deposition of Maria Sosa, July 28, 2025) ("Maria Sosa Depo") 68:3-22. | Undisputed |
| 3 | Before making contact with Mr. Sosa, Officer Ayers learned that the call involved a possibly suicidal male with no criminal record.<br><br>Ayers Depo 30:5-21. | Undisputed |
| 4 | Mr. Sosa had never physically abused or threatened Ms. Sosa, their children, or anyone else.<br><br>Maria Sosa Depo 46:3-10. | Disputed in part. That Mr. Sosa never physically abused "anyone else" is not supported by the cited evidence. |

| | | |
|---|---|---|
| 5 | At about 3:31 a.m., more than an hour before the shooting, as Mr. Sosa drove past Officer Equihua in the apartment complex, his car turned away from the officer.<br>Defs.' Ex. 17, Dkt. 93-20 (Officer Abraham Body-Worn Camera Video 1, lodged) ("Abraham BWC 1") at 3:30:59. | Disputed that Mr. Sosa's car turned away from Officer Equihua is unsupported by the cited evidence. Disputed to the extent Plaintiffs suggest Max did not attempt to strike Equihua, as Max admitted "I tried to run over one of your cops." *See* Defendants' Reply to Sosa Plaintiffs' Response to Separate Statement of Undisputed Facts, Nos. 30, 61; Fed. R. Evid. 804(b)(3). |
| 6 | Before the shooting, no officer had information that Mr. Sosa had ever actually hurt anyone.<br><br>Mayne Decl. ¶ 10, Ex. H (Deposition of Officer Brandon Crockett, Apr. 22, 2026) ("Crockett Depo") 20:25-21:5; Mayne Decl. ¶ 6, Ex. D (Deposition of Officer Anthony Aguilar, Apr. 23, 2026) ("Aguilar Depo") 25:13-15. | Disputed in part that no officer had information that Mr. Sosa had *ever* actually hurt anyone is vague as to time. However, undisputed that no officer had information that Mr. Sosa had hurt anyone the night of the incident. He had, however, assaulted Equihua with his vehicle and put officers and civilians at risk during high-speed vehicle chases. *See* Defendants' Reply to Sosa Plaintiffs' Response to Separate Statement of Undisputed Facts, Nos. 25, 30, 33, 172, 173, 174, 175. |
| 7 | When Officer Crockett left his patrol car for the apartment, he understood he was dealing with a mentally distressed, unarmed person with no prior record.<br><br>Crockett Depo 60:10-23. | Undisputed. |
| 8 | Before the encounter at the apartment, Officers Ayers, Abraham, and Aguilar each understood that Mr. Sosa intended to commit suicide by cop.<br><br>Ayers Depo 47:18-20; Mayne Decl. ¶ 9, Ex. G (Deposition of Officer Jonathan Abraham, Apr. 23, 2026) ("Abraham Depo") 50:7-14; Aguilar Depo 25:21-26:5. | Undisputed |
| 9 | Officers Ayers and Abraham believed it was highly probable that Mr. Sosa would return to the apartment.<br><br>Ayers Depo 47:1-17; Abraham Depo 35:16-20. | Undisputed |

| | | |
|---|---|---|
| 10 | Officers Ayers and Abraham spent about fifteen minutes in the apartment with Ms. Sosa before Mr. Sosa returned. They discussed no tactical plan for his return, did not discuss who would use less-lethal force, and made no effort to move Ms. Sosa out of the living room.<br><br>Abraham Depo 30:18-31:4; 69:4-7; 77:12-18; Ayers Depo 44:3-13; 45:5-8. | Disputed. Officer Abraham answered affirmatively when he was asked "you did try to get Ms. Sosa out of the living room where Mr. Sosa was." Abraham Depo 77:10-14 |
| 11 | Officer Ayers, the primary officer, considered himself in charge of the scene, but he gave the other three officers no explicit communication about the tactical objective. Officer Crockett discussed no plan before taking his position at the door, and Officer Aguilar did not know any other officer's plan.<br><br>Ayers Depo 77:7-17; Crockett Depo 27:3-10; Aguilar Depo 56:3-22. | Undisputed that Officer Ayers testified to this. He also testified that "we did not have time to" communicate about a tactical objective. Ayers Depo 77:7-17.<br><br>Undisputed as to the rest. |
| 12 | All four officers carried Tasers, and Officer Crockett had a bean bag shotgun in his patrol car that he did not consider bringing to the apartment. Officer Ayers did not consider less-lethal force inside the apartment ("that didn't cross my mind"), and Officer Abraham never considered using his Taser.<br><br>Ayers Depo 45:9-12; 65:10-15; Abraham Depo 39:20-24; 52:21-24; Crockett Depo 18:11-23; 20:13-15; Aguilar Depo 30:9-11. | Undisputed. |
| 13 | Only the four patrol officers dealt with Mr. Sosa; no supervisor took part. Officers Crockett and Aguilar did not call a supervisor.<br><br>Abraham Depo 85:17-24; Crockett Depo 16:25-17:2; Aguilar Depo 28:7-9. | Undisputed. |

