Mildred K. O'Linn (State Bar No. 159055)
*missy.olinn@manningkass.com*
Maya Sorensen (State Bar No. 250722)
*Maya.Sorensen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

v.

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,

Plaintiffs,

v.

CITY OF FRESNO and DOES 1-5,

Defendants.

Case No. 1:23-cv-01575-JLT-SAB

District Judge: Jennifer L. Thurston
Magistrate Judge: Stanley A. Boone

**DEFENDANTS' RESPONSE TO OLIVARES PLAINTIFFS' ADDITIONAL DISPUTED FACTS**

Judge: Hon. Jennifer L. Thurston
Date: November 20, 2026
Time: 9:00 a.m.
Crtrm.: 4

Pursuant to Local Rule 260(b) and Federal Rule of Civil Procedure 56(c), defendants respond to plaintiffs' additional material facts in opposition.

| ADF No. | OLIVARES PLAINTIFFS' ADDITIONAL FACTS | DEFENDANTS' RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 1. | Max Sr. has owned and operated a diesel-mechanic business since 2006. In the years before his death he saw Max two to four times a week, and Max helped him with the more difficult jobs, one or two times a week after work, work on engines and motors with computer problems. Max Sr. testified that Max "was the only one who knew what I knew."<br><br>Exs. 25, C (Sosa Sr. Dep.) 16:11-18, 29:17-20, 41:5-14, 41:25–42:3. Decl. of Maximiliano Sosa, Sr. ("Sosa Sr. Decl.") ¶¶ 2, 4–5. Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), Nos. 13, 22. | Undisputed that Max. Sr. testified to this.<br><br>Defendants object to and request the Court to strike Max Sr.'s declaration Max Sr.'s declaration for the reasons stated in their reply brief. |
| 2. | Max helped Max Sr. keep his larger clients, which were vital to the business and to Max Sr.'s ability to support himself. After Max died, Max Sr. had to let go of the accounts Max used to help him with because no one else could do the work, he has not found anyone who can, and the business has suffered failures.<br><br>Exs. 25, C (Sosa Sr. Dep.) 40:21–41:4, 41:15-24, 42:7-16. Sosa Sr. Decl. ¶¶ 6– 7. | Undisputed that Max. Sr. testified to this.<br><br>Defendants object to and request the Court to strike Max Sr.'s declaration Max Sr.'s declaration for the reasons stated in their reply brief. |

| | | |
|---|---|---|
| 3. | Max Sr. owns his business and his income depends on it. He takes no regular salary or draw and receives no Social Security or pension. He relies on the business to support himself, planned to have Max take it over when he became too old to work and to support him, and was relying on it to support him in retirement. [Undisputed in part; SUF 164–165.]<br><br>Exs. 25, C (Sosa Sr. Dep.) 45:24–46:9; Defs.' SUF Nos. 164, 165. Sosa Sr. Decl. ¶¶ 3, 9. | Disputed.<br><br>The evidence shows Max assumed over $50,000 in debt as a result of taking over his father's business.<br><br>Ex. 10 [Sosa Interview] at 5, 6, 8<br><br>Ex. 23 [Maria Dep.] 115:19-25.<br><br>The evidence also shows the business debt from Max Sr.'s business had not resolved at the time of Max's death.<br><br>Ex. 23 [Maria Dep.] 116:16-21.<br><br>Defendants object to and request the Court to strike Max Sr.'s declaration Max Sr.'s declaration for the reasons stated in their reply brief. |
| 4. | Max helped Max Sr. from time to time when he needed it, but not regularly. Most of the help Max gave him was helping him keep his business running. Max Sr.'s deposition answer that Max did not provide financial support was an answer about regular support.<br><br>Sosa Sr. Decl. ¶ 8. Exs. 25, C (Sosa Sr. Dep.) 29:14-16, 45:24–46:3. Maria Sosa Dep. 20:17– 21:1 (Little Decl. Ex. A). | Disputed.<br><br>Max did not provide Max Sr. with financial support during his lifetime.<br><br>Ex. 23 [Max Sr. Dep.] 29:14-16; 45:24-46:9.<br><br>Defendants object to and request the Court to strike Max Sr.'s declaration Max Sr.'s declaration for the reasons stated in their reply brief. |

| | | |
|---|---|---|
| 5. | Max saw how much Martha helped when she stayed with him in September and October 2023 and asked her to move into his home in Fresno as the live-in caregiver for his two young sons, and he agreed to support her. She slept in his home for two to three weeks and did the work of a live-in caregiver. While she was in Fresno Max gave her $200 in cash once or twice a month, and he gave her about $750 in cash to move out of her month-to-month apartment and move to Fresno. She gave notice on her tenancy, and the move came to nothing because Max died. At home she lives modestly on her disability benefit and her partner's partial support, but in Fresno she had no means of support of her own and Max supported her.<br><br>Exs. 24, D (Olivares Dep.) 34:12–35:4, 31:5-8, 37:12-24.<br><br>Resp. to Special Interrogs., Set Two (Little Decl. Ex. E), No. 13.<br><br>Decl. of Martha Zepeda Olivares ("Olivares Decl.") ¶¶ 4–9. | Undisputed that Martha testified to this.<br><br>Defendants object to and request the Court to strike Martha's declaration for the reasons stated in their reply brief. |
| 6. | Martha Zepeda Olivares is the court-appointed administrator of the Estate of Maximiliano Sosa, Jr., Fresno Superior Court No. 23CEPR01424. Her petition to terminate the proceedings and be discharged, filed July 1, 2026 and signed under penalty of perjury, states that "[t]he parties have agreed that Ms. Sosa is capable of representing the interests of the estate in the civil proceedings." The probate examiner has continued the hearing on the petition to November 4, 2026. No order has been entered affecting Martha's status.<br><br>Dkt. 84 at 5; Defs.' Mot. at 7–8, 10 n.3. Mayne Decl. Ex. K (Petition for Termination of Proceedings and Discharge) at 1 (item 4.h), 2. Little Decl. Ex. F (Probate Examiner Notes, reviewed Sept. 28, 2026). | Disputed. On November 4, 2026, the Fresno Superior Court's Probate Division terminated the estate proceedings, and Martha's status as the estate's representative is also terminated.<br><br>*See* Defendants' Request for Judicial Notice, Exs. A and B. |



MK MANNING | KASS

| | | |
|---|---|---|
| 7. | Martha and her son Max were very close. He called her often, spoke with her by video call two to four times a week, traveled the eight hours to visit her on her birthday, at Christmas and on other special dates, and had plans for her and his children. She drove to Fresno four or five times a year to see him and her grandsons. Since his death "it's not the same."<br><br>Exs. 24, D (Olivares Dep.) 28:3–29:7,<br><br>42:11–43:12.<br><br>Olivares Decl. ¶ 3. | Undisputed that Martha testified to this.<br><br>Defendants object to and request the Court to strike Martha's declaration for the reasons stated in their reply brief. |
| 8. | Max Sr. saw his son in person two, three or four times a week in the year before he died, often with his grandsons, for at least three hours and sometimes half a day. Since his son's death, "He's just not in my life anymore."<br><br>Exs. 25, C (Sosa Sr. Dep.) 29:17-20, 30:1-10, 37:3-4, 37:11-16; Sosa Sr. Decl. ¶ 10. | Undisputed that Max. Sr. testified to this.<br><br>Defendants object to and request the Court to strike Max Sr.'s declaration Max Sr.'s declaration for the reasons stated in their reply brief. |
| 9. | At 3:46 a.m. on November 4, 2023, dispatch broadcast that Max intended to commit suicide by cop. Ayers returned to Maria Sosa's apartment at 3:55 a.m., Abraham arrived at 4:12 a.m., and the officers heard a door at 4:35 a.m. The officers had been at the apartment for roughly forty minutes (Ayers) and more than twenty (Abraham) when Max returned.<br><br>Defs.' SUF Nos. 42, 43, 65, 86 (Dkt. 93-1) (undisputed in Dkt. 99-1) | Undisputed. |



MK MANNING | KASS

| | | |
|---|---|---|
| 10. | Ayers and Abraham regarded Max's return as likely. Ayers described "a decent probability" and agreed that he believed Max was "very likely" to come back and intent on suicide by cop; Abraham agreed that there was a high probability Max would come to the apartment and that Max was expressing an intent to force a confrontation with officers and to commit suicide by cop.<br><br>Ex. 26 (Ayers Dep.) 36:21-25; Mayne Decl. Ex. F (Ayers Dep.) 47:13-20; Ex. 27 (Abraham Dep.) 35:16-20, 50:7-14; Sosa SAMF Nos. 8–9 (Dkt. 99-2) | Undisputed |
| 11. | For approximately fifteen minutes before Max returned, Ayers and Abraham were together in the apartment with Maria Sosa.<br><br>Mayne Decl. Ex. G (Abraham Dep.) 69:4-7; Little Decl. Ex. B (Abraham Dep.) 76:13-21; Sosa SAMF No. 10 (Dkt. 99-2) | Undisputed. |
| 12. | In that time Ayers and Abraham did not discuss a tactical plan or what to do if Max arrived, whether non-lethal force would be used or by whom, or who would act as cover officer. Ayers testified there was no "explicit plan," that who would be contact and cover was "not spoken," and that they never discussed which of them would be the less-lethal option. Asked whether he had communicated the tactical objective to the other officers, Ayers answered, "We did not have the time to."<br><br>Mayne Decl. Ex. G (Abraham Dep.) 30:22–31:4; Mayne Decl. Ex. F (Ayers Dep.) 44:11-13, 44:24–45:8, 77:10-17; Sosa SAMF Nos. 10–11 (Dkt. 99-2) | Undisputed. |
| 13. | To Abraham's knowledge, no effort was made to move Maria out of the living room before Max returned. The one plan Abraham had, to leave through the bedroom window, was not communicated to the other officers.<br><br>Mayne Decl. Ex. G (Abraham Dep.) 77:12-18, 78:5-21, 80:2-5; Sosa SAMF No. 10 (Dkt. 99-2) | Undisputed. |

MK MANNING | KASS

| | | |
|---|---|---|
| 14. | The call was dispatched as a "1 Mary," which denotes a mental-health call or a suicidal subject, and the dispatch entry read "SUICIDAL MALE, NO WEAPS." A crisis-intervention officer was requested over the radio.<br><br>Mayne Decl. Ex. F (Ayers Dep.) 29:18-<br><br>Ex. 26 (Ayers Dep.) 18:8-19; Mayne Decl. Ex. B (CAD Report) at FRESNO 000241; Sosa SAMF No. 1 (Dkt. 99-2) | Undisputed. |
| 15. | Ayers tried to reach his sergeant so that a crisis negotiator might be sent, and did not reach him before the shooting. Ayers agreed that "[i]t would have definitely been beneficial to have a CNT." Ayers had not received advanced crisis-negotiation training and did not feel trained enough for this incident.<br><br>Ex. 26 (Ayers Dep.) 42:14-24, 43:3-11, 81:5-9; Mayne Decl. Ex. F (Ayers Dep.) 78:5-15; Defs.' SUF No. 170 (Dkt. 93-1); Sosa SAMF Nos. 17–18 (Dkt. 99-2) | Undisputed that Ayers testified to this. Ayers also testified, "I've got the training for dealing with people in crisis from the academy, field training, in-service, and also briefing trainings we have discussed it. I do not have the advanced crisis negotiation training, which I felt like could have been beneficial." Ayers Depo 77:5-9; 78:15 |
| 16. | No officer called a negotiator, or anyone with negotiation training, to the scene, and no one tried to have a negotiator reach Max by telephone, although Ayers had spoken to Max by telephone that night.<br><br>Ex. 27 (Abraham Dep.) 82:8-13; Mayne Decl. Ex. G (Abraham Dep.) 83:1-13; Ex. 28 (Crockett Dep.) 56:2-7; Mayne Decl. Ex. F (Ayers Dep.) 44:20-22; Sosa SAMF Nos. 14, 16 (Dkt. 99-2) | Undisputed. |
| 17. | Days after the shooting Abraham told a detective that if there had been "someone who's better at negotiating, they probably could talk him down."<br><br>Mayne Decl. Ex. G (Abraham Dep.) 72:14-21; Sosa SAMF No. 19 (Dkt. 99-2) | Undisputed. |

| | | |
|---|---|---|
| 18. | All four officers carried Tasers. Ayers, Abraham and Crockett also carried batons, and Ayers had pepper spray in his bag. Crockett had a less-lethal bean bag shotgun in his vehicle; he knew when he arrived that Max wanted to commit suicide by cop, and he did not consider bringing the shotgun from his vehicle. Abraham believed at least one responding officer had a less-lethal shotgun in his vehicle, and his own patrol car was parked about a hundred feet from the apartment. No officer had a less-lethal shotgun on his person when Max returned.<br><br>Mayne Decl. Ex. F (Ayers Dep.) 45:9-<br><br>Mayne Decl. Ex. G (Abraham Dep.) 39:20-24; Little Decl. Ex. B (Abraham Dep.) 73:5-16, 74:7-16; Mayne Decl. Ex. H (Crockett Dep.) 18:7-23, 20:13-15; Sosa SAMF No. 12 (Dkt. 99-2) | Undisputed. |
| 19. | Ayers testified that using less-lethal force inside the apartment "didn't cross my mind," and Abraham did not consider using his Taser against Max at any point while he was inside. Abraham testified that, depending on the circumstances, "a less-lethal option would be more feasible."<br><br>Mayne Decl. Ex. F (Ayers Dep.) 65:10-15; Ex. 27 (Abraham Dep.) 52:21-24; Mayne Decl. Ex. G (Abraham Dep.) 72:3-7; Sosa SAMF No. 12 (Dkt. 99-2) | Undisputed. |
| 20. | Aguilar agreed that an officer using a Taser can be covered by officers with less-lethal or lethal weapons, and that a bean bag shotgun is a less-lethal weapon.<br><br>Mayne Decl. Ex. D (Aguilar Dep.) 55:8-23, 55:24–56:2 | Undisputed. |

| | | |
|---|---|---|
| 21. | When the officers heard a car door at 4:35 a.m. and believed Max had returned, the apartment door was closed. Ayers and Abraham had their firearms holstered and, until the door was opened, Ayers agreed they were not facing an imminent threat. Ayers agreed that with the door closed Max could not have posed an immediate threat of death or serious bodily injury to him, Abraham or Maria, and never considered keeping it closed.<br><br>Little Decl. Ex. G (Ayers Dep.) 46:8-16; Ex. 26 (Ayers Dep.) 48:2-3, 48:21-24; Sosa SAMF Nos. 21–25 (Dkt. 99-2) | Disputed in part. Ayers testified "So when we heard the car door, we didn't know for a fact if it was him or not, so we went to check" and that it was "a possibility" that it was Mr. Sosa.<br><br>Ayers Depo 36:2-25.<br><br>Ayers also testified, "Mr. Sosa would, I would say, be a threat, not only to the officers that are there, but the other officers that would be responding to the apartment complex, and also any other civilians that might have been leaving their apartment, due to the previous threats that he had already made; his reckless driving, which showed no care for the public and other people on the road; and him trying to run over one of our police officers."<br><br>Ayers Depo 48:11-19. |
| 22. | Abraham opened the door without looking through the window or the peephole, without using his voice to ask who was outside, and with his firearm and Taser holstered. He testified that, knowing Max intended to force a confrontation and to commit suicide by cop, he would still have considered opening the door even if he had known Max was right outside.<br><br>Mayne Decl. Ex. G (Abraham Dep.) 36:21–37:11; Ex. 27 (Abraham Dep.) 50:7-18; Sosa SAMF Nos. 23–24 (Dkt. 99-2) | Undisputed. |
| 23. | The officers were trained that in a crisis time is the officer's ally, that clear communication with a person in crisis is very important, and that unjustified escalation of an incident is to be avoided.<br><br>Mayne Decl. Ex. F (Ayers Dep.) 60:23–61:6, 77:1-4; Sosa SAMF No. 49 (Dkt. 99-2) | Undisputed. |

| | | |
|---|---|---|
| 24. | Inside the apartment Max held a pair of kitchen scissors. He made no lunging motion, never tried to injure anyone, and harmed no one. Ayers believed him when he said he would not hurt his wife. When Aguilar told him not to step toward him he complied, holding the scissors pointed down, and less than a minute before the shooting he stood behind the kitchen counter with his hands resting on it.<br><br>Sosa SAMF Nos. 27–31 (Dkt. 99-2) and the evidence cited there | Undisputed. |
| 25. | Ayers told investigators that Max's movements inside the apartment were "not anything that would have warranted, you know, using deadly force or anything on him at the time," and testified that the statement was accurate. Abraham testified that before he opened the door Max was "not a serious threat." Crockett's only words to Max were "just chill," and the de-escalation he identified was a radio broadcast asking for more officers.<br><br>Ex. 26 (Ayers Dep.) 40:6-10; Mayne Decl. Ex. F (Ayers Dep.) 41:3-13; Mayne Decl. Ex. G (Abraham Dep.) 37:12-18; Ex. 28 (Crockett Dep.) 55:4-6, 55:12–56:1; Sosa SAMF No. 33 (Dkt. 99-2); Dkt. 99-1, SUF Nos. 172– 175 | Disputed. Officer Abraham was asked, "did you feel, at that point [before he opened the door], that you were facing a serious threat?" not whether Max was a serious threat.<br><br>Ex. G (Abraham Dep.) 37:12-18<br><br>Ayers testified that "There's a difference between 'warranted' and 'justified,'" and that "inside the apartment, … it may have been justified to use deadly force, but not warranted." Ayers Dep. at 84:8-85:2 (**Def. Ex. 33** to Supplemental Sorensen Declaration).<br><br>Defendants also object to the argumentative phrasing of this fact. |
| 26. | Ayers, Abraham and Crockett each based their belief that deadly force was justified on events earlier in the night and on Max's return with the scissors, and none of them pointed to any attempt to stab or strike anyone with the scissors.<br><br>Sosa SAMF No. 51 (Dkt. 99-2) and the evidence cited there | Disputed that "none of them pointed to any attempt to stab or strike anyone with the scissors." Officer Crockett testified that "the scissors were, yes, at his side, but the blade was pointed at me" and "Mr. Sosa was looking -- had his head down, face up, looking at me, as he charged towards me and yelled, and made a grunting, yelling sound."<br><br>Crockett Depo 67:19-68:6. |

| | | |
|---|---|---|
| 27. | At about 4:39 a.m. the officers called Maria out of the apartment without telling Max to stay inside or what to do. Ayers walked out ahead of Max into the breezeway, where Crockett and Aguilar were standing, and Abraham stayed in the apartment behind him.<br><br>Defs.' SUF Nos. 128–130 (Dkt. 93-1); Sosa SAMF Nos. 34–35 (Dkt. 99-2) | Disputed As Max turned to walk toward the door, Abraham said, "Wait. Stop, dude." **Def. Ex. 19** [Abraham BWC] at 4:39:20-4:39:26. It is also undisputed that as Max started walking toward the door, the Officers told him to "Wait," "Stop," and "Get back." Amended Joint Statement of Undisputed Fact, No. 133.. |
| 28. | Before Max crossed the threshold Aguilar had decided to Tase him there and had told Crockett so. Aguilar was trained, and agreed, that it is human nature to move away from something that causes pain, and he considered that Max would move away from the Taser. The breezeway was "a very small, tight space" with "not enough room," there was no avenue of escape, and the only directions Max could go led toward officers: the breezeway where the officers stood, or back into the apartment toward Abraham.<br><br>Ex. 29 (Aguilar Dep.) 49:21–50:11, 30:23–31:12; Mayne Decl. Ex. D (Aguilar Dep.) 20:7-14, 23:6-24:19, 55:2-7; Sosa SAMF Nos. 36–38 (Dkt. 99-2) | Disputed. Officer Aguilar testified "it's possible" that a subject may run away or flee in reaction to being struck by non-lethal force and that "it just depends on the circumstances of whatever you're dealing with, and the person you're dealing with." He also testified that depending on the circumstances of whatever call you're on, sometimes it's -- if feasible and if safe, you can leave a specific place or avenue." Aguilar Depo 20:3-22:12.<br><br>Aguilar also testified that the Officers did not intend to give Max an "avenue of escape" because they had probable cause to arrest him for several violent crimes. Aguilar Dep. at 57:21-58:11 (**Def. Ex. 32** to Supplemental Sorensen Declaration). |

| | | |
|---|---|---|
| 29. | Max crossed the threshold at 4:39:25 a.m. with the scissors pointed down. Aguilar Tased him one second later, at 4:39:26, without warning. Max moved away from the Taser's pain along the only path leading away from the apartment, through the officers. At 4:39:28, two seconds into the Taser's five-second cycle, Ayers, Crockett and Abraham fired without warning.<br><br>Defs.' SUF Nos. 134, 135, 140 (Dkt. 93-1); Ex. 29 (Aguilar Dep.) 50:18-22; Sosa SAMF Nos. 39–44 (Dkt. 99-2); Dkt. 99-1, SUF Nos. 134–140 | Disputed that Mr. Sosa "moved away from the pain" as it lacks foundation and is unsupported by the cited evidence. |
| 30. | Abraham fired from behind Max, seeing mostly his back, toward the area where Crockett, Ayers and Aguilar were standing, although he was trained to avoid firing in the direction of other officers because of crossfire. One bullet entered Max's mid-back and passed through his right lung and heart.<br><br>Ex. 27 (Abraham Dep.) 86:6–87:10; Mayne Decl. Ex. I (Coroner's Report) at FRESNO 000230, 000234; Sosa SAMF No. 46 (Dkt. 99-2) | Undisputed, but irrelevant, as to Abraham's position and the entry point of one bullet. Defendants object to the argumentative phrasing of this fact. |
| 31. | Crockett agreed that the scissors were in Max's right hand at his side, and that he had told an investigator he was not sure Max was even fixated on him.<br><br>Ex. 28 (Crockett Dep.) 66:2-19 | Undisputed. |
| 32. | Ayers told investigators that once he saw Max at the door, "it seemed like I just knew that the only way that this incident was gonna end was, how it did."<br><br>Mayne Decl. Ex. J (Ayers Interview) at FRESNO 000566; Sosa SAMF No. 50 (Dkt. 99-2) | Undisputed. |

MANNING | KASS

DATED: November 9, 2026

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Maya Sorensen
Maya Sorensen
Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR