Mildred K. O'Linn (State Bar No. 159055)
*missy.olinn@manningkass.com*
Maya Sorensen (State Bar No. 250722)
*Maya.Sorensen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF FRESNO, FMR. POLICE CHIEF PACO BALDERRAMA, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

| | |
|---|---|
| MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,<br><br>Defendants. | Case No. 1:23-cv-01575-JLT-SAB<br><br>District Judge: Jennifer L. Thurston<br>Magistrate Judge: Stanley A. Boone<br><br>**SUPPLEMENTAL DECLARATION OF MAYA SORENSEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Jennifer L. Thurston<br>Date: November 20, 2026<br>Time: 9:00 a.m.<br>Crtrm.: 4 |
| MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximilian Sosa,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF FRESNO and DOES 1-5,<br><br>Defendants. | |

**DECLARATION OF MAYA SORENSEN**

I, Maya Sorensen, declare as follows:

I am an attorney with Manning & Kass, Ellrod, Ramirez, Trester LLP, counsel for Defendants City of Fresno, Former Chief Paco Balderrama, Officer John Ayers, Officer Jonathan Abraham, Officer Brandon Crockett and Officer Anthony Aguilar in this action. I submit this declaration in further support of Defendants' Motion for Summary Judgment and in response to Plaintiffs' oppositions to that motion. The facts set forth in this declaration are based on my personal knowledge and documents maintained by Manning & Kass in the ordinary course of business. These facts and events are true, or believed by me to be true, and I would testify competently to them if called upon to do so.

1. Attached as **Exhibit 31** are true and correct excerpts of the deposition of Officer Jonathan Abraham, taken in this action on April 23, 2026.

2. Attached as **Exhibit 32** are true and correct excerpts of the deposition of Officer Anthony Aguilar, taken in this action on April 23, 2026.

3. Attached as **Exhibit 33** are true and correct excerpts of the deposition of Officer John Ayers, taken in this action on April 22, 2026.

4. Attached as **Exhibit 34** are true and correct excerpts of the deposition of Maria Sosa, taken in this action on July 28, 2025.

5. Attached as **Exhibit 35** are true and correct excerpts of the deposition of Richard Bryce, taken in this action on September 10, 2026.

6. Attached as **Exhibit 36** is a true and correct copy of Mr. Bryce's Rule 26 report in this action, dated July 20, 2026, which was entered as Exhibit 2 to his deposition.

///

///

///

///

///

///



MK MANNING | KASS

7. Attached as **Exhibit 37** is a true and correct copy of Fresno Police Department correspondence dated October 3, 2024, produced to Plaintiffs in this action bearing Bates No. FRESNO 001580.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 9, 2026, in San Franscisco, California.

/s/ *Maya Sorensen*
Maya Sorensen
Attorney for Defendants

MANNING | KASS

# EXHIBIT 31

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through
Guardian ad litem JENNIFER LOPEZ,
M.S. by and through guardian ad litem
JENNIFER LOPEZ, individually and
as successors-in-interest to
Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS,
BRANDON CROCKETT,
JONATHAN ABRAHAM, and
ANTHONY AGUILAR,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JONATHAN ABRAHAM

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

NICHOLAS MILES LERMAN, ESQ.
6033 West Century Blvd., Ste 740
Los Angeles, CA 90045
nmlerman0@yahoo.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Officer Anthony Aguilar
Ms. Zepeda Olivares
Mr. Sosa, Senior
Jasmine Tanoury, Paralegal

Karen Torres-Corona, Videographer

--oOo--

## INDEX OF EXAMINATION

WITNESS: JONATHAN ABRAHAM

EXAMINATION BY PAGE

MR. MAYNE..............................5

MR. LITTLE............................65

## EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

3 - Video excerpt, Bates No. 690.................61

--oOo--

threshold?

A. From my perspective, I observed Officer Aguilar, he employed his Taser, but it didn't -- it didn't get the full neuromuscular incapacitation. He winced, he stumbled to his left -- or Mr. Sosa stumbled to his left, against the adjacent wall of the opposing apartment.

And then he -- from my perspective, he did some type of swiping motion. It appeared to me that he was trying to get, like, at least the wires off or the prongs off. And then he took two large steps, advancing toward Officer Crockett, Officer Ayers, and Officer Aguilar, with the pair of scissors still in his hand, like, he -- I think at one point I remember he was in arm's reaching distance to even grab Officer Crockett's muzzle of the gun --

(Reporter clarification.)

THE WITNESS: -- and Officer Ayers's muzzle of the gun.

MS. O'LINN: Are you going to ask him another question?

MR. MAYNE: Yes. I'm about done, and then I'll turn it over to Mr. Little.

BY MR. MAYNE:

Q. During the time Mr. Sosa was in the apartment,

how close did he get to you, at the closest? What was the closest he got to you?

A. From the -- from my perspective, from my chest to even the pair of scissors when he punched out, it was approximately 1 yard from my chest to his chest. It was, at the most, 3 yards, 2 to 3 yards.

Q. But at some point, he got within 3 feet of you measuring from your chest to his chest?

A. Yes.

MS. O'LINN: That's the closest he got, is what the question was, ever.

THE WITNESS: I would have to say the closest would be 2 yards from my chest to his chest.

BY MR. MAYNE:

Q. Oh, I thought you said 1 yard?

MS. O'LINN: The question is what's the closest he ever got to you, inside.

THE WITNESS: From inside, it would be from his chest to my chest, would be two to three.

BY MR. MAYNE:

Q. Two to three what?

A. Yards.

Q. Yards.

MS. O'LINN: Counsel, I need to take a break.

MR. MAYNE: Okay.

MS. O'LINN: We can just take 5 minutes.

MR. MAYNE: Let's do 5. We'll be back at 46 after.

MS. O'LINN: We're off the record at 11:41 a.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 11:45 a.m.

BY MR. MAYNE:

Q. Okay. I wanted to give you a chance to clear up an answer to a previous question. So during the period of time that Mr. Sosa was in the apartment, what was the closest he got to you?

A. I would have to say, approximately, 1 yard.

Q. And is that measured between your chest and his chest?

A. I would have to say, it's from my chest to the scissors.

Q. Okay. Thank you.

And I'm going to share an exhibit now, a short video that we'll play, and then I'll ask a couple questions about that, and we'll turn it over to Mr. Little after that.

(Exhibit Number 3 was marked.)

MS. O'LINN: Is it the same video, Mr. Mayne?

MR. MAYNE: No. It's a different video.

So is the reason that one officer would use non-lethal force and the other use lethal force, is the goal of that to try to resolve that situation without having to use lethal force?

A. Yes.

MS. O'LINN: I think the word "formation" throws him off, Counsel, because I don't think they use that term with regard to non-lethal cover. I'm not positive, but I think that's the issue.

BY MR. MAYNE:

Q. Were you trained that deadly force is the highest level of force an officer can use?

A. Well, the level of force use is objectively reasonable under the totality of the circumstances, sir.

Q. But is deadly force the highest level of force?

A. I'm sorry. Can you repeat that question?

Q. Were you trained that deadly force is the highest level of force?

A. Yes.

Q. Were you trained that deadly force should only be used when there is an immediate or imminent threat of death or serious bodily injury?

A. Yes.

Q. Were you trained if that threshold is not met, you should not use lethal force?

if you could determine who was arriving?
A. No, sir.
Q. Did you use your voice, by giving orders or asking questions, to try to find out who was outside the door before you opened it?
A. No, sir.
Q. Before you opened the door, did you have your gun holstered?
A. Yes, sir.
Q. And your Taser holstered?
A. Yes, sir.
Q. Did you feel, at that point, that you were facing a serious threat?
MS. O'LINN: When he opened the door? Before he opened door?
BY MR. MAYNE:
Q. Before you opened the door.
A. No, not a serious threat.
Q. Could you elaborate? "Not a serious threat." But it sounds like you're saying you thought you faced some threat?
A. Yes.
Q. What level of threat do you think you faced?
A. Well, the threat of Mr. Sosa coming back. Because early on in the call for service, he was

possibly drunk driving; he tried striking one of my officers that came inches away from him. He fled. He evaded police.

He ran through stop signs. He ran -- he disregarded the public safety. He was driving recklessly. He kept -- he made repeated attempts of coming back to the apartment.

I think -- I believe it was at least three pursuits. And then, overall, even when Officer Ayers is on the phone, he was making direct threats to Officer Ayers and to the male subject. I believe Mrs. Sosa was seen, so there was still a threat of him coming back.

Q. And when you did open the door, how far away was Mr. Sosa from you?

A. I remember opening the door, standing at the threshold. He was walking -- he was quickly walking toward me, I would say from my chest to his chest, about 1 to 2 yards away, but he was still closing in on me.

MS. O'LINN: Will you let me know when you're ready to take our first break?

MR. MAYNE: Sure. I didn't hear that, Ms. O'Linn. You said you want to take a break?

MS. O'LINN: I said let us know when we can take our first break.

MR. MAYNE: Well, I was saying earlier if you

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

_______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT 32

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through Guardian ad litem JENNIFER LOPEZ, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, and ANTHONY AGUILAR,

Defendants.
________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

ANTHONY AGUILAR

THURSDAY, APRIL 23, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24522

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

NICHOLAS MILES LERMAN, ESQ.
6033 West Century Blvd., Ste 740
Los Angeles, CA 90045
nmlerman0@yahoo.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Officer Jonathan Abraham
Ms. Zepeda Olivares
Mr. Sosa, Senior
Jasmine Tanoury, Paralegal

Karen Torres-Corona, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: ANTHONY AGUILAR

EXAMINATION BY PAGE

MR. MAYNE..............................5

MR. LITTLE............................39

MS. O'LINN............................57

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

(None marked.)

--oOo--

Anthony Aguilar

A. Not from what I heard.

Q. Did you ever hear any of the other officers on scene try to develop a rapport with him the same way that you tried?

A. I only heard one person, and that was Officer Abraham.

Q. Okay. All right. And are you saying you heard him talk, or are saying you heard him try to build a rapport?

A. Build a rapport.

MR. LITTLE: I don't have anything further. Thank you, sir.

THE WITNESS: Thank you.

MS. O'LINN: Mr. Mayne, do you have any follow-up?

MR. MAYNE: No, I don't.

MS. O'LINN: Okay. I just have a couple of questions.

EXAMINATION

BY MS. O'LINN:

Q. Officer Aguilar, you were asked questions about avenue of escape. At the time of this incident when you arrived at the location, did you have an understanding that there was probable cause to arrest Mr. Sosa for crimes?

A. Yes.
Q. What was your understanding of the existence of probable cause to arrest him for any crime when you arrived at the apartment?
A. I knew that he was going to be arrestable for possibly driving under the influence. We have assault on a police officer. We had criminal threats. And then we also had -- that's all I can think of at the moment.
Q. So were you looking to give him an avenue of escape?
A. No.
Q. With regard to the interactions between Officer Ayers and Mr. Sosa, you've watched the body-worn camera footage; correct?
A. Yes.
Q. And his verbal interactions with Mr. Sosa on the phone and in person, you didn't observe those yourself, in person?
A. Correct.
Q. Did you -- when you watched the videos, did you observe Officer Ayers attempting to build rapport with Mr. Sosa?
A. Yes.
Q. Did you observe, in your review of the videos, Officer Abraham trying to build rapport with Mr. Sosa?

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 11th day of May, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT 33

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

MARIA SOSA, L.S. by and through
Guardian ad litem JENNIFER LOPEZ,
M.S. by and through guardian ad litem
JENNIFER LOPEZ, individually and
as successors-in-interest to
Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, JOHN AYERS,
BRANDON CROCKETT,
JONATHAN ABRAHAM, and
ANTHONY AGUILAR,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEOTAPED DEPOSITION OF

JOHN AYERS

WEDNESDAY, APRIL 22, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 24521

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: COOPER MAYNE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
cmayne@galipolaw.com

LAW OFFICE OF KEVIN G. LITTLE
BY: KEVIN G. LITTLE, ESQ.
P.O. Box 8656
Fresno, CA 93747
kevin@kevinglittle.com

FOR THE DEFENDANTS:

MANNING & KASS ELLROD RAMIREZ TRESTER, LLP
BY: MILDRED O'LIN, ESQ.
One California Street, Suite 900
San Francisco, CA 941114
Missy.OLinn@manningkass.com

ALSO PRESENT:

Said Hofiani, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: JOHN AYERS

EXAMINATION BY PAGE
MR. MAYNE............................6, 81
MR. LITTLE.............................59

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE
Ex 1 - Statement................................89

--oOo--

your statement?

A. Yes.

Q. So what I'm trying to understand is, it seems like your testimony here to today is different from the statement. And I'm just hoping to give you an opportunity to explain maybe it isn't, or maybe there's a reason it is.

But was your testimony, essentially, that when you were in the apartment and Mr. Sosa was taking steps towards the officer, or you, it wasn't anything that would have warranted deadly force?

A. Yes.

Q. Is that your same opinion today?

A. Yes. There's a difference between "warranted" and "justified." So warranted could be my opinion as to what I thought at the time, whether or not it was warranted for me to use deadly force; but that's regardless on if it was justified.

So what I was saying earlier is that it would have been justified; but at the time, I didn't feel like it was warranted to use deadly force outside of the apartment.

Q. So your testimony today is that inside the apartment, it may have been warranted to use deadly force, but it would -- it may have been justified to use

deadly force, but not warranted?

A. Yes.

Q. Okay. The last question was how far away from Officer Crockett was Mr. Sosa, when you fired your weapon?

A. It happened so fast. Approximately, less than a foot.

Q. Who was Mr. Sosa directing his movement towards at the time you fired?

A. Officer Crockett.

MS. O'LINN: Never believe a lawyer when they say they have one more question.

But, Counsel, are you done?

MR. MAYNE: Yeah, I am done.

MS. O'LINN: Mr. Little, I presume you're done?

MR. LITTLE: I don't have anything else. Thank you, sir.

MS. O'LINN: I have no questions.

THE VIDEOGRAPHER: Kimberly, would you like to get copy orders on the record?

THE CERTIFIED STENOGRAPHER: Yes, one moment.

Ms. O'Linn, are you ordering a copy?

MS. O'LINN: Yes. We'll take a full transcript, with a condensed and index. Please make sure you include my secretary, Delia Flores, on all

STATE OF CALIFORNIA)
                   ) ss:
COUNTY OF BUTTE    )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of May, 2026.

______________________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT 34

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- o0o --

CERTIFIED COPY

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.,

Plaintiffs,

vs.

Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

(CONTINUED ON PAGE 2)

______________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
MARIA DEL CARMEN SOSA

Fresno, California
Monday, July 28, 2025
10:10 a.m. to 4:17 p.m.

By: Gracie E. Becerra, CA CSR No. 13136
Our File No.: 8403

FRESNO DEPOSITION REPORTERS
516 WEST SHAW AVE., STE. 111, FRESNO, CALIFORNIA
P.O. BOX 755, WOODLAKE, CALIFORNIA 93286

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-- o0o --

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually, and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

v. Case No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO and DOES 1-5,

Defendants.

______________________________

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF MARIA DEL CARMEN SOSA

Fresno, California
Monday, July 28, 2025
10:10 a.m. to 4:17 p.m.

By: Gracie E. Becerra, CA CSR No. 13136
Our File No.: 8403

-- o0o --

The deposition of Maria Del Carmen Sosa was taken in the above-entitled matter pursuant to stipulation via videoconference by all counsel, Maria Del Carmen Sosa, and the court reporter.

The witness' physical location for the taking of the deposition was: Fresno, California.

The reporter's physical location for the taking of the deposition was: Tulare County, California.

-- o0o --

A P P E A R A N C E S

For the Plaintiffs, MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem JENNIFER LOPEZ, individually, and as successors-in-interest to Maximiliano Sosa:

LAW OFFICES OF DALE K. GALIPO
By: Cooper Alison-Mayne, Esq.
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(818) 347-3333

STEVEN A. LERMAN & ASSOCIATES, INC.
By: Nicholas Lerman, Esq.
nmlerman@yahoo.com
6033 West Century Boulevard, Suite 740
Los Angeles, California 90045
(310) 659-8166

For the Plaintiffs, MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, SR.:

LAW OFFICE OF KEVIN G. LITTLE
By: Kevin G. Little, Esq.
kevin@kevinglittle.com
- and -
Michelle Tostenrude, Esq.
michelle@kevinglittle.com
Post Office Box 8656
Fresno, California 93747
(559) 342-5800

APPEARANCES CONTINUED

For the Defendants, CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, and POLICE CHIEF PACO BALDERRAMA:

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
By: Lynn L. Carpenter, Esq.
Lynn.Carpenter@manningkass.com
801 S. Figueroa Street, 15th Floor
Los Angeles, California 90017
(213) 624-6900

Also appearing via videoconference:

Maximiliano Sosa, Sr., Plaintiff
Martha Zepeda Olivares, Plaintiff
Heather Gillespie, videographer

-- o0o --

these are my statements, but I don't remember in details specifically, so I -- I can't answer that question if he was driving or not.

Q. Were you aware on the night of the incident that Max was involved in a pursuit with the police?

A. I want to say at one point -- I don't know if somebody told me or I heard it between the officers, but I -- I do recall something about that.

Q. And do you -- okay. And do you recall the specific statement from Max that you said here in your interview, "I'm gonna take a cop with me" or "take a pig with me," because that's in quotes?

A. Right. Yeah. I -- today I -- I don't remember anything.

Q. But when you told the investigators, were you telling them the truth?

A. Yes. I -- I -- I was in shock. But when the officers came in, I was having so much anxiety and it's like adrenaline took over and I just -- I answered everything as it -- as I remembered from that night. So, yes, everything that I said was from what I remembered that night.

Q. Okay. And then from the way you're describing it, it sounds like the incident was fresher in your mind back then than it is now.

A. Yeah.

I, Gracie E. Becerra, CSR 13136, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn via video conference pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand via video conference and thereafter reduced to text under my direction.

X     That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

No changes have been provided by the witness during the period allowed.

The changes made by the witness are appended to the transcript.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 12th day of August, 2025.



Gracie E. Becerra, CSR 13136

# EXHIBIT 35

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

MARTHA ZEPEDA OLIVARES, individually and on behalf of the ESTATE OF MAXIMILIANO SOSA, JR.; MAXIMILIANO SOSA, JR.,

Plaintiffs,

vs. — No. 1:23-cv-01575-JLT-SAB

CITY OF FRESNO, UNKNOWN LAW ENFORCEMENT OFFICERS, POLICE CHIEF PACO BALDERRAMA and DOES 1-30,

Defendants.

_______________________________

MARIA SOSA, L.S. by and through guardian ad litem MARIA SOSA, M.S. by and through guardian ad litem, JENNIFER LOPEZ, individually and as successors-in-interest to Maximiliano Sosa,

Plaintiffs,

vs.

CITY OF FRESNO and DOES 1-5,

Defendants.

_______________________________

---o0o---

VIDEOCONFERENCE DEPOSITION OF RICHARD BRYCE
Thursday, September 10, 2026
Reported Remotely via Zoom
Reported by Laura L. Stewart, CSR No. 5277

A P P E A R A N C E S

---o0o---

FOR THE PLAINTIFF MARTHA ZEPEDA OLIVARES:

LAW OFFICES OF KEVIN G. LITTLE
P.O. Box 8656
Fresno, California 93747
BY: MICHELLE TOSTENRUDE, ESQ.
559.342.5800
kevin@kevinglittle.com

FOR THE PLAINTIFFS MARIA SOSA, L.S., M.S., and JENNIFER LOPEZ:

STEVEN A. LERMAN & ASSOCIATES, INC.
6033 West Century Bouelvard
Suite 740
Los Angeles, California 90045
310.659.8166
BY: NICHOLAS A. LERMAN, ESQ.
310.659.8166
nlerman@lermanslaw.com

LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard
Suite 310
Woodland Hills, California 91367
BY: COOPER ALISON-MAYNE, ESQ.
818.347.3333
cmayne@galipolaw.com

FOR THE DEFENDANTS CITY OF FRESNO, JOHN AYERS, BRANDON CROCKETT, JONATHAN ABRAHAM, ANTHONY AGUILAR, AND POLICE CHIEF PACO BALDERRAMA:

MANNING & KASS ELLROD, RAMIREZ, TRESTER, LLP
801 South Figueroa Street
15th Floor
Los Angeles, California 90017-3012
BY: MAYA R. SORENSEN, ESQ.
213.624.6900
maya.sorensen@manningkass.com

INDEX OF EXAMINATION

---o0o---

| RICHARD BRYCE | PAGE |
|---|---|
| BY MS. SORENSEN | 4 |

INDEX OF EXHIBITS

---o0o---

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 6-page Notice of Deposition of Plaintiff's Expert Richard Bryce | 63 |
| 2 | 19-page Rule 26 Report | 63 |

document information that's listed in this report, which includes -- what is it? -- 59 separate things.

Q. Anything else besides reviewing the documents?

A. Well, my own personal knowledge and experience.

Q. How did you apply your own personal knowledge and experience to formulate your opinions?

A. After reviewing the reports of the incident, and then I would apply my knowledge and experience in offering opinions on what was done.

Q. Are there any other materials that you reviewed other than this list of 59 case materials?

A. Not that I recall.

Q. Are there any materials or evidence that you are aware of that you didn't review before preparing your opinions?

A. No.

Q. Now, when reviewing the body-worn camera footage, did you conduct a frame-by-frame analysis?

A. Not a frame by frame, no. I mean, I stopped it frame by frame in various areas, but not in its entirety.

Q. What would make you stop to review a scene frame by frame?

A. If I wanted to see very specific things in it.

Q. As a patrol deputy, did you have body-worn cameras?

A. No.

Q. So for your review in this case, did you apply any established peer-reviewed analytical methods or checklists for reviewing officer-involved shootings?

A. Could you repeat that? I'm sorry.

Q. Sure.

Did you apply any established peer-reviewed analytical methods or checklists for reviewing officer-involved shootings?

A. I didn't have a checklist of doing that. I -- I don't completely understand what you are asking, but I utilized standard jail -- or standard police practices in reviewing these.

Q. Are you aware of any standards for reliability specific to forensic police practices review?

A. Not specifically, no.

Q. Did you conduct any independent site visits to the scene?

A. No.

Q. Going back to when you were a law enforcement officer or involved in law enforcement, had you ever conducted a scene reconstruction?

A. A scene reconstruction? Yes.

Q. When was the last time you did that?

A. Well, it would have been I think when I was a

determine exactly what happened.
Q. Did you utilize a biomechanics engineer to do the scene reconstruction?
A. No.
Q. Who did you use with expertise in scene reconstruction when you did that, if anybody?
A. I'm sorry. The best recollection I have -- the most recent one was utilizing officers on the department that were involved in the incident and doing the best we could to reconstruct the scene.
Q. We're making really good time. Let me just go through a few questions here, and then I personally need to take a break. So let me just get through these, and then we can take our first break. But I think this will be shorter than I expected.
Are all of the opinions that you plan to offer at trial contained in the Rule 26 report that you provided?
A. Yes.
Q. Are there any opinions you intend to offer that are not summarized in your report?
A. I don't know what questions I'm going to be asked, but I have none off the top of my head at this time.
Q. Have you updated or supplemented your opinions since you prepared this report?
A. No.

Q. Are all the bases for your opinions included in your report, or do you have any additional bases not identified in the materials section?

A. I don't believe so. No.

Q. Are there any opinions that you have about this case that plaintiffs' counsel specifically asked you to reach?

A. Well, they expressed their concerns about the case and the aspects. I took those into consideration. Yes.

Q. But did they ask you to render any specific opinions?

A. Well, as I stated in this, they asked me to render my opinions -- the appropriateness of the shooting of Mr. Sosa.

Q. Did they ask you to please opine that the use of force was excessive?

A. No.

Q. Have you ever been asked to change or revise your opinions in this case?

A. No.

MS. SORENSEN: All right. I think now is a good time for us to take a break. I would just ask for no more than 10 minutes, if that's okay with everybody.

MR. LERMAN: Sure.

MS. SORENSEN: All right. Be right back.

(Off the record from 2:01 P.M. to 2:11 P.M.)

Q. BY MS. SORENSEN: All right, Mr. Bryce. You listed a number of POST learning domains. It looks like you have five learning domains that you listed in your review and preparation to render an opinion in this case --

A. Yes.

Q. -- is that correct?

What version and date of the POST learning domains did you rely on?

A. 20, 21, 22, 23, and 37 which also involves --

Q. And what were the -- sorry.

A. -- Penal Code Section 835a.

Q. What are the dates of those learning domains?

A. The dates?

Q. Yes.

A. I don't have those. I'd have to look them up.

Q. Do POST training materials mandate specific outcomes, or do they leave discretion to officers based on circumstances?

A. Well, they provide guidelines. In this case, primarily in the use of force in dealing with an individual. They're not laws. And then departments use them to formulate their policy and procedures.

Q. None of those POST learning domains mandate that a

Q. Is it your opinion that the officers violated POST policy or legal standards, or both?

A. Both.

Q. In your report you talk about officer-created jeopardy.

How do you define "officer-created jeopardy"?

A. When their actions create or further bring about the hazards or dangers in the situation.

Q. The term "officer-created jeopardy," is that a term that's used in POST at all?

A. I don't recall whether -- the specific location of that.

Q. Now, what specific actions by the officers in this case, in your view, created the unjustified jeopardy?

A. Well, their failure to use reasonable force because they failed to summon the interaction or de-escalation, the interaction of the resources that they had to deal with this with a person with a mental disability.

Then another area where they put themselves in jeopardy was when -- let's see. It was Officer Abraham fired at the back of Mr. Sosa. There was an officer standing pretty close to right in front of him, and he -- he substantially put that officer in a dangerous situation of crossfire, if you will.

A. Well, jeopardy can really be at any time within a -- it would depend on the circumstances.

Q. And what circumstances would it depend on?

A. What the individual was doing.

Q. When does it become officer-created jeopardy versus suspect-created jeopardy?

MR. LERMAN: I'll just object to the extent that it's vague, overly broad, and incomplete hypothetical.

THE WITNESS: They -- they could intercede with one another. Both of them could be doing something that brings about jeopardy to the officers.

Q. BY MS. SORENSEN: Is there any kind of quantifiable method for measuring when a situation has become an officer-created jeopardy scenario?

A. It would be specific to the incident, not overall.

Q. So you mentioned that there are alternative tactics available to the officers, and one of the tactics you mentioned was utilizing a taser.

Are there any alternative tactics specifically that you believe were available to the officers?

MR. LERMAN: I'll just object. Vague as to time.

MS. SORENSEN: Yes. I should specify.

Q. BY MS. SORENSEN: Between the time that Mr. Sosa entered the apartment until the shooting.

A. Is there any other -- well, again, when he was in

ahead.

Q. Go ahead.

A. When he was coming out of his apartment, he had the scissors behind his back -- both hands behind his back, holding the scissors behind his back. Then as he proceeded out, he was tased, and he pulled his hands up to his chest where the wound was from being tased.

And then he started to run, and then he was shot. He dropped his right hand down to his side. But he never made an aggressive move with the scissors towards any of the officers.

Q. This was your observation based on your review of the body-worn camera; correct?

A. Yes.

Q. At the point you were reviewing that body-worn camera footage of that scene, were you doing a frame-by-frame pause and analysis?

A. In some sections of it I did, yes.

Q. Did you use anybody with technical or video expertise to interpret the body-worn camera?

A. No.

Q. So turning to your opinions on de-escalation, do you believe that de-escalation or nonlethal force was feasible and available for use?

A. For me?

Q. I'm saying -- I'm asking you -- well, let me ask it this way.

On what evidence do you base your opinion that de-escalation was feasible and available?

A. Well, they testified that -- let me see the exact thing. That CNT or CIT was available to them.

Q. I'm sorry. You are saying that the officers themselves said that CNT or CIT was available at that time?

A. Yes. Officer Aguilar stated that in his deposition, to quote my report. It was asked, "So it sounds like what you're saying is that there could have been, that night, someone from CNT available had they been summoned?" And he responded, "Yes."

Q. Did you review any testimony that stated that CNT was ready to respond?

A. I don't recall that.

Q. Are there any policies that you reviewed that govern when officers must seek CIT or CNT resources?

A. I'd have to review the Fresno City policy specific to that. But most commonly in law enforcement, they're instructed whenever possible in these kind of situations -- especially involving people with mental health issues -- to request assistance for de-escalation.

Q. Just to clarify, is it your contention that a crisis negotiation team or a crisis intervention team was

actually available to respond to the scene at the time?
A. That's what Officer Aguilar said.
Q. How did you determine the timeline for availability and potential arrival of CIT or CNT personnel?
A. I didn't. They weren't requested.
Q. Did you analyze whether delays in summoning these resources could have increased or decreased risks at the scene?
A. Well, the purpose of requesting them or having them come is to help de-escalate and reduce the magnitude of the situation.
Q. So do you believe that summoning the CIT or CNT personnel would have decreased the risk at the scene?
A. I'm sorry. Could you repeat that?
Q. Sure.
Do you believe that had crisis negotiators come to the scene, that the risks would have decreased?
A. That would be the purpose of it. I wouldn't know if -- until they got there and tried. But that's -- that's why it's in the policy in departments, is to do everything we can to respect the sanctity of life. To utilize every resource available to de-escalate a situation like that and to avoid using deadly force.
Q. What is your understanding of the officers' ability to delay engagement with the suspect while waiting

for resources like a crisis negotiating team?
A. What could they have done?
Q. Yes.
A. Well, they could have kept him in the apartment.
Q. How would you think they could best keep him in the apartment?
A. Well, to try to keep conversing with him in there until they arrived. But this is all hypothetical, because they didn't request. So it doesn't -- it's -- it didn't exist. They didn't request, so there was no -- no benefit from those two teams responding. If you don't request them, they don't come.
Q. Right.
But if you do request them, it does take some time for them to come to a scene; correct?
A. Yes. It takes some time, depending on where they are when the request is made.
Q. So is it your testimony that the officers could have delayed engagement with Mr. Sosa by locking him in the apartment?
A. That could be one possibility. They were taking his ex-wife out of the apartment, and if necessary, they could have stayed in there with him. Or if absolutely necessary, locking him in until they got more help.
Q. Did you take into account officer safety

And, as a matter of fact, as you can see in the body-worn cameras, he was running parallel to the wall. He never aligned himself with the officers themselves.

Q. Well, were the officers up against or at least very close to the wall, from your observation?

A. Well, they were in a few feet of the wall, but they weren't right against the wall, and he was staying right against the wall. Again, they should have used tasers to try to subdue him.

Q. How many times, approximately, did you view the officers' body-worn camera footage?

A. Well, I'd say 15 times, at least.

Q. Was there a specific video that you reviewed 15 times, or would it have been -- yeah. Let me reask that.

Was there a specific video that you estimate you reviewed 15 times?

A. No. All of them.

Q. Did you ever conduct a slow motion or enhanced analysis of the footage?

A. I didn't have the capability at that time of slowing it down. I'd stop it and kind of go frame by frame.

Q. Was any of your analysis influenced by limitations, such as camera angle, positioning, lighting, or audio?

A. No.

Q. Did you rely on any assumptions regarding where Mr. Sosa's hands or scissors were based on things not visible in the video?
A. No. I could see them plainly in the video.
Q. Were you able to clearly identify what each officer could see from their own perspective based solely on the body-worn camera video?
A. Only on their body-worn cameras. The view.
Q. When you reached conclusions about movement or distance, what are you relying on? Are you relying on your observation of the body-worn camera?
A. Well, I'm familiar with doorways and the approximate size of them and stairways. All of that came into, you know, I guess my evaluation of the distances.
Q. But you didn't go to that apartment complex; correct?
A. No.
Q. Do you know or did you review anyone else's measurements of the scene?
A. No.
Q. Did you review officer statements in depositions regarding what they perceived?
A. Yes.
Q. Did you evaluate whether their perceptions were unreasonable based on the video?

A. He never made an aggressive move towards them with those scissors at any time from the time they first encountered him when he came in the apartment until they shot him. So there wasn't any justification based on that. There was no imminent threat to them when they -- when they used the deadly force.

Q. Did you consider the officers' knowledge of his prior conduct, his prior threats in your opinion regarding an imminent threat?

A. I read them, yes.

Q. You read that Mr. Sosa nearly hit another officer with his vehicle; correct?

A. I heard that statement. Again, I was -- my opinions are based on imminent threat at the time they used deadly force. The mere fear of -- of danger to an officer is not adequate to justify the use of deadly force. Only that that occurs. It has to be immediate.

Q. But prior conduct of a suspect is a factor; would you agree with that?

A. It could be, yes.

Q. In your view, is holding scissors equivalent in threat level to holding a knife, or do you see a difference?

A. Not substantially, no.

Q. Okay.

A. The way -- I'm sorry. The way --

Q. Go ahead.

A. The way he was holding them was substantially different. He wouldn't hold a knife by the blade. But he held the scissors by the blade a lot of the time he was there.

Q. What do you mean by "a lot of the time"?

A. Well, as you can see in the video, he held the scissors by the blades. As I explained when you asked me about him banging on the countertop, he was holding them in his -- holding the scissors in his -- the blades in his hand and banging the handles on the counter. But he also held the blade a number of times. You can see it in the videos.

Q. But he wasn't holding the blade at the point where he was tased; correct? If you remember.

A. I'd have to look at the video again. That happened so quick after he brought his hands back around that I'd have to look at it again.

Q. What role, if any, did Mr. Sosa's earlier actions -- for example, the running over -- not running over an officer, but attempting to hit an officer with his car or the statements about committing suicide by cop -- what role did those, if any, play in your assessment of his immediate threat?

A. Of an imminent threat?

Q. Yes.

A. No. I didn't say that.

Q. So I may have misunderstood, but is your opinion that the taser deployment in the breezeway was reasonable?

A. Yes.

Q. Okay.

So is it your opinion that Officer Aguilar's use of the taser in the breezeway was reasonable?

A. Yes.

Q. I'm almost done.

How many times have you testified as an expert for plaintiffs versus defense in the past five years?

A. Well, I'd have to go through the list.

Q. Well, you can just give me -- if possible, you can give me a rough percentage. Is it more than --

A. The overwhelming majority of the cases in the last five years have been for the plaintiff.

Q. Okay.

When you acted as a defense expert, was that mostly when you were still a law enforcement officer?

A. No.

Q. Okay.

When --

A. About 50 percent of my cases have been for the defense. But the last five years or so it's primarily been the plaintiff. I don't advertise. I'm only referred by one

DEPOSITION OFFICER'S CERTIFICATE

(Civ. Proc. § 2025.520 (e))

STATE OF CALIFORNIA )
) Ss
COUNTY OF LOS ANGELES )

I, LAURA L. STEWART, CSR #5277, hereby certify;

I am a duly qualified Certified Shorthand Reporter, in the State of California, holder of Certificate Number CSR 5277 issued by the Court Reporters Board of California and which is in full force and effect. (Bus. & Prof. § 8016)

I am not financially interested in this action and am not a relative or employee of any attorney of the parties, or of any of the parties. (Civ. Proc. § 2025.320(a))

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the deponent was first placed under oath or affirmation by me. (Civ. Proc. § 2025.320, 2025.540 (a))

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record of the testimony

given. (Civ. Proc. § 2025.540(a))

I have not, and shall not, offer or provide any services or products to any party's attorney or third party who is financing all or part of the action without first offering same to all parties or their attorneys attending the deposition and making same available at the same time to all parties or their attorneys. (Civ. Proc. § 2025.320(b))

I shall not provide any service or product consisting of the deposition officer's notations or comments regarding the demeanor of any witness, attorney, or party present at the deposition to any party or any party's attorney or third party who is financing all or part of the action, nor shall I collect any personal identifying information about the witness as a service or product to be provided to any party or third party who is financing all or part of the action. (Civ. Proc. § 2025.320(c))

Dated: ________________________________

___Laura L. Stewart_______

# EXHIBIT 36

EXHIBIT

2 Bryce 9-10-26 LS

exhibitsticker.com

Richard S. Bryce
Criminal Justice Consulting

Date: 20 July 2026

# Rule 26 Report
# Maria Sosa v. City of Fresno
## Case No.: 1:23-cv-01575-JLT-SAB

The following report is respectfully submitted in compliance with Section (a)(2)(B) of Rule 26. If called upon to testify as a witness in the above-entitled matter, I would offer the following opinions based on the information that was available to me at the time the report was prepared:

**ORIGIN OF ACTIVITY:**

On May 5, 2026, I was retained by Attorney Cooper Alison-Mayne of the Law Offices of Dale K. Galipo to review the documents, videos and photographs provided and render my opinions as to the appropriateness of the shooting of Maximiliano Sosa on November 4, 2023.

**DATA AND INFORMATION RELIED UPON:**

1. Plaintiff's Second Amended Complaint.
2. Officer Ayers BWC.
3. Officer Crockett BWC.
4. Officer Abraham BWC.
5. Officer Aguilar BWC.
6. FPD Incident CAD Report.
7. Deposition of Officer Branden Crockett.
8. Deposition of Officer John Ayers.
9. Deposition of Officer Anthony Aguilar.
10. Deposition of Officer Jonathon Abraham.
11. FPD 911 call at 8:00 am.
12. FPD 911 call at 3:43 am.
13. Lexis Nexis Report on Maximilliano Sosa Jr.
14. AXON Device Report.
15. FPD Crime Scene Log.

16. FPD Diagram Sketch and Legend.
17. FPD Supplemental Report 12/3/23.
18. FPD Supplemental Report 11/4/23.
19. FPD Supplemental Report 11/4/23.
20. FPD Vehicle Impound Report.
21. FPD Incident Report.
22. FPD Incident Report Supplemental 12/13/23.
23. Coroner Report.
24. FPD Incident Report 11/4/23.
25. Toxicology Report.
26. American Ambulance Report.
27. Physical Evidence Submission Form.
28. FPD Property and Evidence Report.
29. Physical Evidence Examination Report.
30. Officer Aguilar Photographs.
31. Officer Aguilar Patrol Vehicle Photos.
32. Officer Crockett Photographs.
33. Officer Crockett Patrol Vehicle Photos.
34. Officer Abraham Photographs.
35. Officer Abraham Patrol Vehicle Photos.
36. Officer Ayers Photographs.
37. Officer Ayers Patrol Vehicle Photos.
38. Crime Scene Arial Photos.
39. Incident Scene Sketch Photos.
40. Scene Bathroom Photos.
41. Photos of Front Door.
42. Photos of Knife Block.
43. Scene Bedroom Photos.
44. Scene Interior Hallway Photos.
45. Kitchen Counter Photos.
46. Living Room Photos.
47. Knife Photos.
48. Autopsy Photos.
49. Firearms Training Roster.
50. CHP Traffic Collision Report.
51. FPD Traffic Collision Incident Report.
52. FPD 647(F) PC Report.
53. POST Learning Domain 20.
54. POST Learning Domain 21.
55. POST Learning Domain 22.

56. POST Learning Domain 23.
57. POST Learning Domain 37.
58. Penal Code 835a.
59. Welfare and Institutions Code Section 5150.

**Case Overview:**

On November 4, 2023, Fresno Police Department received a call from the estranged wife of Maximilliano Sosa Jr., reporting that Mr. Sosa was intoxicated and suicidal. Over the following 90+ minutes, officers engaged in multiple vehicle pursuits and phone negotiations with Mr. Sosa, who stated he wanted "suicide by cop."

Mr. Sosa returned to his residence, holding a pair of scissors in his hand. After conversing with officers for several minutes, Mr. Sosa exited his apartment and attempted to leave. Officer Aguilar unsuccessfully shot Mr. Sosa with a taser and then officers Ayers, Crockett and Abraham shot him with their handguns. Mr. Sosa was pronounced deceased at the scene.

Over the course of the incident, a span of roughly ninety minutes, no officer summoned a crisis negotiator, a Crisis Negotiation Team, a Crisis Intervention Team, or any mental-health professional, and no supervisor responded to the scene before the shooting. (Ayers Depo. 42:14–24, 80:20–81:09; Crockett Depo. 16:22–17:02; Aguilar Depo. 47:24–48:12; Abraham Depo. 82:08–83:13.)

**Peace Officer Standards and Training Regarding the Use of Force:**

California peace officers are trained, through the POST Basic Course, that the level of force an officer may use is governed by the subject's conduct and by the totality of the circumstances, and that officers must continuously reassess and use only the amount of force reasonably necessary as conditions change. POST Learning Domain 20 (Use of Force) instructs that a subject's conduct falls along a continuum (from cooperative, to passive non-compliance, to active resistance, to assaultive conduct, to conduct that is life-threatening), and that only assaultive or life-threatening conduct will support significant or deadly force. An overreaction in the use of force is, by definition, excessive force, and unreasonable force occurs when the type, degree and duration of force employed was not necessary or appropriate. (POST Learning Domain 20.)

That continuum is keyed to the subject's conduct. A subject may be cooperative (offering no resistance); passively non-compliant (not responding to commands but offering no physical resistance); actively resistant (making physically evasive movements to defeat an officer's control, including bracing, tensing, or running away); assaultive (attempting or threatening an assault on the officer or another person); or engaged in conduct that is life-threatening. Only assaultive or life-threatening conduct will support significant or deadly force, and officers are trained to select the option appropriate to the conduct actually presented and to transition to a lower level of force as the subject's conduct changes. (POST Learning Domain 20.)

POST emphasizes communication and de-escalation as an officer's primary tools. Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations, reduces the likelihood of physical confrontation and injuries, and lessens civil liability. Tactical repositioning (an officer making himself less or more visible, or drawing a subject's attention away from a perceived threat) is recognized both as an officer-safety measure and as a de-escalation technique. (POST Learning Domain 20.)

The use of deadly force is the most consequential decision a peace officer can make. Officers are trained that this authority must be exercised with a reverence for human life and only when other reasonable means have been exhausted or are unavailable; that the decision must rest on an objectively reasonable belief in an immediate threat of death or serious bodily injury; and that subjective fear alone can never justify deadly force. Each of the officers in this case acknowledged being trained that deadly force may be used only in response to an immediate threat of death or serious bodily injury. (POST Learning Domain 20; Ayers Depo. 19:15–20:16; Crockett Depo. 14:22–15:01; Abraham Depo. 18:13–19:15; Aguilar Depo. 35:11–36:17.)

The reasonableness of force is measured by an objective standard: the information actually available to the officer at the time of the force, judged from the perspective of a reasonable officer with similar training and experience. POST distinguishes "reasonable fear" (a controlled and legitimate fear based on actual perceived circumstances) from "unreasonable fear," which POST defines as fear generated in the officer's mind with no direct correlation to facts and situations. Deadly force may never rest on subjective or unreasonable fear. (POST Learning Domain 20, Chapters 3 & 5.)

These standards are codified in California Penal Code section 835a. Section 835a(c)(1)(A) permits deadly force only when "necessary ... to defend against an imminent threat of death or serious bodily injury," and section 835a(e)(2) makes clear that an "imminent" harm is one that "must be instantly confronted," not "merely a fear of future harm, no matter how great the fear." Section 835a also declares it the policy of this state that officers use available de-escalation techniques and other resources when reasonably safe and feasible, and that they exercise special care when interacting with persons in mental-health crisis. (Cal. Penal Code § 835a.)

POST further trains officers on interacting with persons in mental-health crisis. POST Learning Domain 37 (People with Disabilities) instructs officers to recognize a person in crisis, to slow the encounter down, to create time and distance, and to summon specialized resources, including crisis-negotiation and crisis-intervention personnel, rather than to escalate. Recognized crisis-intervention principles teach that time, distance, and communication are an officer's most effective tools, and that introducing pain to a person in emotional crisis, for example through a partially effective electronic-control weapon, can escalate rather than resolve the encounter. (POST Learning Domain 37.)

**Generally Accepted Police Tactics and Crisis-Intervention Training:**

Law enforcement agencies throughout California train their officers to recognize and safely interact with persons who are suicidal, mentally ill, or in mental-health crisis, with the objective of avoiding unnecessary injury or death and with reverence for human life as the underlying principle. Officers are trained to recognize the cues of a person in crisis; to take time to assess and calm the situation; to move slowly, reduce environmental distractions, and provide reassurance that the officers are there to help; and to request additional resources, including crisis-negotiation and mental-health personnel. Officers are trained to recognize "suicide by cop" (a method in which a suicidal person deliberately behaves in a threatening manner to provoke a lethal response from law enforcement in order to end his own life) and to respond with de-escalation rather than force. (POST Learning Domain 37; POST Learning Domain 20, Chapter 2.)

POST Learning Domain 37 and Welfare and Institutions Code section 5150 provide that a person who, as a result of a mental disorder, is a danger to himself may be taken into protective custody for a period of evaluation and treatment. Indicators of danger to self include words or actions that imply an intent to commit suicide or to inflict harm on oneself, and statements or actions implying a plan to

do so together with the means to carry it out. A person exhibiting these indicators is to be taken into custody for care, not treated as a criminal suspect. (POST Learning Domain 37, Chapter 4; Welf. & Inst. Code § 5150.)

POST also trains officers in the tactical fundamentals that govern armed and high-risk encounters. Officers are taught that they must approach every contact with officer safety in mind, and that complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack. Officers are trained to formulate a plan of action before engaging a subject and to consider alternative actions; to establish inner and outer perimeters to contain and isolate a subject and prevent his escape; to identify, use, and maintain available cover; to keep distance and a position of advantage; to request backup and wait for it to arrive before acting; and not to rush, because time is ordinarily on the officers' side. POST identifies rushing into the situation without any plan of action and failure to establish a plan of action prior to engaging the suspect as hallmarks of poor or no planning. (POST Learning Domain 21; POST Learning Domain 23.)

POST further trains officers to work as a team and to communicate effectively. When more than one officer is present, the contact and cover officers must communicate with one another, advise of any critical occurrences or safety issues, and avoid giving conflicting directions. Officers responding to a person who is mentally ill, emotionally disturbed, or suicidal are trained to maintain communication, move slowly and methodically, exercise emotional restraint and self-control, use available cover and a position of advantage, and guard against impatience. Moving to a position of cover itself allows officers to slow the encounter and to de-escalate through verbal strategies. (POST Learning Domain 21; POST Learning Domain 22; POST Learning Domain 23.)

**Opinions and Observations:**

1. **Officers had ample time and opportunity to employ de-escalation techniques.**

   Mr. Sosa was inside the apartment more than 4 minutes, providing the officers with ample opportunity and time to deploy non-lethal force to detain him. (Ayers Depo. 37:15–16, 68:10–13.)

   Officer Ayers stated in his deposition, when speaking about de-escalation, "I don't remember if I mentioned - - I - - I don't remember if I mentioned using

non-lethal inside the apartment, because that didn't cross my mind." (Ayers Depo. 65:13–15.)

Officer Crockett stated that he did not call for CNT or CIT assistance during this incident, nor did he call for assistance from a supervisor. (Crockett Depo. 16:22–17:02.)

Officer Aguilar was asked in his deposition, "So it sounds like what you're saying is that there could have been, that night, someone from CNT available had they been summoned?" He responded, "Yes." He was then asked, "As far as you know, did either you or any of the other three officers on scene ever seek to have someone from CNT respond?" He answered, "Not that I'm aware of, sir." (Aguilar Depo. 45:16–21; 47:24–48:05.)

All four officer who were at the scene, testified that they were in possession of tasers. (Ayers Depo. 45:09–16; Abraham Depo. 39:20–24; Crockett Depo. 18:14–19; Aguilar Depo. 30:03–24.)

Officer Ayers admitted that he is not a certified crisis negotiator, that this situation was "outside the scope of [his] training," and that he "did not feel like [he] was trained enough" for this incident; and although a Crisis Intervention Team was requested over the radio, none ever responded to the scene. (Ayers Depo. 41:23–42:13, 77:24–78:15, 18:08–16.)

Officer Ayers tried unsuccessfully to reach his sergeant, three times by telephone and once by radio, to request additional resources, including a crisis negotiator, but was unable to reach him. Officer Ayers agreed that "it would have definitely been beneficial to have a CNT." (Ayers Depo. 42:14–24, 80:20–81:09.)

**2. Mr. Sosa did not pose an imminent threat of death or great bodily injury to officers prior to when they shot him.**

Officer Ayers was asked in his deposition, "Would you agree that, at no point while you were inside the apartment, did Mr. Sosa attempt to injure you or any other officer with the scissors?" He responded, "Correct." (Ayers Depo. 71:12–17.)

Officer Ayers was asked when Mr. Sosa got outside of the apartment and started walking with the scissors, you believe that deadly force was

appropriate at that point? Officer Ayers answered, “I did believe it would be justified, based on the totality of the circumstances. From the very beginning, him leaving the apartment, driving under the influence, trying to run over a police officer, leading officers on multiple pursuits at high speeds through the city, causing a danger to the public, the phone calls, the threats that he made directly to me, individually, and to other officers.
And then showing up at the apartment with the scissors, shows an intent to follow through with the threats.” (Ayers Depo. 72:12–73:05.)

As set forth in POST Learning Domain 20, California Penal Code Section 835a states: “A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary … to defend against an imminent threat of death or serious bodily injury to the officer or to another person.”

Imminent means a threat of death or serious injury is “imminent” when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2).

Body camera videos show that Mr. Sosa held the scissors behind his back or down at his side while exiting the apartment, and that he did not raise the scissors toward the officers or make any stabbing, cutting, or jabbing motion with them prior to and while being shot. (Ayers BWC; Crockett BWC; Abraham BWC; Aguilar BWC.)

Mr. Sosa was armed only with a pair of household kitchen scissors, not a firearm, and not a knife. Officers Ayers, Abraham, and Aguilar each acknowledged being trained that an officer may not use deadly force against a person merely because the person is holding a knife, and Officer Ayers confirmed that the same is true of scissors. (Ayers Depo. 51:07–11, 50:21–51:06; Abraham Depo. 30:08–17; Aguilar Depo. 36:11–17.)

Officer Aguilar, who deployed the Taser, testified that before he arrived, he had no information that Mr. Sosa was armed or that he had actually hurt anyone; and the officers confirmed that Mr. Sosa never stabbed, cut, or

injured anyone with the scissors. (Aguilar Depo. 25:11–15, 37:04–15; Ayers Depo. 71:12–17; Crockett Depo. 52:16–19; Abraham Depo. 51:24–52:02.)

3. **Mr. Sosa was obviously having a mental health issue and was requesting officers to shoot him.**

Officer Crockett was asked in his deposition, "When you first arrived at the apartment, before even seeing the officers in the apartment, did you know that the subject wanted to commit suicide by cop?" He responded, "Yes." (Crockett Depo. 18:07–10.)

Office Ayers was asked in his deposition, "And you believed, at that point, that he was intent on committing suicide by cop; is that correct?" He responded, "Yes." (Ayers Depo. 47:18–20.)

Officer Ayers stated in his interview, referring to the time Mr. Sosa was in the apartment with officers, Abraham and Ayers, "He kept moving around a little bit, like he was taking a couple of steps towards Abraham. He was taking a couple of steps towards me, but not anything that would have warranted you know, using deadly force or anything on him at the time." (Ayers Statement at 568; Ayers Depo. 40:06–41:13.)

Officer Aguilar also knew, before he arrived, that Mr. Sosa had expressed the intention to commit suicide by cop, having heard Officer Ayers broadcast that Mr. Sosa said that "tonight was either going to be his own life, an officer's life, or the male that Mrs. Sosa was talking to or seeing"; and Officer Abraham likewise understood that Mr. Sosa was expressing an intent to commit suicide by cop. (Aguilar Depo. 25:25–26:08; Abraham Depo. 50:07–14.)

4. **The officers created the very jeopardy that they then resorted to deadly force to resolve. Their tactics were contrary to their training regarding officer-created jeopardy, the "fatal funnel," and the containment of a barricaded subject, and they unnecessarily produced the close-quarters confrontation in which Mr. Sosa was killed.**

Officer Abraham opened the apartment door after hearing a car door, without knocking, announcing, or looking through the window, and testified that he would still have considered opening the door even had he known Mr. Sosa was right outside. Officer Ayers testified that he never considered

looking through the peephole, checking the window, or keeping the door closed. He also agreed that, with the door closed, Mr. Sosa could not have posed an immediate threat to anyone inside. (Abraham Depo. 75:03–06, 50:15–21, 36:21–37:06; Ayers Depo. 47:24–48:03, 48:25–49:03, 48:21–24.)

No tactical plan was discussed among the officers. Officer Abraham believed the better solution was to keep Mr. Sosa contained inside the apartment, and had considered having the others leave so that he could barricade himself and exit through a window, but he never communicated that plan, and it was never carried out. (Crockett Depo. 27:07–10; Ayers Depo. 77:10–17; Abraham Depo. 80:18–81:05, 41:01–17, 78:05–14.)

Instead of containing Mr. Sosa, the officers directed Ms. Sosa to leave without ever instructing Mr. Sosa to remain, and Officer Ayers, who had misread a hand signal, walked out of the apartment, drawing Mr. Sosa out after him into a narrow breezeway. (Crockett Depo. 52:20–24, 58:22–59:01; Ayers Depo. 66:01–06, 66:23–67:12; Abraham Depo. 81:21–82:06.)

Officer Aguilar testified that there was no avenue of escape for Mr. Sosa, in either the apartment or the "very small, tight" breezeway, where three officers were crowded together with him. Officers Ayers, Abraham, and Aguilar each acknowledged being trained to avoid officer-created jeopardy, and Officer Ayers acknowledged training on the "fatal funnel." (Aguilar Depo. 23:06–10, 53:16–54:02, 55:02–07, 36:02–10; Ayers Depo. 22:15–23:16; Abraham Depo. 29:02–10.)

These were failures of basic, well-established tactical principles. The officers established no perimeter or containment plan for Mr. Sosa's anticipated return; discussed no tactical plan before engaging him; failed to use available cover or to maintain distance and a position of advantage, instead crowding the apartment threshold and the narrow breezeway; and neither summoned nor waited for the additional resources that officer safety and de-escalation required. POST expressly identifies "rushing into the situation without any plan of action" as a hallmark of poor or no planning, and teaches that "time is usually on the officer's side." (POST Learning Domain 21, Chapters 1 & 2; POST Learning Domain 23; Crockett Depo. 27:07–10; Ayers Depo. 77:10–17.)

Officer Aguilar acknowledged that, in deciding to deploy his Taser, he understood that one likely result was that Mr. Sosa would react to the pain

by moving away from its source. Yet the officers had left Mr. Sosa no avenue of escape, either in the apartment or in the narrow breezeway, which was occupied by officers on every side. Any movement Mr. Sosa made to flee the pain of the Taser would therefore necessarily carry him toward an officer: back into the apartment toward Officer Abraham, or out into the breezeway where the other officers stood. Deploying a Taser against a person who has been boxed in, so that the predictable pain response drives him into the officers themselves, is a foreseeably dangerous tactic, and it is precisely the kind of officer-created jeopardy that produced the close-quarters confrontation the officers then resorted to deadly force to resolve. (Aguilar Depo. 23:06–10, 23:15–18, 23:19–24:19, 55:02–07.)

5. **The officers failed to give any warning that deadly force was about to be used before shooting Mr. Sosa, although such a warning was feasible, contrary to their training and to generally accepted police practices.**

   Each of the officers acknowledged being trained to give a verbal warning before using deadly force when feasible. Here, no such warning was given. The only words directed at Mr. Sosa in the final moments were "stop" and "chill"; no officer warned Mr. Sosa that he would be shot. (Ayers Depo. 20:01–04; Crockett Depo. 15:02–04, 45:10–22; Abraham Depo. 19:02–04, 58:20; Aguilar Depo. 35:24–36:01, 38:09–17, 56:23–57:01.) Given that there was time to say "stop" and "chill," it was also feasible to give a clear verbal warning.

**Qualifications:**

I am qualified and competent to render my opinions in the case before this Court due to my education, experience, training and professional activities in criminal justice.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

I have over 33 years of continuous and escalating experience in law enforcement.

My initial experience was as a patrol deputy with the Ventura County Sheriff's Department assigned to the contract city of Camarillo. I performed routine patrol, traffic investigation and criminal investigation. I was later assigned to a special enforcement patrol unit in the unincorporated area of Ventura County. I performed surveillance of known criminals, gang activity, and special events along with assisting routine patrol deputies with their responsibilities.

In October of 1968, I was promoted to Senior Deputy and assigned as a training officer at the Ventura County Sheriff's Academy.

From April 1972, until December 1976, I was assigned to the Criminal Investigation Division. During that period of time I worked burglary investigation, undercover fencing and property crime investigation, undercover vice investigation, undercover narcotics investigation and undercover criminal intelligence investigation.

In December of 1976, I was promoted to sergeant and assigned to the Custody Division. I began my custody experience as a shift sergeant assigned to the Branch Jail Honor Farm and was later assigned as the administrative sergeant of that facility. I was responsible for budget, scheduling of personnel and development of operational policy.

In May of 1978, I was transferred to the Court Services Division. I was the supervisor of all bailiff's and court security deputies servicing the Ventura County Superior Court.

In January of 1979, I was promoted to Lieutenant and assigned to the Custody Division as the Facility Manager of the Oxnard Branch Jail. I also had collateral management responsibilities for the Sheriff's Inmate Transportation Unit and the Court Holding Facilities.

In November of 1979, I was transferred to the Support Services Division as the Court Services Bureau Commander. I was responsible for the management of all court services and civil process service. I was also given the responsibility of justification, preparation, presentation and implementation of a merger of the Ventura County Marshal's Department into the Sheriff's Court Services Division.

In December of 1980, I was transferred to the Special Services Division as the Special Investigations Bureau Commander. I was responsible for the management and operation of the Sheriff's Narcotics, Vice, and Criminal Intelligence Units.

In October of 1982, I was promoted to Commander and assigned as the Commander of the Special Services Division. I was responsible for the overall operation and administration of the Special Services Division, which included; major criminal investigation, narcotics investigation, vice and intelligence investigation, criminalistics laboratory, Sheriff's Air Unit and other special investigation functions.

In February of 1983, I was assigned as the Commander of the Custody Division. My responsibilities in that assignment included the operation and administration of 5 custodial facilities, 339 employees and the supervision of over 1500 inmates.

In March of 1986, I was appointed Assistant Sheriff. I was responsible for the administration and direction of 4 of the 8 major divisions within the Sheriff's Department. My primary responsibilities included; providing administrative direction to the Custody Division and its 5 facilities, giving administrative oversight to the Project Development Division with the design, development and construction of a new 2000 bed jail, providing administrative control over the entire Department's operational budget, giving primary approval for most disciplinary actions within the Department, presenting budget requests and other Department related matter to the Board of Supervisors, and representing the Sheriff in public forums.

In June of 1993, I was appointed Undersheriff and served in that position until my retirement in August of 1999. As Undersheriff, I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff. At the time of my appointment the Sheriff's Department was reorganized into 4 major divisions each headed by a Chief Deputy. Each Chief Deputy reported directly to me. The 4 divisions of the Sheriff's Department were comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division, and Support Services Division. The police services divisions included police service for the 5 contract cities of Thousand Oaks, Camarillo, Moorpark, Ojai and Fillmore. The Sheriff's Department employed 1355 individuals with an operational budget in excess of $140,000,000.00.

FORMAL EDUCATION:

1985 Master of Public Administration
University of La Verne

1982 Bachelor of Science: Criminal Justice
University of La Verne

PROFESSIONAL CERTIFICATES:

P.O.S.T. Management Certificate

P.O.S.T. Supervisory Certificate

P.O.S.T. Advanced Certificate

P.O.S.T. Intermediate Certificate

P.O.S.T. Basic Certificate

California Community College Teaching Credential (life)

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Manager's Association

Ventura County Deputy Sheriff's Association

**PREVIOUS CASES:**

Mesa, Arizona
Spencer v. City of Mesa – Feb 25 P

Santa Clara County, California
Leal v. Officer Siegal et al. – Sep 06 D
Garcia et al. v. County of Santa Clara – Dec 06 D
Richard Carrasco v. County of Santa Clara – Jan 07 D
Marino v. County of Santa Clara – Mar 07 D

Fresno, California
Eliseo Renteria v. Tulare County – Sep 03 P
Cindy Staunton v. City of Clovis – Jun 01 P
Brock v. County of Fresno – Jul 21 P
Flores v. County of Fresno – Jan 22 P

City of Houston, Texas
Claudia Navarro Pineda, et al. v. City of Houston – Dec 00 D

Riverside County, California
Zaragoza v. Riverside County – Mar 22 P

City of Bakersfield, California
Perry v. City of Bakersfield – Sep 20 P

Pasadena, Texas
Moises Delao v. The City of Pasadena, Texas – Dec 96 D

Calaveras County, California
Payne v. Calaveras County – Jan 20 P

City of San Bernardino
Urena v. City of San Bernardino – Jul 25 P

Palm Springs, California
Sandra Lee Denham v. City of Palm Springs – Nov 99 P

San Joaquin County, California
Friends v. San Joaquin County – Mar 19 P

Harris County, Texas
Alberti, v. Harris County – Apr 92 D
Laura Sherrard v. Harris County – Nov 93 D
Robert Earl McMullen III v. Harris County – Sep 94 D

Jason Aguillard v. Joseph McGowen – Feb 96 D
Alphonso Robinson v. Constable A. B. Chambers – May 98 D
Brad Allen Mathes v. Harris County – Jun 99 D

Liberty County, Texas
Womack v. Liberty County – Nov 93 D

Orleans Parish, Louisiana
Hamilton v. Morial – Jun 93 D

Warren, Michigan
Sondey v. Woloweic et al – Feb 16 P

Yuba County, California
Court Appointed Monitor -- Present

Cass County, Michigan
Nash v. Sheriff Underwood, Jr., et al. – Feb 16 P

Bexar County, Texas, Texas Attorney General
DeVonish v. Lopez – Oct 93 D

Mendocino County, California
Neuroth, et al. v. Mendocino County, et al. – Oct 17 D

San Bernardino County, California
Mendoza v. San Bernardino County – Feb 21 P
Person-Lynn v. San Bernardino County – Apr 22 P
Wright v. San Bernardino County – Dec 25 P

Kern County, California
McClure v. PTS – Dec 19 D

Monterey County, California
Thomas Dewey v. Monterey County, et al. – June 15 D
Claypole v. County of Monterey, et al. – Sep 15 D
Villerreal v. County of Monterey – May 17 D
Hernandez v. County of Monterey Court appointed monitor Present

Chino, California

Brown v. City of Chino – July 21 P

San Mateo County, California
Doe v. San Mateo County, et al. – Sep 17 P

Los Angeles County, California
Dion Starr v. County of Los Angeles et al. -- 09 D
William Russell v. County of Los Angeles et al. – Jul 09 D
Justin Henderson, et al. v. County of Los Angeles – Sep 10 D
Ronald Johnson v. County of Los Angeles – Nov 10 D
Kevin King v. County of Los Angeles – May 11 D
Mariano Duvall v. Richard Torres et al. – Aug 12 D
XYZ Distributors Inc. v. County of Los Angeles – Oct 12 D
Christopher Brown v. County of Los Angeles – Jan 13 D
Timothy Smith v. County of Los Angeles – May 13 D
Mancilla v. County of Los Angeles – May 13 D
Tyler Willis v. County of Los Angeles – Jun 13 D
Frank Martinez v. County of Los Angeles – Jan 15 D
Jaime A. Moreno v. County of Los Angeles – Aug 15 D
Corey Crittenden v. County of Los Angeles – Aug 25 P

City of Santa Monica, California
Gonzales v. City of Santa Monica – Sep 21 P

City of Huntington Beach, California
Shay v. City of Huntington Beach – Jun 18 P
Tyler Smith v. City of Huntington Beach – Mar 26 P

City of Hemet, California
Arturo Jordan v. City of Hemet Dec 25 P

City of Long Beach, California
Pream v. City of Long Beach – May 18 P
Eugene Martindale v. City of Long Beach – Jun 22 P
Rudolph v. City of Long Beach – Jan 23 P

State of California
Brafford v. State of California – Oct 25 P

City of Los Angeles, California

Kathleen Washington v. City of Los Angeles – Apr 12 D
Hendley v. City of Los Angeles – Oct 16 P
Murillo v. City of Los Angeles – Jul 22 P
Gautier v. City of Los Angeles – Dec 22 P
Peralta v. City of Los Angeles – Mar 25 P
Petit v. City of Los Angeles – Aug 25 P
L.L. a Minor v. City of Los Angeles – Feb 26 P

United States Department of Justice
Doe v. Johnson – Jan 16 D
Lion v. ICE – Feb 16 D

**FEE SCHEDULE:**

Initial Case Review $2000.00

This is a one-time fee for an initial review and assessment of the case and includes a preliminary written or oral report to client.

Consultation on Management and Operations ($250.00 per hour)

This hourly fee includes all labor associated with the study of jail or law enforcement management and operations, including preparation of reports and travel to and from site.

Case Review and Preparation ($250.00 per hour)

This hourly fee includes review of documents, interviews, site inspection, preparation of expert report and affidavit; and any other associated labor performed as directed.

Travel - $100.00 per/hr.

Formal Presentations ($3000.00 per day or $1500.00 per half day)

This fee applies to Court appearances, and hearings. Depositions are $500.00 per hour.

Expenses (actual)

Travel related expenses, including transportation, on site lodging and meals; will be billed at actual cost. Other expenses associated with the provision of consultation or expert testimony may include postage, vehicle rental, parking, ground and air transportation, telephone and photography, all of which will be billed at actual cost.

Respectfully submitted,

*/s/ Richard Bryce*
Richard S. Bryce

# EXHIBIT 37

City of FRESNO
POLICE DEPARTMENT

Mariposa Mall
P.O. Box 1271
Fresno, CA 93715-1271

**MINDY CASTO**
Interim Chief of Police

October 3, 2024

[redacted]

**RE: Maximiliano Sosa**
**IA Case #2023-0079 / FPD Case #23-11040123**

Dear [redacted]:

A formal investigation into the officer involved shooting involving Maximiliano Sosa, has been completed. Following a thorough and objective investigation, we have determined that the shooting was within Department policy.

This department takes appropriate corrective action if and when it is determined that an employee has committed violations of department rules and regulations. However, pursuant to California Penal Code 832.7, I am unable to provide you with the specific details of corrective action taken or information gathered during the investigation.

Sincerely,

Burke Farrah
Deputy Chief of Police
Administrative Services Division

BF/tr