| | | |
|---|---|---|
| 14 | No officer on scene summoned the Crisis Negotiation Team or a supervisor to the scene. Officer Crockett did not call for it, and he did not see or hear any other officer request it. Officer Abraham testified that, to his knowledge, no officer on scene called anyone from the team, and that he did not call any officer with negotiation training to the scene. Officer Aguilar was not aware of any officer on scene calling for someone from the team, or anyone with more crisis intervention training. Officer Ayers did not call a crisis negotiator himself.<br><br>Crockett Depo 16:22-17:2; 56:2-7; Abraham Depo 82:8-13; 82:23-83:5; 85:17-24; Aguilar Depo 47:19-48:12; Ayers Depo 29:6-10. | Undisputed. |
| 15 | Officer Aguilar testified that the Crisis Negotiation Team is usually requested when a subject is contained and is not an imminent or immediate threat to another person or officer, such as a barricade situation.<br><br>Aguilar Depo 59:5-14. | Undisputed. |
| 16 | No one tried to have a negotiator contact Mr. Sosa by telephone.<br><br>Abraham Depo 83:7-13. | Undisputed. |
| 17 | None of the four officers had Crisis Intervention Team or Crisis Negotiation Team certification or crisis training beyond what every officer receives. Officer Ayers, the primary officer, was about nine months out of field training and had never requested a crisis negotiator before. Ayers Depo 11:9-12; 14:10-15:6; 17:5-13; 28:22-29:5; Abraham Depo 23:3-15; Aguilar Depo 11:24-12:4; 42:24-43:5. | Undisputed. |
| 18 | Officer Ayers told investigators the incident was outside the scope of his training, because he is not a certified crisis negotiator. He testified that he did not feel trained enough for this incident and that "[i]t would have definitely been beneficial to have a CNT."<br><br>Ayers Depo 41:23-42:13; 77:24-78:15; 80:20-81:9. | Undisputed that Ayers testified to this. Ayers also testified, "I've got the training for dealing with people in crisis from the academy, field training, in-service, and also briefing trainings we have discussed it. I do not have the advanced crisis negotiation training, which I felt like could have been beneficial." Ayers Depo 77:5-9; 78:15 |

| | | |
|---|---|---|
| 19 | Officer Abraham told the homicide investigator that with "someone there, like, with, like, a less-lethal, or someone who's better at negotiating, they probably could talk him down."<br><br>Abraham Depo 72:9-23. | Undisputed. |
| 20 | The Department's Policy 417 governs responses to people in mental distress and encourages de-escalation where possible and tactical disengagement. Officer Abraham was trained on it. Officer Ayers did not think about tactical disengagement that night.<br><br>Crockett Depo 50:18-22; 54:21-55:2; Abraham Depo 84:2-24; Ayers Depo 75:24-76:11. | Undisputed. |
| 21 | Just before Officer Abraham opened the door, the officers heard a car door. There were no sirens or police lights and no radio traffic that another officer was arriving, and both officers believed it was likely Mr. Sosa.<br><br>Abraham Depo 35:16-36:20; Ayers Depo 36:2-25. | Disputed. Ayers testified "So when we heard the car door, we didn't know for a fact if it was him or not, so we went to check" and that it was "a possibility" that it was Mr. Sosa.<br><br>Ayers Depo 36:2-25. |
| 22 | Officer Abraham opened the door at 4:35:07 a.m. Mr. Sosa did not come into view until 4:35:12 a.m., walking at an ordinary pace. Officer Abraham never considered closing the door.<br><br>Defs.' Ex. 19, Dkt. 93-22 (Officer Abraham Body-Worn Camera Video 2, lodged) ("Abraham BWC 2") at 4:35:07-12; Abraham Depo 46:14-17. | Undisputed as to the stated times. Defendants object to the term "ordinary pace" as vague and subjective. |
| 23 | Officer Abraham opened the door without looking through the window or peephole and without asking who was there. Officer Ayers never considered checking the window or peephole or keeping the door closed.<br><br>Abraham Depo 36:21-37:6; 75:2-15; Ayers Depo 47:21-48:3; 48:25-49:3. | Undisputed. |

| | | |
|---|---|---|
| 24 | Officer Abraham testified that, knowing Mr. Sosa intended to commit suicide by cop, he still would have considered opening the door even had he known Mr. Sosa was right outside.<br><br>Abraham Depo 50:7-18. | Undisputed. |
| 25 | Officer Ayers agreed that with the door closed, Mr. Sosa could not have posed an immediate threat of death or serious bodily injury to him, Officer Abraham, or Ms. Sosa.<br><br>Ayers Depo 48:21-24. | Undisputed, but Officer Ayers also testified, “Mr. Sosa would, I would say, be a threat, not only to the officers that are there, but the other officers that would be responding to the apartment complex, and also any other civilians that might have been leaving their apartment, due to the previous threats that he had already made; his reckless driving, which showed no care for the public and other people on the road; and him trying to run over one of our police officers.”<br><br>Ayers Depo 48:11-19. |
| 26 | Inside the apartment, Officers Ayers and Abraham, and then Officer Crockett, had their firearms drawn and pointed at Mr. Sosa, and Officer Aguilar had his Taser out.<br><br>Crockett Depo 37:4-7; Mayne Decl. ¶ 12, Ex. J (Transcript of Officer Ayers's Nov. 6, 2023 Interview) ("Ayers Interview") at FRESNO 000566; SUF 109, 113, 122. | Undisputed. |
| 27 | The only thing Mr. Sosa held was a pair of kitchen scissors. The kitchen was directly behind him, and at one point he went into it. Officers Ayers and Abraham each agreed that a kitchen would ordinarily hold a variety of knives, and neither saw Mr. Sosa try to switch from the scissors to a knife.<br><br>Ayers Depo 51:7-11; 51:24-52:17; 52:21-23; Abraham Depo 52:3-14; 52:17-20. | Undisputed. Defendants object that the phrase “the only thing” is argumentative. |
| 28 | Inside the apartment, Mr. Sosa made no lunging motions, never attempted to injure any officer with the scissors, and harmed no one.<br><br>Abraham Depo 51:24-52:2; Ayers Depo 71:12-17; Crockett Depo 52:16-19. | Undisputed. |

| | | |
|---|---|---|
| 29 | Officer Ayers believed Mr. Sosa when he said he would not hurt Ms. Sosa. Ms. Sosa saw Mr. Sosa do nothing with the scissors except open and close them, and saw nothing threatening in his conduct.<br><br>Ayers Depo 52:24-53:6; Maria Sosa Depo 71:1-7; 71:13-19; *see* JtSF 6. | Undisputed. |
| 30 | When Officer Aguilar spoke to Mr. Sosa by his first name and told him not to step toward him, Mr. Sosa responded and complied, holding the scissors pointed down.<br><br>Aguilar Depo 41:1-42:16. | Undisputed. |
| 31 | Less than a minute before the shooting, Mr. Sosa had his back turned to the officers and then stood behind the kitchen counter with his hands resting on it.<br><br>Defs.' Ex. 18, Dkt. 93-21 (Officer Ayers Body-Worn Camera, lodged) ("Ayers BWC") at 4:38:43-48. | Disputed. That Sosa "had his back turned to the officers" is unsupported by the cited evidence. |
| 32 | Officer Abraham believed the better course was to keep Mr. Sosa contained inside the apartment, because alone and contained "it would be more of a better way for a de-escalation."<br>Abraham Depo 44:8-18; 80:18-81:5. | Disputed as misleading. Mr. Sosa made the choice to follow the officers outside rather than the officers failing to "keep Mr. Sosa contained inside." |
| 33 | Officer Ayers told investigators that Mr. Sosa's steps inside the apartment were "not anything that would have warranted, you know, using deadly force or anything on him at the time," and testified that the statement was accurate.<br><br>Ayers Depo 41:3-13; 84:8-13. | Disputed as misleadingly incomplete. Ayers testified that "There's a difference between 'warranted' and 'justified,'" and that "inside the apartment, … it may have been justified to use deadly force, but not warranted." Ayers Dep. at 84:8-85:2 (**Def. Ex. 33** to Supplemental Sorensen Declaration). |

MANNING | KASS

MANNING | KASS

| | | |
|---|---|---|
| 34 | When the officers told Ms. Sosa to leave, no officer told Mr. Sosa to stay inside, and Officer Ayers agreed that no officer gave Mr. Sosa any clear communication about whether to leave or what to do if he did.<br><br>Crockett Depo 58:17-59:1; Abraham Depo 81:6-82:6; Aguilar Depo 38:2-7; Ayers Depo 73:7-74:7. | Disputed as to Officer Abraham's testimony who testified "No words were used, because he was -- his behavior, the way he was talking to us. He continued to ignore our commands. He was speaking over us. After multiple attempts at me trying to reason with him, me trying to talk to him, me being empathetic." Abraham Depo 81:21-25. It is also undisputed that as Max started walking toward the door, the Officers told him to "Wait," "Stop," and "Get back." Amended Joint Statement of Undisputed Fact, No. 133. |
| 35 | Officer Abraham gestured for Officer Ayers and Ms. Sosa to leave. Officer Ayers thought the signal was meant for him and walked out of the apartment ahead of Mr. Sosa. He did not intend for Mr. Sosa to follow him and gave Mr. Sosa no instruction not to.<br><br>Abraham Depo 58:6-13; Ayers Depo 66:1-15; 67:3-12; 69:20-70:3. | Disputed in part. As Max turned to walk toward the door, Abraham said, "Wait. Stop, dude." **Def. Ex. 19** [Abraham BWC] at 4:39:20-4:39:26. It is also undisputed that as Max started walking toward the door, the Officers told him to "Wait," "Stop," and "Get back." Amended Joint Statement of Undisputed Fact, No. 133. |
| 36 | There was no avenue of escape for Mr. Sosa in the apartment or in the breezeway, which was a "very small, tight space" with "not enough room." Across from the apartment door were a closed door and a wall. The breezeway was "exactly where we were standing." And Officer Abraham was still inside the apartment, so moving back inside meant moving toward him.<br><br>Aguilar Depo 23:6-10; 23:19-24:19; 55:2-7. | Undisputed that Officer Aguilar testified to this. He also testified that the Officers did not intend to give Max an "avenue of escape" because they had probable cause to arrest him for several violent crimes. Aguilar Dep. at 57:21-58:11 (**Def. Ex. 32** to Supplemental Sorensen Declaration). |
| 37 | Officer Aguilar had decided in advance that he would deploy his Taser when Mr. Sosa walked through the threshold.<br><br>Aguilar Depo 49:21-50:11. | Disputed as to "decided in advance". This misstates Officer Aguilar's testimony. |

MANNING | KASS

| | | |
|---|---|---|
| 38 | Officer Aguilar was trained that it is human nature to move away from something causing pain, to consider not cornering or boxing in a person in crisis, and to leave an avenue of escape where safe, which can prevent danger to officers and the subject. When he decided to deploy his Taser, he considered that Mr. Sosa might move away from the source of the pain.<br><br>Aguilar Depo 20:3-23:5; 23:11-18. | Disputed. Officer Aguilar testified "it's possible" that a subject may run away or flee in reaction to being struck by non-lethal force and that "it just depends on the circumstances of whatever you're dealing with, and the person you're dealing with." He also testified that depending on the circumstances of whatever call you're on, sometimes it's -- if feasible and if safe, you can leave a specific place or avenue."<br>Aguilar Depo 20:3-22:12. |
| 39 | Mr. Sosa walked out of the apartment at a normal pace, holding the scissors behind his back as he crossed the threshold; shortly after, they were down at his side. Before he was Tased, he did not lunge, did not try to strike anyone, and made no jabbing motion.<br><br>Ayers BWC, Abraham BWC 2, Defs.' Ex. 20, Dkt. 93-23 (Officer Crockett Body-Worn Camera, lodged) ("Crockett BWC"), and Defs.' Ex. 21, Dkt. 93-24 (Officer Aguilar Body-Worn Camera, lodged) ("Aguilar BWC"), each at 4:39:23-26. | Disputed as to "he did not lunge, did not try to strike anyone, and made no jabbing motion." This is unsupported by the cited evidence. |
| 40 | Officer Aguilar Tased Mr. Sosa without warning, and no officer warned Mr. Sosa that deadly force would be used. Officer Crockett's only warning was "Chill out," and the only other command he heard was "Stop."<br><br>Crockett BWC and Aguilar BWC, each at 4:39:23-28; Crockett Depo 45:10-22; Aguilar Depo 38:9-17. | Undisputed, but argumentative as phrased. |
| 41 | The Taser caused Mr. Sosa pain. He grunted, stumbled to his left against the wall of the opposite apartment, clutched his side, and swatted at the Taser wires on his chest.<br><br>Ayers BWC; Abraham BWC 2; Crockett BWC; Aguilar BWC; Aguilar Depo 18:17-19:6; Crockett Depo 40:13-19; 43:8-16; Abraham Depo 59:2-10. | Undisputed. |

| | | |
|---|---|---|
| 42 | Mr. Sosa then moved away from the pain along the only path leading away from the apartment, which ran through the breezeway where the officers stood. When he was shot, his arm was down at his side and the scissors were not raised toward anyone.<br><br>Ayers BWC, Abraham BWC 2, Crockett BWC, and Aguilar BWC, each at 4:39:23-28; Crockett Depo 66:2-9; 76:15-23. | Disputed that Mr. Sosa "moved away from the pain" as it lacks foundation and is unsupported by the cited evidence.<br><br>Disputed as to his arm being down by his side with the scissors not raised. This is unsupported by the BWC camera footage cited. Officer Crockett testified that Sosa "had a bent arm, still with the arm forward, near his bent over chest, with the scissors in his right hand, with the blade faced towards me." Crockett Depo 75:15-19. This is corroborated by Abraham's bodyworn camera footage. **Def. Ex. 19** [Abraham BWC 2] at 4:39:27-4:39:30. |
| 43 | At no point before or while he was shot did Mr. Sosa raise the scissors toward an officer or make any stabbing, slashing, or lunging motion with them.<br><br>Ayers BWC; Abraham BWC 2; Crockett BWC; Aguilar BWC; Declaration of Richard Bryce ("Bryce Decl.") ¶ 8. | Disputed. Max was gripping the scissors as he charged the Officers with the blade pointing up. Abraham BWC #2 at 4:39:27-4:39:29.<br><br>Crockett BWC at 4:39:28-4:39:30.<br><br>Crockett Dep. 66:2-9; 67:8-21; 75:6-10; 75: 15-19; 76:15-23<br><br>Abraham Dep. 86:24-87:3; 88:6-16. |
| 44 | The Taser, once triggered, stays active for five seconds. The shots came about two seconds after the Taser struck Mr. Sosa.<br><br>Crockett Depo 40:23-41:10; SUF 135, 140. | Undisputed that Crockett testified that the taser stays active for five seconds. |
| 45 | Officer Aguilar did not fire his gun.<br><br>Aguilar Depo 30:12-24; 63:15-18; Mayne Decl. ¶ 5, Ex. C (Detective Rockwell Homicide Supplemental Report) ("Homicide Report") at FRESNO 000168. | Undisputed. |



MANNING | KASS

| | | |
|---|---|---|
| 46 | Officer Abraham fired from behind Mr. Sosa, seeing mostly his back, toward the area where Officers Crockett, Ayers, and Aguilar were standing, although he was trained to avoid firing toward other officers. One bullet entered Mr. Sosa's mid-back and traveled through his right lung and heart.<br><br>Abraham Depo 86:6-87:3; 87:4-10; Mayne Decl. ¶ 11, Ex. I (Fresno County Coroner's Report) ("Coroner's Report") at FRESNO 000230, 000234. | Undisputed, but irrelevant. |
| 47 | The officers were trained that deadly force may be used only for an immediate threat of death or serious bodily injury, that subjective fear is not enough, and that a verbal warning should be given before deadly force when feasible.<br><br>Ayers Depo 19:15-20:10; Abraham Depo 18:17-19:15; Aguilar Depo 35:11-36:1; Crockett Depo 14:21-15:4. | Undisputed. |
| 48 | The officers were trained that they cannot shoot a person merely for holding a knife. Officer Ayers testified that the same is true of scissors.<br><br>Ayers Depo 50:21-51:6; 71:19-72:11; Abraham Depo 30:8-17; Aguilar Depo 36:11-17. | Undisputed. |
| 49 | The officers were trained that in a crisis time is their ally, to avoid officer-created jeopardy, and, as Officer Ayers was trained, to avoid a "fatal funnel" such as a doorway or hallway with no means of escape.<br><br>Ayers Depo 22:15-23:22; 60:23-61:1; Crockett Depo 72:11-17; Abraham Depo 29:2-10; 44:19-45:8; 77:20-78:3; Aguilar Depo 36:2-10. | Undisputed. |
| 50 | Officer Ayers told investigators that once he saw Mr. Sosa at the front door, "it seemed like I just knew that the only way that this incident was gonna end was, how it did."<br><br>Ayers Interview at FRESNO 000566. | Undisputed. |

| | | |
|---|---|---|
| 51 | Officers Ayers, Abraham, and Crockett each based their belief that deadly force was justified on events earlier in the night and Mr. Sosa's return with the scissors, and Officer Abraham also cited "his behavior at the time"; none of them pointed to any attempt to stab or strike anyone with the scissors.<br><br>Ayers Depo 72:12-73:5; Abraham Depo 54:7-56:20; Crockett Depo 30:12-31:4. | Disputed that "none of them pointed to any attempt to stab or strike anyone with the scissors." Officer Crockett testified that "the scissors were, yes, at his side, but the blade was pointed at me" and "Mr. Sosa was looking -- had his head down, face up, looking at me, as he charged towards 6 me and yelled, and made a grunting, yelling sound." Crockett Depo 67:19-68:6. |
| 52 | Plaintiffs' police practices expert, Richard Bryce, a former Undersheriff of the Ventura County Sheriffs Department with more than thirty-three years in law enforcement, reviewed the body-worn camera recordings, the officers' depositions, the Department's reports, and POST Learning Domains 20, 21, 22, 23, and 37.<br><br>Bryce Decl. ¶¶ 1-3. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 53 | Mr. Bryce opines that the officers had ample time and opportunity to use de-escalation techniques and less-lethal force, and did not.<br><br>Bryce Decl. ¶ 7. | Undisputed that Mr. Bryce declared this. Disputed that officers had ample time and opportunity to use de-escalation techniques and less-lethal force, and did not. The evidence shows that Max walked into the apartment at 4:35 a.m. after his whereabouts were unknown and that shots were fired at 4:39:28 a.m. leaving less than five minutes.<br>Ex. 18 [Ayers BWC] at 4:35:04-4:35:10 and at 4:39:28.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |

| | | |
|---|---|---|
| 54 | Mr. Bryce opines that Mr. Sosa did not pose an imminent threat of death or serious bodily injury when the officers shot him.<br><br>Bryce Decl. ¶¶ 8, 15. | Undisputed that Mr. Bryce declared this. Disputed that Mr. Sosa did not pose an imminent threat of death or serious bodily injury when the officers shot him.<br><br>This opinion improperly instructs the factfinder on governing law rather than addressing police training and practices.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 55 | Mr. Bryce opines that the officers created the close-quarters confrontation in which they killed Mr. Sosa: they opened the door, failed to contain him or form a plan, walked out ahead of him into a breezeway with no avenue of escape, and Tased him there, so that his predictable movement away from the pain carried him toward officers.<br><br>Bryce Decl. ¶¶ 10, 12. | Undisputed that Mr. Bryce declared this. Disputed that the officers created the close-quarters confrontation.<br>The undisputed evidence is that Mr. Sosa chose to approach the door and enter the breezeway despite commands to “stop” “wait!” and “get back”.<br>Ex. 18 [Ayers BWC] at 4:39:23-4:39:25.<br>Ex. 19 [Abraham BWC #2] at 4:39:23-4:39:25.<br>Ex. 20 [Crockett BWC] at 4:39:20-4:39:24.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 56 | Mr. Bryce opines that a warning before deadly force was feasible, because there was time to say "stop" and "chill."<br><br>Bryce Decl. ¶ 13. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |

| | | |
|---|---|---|
| 57 | Mr. Bryce opines that officers are trained to let a Taser complete its cycle of about five seconds and assess its effect before escalating; that the officers fired about two seconds into the cycle; and that a properly trained officer would have recognized Mr. Sosa's movement as a reaction to the Taser, not an attack.<br><br>Bryce Decl. ¶ 12. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 58 | Mr. Bryce opines that deadly force was not a last resort, because reasonable, safe, and feasible alternatives were available at every stage, including summoning the Crisis Negotiation Team or a supervisor, forming a plan, keeping the door closed, containing Mr. Sosa inside, using cover and distance, warning him, and letting the Taser take effect, and the officers used none of them.<br><br>Bryce Decl. ¶ 14. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 59 | POST trains officers responding to a suicidal person in crisis to slow the encounter, create time and distance, summon crisis negotiation and intervention resources, form a plan before engaging, establish a perimeter and contain the subject, use cover and keep a position of advantage, and request backup and wait for it. POST teaches that time is ordinarily on the officers' side, that contact and cover officers must communicate, and that rushing into a situation without a plan is a hallmark of poor planning.<br><br>Bryce Decl. ¶ 5. | Undisputed that Mr. Bryce declared this.<br>Disputed that the POST Learning Domains cited by Mr. Bryce say this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 60 | POST teaches that introducing pain to a person in emotional crisis, for example through a partially effective Taser, can escalate the encounter rather than resolve it.<br><br>Bryce Decl. ¶ 5. | Undisputed that Mr. Bryce declared this.<br>Disputed that the POST Learning Domain cited by Mr. Bryce says this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |



MK MANNING | KASS

MANNING | KASS

| | | |
|---|---|---|
| 61 | Mr. Bryce opines that, had the officers followed their training, by keeping the door closed and Mr. Sosa contained, summoning the Crisis Negotiation Team or a supervisor, forming a plan, and using time and distance, the confrontation in the breezeway would not have occurred.<br><br>Bryce Decl. ¶ 12. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 62 | Mr. Bryce opines that moving away from the source of the pain is a common reaction to a Taser, and that officers are trained to expect it.<br><br>Bryce Decl. ¶ 12. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 63 | POST trains officers that the force they may use depends on the subject's conduct: only assaultive or life-threatening conduct will support significant or deadly force, and an overreaction in the use of force is excessive force.<br><br>Bryce Decl. ¶ 4. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 64 | California Penal Code section 835a permits deadly force only when necessary to defend against an imminent threat, one that "must be instantly confronted and addressed," and declares the state's policy that officers use available de-escalation techniques and exercise special care with persons in mental health crisis.<br><br>Bryce Decl. ¶ 4. | Undisputed that Mr. Bryce declared this.<br>Mr. Bryce misstates PC 835a when he says that it “declares the state's policy that officers use available de-escalation techniques and exercise special care with persons in mental health crisis.”<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |

| | | |
|---|---|---|
| 65 | Generally accepted police practices and POST training required the officers to treat Mr. Sosa as a person to be taken into protective custody for care, not as a criminal suspect, and to respond with time, distance, communication, and specialized resources.<br><br>Bryce Decl. ¶ 9. | Undisputed that Mr. Bryce declared this.<br>Disputed that POST training required officers to treat Mr. Sosa not as criminal suspect when he attempted to run an officer over with his car. Abraham BWC #1 at 3:30:59.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |
| 66 | Mr. Bryce opines that the officers placed themselves in a crossfire, with Officer Abraham firing from the doorway toward Officers Ayers, Crockett, and Aguilar in the breezeway, contrary to basic POST training, and that the crossfire was the product of their failure to plan, contain Mr. Sosa, and establish cover.<br><br>Bryce Decl. ¶ 11. | Undisputed that Mr. Bryce declared this.<br><br>Defendants object to and request the Court to strike the Bryce Declaration for the reasons stated in their separately filed objection and request to strike. |

DATED: November 9, 2026

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Maya Sorensen

Maya Sorensen
Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR